JEFFREY C. HALLAM (State Bar No. 161259)
E-Mail:      *jhallam@sideman.com*
ZACHARY J. ALINDER (State Bar No. 209009)
E-Mail:      *zalinder@sideman.com*
PETER M. COLOSI (State Bar No. 252951)
E-Mail:      *pcolosi@sideman.com*
REBECCA K. FELSENTHAL (State Bar No. 303476)
E-Mail:      *rfelsenthal@sideman.com*
SIDEMAN & BANCROFT LLP
One Embarcadero Center, Twenty-Second Floor
San Francisco, California 94111-3711
Telephone:      (415) 392-1960
Facsimile:      (415) 392-0827

Attorneys for Plaintiff
FITBIT, INC.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FITBIT, INC., a Delaware Corporation,<br><br>                Plaintiff,<br><br>        v.<br><br>LAGUNA 2, LLC, A New Jersey Limited Liability Company; JOEL BLANK, an individual; and DOES 1-30, inclusive,<br><br>                Defendants. | Case No. 3:17-cv-00079 EMC<br><br>**PLAINTIFF'S *EX PARTE* MOTION FOR ENTRY OF A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Judge:   Honorable Edward M. Chen<br>Dept.:   Courtroom 5, 17th Floor<br>Date:    TBD<br>Time:    TBD |

**NOTICE OF MOTION, MOTION, AND STATEMENT OF RELIEF SOUGHT**

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that at a date and time to be set by the Court, or as soon thereafter as the matter may be heard, in Courtroom 5 on the 17th Floor of the United States District Court for the Northern District of California, San Francisco Courthouse, 450 Golden Gate Avenue, San Francisco, CA 94102, before the Honorable Edward M. Chen, Plaintiff Fitbit, Inc. ("Fitbit") will, and hereby does, respectfully move *ex parte* for entry of (1) a temporary restraining order, and (2) an order to show cause why a preliminary injunction should not issue against Defendants Laguna 2 LLC ("L2") and Joel Blank (collectively, "Defendants"), and anyone acting in concert with them. Prior to filing this Motion, Fitbit, by and through its undersigned counsel, provided notice to Defendants' counsel of its intention to bring this Motion (along with a copy of the Complaint), pursuant to Civ. L.R 65-1(b). Accordingly, Fitbit brings this Motion, with Notice to Defendants, pursuant to Federal Rule of Civil Procedure 65 and 15 U.S.C. § 1116.

Fitbit's *Ex Parte* Motion seeks temporary and preliminary injunctive relief against Defendants to enjoin them from (i) further sales of purportedly refurbished "Fitbit" branded product from their inventory, until such time as Fitbit has been allowed to inspect and approve the products to ensure no further sale of scrap products occurs, and (ii) further use of any counterfeit Fitbit trademarks, including on their product packaging.

This Motion is based on this Notice of Motion and Motion; the Memorandum of Points and Authorities below; the Declarations of Brett Millar and Jeff Hallam filed in Support of this Motion, including the Exhibits attached thereto; the Proposed Order submitted in support of this Motion; the Complaint and record in this matter; and such other and further papers, evidence, and argument as may be submitted in connection with this Motion.

DATED: January 11, 2017                    SIDEMAN & BANCROFT LLP

                                           By:  /s/ Zachary J. Alinder
                                                Zachary J. Alinder
                                                Attorneys for Plaintiff
                                                FITBIT, INC.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..................................................................................................... 1

II.   STATEMENT OF ISSUES TO BE DECIDED ..................................................... 2

III.  STATEMENT OF FACTS ...................................................................................... 3

    A.    Relevant Background Regarding Fitbit ......................................................... 3

    B.    Fitbit's Supply Chain And Related Quality Control Processes .................... 3

    C.    Fitbit's Federally-Registered Trademarks .................................................... 4

    D.    Defendant's Infringement and Counterfeiting Activities .............................. 5

        1.    Fitbit Puts Defendants On Notice Of The Fitbit Marks And Warranty ............................................................................................. 5

        2.    Defendants Expand Their Infringement ........................................... 5

    E.    Defendants' Misleading and Inferior Warranty ........................................... 7

    F.    Consumer Confusion Already Caused By Defendants .................................. 8

    G.    Fitbit Attempts To Avoid Urgent Court Relief And Defendant L2 Sues Over Statements Purportedly Made To Groupon ............................................. 9

    H.    Defendants' Continued Attempts To Resell Products That Were Likely Designated As Scrap Too Requires Urgent Relief ........................................ 9

IV.   ARGUMENT ........................................................................................................... 10

    A.    Standard for Temporary Restraining Order and Preliminary Injunction ................ 10

    B.    Fitbit Will Likely Succeed on the Merits of Each of its Causes of Action ............. 11

        1.    Federal Trademark Counterfeiting and Infringement ................................. 11

            a.    Fitbit has a Protectable Ownership Interest in the Trademark ........ 11

            b.    The Court Should Presume Consumer Confusion ........................ 11

            c.    The *Sleekcraft* Factors Also Sharply Tip In Favor Of Fitbit .......... 14

                (1)    Strength of the Fitbit Marks ................................................. 14

                (2)    Proximity of the Goods ....................................................... 15

                (3)    Similarity Between the Marks .............................................. 15

                (4)    Evidence of Actual Confusion ............................................. 15

(5)     Marketing Channels Used ................................................... 16

(6)     Type of Goods and Purchasers' Likely Degree of Care ............................................................................ 16

(7)     Defendants' Intent in Selecting the Mark .......................... 17

(8)     Likelihood of Expansion of the Product Lines.................. 17

2.     Federal Trademark Dilution ...................................................... 18

3.     Federal Unfair Competition and California Unfair Competition ............... 19

C.     Fitbit is Likely to Suffer Irreparable Harm in the Absence of Preliminary Relief for which there is No Adequate Legal Remedy ........................................... 19

D.     The Balance of Equities Sharply Tips in Favor of Fitbit ....................................... 20

E.     The Proposed Injunction Serves the Public's Interest............................................ 21

F.     A Bond, If Any, Should Be Nominal ............................................................... 21

V.     CONCLUSION ............................................................................................... 22

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

MOTION FOR TRO AND OSC RE PRELIMINARY INJUNCTION; MPA IN SUPPORT THEREOF

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Acad. of Motion Picture Arts & Sciences v. Creative House Promotions, Inc.*,
  944 F.2d 1446 (9th Cir. 1991).............................................................................................19

*ACI Int'l Inc. v. Adidas-Salomon AG*,
  359 F. Supp. 2d 918 (C.D. Cal. 2005)...............................................................................19

*Alliance for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011)............................................................................................10

*AMF Inc. v. Sleekcraft Boats*,
  599 F.2d 341 (9th Cir. 1979)..........................................................................14, 15, 17, 19

*Apple Computer, Inc. v. Formula Int'l Inc.*,
  725 F.2d 521 (9th Cir. 1984).............................................................................................20

*Beaty v. Brewer*,
  649 F.3d 1071 (9th Cir. 2011)............................................................................................10

*Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*,
  174 F.3d 1036 (9th Cir. 1999)...........................................................................14, 15, 16, 17

*Mattel, Inc. v. Walking Mountain Prods.*,
  353 F.3d 792 (9th Cir. 2003)..............................................................................................14

*Cartier, a Div. of Richemont N. Am., Inc. v. Symbolix, Inc.*,
  454 F. Supp. 2d 175 (S.D.N.Y. 2006)................................................................................13

*Cleary v. News Corp.*,
  30 F.3d 1255 (9th Cir. 1994)..............................................................................................19

*Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*,
  508 F.3d 641 (11th Cir. 2007)............................................................................................12

*Dallas Cowboys Football Club, Ltd. v. Am's Team Props., Inc.*,
  616 F. Supp. 2d 622 (N.D. Tex. 2009)...............................................................................12

*Dan-Foam A/S v. Brand Named Beds, LLC*,
  500 F. Supp. 2d 296 (S.D.N.Y. 2007)................................................................................18

*E. & J. Gallo Winery v. Gallo Cattle Co.*,
  967 F.2d 1280 (9th Cir. 1992)......................................................................................14, 17

*E Clampus Vitus v. Steiner*,
  No. 2:12-CV-01381-TLN, 2013 WL 4431992 (E.D. Cal. Aug. 16, 2013)..........................19

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

iii                    Case No. 3:17-cv-00079 EMC

*Eclipse Assoc., Ltd. v. Data Gen. Corp.*,
   894 F.2d 1114 (9th Cir. 1990)........................................................................14

*El Greco Leather Prods. Co, Inc.. v. Shoe World, Inc.*,
   806 F.2d 392 (2d Cir. 1986).........................................................................12

*Entrepreneur Media, Inc. v. Smith*,
   279 F.3d 1135 (9th Cir. 2002).......................................................................15

*Fleischmann Distilling Corp. v. Maier Brewing Co.*,
   314 F.2d 149 (9th Cir. 1963).........................................................................17

*GoTo.com, Inc. v. Walt Disney Co.*,
   202 F.3d 1199 (9th Cir. 2000)..................................................................14, 16

*Jada Toys, Inc. v. Mattel, Inc.*,
   518 F.3d 628 (9th Cir. 2008).........................................................................18

*JL Beverage Co., LLC v. Jim Beam Brands Co.*,
   828 F.3d 1098 (9th Cir. 2016).......................................................................19

*KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*,
   408 F.3d 596 (9th Cir. 2005).........................................................................11

*La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*,
   762 F.3d 867 (9th Cir. 2014).........................................................................16

*Landscape Forms, Inc. v. Columbia Cascade Co.*,
   113 F.3d 373 (2d Cir. 1997).........................................................................12

*Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*,
   658 F.3d 936 (9th Cir. 2011).........................................................................11

*M/A-COM Tech. Solutions, Inc. v. Integrated Semiconductor Serv., Inc.*,
   No. C–15–2423 EMC, 2015 WL 4463920 (N.D. Cal. Jul. 21, 2015).......................10

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
   571 F.3d 873 (9th Cir. 2009)..................................................................... 19-20

*Maxim Integrated Prods., Inc. v. Quintana*,
   654 F. Supp. 2d 1024 (N.D. Cal. 2009) .....................................................20, 21

*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*,
   638 F.3d 1137 (9th Cir. 2011).......................................................................11

*New W. Corp. v. NYM Co. of California, Inc.*,
   595 F.2d 1194 (9th Cir. 1979).......................................................................19

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

iv                                   Case No. 3:17-cv-00079 EMC

*Obesity Research Inst., LLC v. Fiber Research Int'l, LLC*,
    165 F. Supp. 3d 937 (S.D. Cal. 2016) ................................................................. 19

*Official Airline Guides, Inc. v. Goss*,
    6 F.3d 1385 (9th Cir. 1993) ................................................................................ 17

*Opticians Ass'n of Am. v. Indep. Opticians of Am.*,
    920 F.2d 187 (3d Cir. 1990) ............................................................................... 20

*Perkins School for the Blind v. Maxi-Aids, Inc.*,
    274 F. Supp. 2d 319 (E.D.N.Y. 2003) ................................................................. 13

*Playboy Enters., Inc. v. Welles*,
    279 F.3d 796 (9th Cir. 2002) .............................................................................. 18

*Printers Servs. Co. v. Bondurant*,
    No. CV 91-0916 JSL (SX), 1991 WL 332055 (C.D. Cal. Apr. 16, 1991) ........... 21-22

*Sun Microsystems, Inc. v. Microsoft Corp.*,
    999 F. Supp. 1301 (N.D. Cal. 1998) ................................................................... 21

*Surfvivor Media, Inc. v. Survivor Prods.*,
    406 F.3d 625 (9th Cir. 2005)........................................................................... 16-17

*Ubiquiti Networks, Inc. v. Kozumi USA Corp.*,
    No. 12-2582 CW, 2012 WL 2343670 (N.D. Cal. June 20, 2012)......................... 11

*United States v. Farmer*,
    370 F.3d 435 (4th Cir. 2004) ............................................................................. 12

*United States v. Hon*,
    904 F.2d 803 (2d Cir. 1990) ......................................................................... 12, 13

*United States v. Milstein*,
    401 F.3d 53 (2d Cir. 2005) ................................................................................. 13

*Vertos Med., Inc. v. Globus Med., Inc.*,
    No. C 09-1411 PJH, 2009 WL 3740709 (N.D. Cal. Nov. 6, 2009) ..................... 21

*Warner-Lambert Co. v. Northside Dev. Corp.*,
    86 F.3d 3 (2nd Cir. 1996)............................................................................... 12-13

*Westinghouse Elec. Corp. v. Gen. Circuit Breaker & Elec. Supply Inc.*,
    106 F.3d 894 (9th Cir. 1997) ............................................................................. 12

*Zeltiq Aesthetics, Inc. v. BTL Indus., Inc.*,
    32 F. Supp. 3d 1088 (N.D. Cal. 2014) ................................................................ 19

LAW OFFICES

SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

v                                   Case No. 3:17-cv-00079 EMC

**Statutes**

15 U.S.C. § 1125(c)(1), (2) ..............................................................................................18

Cal. Civ. *Code Section* 1797.81 ....................................................................................7, 8

**Other Authorities**

Federal Rule of Civil Procedure 65(d) ............................................................................21

Local Rule 65.1.1 ............................................................................................................21

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

PLAINTIFF'S *EX PARTE* MOTION FOR TRO AND OSC RE PRELIMINARY INJUNCTION; MPA IN SUPPORT
THEREOF

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

## I.   INTRODUCTION

Fitbit recently caught Defendants selling non-genuine "Fitbit" branded products that were never supposed to be resold to consumers.  Indeed, nine separate purchases from Defendants all turned out the same.  These products were originally manufactured by Fitbit, but because they did not meet Fitbit's high quality standards, they were designated to be scrapped and/or recycled.  Rather than being destroyed as part of Fitbit's standard quality control processes, these scrap products instead were diverted from Fitbit's supply chain, placed into counterfeit packaging, and then resold by Defendants through numerous non-authorized online retailers, under the guise that they were "refurbished" genuine Fitbit products.

As the customer reviews for Defendants' recent online sales make clear, Defendants' sales have caused significant actual confusion with members of the consuming public, deceived by Defendants into believing they were buying a high-quality genuine Fitbit product only to receive an inferior product with an inferior warranty:



These customer reviews also detail the continuing irreparable harm to Fitbit's brand and goodwill as a result of Defendants' conduct, as these customers attempted to contact Fitbit for customer service and warranty support only to find out there is none:



MOTION FOR TRO AND OSC RE PRELIMINARY INJUNCTION; MPA IN SUPPORT THEREOF

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1    The scathing product reviews from Defendants' online sales continue to grow day after

2  day, requiring Fitbit to seek urgent temporary and preliminary injunctive relief to ensure that the

3  irreparable harm to Fitbit's brand and goodwill does not continue during the pendency of this

4  Action.  The critical need for this relief crystalized during the holidays, as Defendants' negative

5  customer reviews mounted and Fitbit learned that one of Defendants' distribution channels –

6  Groupon – was returning to Defendants roughly 2,200 "Fitbit" branded products already rejected

7  by their customers.  Fitbit sought to inspect Defendants' remaining "Fitbit" branded inventory to

8  determine whether additional products may have been designated for scrap, including these

9  Groupon product returns, to ensure that Defendants did not resell any further scrap products.

10  Defendants not only refused to allow Fitbit to inspect this inventory, but also sued Fitbit in New

11  Jersey based on purported state law claims that Fitbit was somehow defaming them with one of

12  their online retailers, Groupon.

13    Because there is no jurisdiction over Fitbit in New Jersey, that lawsuit presents a different

14  set of legal issues, and further irreparable harm would occur before Fitbit's jurisdictional motion

15  can be heard in any event, good cause exists for this Court to temporarily restrain Defendants from

16  reselling any further purportedly refurbished "Fitbit" branded products, including the returned

17  Groupon products, from their inventory without first allowing Fitbit to inspect and approve it as

18  requested in the proposed order submitted concurrently with the Motion.  This temporary

19  injunctive relief should also prohibit Defendants from using counterfeit packaging, to the extent

20  they have not ceased such conduct.  Further, Fitbit respectfully requests that the Court order

21  Defendants to show cause why a preliminary injunction should not issue granting this same relief

22  during the pendency of this litigation, or until permanent injunctive relief may be ordered.

## II.    STATEMENT OF ISSUES TO BE DECIDED

24    Should the Court grant a narrow Temporary Restraining Order and Order to Show Cause

25  re Preliminary Injunction against Defendants where: (i) Fitbit is likely to succeed on its claims that

26  Defendants have infringed, tarnished, and counterfeited Fitbit's trademarks and unfairly competed

27  with Fitbit as a result; (ii) Fitbit has suffered, and will likely continue to suffer, irreparable harm to

28  its good will and reputation as a result of Defendants' actions, if no TRO is entered; (iii) the

1  balance of equities tips sharply in Fitbit's favor based on the consideration of all the relevant facts;

2  and (iv) the narrow injunctive relief Fitbit requests would benefit the public interest by ensuring

3  that members of the public are not further confused or deceived about the nature and quality of

4  non-genuine "Fitbit" branded products being offered for sale to the public?

5  ### III.   STATEMENT OF FACTS

6  **A.   Relevant Background Regarding Fitbit**

7  Fitbit is a San Francisco-based corporation that specializes in the design, production, and

8  sale of connected health and fitness wearable products and various associated mobile applications

9  and online resources with current sales exceeding $2 billion annually. *See* Declaration of Brett

10 Millar in Support of Plaintiff's *Ex Parte* Motion for Entry of a Temporary Restraining Order and

11 Order to Show Cause why a Preliminary Injunction Should not Issue ("Millar Decl."), ¶ 2.  Fitbit's

12 customers recognize these products and services for their high quality and reliability in helping

13 those customers achieve their health-related goals. *See id.*  Fitbit has worked hard to earn that

14 reputation by investing significant financial and human resources to develop its cutting-edge

15 products and services, which, in turn, have achieved worldwide acclaim and popularity. *See id.*

16 As a result, Fitbit has created substantial goodwill in its brand and the Fitbit trademarks have come

17 to signify the high quality and reliable products and services that are the fruit of Fitbit's efforts.

18 *See id.*

19 **B.   Fitbit's Supply Chain And Related Quality Control Processes**

20 To maintain its reputation for high quality and reliable products and services, Fitbit has

21 established substantial, legitimate, and non-pretextual quality-control procedures to ensure that

22 non-conforming units do not diminish or tarnish Fitbit's brand and goodwill. *See* Millar Decl., ¶

23 3.  One of the ways that Fitbit does so is through a robust warranty and return program, as well as

24 an established supply chain quality control process for any returns or exchanges from consumers,

25 distributors, or anyone else. *See id.*

26 Because of the technical complexity of Fitbit products, Fitbit does not authorize any third

27 party not associated with Fitbit to conduct refurbishment of Fitbit products for the intent of resale.

28 *See id.*  Instead, Fitbit has a reverse logistics supply chain process, whereby Fitbit products that do

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

not meet its high quality standards or that have been returned for any reason are evaluated and either refurbished by authorized third parties to be used as replacements for customer returns or designated to be scrapped and/or recycled. *See id.* The determination that a product should be scrapped occurs for many reasons, including the existence of physical defects and other material differences between those products and genuine Fitbit products that are authorized for resale. *See id.*

### C.    Fitbit's Federally-Registered Trademarks

Fitbit is the owner of numerous federally-registered trademarks related to the Fitbit brand of products and services, including but not limited to the Federal Registration Numbers 3,732,334; 4,507,210; 4,851,801; 4,851,802; and, 4,851,803, (collectively, the "Fitbit Marks"). *See* Complaint, ECF No. 1, ¶¶ 17-25; Millar Decl., ¶ 4. The Fitbit Marks were registered to Fitbit at its principal place of business at the time of registration in San Francisco, California, and have been used in interstate commerce to identify and distinguish Fitbit's high quality products and services since approximately 2009. *See* Millar Decl., ¶ 4.

Fitbit has built tremendous goodwill and brand reputation among consumers through significant investment in advertising, promoting, and delivering products and services of the highest quality under Fitbit's federally-registered trademarks and the Fitbit trade name. *See id.* Fitbit has used the Fitbit Marks to identify goods and services as being genuine, and the Fitbit Marks and name are well-recognized and famous worldwide. *See id.* Fitbit vigorously protects this reputation, and the consumers who have come to rely on the Fitbit Marks, by maintaining quality-control and supply-chain standards for all of its products. *See id.* As a result, purchasers, potential purchasers, members of the public, and those who care about fitness trackers associate Fitbit's products with exceptional materials, design, functionality, and reliability. *See id.*

Fitbit's significant investment in advertising, promoting, and delivering products and services of the highest quality have resulted in a high degree of fame and notoriety to Fitbit and the Fitbit Marks, from being named a runner-up at TechCrunch50 in 2008, and CES 2009 Innovation honoree and best in the Health & Wellness category, to being ranked by Fast Company as one of the top 50 most innovative companies of 2014 and 2016. *See, e.g.,*

MOTION FOR TRO AND OSC RE PRELIMINARY INJUNCTION; MPA IN SUPPORT THEREOF

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1  https://www.fastcompany.com/company/fitbit.

2      **D.**    **Defendant's Infringement and Counterfeiting Activities**

3          Defendants' business model is to sell end of life, discontinued, and refurbished consumer

4  electronics products, through online retailers.  *See* Declaration of Jeffrey C. Hallam in Support of

5  Plaintiff's *Ex Parte* Motion for Entry of a Temporary Restraining Order and Order to Show Cause

6  Why a Preliminary Injunction Should not Issue ("Hallam Declaration"), Ex. D at p. 1.  Since at

7  least sometime in 2015, Defendants' product offerings have included certain "Fitbit" branded

8  products.  *See id*.

9          **1.**    **Fitbit Puts Defendants On Notice Of The Fitbit Marks And Warranty**

10          In 2015, Fitbit discovered that Defendants were using the name "Fitbit" as their vendor

11  name on a consumer electronics website, called www.thenextweb.com, and had misappropriated

12  Fitbit's trademarks and other intellectual property rights in the process.  *See* Millar Decl., ¶ 10.

13  Defendants were also not disclosing that their sales were not covered by Fitbit's warranty.  *See id*.

14  Fitbit sent Defendants a cease and desist letter on November 19, 2015 demanding that Defendants

15  halt their infringement of Fitbit's intellectual property rights and not mislead consumers about any

16  warranty.  *See id*.  As such, no later than 2015, Defendants were on notice of Fitbit's federally-

17  registered trademarks and that further infringement would necessarily be a willful violation of

18  Fitbit's intellectual property rights.  Defendants appeared to comply with Fitbit's cease and desist

19  letter, and Fitbit believed that would be the end of the matter.  *See id*.

20          **2.**    **Defendants Expand Their Infringement**

21          Unfortunately, Defendants instead have expanded their infringement, selling non-genuine

22  "Fitbit" products  in counterfeit packaging, through much more established distribution channels,

23  such as eBay.com, Groupon.com, and Woot.com (Defendants' "Established Distribution

24  Channels").  *See* Millar Decl., ¶¶ 5-9, 11.  Indeed, Fitbit is informed and believes that, beginning

25  in approximately 2015, Defendants began selling a large volume of non-genuine "Fitbit" products

26  online through their Established Distribution Channels, under the guise that these products had

27  merely been "refurbished."  *See id.*; Hallam Decl., ¶ 2.

28          Through the Groupon platform alone, Defendants have apparently sold over 200,000

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

"Fitbit" branded products over the past two years, with an MSRP value for new Fitbit products of over $20 million. *See* Millar Decl., ¶ 7. Defendants have sold many more through its other Established Distribution Channels, including over $80,000 of "Fitbit" branded products on eBay.com in the last two years. *See* Hallam Decl., ¶ 5.

Due to the complexity of these products, Fitbit was skeptical of Defendants' claims that they were offering "refurbished" Fitbit products for sale. That skepticism turned out to be well founded. Fitbit has now confirmed through numerous purchases of Defendants' purportedly "refurbished" Fitbit products through Defendants' Established Distribution Channels that Defendants have been selling non-genuine and otherwise infringing "Fitbit" products, including in counterfeit packaging mocked up to resemble genuine Fitbit return replacement packaging. *See* Millar Decl., ¶¶ 5-7; Hallam Decl., ¶ 2. While Defendants claimed the products were merely "refurbished," Fitbit confirmed that nine separate products purchased from Defendants had actually been designated to be scrapped and/or recycled as part of Fitbit's standard quality control processes, and had somehow been diverted from Fitbit's reverse logistics supply chain and obtained by Defendants. *See id.*

To further deceive consumers, Defendants sold these scrap products in counterfeit packaging that attempts to mimic Fitbit's genuine return replacement packaging.

Example of Genuine Fitbit Return
Replacement Packaging:

Counterfeit "Fitbit" Packaging Used
By Defendants:




MOTION FOR TRO AND OSC RE PRELIMINARY INJUNCTION; MPA IN SUPPORT THEREOF

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1  *See* Millar Decl., ¶ 6, Ex. F.  As shown above, the counterfeit packaging used by Defendants

2  reproduced, counterfeited, copied, and/or colorably imitated the Fitbit Marks and Fitbit trade

3  name.  Defendants' counterfeit packaging also referred the consumer to Fitbit.com to setup the

4  product to further confuse and deceive the consumer into believing that Fitbit authorized, was

5  affiliated with, and/or approved the sale of this product to consumers.  *See id.*

6        **E.**        **Defendants' Misleading and Inferior Warranty**

7        In addition, Defendants included a "Warranty Card" in their product shipments that

8  referred the customer to the Fitbit website to download a product manual, and further misled the

9  consumer into believing that Fitbit authorized, was affiliated with, and/or approved the sale of this

10 non-genuine product to consumers by failing to state that there is no warranty provided by Fitbit

11 for these products:



21 *See* Millar Decl., ¶ 6, Ex. F.  Thus, Defendants sold scrap products without advising consumers

22 that they are not Fitbit authorized retailers, and that the products are not eligible for Fitbit warranty

23 support, as required for example by Cal. Civ. Code Section 1797.81.  This failure dramatically

24 increased the likelihood, confirmed in the consumer reviews of Defendants' product sales, that

25 their customers would be confused about Fitbit's support of the warranty, further damaging the

26 consumer experience and increasing the damage to Fitbit's brand.

27       In addition, Defendants' warranty itself is far inferior to, and materially different from,

28 Fitbit's warranty.  Defendants provide a 60-day warranty, but only for replacement of broken

MOTION FOR TRO AND OSC RE PRELIMINARY INJUNCTION; MPA IN SUPPORT THEREOF

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1  units.  *See id.*  On the other hand, Fitbit has a 45-day Satisfaction Guaranteed Return Policy that

2  allows the consumer to return a product for any reason for 45 days and allows the return of

3  defective products for a year in the United States.  *See* Fitbit's Warranty and Return Policy,

4  available at https://www.fitbit.com/legal/returns-and-warranty.

5     **F.     Consumer Confusion Already Caused By Defendants**

6        Not only are consumers *likely* to be confused by Defendants' use of the Fitbit Marks, but

7  there is also significant evidence of *actual* consumer confusion and brand reputational harm to

8  Fitbit from consumers who have recently complained about the products sold by Defendants.

9        The harm to Fitbit's brand and goodwill caused by Defendants' conduct is ongoing, as the

10  negative reviews continue to mount (*see* the most recent reviews in Introduction for example), and

11  confirm the confusion and disappointment caused to consumers due to the inferior quality of the

12  product and warranty sold by Defendants:

13  ★★★★★ Kristdel C.                                                    Dec 20th, 2016
     Bought two Fitbit Ilex bracelets, only one would work/connect to app. Very poor product.

14  Was this helpful?          Yes                    No

15  ★★★★★ Kimberley R.                                                   Dec 3rd, 2016

16  I bought two Fitbit's and the one I use stopped working after vibrating non-stop on my wrist for 5 minutes.  The one my daughter uses needs charging every
     day.  Note to self..... never buy a refurbished Fitbit again!

17  Was this helpful?          Yes                    No

     1 person found this review helpful

18
19  ★★★★★ angela s.                                                      Nov 25th, 2016

     The Fitbit flex came with no directions. It does not work properly and is a piece of junk.  I would like to return it but don't know how

20  Was this helpful?          Yes                    No

21  ★★★★★ Frangca P.                                                     Nov 22nd, 2016

22  This fitbit worked fine for the first two months, but I started to get issues.  It was fully charged, but was unresponsive.  I reset this fitbit several times and
     wasn't able to address this issue.  Because I was outside of the time frame for returns, there was nothing Groupon could do to help me. I just ended up
     wasting my money on this product.

23  Was this helpful?          Yes                    No

     2 people found this review helpful

24
25  ★★★★★ Karen F.                                                       Nov 21st, 2016

     would not hold a charge for even a 12 hour period. was a waste of my time and money

26  Was this helpful?          Yes                    No

27  ★★★★★ Rasheda T.                                                     Nov 20th, 2016

     I will be returning item. FITBIT say's I've walked my 10,000 steps even though I've been sleeping

28  Was this helpful?          Yes                    No

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1 Hallam Decl., Ex. F.  As just a small sampling of the reviews by Defendants' customers confirms[1],

2 Defendants' use of the Fitbit Marks has caused actual confusion or mistake, and deceived

3 consumers into believing there is an affiliation, connection, or association between Fitbit and

4 Defendants, and has confused members of the public as to the origin, sponsorship, authorization

5 and/or approval by Fitbit of Defendants' "Fitbit" branded product sales.  This has caused

6 irreparable harm to Fitbit's brand and reputation, as to which there is no adequate remedy at law.

7      **G.     Fitbit Attempts To Avoid Urgent Court Relief And Defendant L2 Sues Over**

8             **Statements Purportedly Made To Groupon**

9      Fitbit attempted to avoid the need to seek this relief on an exigent basis, by requesting that

10 Defendants allow Fitbit to inspect their inventory to ensure that Defendants did not resell any

11 more products that had been designated for scrap.  *See* Hallam Decl., ¶ 2, Ex. A.  Defendants

12 refused that request, and instead demanded that Fitbit authorize them to sell the rest of their

13 inventory on Groupon, which Fitbit could not possibly do without inspecting it.  *See id.* ¶ 3, Ex. B.

14      Defendant L2 then sued Fitbit in mid-December 2016 in state court in New Jersey,

15 claiming that certain of Fitbit's alleged statements to Groupon were defamatory.  *See id.*, ¶ 4.

16 Fitbit removed that lawsuit to Federal Court, and the matter is still pending there.  *See id.*  Fitbit's

17 motion to dismiss, including but not limited for lack of personal jurisdiction over Fitbit in New

18 Jersey, is currently due to be filed January 18, 2017.  *See id.*  Thus far, the Court has denied

19 Defendant L2's requests for emergency relief, and Fitbit intends to specially appear through

20 counsel only to establish the lack of jurisdiction.

21      **H.     Defendants' Continued Attempts To Resell Products That Were Likely**

22             **Designated As Scrap Too Requires Urgent Relief**

23      Around the same time, Fitbit received notice from Groupon that it had received over 2,000

24 products returns that were sold by Defendants.  *See* Millar Decl., ¶ 9.  Although Fitbit requested

25

26 [1] Defendants' customer reviews in this Motion and many other reviews compiled from the
Groupon pages associated with Defendants' product sales have been attached as Exhibits F to J to
27 the Hallam Declaration.

28

1   that Groupon quarantine these products for inspection by Fitbit, Groupon notified Fitbit on

2   December 16, 2016 that it was returning those products to Defendants on December 19, 2016. *See*

3   *id*. Given the continuing and irreparable nature of the harm to Fitbit if Defendants are allowed to

4   continue selling "Fitbit" branded products that may have been designated as scrap, including

5   potentially thousands that have already been rejected by Groupon customers, Fitbit filed the

6   current Action in this Court, which has personal jurisdiction over all parties, to ensure that

7   appropriate temporary and preliminary injunctive relief can be entered to prevent further harm to

8   Fitbit's brand and goodwill during the pendency of this Action.

9       Accordingly, good cause and exigent circumstances exist here to order temporary and

10  preliminary injunctive relief to prevent Defendants from reselling any "Fitbit" branded products in

11  their inventory that had been designated for scrap, and from any further use of counterfeit "Fitbit"

12  packaging.[2]

13              **IV.    ARGUMENT**

14  **A.    Standard for Temporary Restraining Order and Preliminary Injunction**

15      The standard for issuing a temporary restraining order is essentially the same as that for

16  issuing a preliminary injunction. *Beaty v. Brewer*, 649 F.3d 1071, 1072 (9th Cir. 2011); *see also*

17  *M/A-COM Tech. Solutions, Inc. v. Integrated Semiconductor Serv., Inc.*, No. C–15–2423 EMC,

18  2015 WL 4463920, *1 (N.D. Cal. Jul. 21, 2015).  To obtain a temporary restraining order or a

19  preliminary injunction, the moving party must demonstrate that "(1) it is likely to succeed on the

20  merits; (2) it is likely to suffer irreparable harm in the absence of relief; (3) the balance of equity

21  tips in its favor; and (4) the injunction is in the public interest. " *M/A-COM Tech. Solutions*, 2015

22  WL 4463920 at *1.  Courts in the Ninth Circuit apply a "sliding scale" test and balance each of the

23  four factors. *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

24  Because each of these four factors tips sharply in Fitbit's favor, the Court should grant Fitbit's

25  _____

26  [2] Defendants have recently claimed that they have stopped using counterfeit packaging; however,
    Fitbit cannot conclusively confirm that is the case, and therefore the temporary and preliminary
27  injunctive relief should also prohibit use of counterfeit Fitbit Marks on packaging.

28

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1  narrow request for temporary and preliminary injunctive relief.

2  **B.     Fitbit Will Likely Succeed on the Merits of Each of its Causes of Action**

3  **1.     Federal Trademark Counterfeiting and Infringement**

4  First, to prevail on its trademark infringement claims under the Lanham Act, it "must

5  prove: (1) that it has a protectible ownership interest in the mark; and (2) that the defendant's use

6  of the mark is likely to cause consumer confusion." *Network Automation, Inc. v. Advanced Sys.*

7  *Concepts, Inc.*, 638 F.3d 1137, 1144 (9th Cir. 2011) (quotation omitted).

8  **a.     Fitbit has a Protectable Ownership Interest in the Trademark**

9  Fitbit has registered the Fitbit Marks with the US Patent and Trademark Office and has

10  used at least one of the Fitbit Marks for nearly ten years. *See* Millar Decl., ¶ 4.  There can be no

11  dispute that Fitbit has a protectable ownership in the Fitbit Marks.

12  **b.     The Court Should Presume Consumer Confusion**

13  As established above, Defendants have been selling non-genuine scrap products in

14  packaging with counterfeit Fitbit Marks, and consumer reviews related to Defendants' sales show

15  not just *likely*, but *actual* consumer confusion.  "Likelihood of confusion exists when consumers

16  viewing the mark would probably assume that the goods it represents are associated with the

17  source of a different product identified by a similar mark." *KP Permanent Make-Up, Inc. v.*

18  *Lasting Impression I, Inc.*, 408 F.3d 596, 608 (9th Cir. 2005).  Where the products at issue bear

19  counterfeit marks, likelihood of confusion is presumed. *See Ubiquiti Networks, Inc. v. Kozumi*

20  *USA Corp.*, No. 12-2582 CW, 2012 WL 2343670, at *14 (N.D. Cal. June 20, 2012) (holding

21  "counterfeit marks are inherently confusing") (citing *Phillip Morris USA Inc. v. Shalabi*, 352 F.

22  Supp. 2d 1067, 1073 (C.D. Cal. 2004)); *Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*,

23  658 F.3d 936, 945 (9th Cir. 2011) (noting that a presumption of confusion arises where "intent to

24  cause confusion is coupled with the use of a counterfeit mark or a mark virtually identical to a

25  previously registered mark").  Here, as described in detail above, Fitbit has confirmed that

26  Defendants have resold numerous non-genuine scrap "Fitbit" products bearing Fitbit trademarks in

27  counterfeit packaging.  Therefore, the Court should presume likelihood of confusion for at least

28  two reasons (although actual consumer confusion has already occurred here as well).

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

*First*, although Fitbit does not dispute the products sold were originally manufactured by Fitbit, as a result of Defendants' actions, these products nevertheless bear counterfeit Fitbit Marks. Where a good which was originally manufactured by the rights holder is distributed without the rights holder's authorization, that good is not "genuine" within the definition of the Lanham Act. *See El Greco Leather Prods. Co, Inc.. v. Shoe World, Inc.*, 806 F.2d 392, 395 (2d Cir. 1986) (shoes initially ordered by the company which were subsequently sold without the company's approval after the order was cancelled were not "genuine" under the Lanham Act because the company "never gave its consent to the use of the mark on those shoes"); *see also Westinghouse Elec. Corp. v. Gen. Circuit Breaker & Elec. Supply Inc.*, 106 F.3d 894, 900 (9th Cir. 1997) (citing *El Greco* and holding that "[w]hen an original mark is attached to a product in such a way as to deceive the public, the product itself becomes a 'counterfeit' just as it would if an imitation of the mark were attached").  The reason for this is to protect a brand owner's "'right to control the quality of the goods manufactured and sold.'"  *United States v. Farmer*, 370 F.3d 435, 441 (4th Cir. 2004) (*quoting Shell Oil Co. v. Commercial Petroleum, Inc.*, 928 F.2d 104, 107 (4th Cir. 1991)) (affirming a criminal counterfeit conviction as to sales of irregular shirts, rejected as defective by manufacturer, that would "deceive consumers, to trick them into purchasing as Nike or Hilfiger clothing the very shirts those companies had already rejected as of lesser quality" because "the whole point is that deciding whether shirts pass muster is reserved to Nike and Hilfiger, not to [the defendant]. . . .")[3]; *see also Warner-Lambert Co. v. Northside Dev. Corp.*, 86

---

[3] Although the *Farmer* court was examining the criminal counterfeiting statute, the confusion requirement is the same in the criminal and civil contexts.  *See United States v. Hon*, 904 F.2d 803, 805 (2d Cir. 1990) ("There is no doubt that Congress wished to incorporate the Lanham Act's confusion requirement into 18 U.S.C. § 2320 and did so.").  Further, civil courts often look to criminal courts for help analyzing whether consumer confusion exists.  *See Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 650 (11th Cir. 2007) (analyzing *United States v. Torkington,* 812 F.2d 1347 (11th Cir. 1987) in its analysis of post-sale consumer confusion); *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 382 (2d Cir. 1997) (citing *Hon*, 904 F.2d at 804-808, in its confusion analysis); *Dallas Cowboys Football Club, Ltd. v. Am's Team Props., Inc.*, 616 F. Supp. 2d 622, 637 (N.D. Tex. 2009) (citing *United States v. Yamin*, 868 F.2d 130, 133 (5th Cir. 1989) for same); *Cartier, a Div. of Richemont N. Am., Inc. v. Symbolix, Inc.*, 454 F. Supp. 2d 175, 183 (S.D.N.Y. 2006) (comparing to *Hon*, 904 F.2d at 804-808, in analysis of

(footnote continued)

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

F.3d 3, 6 (2nd Cir. 1996) ("Distribution of a product that does not meet the trademark holder's quality control standards may result in the devaluation of the mark by tarnishing its image. If so, the non-conforming product is deemed for Lanham Act purposes not to be the genuine product of the holder, and its distribution constitutes trademark infringement."); *Perkins School for the Blind v. Maxi-Aids, Inc.*, 274 F. Supp. 2d 319, 323-34 (E.D.N.Y. 2003) ("Put simply, a distribution of non-conforming products may constitute trademark infringement.").

Here, Fitbit confirmed through numerous purchases of Defendants' products, which bore the Fitbit Marks, that Defendants have been reselling "Fitbit" branded products that had been designated to be scrapped and/or recycled as part of Fitbit's standard quality-control processes. By selling such products, Defendants subverted Fitbit's quality-control procedures. Therefore, such goods are not genuine within the meaning of the Lanham Act and are infringing.

**Second**, Defendants sold the products using counterfeit packaging. *See* Millar Decl. ¶ 6. Indeed, even if the Fitbit products enclosed within that packaging had been "genuine," where a party repackages genuine goods in packaging bearing a trademark without the trademark owner's authorization, the trademark on the packaging is counterfeit. *See United States v. Milstein*, 401 F.3d 53, 62-63 (2d Cir. 2005). In *Milstein*, the defendant purchased genuine drugs from foreign markets, "stripped them of their original factory packaging, [then] repackaged them with forged labels and packaging materials closely resembling those of drugs produced in accordance with FDA requirements for the U.S. market . . ." *Id.* at 59. The Court specifically held that a party's "knowing repackaging of [goods] without the trademark holders' authorization" means that party knowingly trafficked in goods with a counterfeit mark in violation of 18 U.S.C § 2320(a). *Id.* at 63. Here, as shown above, Defendants' sales were repackaged in plastic bags bearing the Fitbit Marks without Fitbit's authorization, thus they were counterfeit. The Court again should accordingly presume consumer confusion.

/ / / /

---

likelihood of confusion).

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

c.      The *Sleekcraft* Factors Also Sharply Tip In Favor Of Fitbit

Even if the presumption did not apply (though it should), Defendants' product sales have caused, and are likely to continue to cause, consumer confusion under established Ninth Circuit law.  In cases where counterfeit marks are not used, the Ninth Circuit  applies the eight-factor *Sleekcraft* test to gauge the likelihood of consumer confusion: 1) strength of the plaintiff's mark; 2) proximity of the goods; 3) similarity between the marks in sound, appearance, and meaning; 4) evidence of actual confusion; 5) similarity in the marketing channels used; 6) type of goods and degree of care likely to be exercised by the purchaser; 7) defendant's intent in selecting the mark; and 8) likelihood of expansion of the product lines.  *See AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979), *abrogated on other grounds by Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 810 n.19 (9th Cir. 2003); *see also Eclipse Assoc., Ltd. v. Data Gen. Corp.*, 894 F.2d 1114, 1117 n.3 (9th Cir. 1990).  Analysis of the *Sleekcraft* factors establishes a strong likelihood of confusion here.

(1)     Strength of the Fitbit Marks

A stronger mark is afforded greater protections under trademark laws.  *See Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1058 (9th Cir. 1999).  "The strength of a mark is determined by its placement on a continuum of marks from generic, afforded no protection; through descriptive or suggestive, given moderate protection; to arbitrary or fanciful awarded maximum protection."  *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1291 (9th Cir. 1992) (quotations omitted).  Determining a mark's strength requires evaluating its "conceptual strength and commercial strength."  *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir. 2000).

The Fitbit Marks require no imagination to form an association between the mark and the product.  It is precisely the strength of the Fitbit Marks, and the positive association consumers have with the products bearing that mark, which makes it a desirable target for would-be infringers, like Defendants, who seek only to profit from Fitbit's hard work and expense.  As such, the first factor weighs in Fitbit's favor.

/ / /

MOTION FOR TRO AND OSC RE PRELIMINARY INJUNCTION; MPA IN SUPPORT THEREOF

(2)     Proximity of the Goods

The products sold by Defendants on Groupon compete directly with genuine Fitbit products—thus meeting the second factor.  "When the goods produced by the alleged infringer compete for sales with those of the trademark owner, infringement usually will be found if the marks are sufficiently similar that confusion can be expected."  *Sleekcraft*, 599 F.2d at 348.  Here, Defendants have sold Fitbit products originally manufactured by Fitbit that were supposed to be scrapped and/or recycled.  Thus, there can be little doubt that Defendants' non-genuine "Fitibit" products and genuine Fitbit products are related and "[r]elated goods are generally more likely than unrelated goods to confuse the public as to the producers of the goods."  *Brookfield*, 174 F.3d at 1055.  As such, this factor also heavily favors Fitbit.

(3)     Similarity Between the Marks

Defendants' non-genuine "Fitbit" products not only have the Fitbit Marks on the products themselves, but also came in packaging bearing colorable imitations of the Fitbit Marks affixed without Fitbit's consent.  Thus, this factor also strongly supports the likelihood of Fitbit's ultimate success on the merits and consumer confusion.  *See Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1144 (9th Cir. 2002) (while the court may consider the differences between the respective trademarks, the similarities should be weighed more heavily than the differences).

(4)     Evidence of Actual Confusion

Customer feedback regarding Defendants' sales of "Fitbit" branded products has already established that consumers are actually confused as to the source, nature, and quality of the goods.  "Evidence that use of the two marks has already led to confusion is persuasive proof that future confusion is likely."  *Sleekcraft*, 599 F.2d at 352.  Indeed, the consumer reviews established that certain consumers believed the refurbished Fitbit products sold by Defendants were actually <u>new</u> Fitbit products.  *See* Hallam Decl., ¶ 6, Ex. F-J ("bands were brand new"; "absolutely love my new Fitbit"; "I love my new Fitbit").  Similarly, the reviews show consumer confusion leading customers to contact Fitbit directly regarding their customer support and warranty claims.  *See id*.

While certain of these consumers understood that they were not purchasing a new Fitbit product, none even mention that the source of the goods was anything other than Fitbit.  In short,

MOTION FOR TRO AND OSC RE PRELIMINARY INJUNCTION; MPA IN SUPPORT THEREOF

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

Fitbit has been harmed because consumers buying these products, commenting on them, or even reviewing them believe that these products are in the marketplace because Fitbit wanted them in the marketplace.  That alone is evidence of confusion.  One comment is a damning illustration of the harm done by the inferior products Defendants sold on Groupon—merchandise that Fitbit wanted removed from the marketplace: "Don't waste your money on a refurbished item. I would even question purchasing this model new."  Hallam Decl., ¶ 6.  This demonstrates that even though the consumer knew the product purchased was refurbished, the general quality of these inferior goods caused members of the consuming public to even question the quality of a new Fitbit as well.

The consumers' frustration with the poor quality of the goods sold by Defendants plainly harms Fitbit's brand and goodwill, as consumers have mistakenly believed, and will continue to mistakenly believe, that these inferior goods are a reflection of Fitbit.  Indeed, the harm is not just to those consumers who purchased these goods, but all members of the consuming public exposed now to these misleading reviews about products that were never intended to be resold to customers at all.  This evidence of actual confusion, and irreparable harm to Fitbit, its brand, and its goodwill tips this factor sharply in favor of Fitbit.

(5)    <u>Marketing Channels Used</u>

Both genuine Fitbit products and the products sold by Defendants were sold online, thus the marketing channels used are the same.  The Internet "as a marketing channel, is particularly susceptible to a likelihood of confusion since, as it did in this case, it allows for competing marks to be encountered at the same time, on the same screen."  *GoTo.com*, 202 F.3d at 1207; *see also Brookfield*, 174 F.3d at 1057 ("[C]ourts have consistently recognized [the Internet] as exacerbating the likelihood of confusion."); *La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 877 (9th Cir. 2014).  Because Defendants offered their infringing products using the same marketing channels as Fitbit, this factor also weighs in Fitbit's favor.

(6)    <u>Type of Goods and Purchasers' Likely Degree of Care</u>

As shown by the customer complaints, consumers online looking for good deal often do not take a high degree of care with respect to such purchases.  "In analyzing the degree of care that

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

a consumer might exercise in purchasing the parties' goods, the question is whether a 'reasonably prudent consumer' would take the time to distinguish between the two product lines." *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 634 (9th Cir. 2005) (citing *Brookfield*, 174 F.3d at 1060). The expectations as to the behaviors of the "reasonably prudent" consumer depend on the circumstances. *Brookfield*, 174 F.3d at 1060. "[W]hen dealing with inexpensive products, customers are likely to exercise less care, thus making confusion more likely." *Id.* (citing *Gallo*, 967 F.2d at 1293). Given the price of these products, the similarities between the two, and that consumers shopping online are unable to see how well a product works, consumers are not likely to take high care in differentiating between a genuine Fitbit and the ones Defendants sold. This factor therefore also weighs in favor of Fitbit.

(7)    Defendants' Intent in Selecting the Mark

That Defendants intended to profit from infringing on the Fitbit Marks cannot reasonably be disputed. Just looking at the counterfeit packaging, Defendants adopted the Fitbit Marks deliberately to benefit from the "good will, good name, and good trade which [Fitbit] has built up," and to reinforce with the consumer that these products were affiliated with, sponsored by, or otherwise approved by Fitbit. *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 158 (9th Cir. 1963). Thus, this factor also tips in Fitbit's favor, as Defendants' conduct indicates that it "expect[ed] confusion and resultant profit." *Id.*

(8)    Likelihood of Expansion of the Product Lines

If the Court does not enjoin Defendants from reselling scrap products and trading on Fitbit's strong trademark rights, Defendants are much more likely to expand their product offerings, further harming Fitbit. "A strong possibility that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing." *Sleekcraft*, 599 F.2d at 354 (quotation omitted); *see also Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1394 (9th Cir. 1993). Defendants thus far have done precisely that in this case. As such, this factor also favors Fitbit.

Based on either the presumption of confusion or analysis of the *Sleekcraft* factors, the facts here easily establish that Fitbit is likely to succeed on the merits of its Lanham Act claims.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

### 2.   Federal Trademark Dilution

Fitbit will also succeed on its second cause of action for Federal Trademark Dilution as the Defendants' actions have diluted and tarnished its brand.  Subject to the principles of equity, the owner of a famous mark is entitled to an injunction "against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark."  15 U.S.C. § 1125(c)(1).  A trademark holder alleging trademark dilution must demonstrate that "(1) the mark is famous and distinctive; (2) the defendant is making use of the mark in commerce; (3) the defendant's use began after the mark became famous; and (4) the defendant's use of the mark is likely to cause dilution by blurring or dilution by tarnishment."  *Jada Toys, Inc. v. Mattel, Inc.,* 518 F.3d 628, 634 (9th Cir. 2008).

Here, there is no doubt that the Fitbit Marks are famous, that Defendants are using the marks in commerce, and that Defendants' conduct began after the Fitbit Marks first came to prominence in 2009.  The only question remaining is whether Fitbit can show that the Defendants' use of the mark has tarnished Fitbit's rights to the Fitbit Marks.

Dilution by tarnishment occurs when "association arising from the similarity between a mark or a trademark and a famous mark . . . harms the reputation of the famous mark."  15 U.S.C. § 1125(c)(2).  Tarnishment may be found "when a famous mark is improperly associated with an inferior or offensive product or service."  *Playboy Enters., Inc. v. Welles,* 279 F.3d 796, 805 (9th Cir. 2002) (quotations omitted); *see also Dan-Foam A/S v. Brand Named Beds, LLC*, 500 F. Supp. 2d 296, 325-26 (S.D.N.Y. 2007) (holding that a trier of fact could find that the sale of "non-conforming" products outside of the trademark holder's quality control procedures could dilute the trademark by tarnishment).  Here,  the scrap "Fitbit" branded products sold by Defendants are markedly inferior to genuine Fitbit products.  The significant number of negative consumer reviews shown above in Section III.F. establish that the Fitbit Marks are being tarnished by the "Fitbit" branded products being sold by Defendants, and will likely continue to be tarnished should the Court deny the narrow injunctive relief requested here.

/ / /

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

### 3.    Federal Unfair Competition and California Unfair Competition

Finally, Fitbit is also likely to succeed on its claims of Federal Unfair Competition and California Unfair Competition against Defendants.  These claims largely overlap with the analysis above regarding the Lanham Act's consumer confusion test.  *Cleary v. News Corp.*, 30 F.3d 1255, 1262–63 (9th Cir. 1994) (finding that 17200 claims are substantially congruent with Lanham Act); *see also Acad. of Motion Picture Arts & Sciences v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1457 (9th Cir. 1991); *Zeltiq Aesthetics, Inc. v. BTL Indus., Inc.*, 32 F. Supp. 3d 1088, 1099 (N.D. Cal. 2014).

Even when the allegations "do not involve trademark infringement, in order to determine the likelihood of confusion, courts use the trademark infringement analysis."  *Obesity Research Inst., LLC v. Fiber Research Int'l, LLC*, 165 F. Supp. 3d 937, 949 (S.D. Cal. 2016).  "Whether we call the violation infringement, unfair competition or false designation of origin, the test is identical is there a 'likelihood of confusion?'"  *New W. Corp. v. NYM Co. of California, Inc.*, 595 F.2d 1194, 1201 (9th Cir. 1979); *see also ACI Int'l Inc. v. Adidas-Salomon AG*, 359 F. Supp. 2d 918, 921 (C.D. Cal. 2005) ("The ultimate test for unfair competition is exactly the same as for federal trademark infringement.").  Thus, courts analyzing unfair competition claims under federal and California law apply the eight *Sleekcraft* factors to determine whether likelihood of confusion has been alleged.  *See E Clampus Vitus v. Steiner*, No. 2:12-CV-01381-TLN, 2013 WL 4431992, at *8 (E.D. Cal. Aug. 16, 2013); *see also JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1106 (9th Cir. 2016) (applying *Sleekcraft* factors to determine whether consumer confusion exists supporting a claim for unfair competition).

As shown by the Lanham Act analysis in Section IV.B.1. above, Defendants' sales of "Fitbit" products have caused consumer confusion and may continue to do so if the requested injunctive relief is not granted.  Thus, Fitbit has also shown it is likely to succeed on the Federal and State Unfair Competition claims.

### C.    Fitbit is Likely to Suffer Irreparable Harm in the Absence of Preliminary Relief for which there is No Adequate Legal Remedy

Fitbit can also easily demonstrate "that [it] is likely to suffer irreparable harm in the

1  absence of preliminary relief, that the balance of equities tips in [Fitbit's] favor, and that an

2  injunction is in the public interest." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,

3  571 F.3d 873, 877 (9th Cir. 2009) (quotation omitted).

4          Companies are irreparably harmed when counterfeit or infringing goods trade on the

5  reputation of a rights holder and erode that party's ability to control the quality of the goods

6  bearing its marks.  *See Apple Computer, Inc. v. Formula Int'l Inc.*, 725 F.2d 521, 525-26 (9th Cir.

7  1984) (finding of irreparable harm supported by plaintiff's evidence that it invested "considerable

8  time and money" in developing the products jeopardized by defendants' "wholesale copying");

9  *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 196 (3d Cir. 1990) (holding that

10  potential damage to reputation due to defendant's infringement constitutes irreparable injury for

11  the purpose of granting a preliminary injunction in a trademark case); *see also Maxim Integrated*

12  *Prods., Inc. v. Quintana*, 654 F. Supp. 2d 1024, 1036 (N.D. Cal. 2009) (finding that irreparable

13  harm was likely, absent a preliminary injunction where plaintiff submitted evidence showing that

14  it had "lost some control over its business reputation and goodwill").  Here, the harm that Fitbit

15  will suffer if Defendants are allowed to continue to sell non-genuine "Fitbit" branded products that

16  have been diverted from Fitbit's quality control processes is plainly irreparable and ongoing.

17          Fitbit invests heavily in its products and its trademarks.  *See* Millar Decl., ¶¶ 2-4.  And

18  Fitbit's brand and goodwill depend on the ability of Fitbit to control the high quality and reliability

19  of its products.  Given that Defendants have taken, and threaten to continue to take, that quality

20  control out of Fitbit's hands by selling products that were supposed to be scrapped and/or

21  recycled, there can be no doubt of the significant and irreparable harm of such unauthorized sales

22  on Fitbit's brand and goodwill with members of the consuming public.  That irreparable harm will

23  likely continue unless the Court enjoins Defendants or until Defendants run out of infringing and

24  counterfeit products and packaging to sell.

25          **D.      The Balance of Equities Sharply Tips in Favor of Fitbit**

26          Taken in its entirety, the irreparable harm caused to Fitbit as a result of Defendants' sale of

27  inferior "Fitbit" branded products in counterfeit packaging greatly outweighs any harm to

28  Defendants which might come from not having the ability to resell infringing and counterfeit

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

20                                         Case No. 3:17-cv-00079 EMC

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

goods.  *See, e.g., Vertos Med., Inc. v. Globus Med., Inc.*, No. C 09-1411 PJH, 2009 WL 3740709, at *12 (N.D. Cal. Nov. 6, 2009) (finding that potential irreparable harm to the plaintiff outweighed any injury to defendant, who needed only to cease its use of the infringing mark); *Sun Microsystems, Inc. v. Microsoft Corp.*, 999 F. Supp. 1301, 1307-08 (N.D. Cal. 1998) (holding that the irreparable harm to the plaintiff, its licensees, and the consuming public by defendant's infringement outweighed any hardship to defendant).  Put simply, Defendants have no legitimate interest in selling products that they are not legally allowed to sell and that confuse consumers, while Fitbit has every interest in protecting its brand and goodwill by keeping inferior scrap products bearing the Fitbit Marks and counterfeit packaging out of the marketplace.  Here, the balance of equities strongly supports enjoining Defendants' further sale of scrap "Fitbit" branded products and use of any counterfeit packaging.

### E.    The Proposed Injunction Serves the Public's Interest

By reducing consumer confusion and anger over purchasing inferior products, the injunctive relief that Fitbit seeks is also in the public's interest.  "In the trademark context, courts often define the public interest at stake as the right of the public not to be deceived or confused." *Maxim Integrated Prods.*, 654 F. Supp. 2d at 1036 (citing *Moroccanoil, Inc. v. Moroccan Gold, LLC*, 590 F. Supp. 2d 1271, 1282 (C.D. Cal. 2008).  Where, as here, Defendants' actions prey upon consumers who are shopping online with no opportunity to inspect the items, injunctive relief is necessary to protect the public from deceptive business practices designed to create confusion as to the source and quality level of the product being purchased.  Thus, the public interest also supports issuance of the requested injunctive relief.

### F.    A Bond, If Any, Should Be Nominal

While Fitbit is prepared to provide such security as the Court deems appropriate according to Federal Rule of Civil Procedure 65(d) and Civil Local Rule 65.1.1, because here, the request for injunctive relief is narrow and merely requires Defendants to stop conduct and sales that infringe, tarnish, and/or counterfeit the Fitbit Marks, a bond, if any, required by the Court should be nominal in amount.  *See e.g., Printers Servs. Co. v. Bondurant*, No. CV 91-0916 JSL (SX), 1991 WL 332055, at *11 (C.D. Cal. Apr. 16, 1991) (imposing nominal bond in the amount of $1,000 in

1  trademark infringement and counterfeiting action).  Because of the low likelihood that Defendants

2  will be harmed by an injunction that requires them to at most to take action to prevent further

3  infringement, tarnishment, and counterfeiting, Fitbit requests that any such bond not exceed

4  $10,000.

5                                        **V.      CONCLUSION**

6         For the foregoing reasons, Fitbit respectfully requests that the Court grant Fitbit's Motion

7  for entry of the requested Temporary Restraining Order against Defendants and also issue an

8  Order for Defendants to show cause why the Court should not also grant a preliminary injunction

9  granting the same relief during the pendency of this Action.

10

11  DATED: January 11, 2017                    SIDEMAN & BANCROFT LLP

12

13                                      By:   /s/ Zachary J. Alinder
                                              Zachary J. Alinder
14                                            Attorneys for Plaintiff
                                              FITBIT, INC.

15

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

MOTION FOR TRO AND OSC RE PRELIMINARY INJUNCTION; MPA IN SUPPORT THEREOF