JEFFREY C. HALLAM (State Bar No. 161259)
E-Mail:      *jhallam@sideman.com*
ZACHARY J. ALINDER (State Bar No. 209009)
E-Mail:      *zalinder@sideman.com*
ELLEN P. LIU (State Bar No. 280459)
E-Mail:      *eliu@sideman.com*
SIDEMAN & BANCROFT LLP
One Embarcadero Center, Twenty-Second Floor
San Francisco, California 94111-3711
Telephone:      (415) 392-1960
Facsimile:      (415) 392-0827

Attorneys for Plaintiff
FITBIT, INC.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FITBIT, INC., a Delaware Corporation,<br><br>            Plaintiff,<br><br>      v.<br><br>LAGUNA 2, LLC, a New Jersey Limited Liability Company; JOEL BLANK, an individual; CALI RESOURCES, INC. dba BUY NOW FACTORY DIRECT, a California Corporation; CARLOS KELVIN, an individual; GREAT VALUE, LLC, a California Limited Liability Company; P-COVE ENTERPRISES INC. dba BUYERS CONSULTATION SERVICE, a California Corporation; ENVIRONMENTAL LIQUIDATION, INC., a California Corporation; JONATHAN MANHAN, an individual; FRANCIS MICHAEL BAKER aka MIKE BAKER, an individual; MI TECHNOLOGIES, INC. dba DISCOUNT MERCHANT, a California Corporation, AMIR TAFRESHI, an individual, INNOVATIVE ENTERPRISES, INC. dba THE MERCHANT KING, a California Corporation; JOUBIN RAHIMI, an individual, and DOES 12-30, inclusive,<br><br>            Defendants. | Case No. 3:17-cv-00079-EMC<br><br>**PLAINTIFF FITBIT, INC.'S OPPOSITION TO MOTIONS TO DISMISS FILED BY CALI DEFENDANTS AND L2 DEFENDANTS**<br><br>Judge:        Honorable Edward M. Chen<br>Date:          September 28, 2017<br>Time:          1:30 p.m.<br>Court Room:   5, 17th Floor<br><br>Trial Date:    None Set |

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1

## TABLE OF CONTENTS

2

**Page**

3  I.  INTRODUCTION.................................................................................................. 1

4  II.  RELEVANT FACTUAL ALLEGATIONS.......................................................... 3

5  A.  The Scrap Products Were Not "Sold" To BCS ...................................... 3

6  B.  The Scrap Product Shipments Were Materially Different ...................... 4

7  C.  The Cali Defendants' Relevant Unlawful Conduct................................ 5

8  D.  Defendant Great Value ........................................................................... 8

9  E.  The L2 Defendants ................................................................................. 9

10  III.  RELEVANT PROCEDURAL BACKGROUND ................................................ 10

11  A.  The TRO Briefing and Court Order on the First Sale Doctrine ........... 10

12  B.  The L2 Defendants' First Motion to Dismiss....................................... 11

13  C.  The Cali Defendants' First Motion to Dismiss and Answer ................ 12

14  IV.  LEGAL STANDARDS ON A MOTION TO DISMISS ................................... 12

15  V.  DEFENDANTS' MOTIONS TO DISMISS FAIL AS A MATTER OF LAW AND BASED ON THE FACTS ALLEGED IN THE AMENDED COMPLAINT ................... 13

16

   A.  Both Motions Are Procedurally Improper And Untimely...................... 13

17

   B.  The Court Should Reject Defendants' Request To Reconsider Its Prior Ruling On The First Sale Doctrine, And It Is Inapplicable Here In Any

18  Event...................................................................................................... 14

19

   C.  Defendants' Remaining Grab-Bag Of Arguments All Fail To Raise Any

20  Pleading Defect Here ............................................................................ 21

21  1.  Fitbit's Complaint States A Claim Against Defendants Cali and Kelvin for Conspiracy to Defraud .............................................. 21

22

   2.  Fitbit's Complaint States A Claim Against Defendants for

23  Counterfeiting.............................................................................. 23

24  3.  The Cali Defendants' Vague Catch-All Argument Fails As Well ............. 24

25  D.  The Cali Defendants Do Not Assert Any Separate Or Distinct Basis To Challenge The SAC On Behalf Of Defendant Great Value................... 24

26

27  VI.  CONCLUSION .................................................................................................. 25

28

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ally Bank v. Castle,*
    11–CV–896 YGR, 2012 WL 3627631 (N.D. Cal. Aug. 20, 2012)......................................22, 23

*Analog Devices v. West Pac. Indus.,*
    152 F.3d 923 (9th Cir. 1998)..............................................................................................19

*Arizona v. California,*
    460 U.S. 605 (1983)............................................................................................................15

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)............................................................................................................12

*Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC,*
    562 F.3d 1067 (10th Cir. 2009)..........................................................................................20

*Chaffee v. Boston Belting Co.,*
    63 U.S. 217 (1859)..............................................................................................................18

*Conley v. Gibson,*
    355 U.S. 41 (1957) .............................................................................................................12

*F.T.C. v. Wellness Support Network, Inc.,*
    2011 WL 4026867 (N.D. Cal. Sept 12, 2011)..............................................................13, 14

*Facebook, Inc. v. MaxBounty, Inc.,*
    5:10–CV–04712–JF HRL, 2011 WL 4346514 (N.D. Cal. Sept. 14, 2011) ...........................22

*FURminator, Inc. v. Kirk Weaver Enterprises, Inc.,*
    545 F.Supp.2d 685 (N.D. Ohio April 7, 2008)...........................................................16, 17, 18

*General Talking Pictures Corp. v. Western Elec. Co.,*
    305 U.S. 124 (1938) ...........................................................................................................18

*Grateful Palate Inc. v. Joshua Tree Imps., LLC,*
    220 Fed. Appx. 635 (9th Cir. 2007) ......................................................................1, 11, 15, 20

*Greenwood v. Mooradian,*
    137 Cal. App. 2d 532 (1955)..............................................................................................23

*Hokto Kinoko Co. v. Concord Farms, Inc.,*
    810 F. Supp. 2d 1013 (C.D. Cal. 2011) ...........................................................................1, 11

*Idaho Potato Comm'n v. G&T Terminal Pkg., Inc.,*
    425 F.3d 708 (9th Cir. 2005)...........................................................................................2, 11, 21

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

Case No. 3:17-cv-00079-EMC

PLAINTIFF FITBIT, INC.'S OPPOSITION TO MOTIONS TO DISMISS

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

*Impression Prods. v. Lexmark Int'l, Inc.*,
    __ U.S. __, 137 S.Ct. 1523 (2017) ..........................................................................17, 18

*Knievel v. ESPN*,
    393 F.3d 1068 (9th Cir. 2005) .........................................................................................12

*Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc.*,
    979 F.Supp. 224 (S.D.N.Y. 1997) ..................................................................................15

*Lopez v. Smith*
    203 F.3d 1122 (9th Cir. 2000) .........................................................................................13

*McCarthy v. Fuller*,
    2013 U.S. Dist. LEXIS 162826 (S.D. Ind. Nov. 15, 2013).....................................19, 20

*Microban Products Co. v. API Indus., Inc.*,
    2014 WL 1856471 (S.D.N.Y May 8, 2014) ....................................................................16

*Northstar Fin. Advisors, Inc. v. Schwab Investments*,
    135 F. Supp. 3d 1059, 1070 (N.D. Cal. 2015) ...............................................................13

*Opperman v. Path, Inc.*,
    2014 WL 246972 (N.D. Cal. Jan. 22, 2014) ...................................................................15

*RFA Brands, LLC v. Beauvais*,
    2014 WL 7780975 (E.D. Mich., Dec. 23, 2014).......................................................16, 17

*Rolex Watch USA, Inc. v. Agarwal*,
    2012 WL 12886444 (C.D. Cal. 2012) .............................................................................20

*Sebastian Intern., Inc. v. Longs Drug Stores Corp.*,
    53 F.3d 1073 (9th Cir. 1995).............................................................................................19

*SoftMan Prods. Co. v. Adobe Sys.*,
    171 F. Supp. 2d 1075 (C.D. Cal. 2001).................................................................1, 11, 20

*In re Sunset Bay Assocs.*,
    944 F.2d 1503 (9th Cir. 1991)....................................................................................22, 23

*Thomas v. Bible*,
    983 F.2d 152 (9th Cir. 1993)............................................................................................15

*Transamerica Life Ins. Co. v. Jurin*,
    2014 WL 3519205 (N.D. Cal. July 16, 2014)......................................................21, 22, 23

*Wasco Prods., Inc. v. Southwall Techs., Inc.*,
    435 F.3d 989 (9th Cir. 2006)............................................................................................21

**Other Authorities**

Civil L.R. 7-9 ...................................................................................................2, 4, 14, 15

Fed. R. Civ. Proc. Rule 12............................................................................................13

Fed. R. Civ. Proc. Rule 12(b)..................................................................................12, 13

Fed. R. Civ. Proc. Rule 12(c)......................................................................................13

Fed. R. Civ. Proc. Rule 12(e)......................................................................................12

Fed. R. Civ. Proc. Rule 12(g)..................................................................................13, 14

Fed. R. Civ. Proc. Rule 12(h)..................................................................................13, 14

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiff Fitbit, Inc. ("Fitbit" or "Plaintiff") respectfully submits the following Opposition to the Motions to Dismiss Fitbit's Second Amended Complaint, ECF Nos. 99 and 101, filed by Defendants Cali Resources, Inc. ("Cali"), Carlos Kelvin ("Mr. Kelvin"), Great Value, LLC ("Great Value," and together with Cali and Mr. Kelvin, the "Cali Defendants"), as well as Defendants Laguna 2, LLC ("L2") and Joel Blank ("Mr. Blank," and together with L2, the "L2 Defendants," and collectively with the Cali Defendants, the "Defendants") in the above-captioned Action.

## I.      INTRODUCTION

The Court should deny Defendants' Motions to Dismiss in their entirety because they are procedurally defective and also substantively meritless.  There is no reason to exercise discretion to consider these Motions because the Defendants have previously moved to dismiss without this first sale doctrine argument, and in any event, the Court has already considered and rejected the first sale doctrine argument in its prior TRO order.  In establishing this law of the case, the Court previously ruled that there were two separate bases to reject the first sale doctrine argument that Defendants ask the Court to reconsider here:

> 1.      "[I]f the product is in fact scrap, there is arguably no authorized first sale which would render the first sale doctrine inapplicable. *Cf. Grateful Palate Inc. v. Joshua Tree Imps., LLC*, 220 Fed. Appx. 635, 637 (9th Cir. 2007) (stating that, "[u]nder the first sale doctrine, the mark holder may ordinarily control the initial sale of the product, and a product sold without the authorization of the mark holder is generally deemed non-genuine")." February 24, 2017 Order, ECF No. 52, at 3:14-19.
>
> 2.      "Furthermore, if the product is in fact scrap, it could well be materially different (although L2 disputes this fact) which would also render the first sale doctrine inapplicable. *See SoftMan Prods. Co. v. Adobe Sys.*, 171 F. Supp. 2d 1075, 1091 (C.D. Cal. 2001) (stating that "[a] materially different product is not genuine"); *see also Hokto Kinoko Co. v. Concord Farms, Inc.*, 810 F. Supp. 2d 1013, 1025 (C.D. Cal. 2011) (noting that "[m]aterial

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

differences can relate to a product's quality control standards"); *Idaho Potato Comm'n v. G&T Terminal Pkg., Inc.*, 425 F.3d 708, 721-22 (9th Cir. 2005) (stating that "many cases have found a likelihood of confusion where a trademark owner was prevented from exercising quality control over the merchandise bearing its mark" and that "'the actual quality of the goods is irrelevant'" as " 'it is the control of quality that a trademark holder is entitled to maintain'")." *Id.* at 3:20-4:5.

The Court's prior Order therefore shows that Fitbit's Complaint at the time pled more than sufficient factual detail that, if taken as true, would establish there was no authorized first sale and that the first sale doctrine is also inapplicable because the products are materially different from genuine products. *See id.* Of course, the Second Amended Complaint just adds further detailed factual allegations in support of this conclusion. Indeed, the Court's first sale doctrine ruling even went beyond the bare pleadings, as it was based on significant evidentiary support, from which the Court determined that Fitbit had established a "reasonable likelihood of success" on the merits. *Id.* at 3:12.

Defendants provide no basis for the Court to reconsider this order, but simply reargue the same legal points, as if the Court had not considered and rejected them already. They do so without seeking leave of Court as required by Local Rule 7-9 and without justifying a departure from the law of the case doctrine. In re-hashing their previous arguments, Defendants ignore and misconstrue the relevant factual allegations and relevant caselaw, relying instead on patent cases that are either inapposite or, like the recent *Impression Products* case, that merely confirm this Court's prior ruling. Further undermining the merit of their argument, each of these Defendants (except Great Value) previously moved to dismiss the Complaint but failed to even assert this ground in either Motion (and Defendants Cali and Kelvin also answered in the meantime), making the current motions procedurally defective for yet another reason.

In addition to asking the Court to reconsider their previously-rejected first sale doctrine arguments, the Defendants' Motions take a scattershot approach to challenging the SAC. Like their arguments as to the first sale doctrine, Defendants can only construct a plausible argument by

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1   ignoring or misconstruing the relevant factual allegations and caselaw or by simply not citing any

2   law at all.[1]   None of their arguments remotely establishes a single pleading defect here.

3        In short, Defendants' Motions to Dismiss are both improper under the law and unsupported

4   by the allegations of the Second Amended Complaint.   As such, the Court should deny both of

5   their Motions to Dismiss in their entirety and with prejudice.

6   ## II.   RELEVANT FACTUAL ALLEGATIONS

7        The relevant factual allegations against the Defendants in the Second Amended Complaint

8   are fairly straightforward, even if the allegations and claims have expanded.   *See* Second Amended

9   Complaint ("SAC"), ECF No. 92.   At its heart, the SAC now details how Defendants fraudulently

10   obtained hundreds of thousands of scrap products from Fitbit's reverse supply chain, by

11   representing that they would be destroyed and the raw materials recycled.   Instead, the scrap

12   products were then placed into counterfeit packaging, often commingled with counterfeit chargers,

13   and then resold in competition with genuine Fitbit products through online distribution channels,

14   like Groupon and eBay, and in brick-and-mortar stores, like Fry's.   *See id.*, ¶¶1-11.

15   ### A.   The Scrap Products Were Not "Sold" To BCS

16        While the BCS Defendants were only recently added, the story truly starts with them.[2]   In

---

[1] The Cali Defendants in particular strangely question why Fitbit did not broadly quote their documents in Fitbit's Second Amended Complaint.   *See* Motion to Dismiss, ECF No. 99, at 3:4-9. The reason, of course, is that doing so could have been construed as a violation of the Stipulated Protective Order, given that the Cali Defendants designated all of their documents Highly Confidential pursuant to the Stipulated Protective Order (some of which have been downgraded to Confidential following a formal request by Fitbit).   *See* Declaration of Zachary J. Alinder in Support of Opposition to Motions to Dismiss ("Alinder Decl."), filed concurrently with this Opposition, ¶2.   Indeed, Fitbit's counsel met and conferred with Cali's counsel prior to filing the Second Amended Complaint to ensure that Cali did not object to Fitbit including certain key facts from their documents in the Second Amended Complaint, and in doing so, assured Cali's counsel that it would endeavor not to quote from their documents directly.   *See* Alinder Decl., ¶3.   If their assertions and easy willingness to publicly file their own Confidential-designated document show anything, it is that the Cali Defendants have improperly over-designated their documents pursuant to the Stipulated Protective Order.

[2] BCS Defendants here includes Defendants P-Cove Enterprises Inc. dba Buyers Consultation (footnote continued)

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1   mid-2015, Fitbit engaged a scrap destruction vendor, called BCS, to provide global scrap

2   destruction and recycling services in support of Fitbit's reverse supply chain.  *See id.*, ¶¶46-50.

3   Contrary to Defendants' claims, Fitbit did not <u>sell</u> any products to BCS, but rather engaged BCS

4   as a services vendor in its supply chain to break down these scrap products into raw materials and

5   to either properly destroy and dispose of them, or to the extent possible, recycle recoverable raw

6   materials.  *See id.*  BCS was to then use any money recouped from recycling these raw materials to

7   offset the cost of the scrap destruction services they were engaged to provide, and to the extent the

8   services were net positive, to split the proceeds with Fitbit.  *See id.*  Thus, BCS was a trusted

9   services provider within Fitbit's reverse logistics supply chain, not a customer somehow

10  purchasing these scrap products.  *See id.*  "Under no circumstances was BCS entitled to resell the

11  scrap 'Fitbit' products that it received through Fitbit's reverse supply chain."  *Id.*, ¶50.  Consistent

12  with this, BCS represented over and over to Fitbit that they were not reselling any of the scrap

13  products entrusted to them.  *See id.*, ¶¶48-62.  As such, there was no authorization or intent by

14  Fitbit to "sell" or otherwise introduce these scrap products into the stream of commerce

15  whatsoever.  *See id.*, ¶¶1-3 & 46-50.

16      **B.      The Scrap Product Shipments Were Materially Different**

17          Furthermore, as alleged in detail, these scrap products were, and are, "materially different"

18  from genuine Fitbit products for a variety of reasons, not the least of which is that Fitbit's reverse

19  supply chain had determined that they should be sent for scrap destruction rather than

20  refurbishment.  *See, e.g., id.*, ¶¶45, 63-65, & 84.  In addition, the scrap products from Defendants

21  were shipped in counterfeit packaging and many of the scrap products were packaged with

22  counterfeit charging cables.  *See id.*, ¶¶1-8, 63 & 81.  As further alleged in the SAC, certain of the

23  scrap products also had "obvious physical defects and changes," including having been defaced to

24  remove the Serial Number, MAC address label, and other identifying, regulatory and/or

25

26  _____

27  Service ("BCS"), Environmental Liquidation, Inc. ("ELI"), Jonathan Manhan ("Mr. Manhan"),
    and Francis Michael Baker aka Mike Baker ("Mr. Baker").

28

compliance information.  *See id.*, ¶¶64 & 72.[3]  Further confirming the counterfeit and materially-different, non-genuine nature of the shipments of scrap products and related accessories/packaging sold by Defendants, at least two known shipments have been seized in the last year by United States Customs, after certain Defendants attempted to "refurbish" them in Mexico and reimport them into California.  *See id.*, ¶¶8-9 & 73.  Finally, as alleged in the SAC, the misleading and inferior warranty and support for these scrap products also constituted a material difference between these scrap product sales and genuine Fitbit product sales.  *See id.*, ¶¶85-87.

      **C.**      **The Cali Defendants' Relevant Unlawful Conduct**

      As the SAC sets forth in detail, Fitbit has also now learned through the Cali Defendants' documents that BCS was defrauding Fitbit from the start, using the above representations about its purported recycling and destruction program to obtain Fitbit's scrap products under false pretenses.  *See id.*, ¶53.  And from the start BCS and the Cali Defendants engaged in a profit share from the resale of the fraudulently obtained Fitbit scrap.  *See id.*, ¶55.

      As Fitbit has alleged in more detail in the SAC, due to this close coordination between BCS and Cali, the Cali Defendants were well aware of the fraud being committed against Fitbit, "establish[ing] either an express agreement or at least a tacit understanding of the common plan and design to defraud Fitbit, after which Cali and Kelvin dutifully performed their role of receiving, processing, and reselling the fraudulently obtained scrap 'Fitbit' products."  *Id.*, ¶60. Here are some key allegations from the SAC regarding the Cali Defendants' unlawful conduct and their knowledge and agreement to engage in the fraud with BCS:

          •   The Cali Defendants coordinated with BCS on the fraudulent settlement statements that BCS was sending to Fitbit, purporting to prove to Fitbit how many tons of raw materials (*e.g.* plastic, rubber, steel, glass) had been recycled through the scrap

---

[3] In making its motion for a TRO, Fitbit also made an evidentiary showing that certain scrap designated "Fitbit" products sold by Defendants themselves were physically, materially different from genuine Fitbit products, including due to cosmetic defects, as well as damage to the bands or buttons.  *See, e.g.,* Fitbit's Supplemental Memorandum In Support of TRO, ECF No. 28, at 3:15-4:28.

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

PLAINTIFF FITBIT, INC.'S OPPOSITION TO MOTIONS TO DISMISS

destruction process.  *Id.*, ¶¶54-56.  Of course, "all or substantially all of the raw materials listed on these [settlement statements] were not recycled at all, but rather were still part of the scrap 'Fitbit' products later resold by Cali."  *Id.*, ¶54.  As such the Cali Defendants "knew or should have known that BCS was defrauding Fitbit and representing to Fitbit that the scrap products were being recycled and/or destroyed, when they were actually being resold by Defendants Cali and Kelvin."  *Id.*, ¶56.

- The coordination between BCS and the Cali Defendants on the falsely submitted Settlement reports to Fitbit was necessary due to the profit sharing arrangement between the two companies, *i.e.* the fake amounts reported as being recouped from recycling raw materials were treated as a cost to be deducted from the revenue that they actually made from reselling the scrap products, and thus split between BCS and the Cali Defendants.  *Id.*, ¶¶55-56.  Thus, the Cali Defendants plainly knew or should have known that BCS was submitting false settlement reports with false recycling/destruction certifications to Fitbit.  *See id.*  Further confirming the Cali Defendants' knowledge of the underlying scheme, Cali paid a commission directly to Mike Baker, even though he was a BCS employee, for his role in putting together the fraud scheme.  *Id.*, ¶55.

- In September 2016, faced with direct questions from Fitbit about a legal inquiry into the recycling and destruction of the scrap products, BCS looped in the Cali Defendants on an email from Fitbit.  *Id.*, ¶¶57-60.  This was not some innocuous email, as the Cali Defendants argue.  *See* Cali Defendants' Motion to Dismiss, ECF No. 99, at 2-3 and Ex. 1.[4]  In this email, Fitbit's reverse logistics manager asks for "some details" from the BCS Defendants because she has a "meeting with [Fitbit]

---

[4] The Cali Defendants do not request judicial notice of this email string, however, Fitbit has no objection to it, as it helps further establish the Cali Defendants' collusion in the fraudulent scheme with BCS.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

legal tomorrow in regards to our scrap process." *Id.*, Ex. 1 at p.3.  Defendant Baker

then asks his boss, Defendant Manhan, how best to lie to Fitbit about "[w]hich

company's [sic] do we want to tell her" to further conceal the fact that they are

actually selling these scrap products directly to the Cali Defendants.  *Id.*  Defendant

Manhan then forwards this to Defendant Kelvin, saying "See below," thus ensuring

that Defendant Kelvin has been made aware that Fitbit is asking legal questions and

that BCS is going to need to further lie to Fitbit to conceal the fact that the products

were actually being sent to the Cali Defendants.  *Id.*  And of course, that is exactly

what occurred, as BCS continued to fraudulently conceal the scheme, representing

to Fitbit the next day:

> 1) "Cardboard Recycled by paper mill.  Plastic is sent to plastics recycler who then shreds, cleans, and makes new plastic...Charging cable and dongles are separated and sent to ferrous and Nonferrous recycler for metal and copper and gold content.  Our downstream processes and resells to end users that buy Copper, steel and gold (precious metals).....  Bands are shredded then sold to downstream that makes soles for sandals and other types of shoes.  The brain/tracker is sold to Dowa and a [sic] other down streams as e-waste." *Id.*, ¶58.

> 2) And further representing the following day: "Charging cables and dongles Are separated[.]  Chargers sold by the lbs to metal recycling down stream for copper ( base Metal) the down stream processes and resells to manufactures [sic] that buy copper.  Dongles – are processed at smelter for Gold and for the ferrous metal(steel). The smelter will resell the gold and steel to manufactures [sic] to manufacture new items that use this material[.]  Wrist bands – we shred wrist bands without tracker. We then resell shredded wrist band material to down stream that will manufacture soles for Sandals and Mats[.]" *Id.*, ¶59.

• Further confirming the Cali Defendants' volitional conduct in support of the fraud

being perpetrated on Fitbit, the Cali Defendants later attempted to help conceal the

fraud by falsely representing a few months later that the "Fitbit goods provided by

us to L2...are obtained legitimately through legal sources.  We are not at liberty to

provide our supply chain but we would never, ever, purchase from a supplier that

did not have the legal right to sell to us." *Id.*, ¶61.  This representation was also

made in context of the Cali Defendants at least knowing the communications

above, which being generous directly contradict the representation made.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

- The Cali Defendants made similar false representations and attempts to conceal the scheme to CBP "attempting to convince [CBP] to release a large counterfeit and/or otherwise non-genuine shipment of 'Fitbit' products seized at the border earlier this year." *Id.*, ¶8; *see also* Cali Defendants' Answer and Counterclaims, ECF No. 78, p. 10:8-10 (alleging that the Cali Defendants "did everything possible to prove the legitimacy of the seized items" in their communications with CBP). Indeed, the Cali Defendants made these false representations, even though "there was no mistaking the scrap nature and origin of these products, as they were designated as scrap in the shipping records and on the pallets themselves." *Id.*, ¶63.

In short, through allegations like those above, the SAC more than adequately alleges that "Defendant Cali and Kelvin's coordination with Defendants BCS, Manhan, and Baker in communicating with Fitbit, as well as their profit share with Defendants BCS and Manhan on the resale of the scrap as alleged above, establishes either an express agreement or at least a tacit understanding of the common plan and design to defraud Fitbit, after which Defendants Cali and Kelvin dutifully performed their role of receiving, processing, and reselling the fraudulently obtained scrap 'Fitbit' products." SAC, ¶60.

After the Cali Defendants received these scrap products from BCS, Fitbit's SAC alleges that the Cali Defendants sent them to an industrial facility in Tijuana, Mexico for some sort of processing, after which the Cali Defendants "placed [them] into counterfeit packaging" along with "counterfeit charging cables" and resold them under the guise that such products were "like new" and merely "refurbished." *Id.*, ¶¶1 & 63-66. In addition to reselling directly to unwitting consumers, the Cali Defendants "arranged to resell the scrap "Fitbit" products and counterfeit packaging/accessories through various third party and online distribution channels." *Id.*, ¶65.

## D.    Defendant Great Value

"Among these distribution channels was a related sister company, called Great Value, LLC," apparently set up by Defendant Cali's outside general counsel. *Id.*, ¶66. "Great Value resold thousands of these scrap Flex, Surge, Charge, and Charge HR products in counterfeit packaging and at least some with counterfeit and/or otherwise non-genuine charging cables and

accessories." *Id*. "Great Value appears to have been focused on reselling these scrap 'Fitbit' products into the Canadian market." *Id*. "Further, confirming the direct relationship between Defendants Cali and Great Value, Great Value used the same business address as Defendant Cali's dba Buy Now Factory Direct in reselling the scrap 'Fitbit' products into Canada." *Id*.

### E.    The L2 Defendants

"[O]ne of the main distribution channels for Defendants Cali and Kelvin was Defendant L2, acting through Defendant Blank and other L2 employees." *Id*., ¶67.  Thus, and even though Fitbit had previously put them on notice in 2015 (*id*., ¶75), the L2 Defendants were the ones Fitbit ultimately caught in late-2016 reselling these fraudulently obtained and materially different scrap "Fitbit" products on established online "e-commerce distribution channels, such as eBay.com, Groupon.com, and Woot.com." *Id*., ¶¶1 & 76-84.  **"Prior to filing its original complaint, Fitbit confirmed through numerous purchases of the purportedly 'refurbished' Fitbit products sold by Defendants L2 and Blank through their Established Distribution Channels that they were selling non-genuine and otherwise infringing 'Fitbit' products, including in counterfeit packaging mocked up to resemble genuine Fitbit return replacement packaging." *Id*., ¶78. "In addition, many of the cables and accessories included with the shipments purchased and received from Defendants L2 and Blank turned out to be counterfeit and/or non-genuine products that attempted to colorably imitate or copy genuine Fitbit cables/accessories and the Fitbit Marks." *Id*.; *see also id*., ¶81 (comparison photographs of the counterfeit packaging used by the L2 Defendants and allegedly created by the Cali Defendants).  The L2 Defendants also sold these products with a misleading and inferior warranty that unlawfully suggested an affiliation with Fitbit. *Id*., ¶¶85-87.  The L2 Defendants also copied Fitbit copyrighted images in their online advertising and marketing, further "impl[ying] an affiliation and/or endorsement from Fitbit in a manner that was likely to confuse consumers." *Id*., ¶89.[5]

---

[5] As alleged in the SAC, Fitbit was in the process of formally registering a selection of the many copyrighted images infringed by Defendants at the time of the filing of the SAC.  SAC, p.30 at n.3.  Fitbit has since already received a number of these registrations back from the Copyright
(footnote continued)

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1   "Not only are consumers *likely* to be confused by Defendants' use of the Fitbit Marks,

2   images, and misleading advertising and warranty, but Fitbit has found significant evidence of

3   *actual* consumer confusion and brand/reputational harm to Fitbit from consumers who have

4   recently complained about the products sold by Defendants." *Id.*, ¶90.  These unlawful sales

5   therefore not only damaged Fitbit, but also caused irreparable harm to Fitbit's brand and

6   reputation.  *Id.*, ¶¶91-94.

7       The above factual allegations in the SAC more than sufficiently allege the Cali

8   Defendants' (including Great Value) and L2 Defendants' liability on each of the claims alleged by

9   Fitbit for their unlawful conduct in relation to the scheme to resell fraudulently-obtained, non-

10  genuine, counterfeit, and otherwise infringing products with counterfeit and otherwise infringing

11  packaging and cables, as well as liability of Defendants Cali and Kelvin for conspiring with the

12  BCS Defendants to defraud Fitbit.  *See* SAC, ¶¶ 98-153.

13  **III.     RELEVANT PROCEDURAL BACKGROUND**

14      **A.     The TRO Briefing and Court Order on the First Sale Doctrine**

15      On January 11, 2017, Fitbit filed a motion seeking a temporary restraining order and

16  preliminary injunctive relief.  *See* Fitbit's Motion for TRO, ECF No. 12.  On January 13, 2017, the

17  L2 Defendants filed an Opposition to the TRO Motion based in part on the same first sale doctrine

18  arguments made in the current Motions to Dismiss.  *See* ECF No. 18 at p. 1 & 7-8 ("Trademarks,

19  like patents and copyrights are limited by the doctrine of first sale.").  Following the Court's initial

20  order granting in part and deferring in part Fitbit's Motion for TRO, ECF No. 24, Fitbit then

21  provided further supplemental briefing including specifically to rebut the first sale doctrine

22  argument made by the L2 Defendants.  ECF No. 28 at pp. 5-10.  In response, the L2 Defendants

23  provided a responsive supplemental brief with even more argument on these same first sale

24  _____

25  Office.  *See, e.g.*, Registration Numbers VA0002063236, VA0002063238, and VA0002063235
    for the copyrighted images shown in Paragraph 89 of the SAC, available at

26  http://cocatalog.loc.gov/cgi-
    bin/Pwebrecon.cgi?Search_Arg=Fitbit&Search_Code=NALL&PID=y7oX-

27  dP1GFCvdqSsM1Y_fpugp1&SEQ=20170829180722&CNT=25&HIST=1.

28

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1   doctrine issues, again arguing that the "first sale doctrine applies" to the scrap "Fitbit" products

2   they bought from the Cali Defendants and resold.  ECF No. 32 at pp. 7-9.

3       Following some additional supplemental briefing (ECF Nos. 46 & 50), and hearings on

4   February 2nd (ECF No. 41) and 23rd (ECF No. 51), the Court granted Fitbit's motion, seeking to

5   convert the TRO into a preliminary injunction as to further sales of scrap "Fitbit" products.

6   February 24, 2017 Order, ECF No. 52, at pp. 2-4.  In granting this relief, the Court specifically

7   addressed the first sale doctrine arguments made by the L2 Defendants:

8       Relief is appropriate because there are serious questions going to the merits –
        indeed a reasonable likelihood of success – and the balance of hardships tips
9       sharply in Fitbit's favor.

10      More specifically, there are serious questions going to the merits, particularly to the
        extent L2 is selling scrap product, because, if the product is in fact scrap, there is
11      arguably no authorized first sale which would render the first sale doctrine
        inapplicable. *Cf. Grateful Palate Inc. v. Joshua Tree Imps., LLC*, 220 Fed. Appx.
12      635, 637 (9th Cir. 2007) (stating that, "[u]nder the first sale doctrine, the mark
        holder may ordinarily control the initial sale of the product, and a product sold
13      without the authorization of the mark holder is generally deemed non-genuine").
        Furthermore, if the product is in fact scrap, it could well be materially different
14      (although L2 disputes this fact) which would also render the first sale doctrine
        inapplicable. *See SoftMan Prods. Co. v. Adobe Sys.*, 171 F. Supp. 2d 1075, 1091
15      (C.D. Cal. 2001) (stating that "[a] materially different product is not genuine"); *see
        also Hokto Kinoko Co. v. Concord Farms, Inc.*, 810 F. Supp. 2d 1013, 1025 (C.D.
16      Cal. 2011) (noting that "[m]aterial differences can relate to a product's quality
        control standards"); *Idaho Potato Comm'n v. G&T Terminal Pkg., Inc.*, 425 F.3d
17      708, 721-22 (9th Cir. 2005) (stating that "many cases have found a likelihood of
        confusion where a trademark owner was prevented from exercising quality control
18      over the merchandise bearing its mark" and that "'the actual quality of the goods is
        irrelevant'" as "'it is the control of quality that a trademark holder is entitled to
19      maintain'").

20  *Id*. at 3:11-4:5.

21      Neither the L2 Defendants, nor the Cali Defendants, have sought formal reconsideration of

22  this Order, and it constitutes law of the case here.

23      **B.    The L2 Defendants' First Motion to Dismiss**

24      On February 9, 2017, the L2 Defendants filed a Motion to Dismiss or Transfer, arguing

25  only that the Court should dismiss or transfer the Action in favor an Action pending in the District

26  of New Jersey pursuant to the first to file doctrine.  *See* L2 Motion to Dismiss or Transfer, ECF

27  Nos. 42-43.  Even though the L2 Defendants had already filed motion briefing on the first sale

28  doctrine issue, as set forth above, this Motion to Dismiss did not include first sale doctrine

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

11

1  arguments.  *See id.*  On June 8, 2017, after the Court in the District of New Jersey dismissed that

2  Action for lack of personal jurisdiction, this Court denied the L2 Defendants' first Motion to

3  Dismiss as moot.  *See* Civil Minutes, ECF No. 85.

4          **C.**      **The Cali Defendants' First Motion to Dismiss and Answer**

5          On April 4, 2017, the Cali Defendants filed a Motion to Dismiss on two grounds.  *See* Cali

6  Defendants' Motion to Dismiss, ECF Nos. 62-63.  First, the Cali Defendants argued that, under

7  Rule 12(b)(6), the First Amended Complaint ("FAC") did not allege sufficient facts to state a

8  claim against Defendant Kelvin personally.  *See* Notice of Motion to Dismiss, ECF No. 62, at 2:6-

9  8.  Second, they argued that, under Rule 12(e), the factual allegations against Defendant Kelvin

10  were too vague.  *See id.* at 2:8-10.  The Cali Defendants did not challenge the Complaint on first

11  sale doctrine grounds, even though the allegations supporting Fitbit's Lanham Act trademark

12  infringement and counterfeiting claims have not fundamentally changed.  *See id.*  On April 26,

13  2017, the Court denied the Cali Defendants' Motion to Dismiss.  ECF No. 76.

14          Following denial of the Cali Defendants' Motion to Dismiss, they answered and

15  counterclaimed on May 9, 2017.  ECF No. 78.

16          Despite the prior motions and answer, both the L2 Defendants and Cali Defendants filed

17  the instant Motions to Dismiss on August 21, 2017, primarily to reargue the first sale doctrine

18  issues previously decided by the Court.  *See* ECF Nos. 99-101.

19  **IV.**     **LEGAL STANDARDS ON A MOTION TO DISMISS**

20          <u>**Standard Under Rule 12(b)(6)**</u>.  In considering a motion to dismiss a Complaint for

21  failure to state a claim, the Court accepts as true all material allegations in the Complaint and

22  construes those allegations in the light most favorable to the plaintiff.  *See Knievel v. ESPN*, 393

23  F.3d 1068, 1072 (9th Cir. 2005).  "Detailed factual allegations" are not required, but the

24  "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

25  plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at

26  570).  Thus, "a complaint should not be dismissed for failure to state a claim unless it appears

27  beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle

28  him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1    **Standard for Leave to Amend**.  Finally, to the extent that a Court dismisses a complaint

2  or claim, leave to amend generally is granted, unless further amendment would be futile.  *See*

3  *Lopez v. Smith* 203 F.3d 1122, 1127 (9th Cir. 2000).

4  **V.   DEFENDANTS' MOTIONS TO DISMISS FAIL AS A MATTER OF LAW AND
      BASED ON THE FACTS ALLEGED IN THE AMENDED COMPLAINT**

5

6    The Court should deny the Defendants' Motions to Dismiss in their entirety and with

7  prejudice because they both are procedurally improper, untimely, and also misinterpret or ignore

8  the applicable law as well as the factual allegations actually made in the SAC.

9  **A.   Both Motions Are Procedurally Improper And Untimely**

10    Rules 12(g) and 12(h) set forth limitations on successive motions to dismiss, like those

11  brought by Defendants.  *See* Fed. R. Civ. Proc. 12(g) & (h).  "[U]nder Rule 12(g)(2) and Rule

12  12(h)(2), a party that seeks to assert a defense that was available but omitted from an earlier Rule

13  12 motion can only do so in a pleading, a Rule 12(c) motion, or at trial."  *Northstar Fin. Advisors,*

14  *Inc. v. Schwab Investments*, 135 F. Supp. 3d 1059, 1070 (N.D. Cal. 2015) (declining to consider

15  previously un-asserted defense on successive motion to dismiss).  Thus, "where the complaint is

16  amended after the defendant has filed a Rule 12(b) motion, the defendant may not thereafter file a

17  second Rule 12(b) motion asserting objections or defenses that could have been asserted in the

18  first motion."  *Id.* (citations omitted).  While courts may excuse a technical violation like this

19  where doing so advances judicial economy, it makes no sense to do so where, like here, "judicial

20  economy does not favor an exercise of discretion...."  *F.T.C. v. Wellness Support Network, Inc.*,

21  2011 WL 4026867, *3 (N.D. Cal. Sept 12, 2011) (denying motion to dismiss as untimely under

22  Rule 12(g)).

23    Defendants both previously brought pre-answer motions to dismiss, and indeed, the Cali

24  Defendants previously answered the Complaint.  *See* Sections III.B and C. above.  As such, there

25  is certainly a technical violation of Rule 12 here.  In addition, the Court should not excuse these

26  violations in the interest of judicial economy for at least two reasons.  The first is that their

27  primary arguments seek reconsideration of first sale doctrine issues that the Court previously

28  decided in the context of the earlier TRO briefing, which suggests that these motions were filed

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

for delay.  As discussed further below, the only relevant distinction now is that the standard on a motion to dismiss is much more favorable to Fitbit, as it only needs to plausibly allege a claim for relief in contrast to the much higher burden that it already met in seeking, and receiving, temporary and preliminary injunctive relief.  The second is that these motions seek to challenge factual issues, *e.g.* whether the scrap products were materially different, which not proper on a pleading motion in any event.  *See Wellness Support Network*, 2011 WL 4026867 at *3 (declining to exercise discretion to consider "fact questions that are properly addressed at the summary judgment stage of the case and *not* on the pleadings.")  As such, other than the newly-added fraudulent conspiracy allegations, the Court should deny the motions as procedurally improper and untimely under Rules 12(g) and (h).[6]

**B.**     **The Court Should Reject Defendants' Request To Reconsider Its Prior Ruling On The First Sale Doctrine, And It Is Inapplicable Here In Any Event**

The primary relief sought in both Motions to Dismiss is a thinly-veiled motion for reconsideration of first sale doctrine arguments that the Court rejected months ago in the course of the initial TRO and Preliminary Injunction briefing.  *See* Cali Defendants' Motion to Dismiss at pp. 6-10 & L2 Defendants' Motion to Dismiss at pp. 5-9; *see also* Section III.A. above.  Defendants failed to seek leave to file a motion for reconsideration as required by Civil L.R. 7-9 and also have not shown good cause for the Court to deviate from the law of the case.  Indeed, the only relevant factual change from the Court's prior order on the first sale doctrine issues is that Fitbit has now uncovered, and alleged, many more facts establishing that there was no authorized first sale and that the scrap products were materially different from genuine Fitbit products. Further, the only relevant legal change is that the posture of these pleadings motions requires the Court to accept all of Fitbit's factual allegations as true, a far lower burden than the TRO standard already met by Fitbit.  The Court should deny Defendants' Motions to Dismiss premised on the

---

[6] Though Defendant Great Value has not previously brought a motion to dismiss, it is directly related to the Cali Defendants who have done so, and as discussed further below, their motion does not make any independent arguments related to Great Value and indeed barely even mentions Great Value at all.  *See* Section V.D. below.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1    first sale doctrine argument for at least three reasons.

2    **First,** the Court already considered and rejected the applicability of these same arguments

3    to the facts alleged here, and that ruling is now law of the case.  *See* Section III.A. above.  "[A]

4    court is generally precluded from reconsidering an issue that has already been decided by the same

5    court, or a higher court in the identical case." *Thomas v. Bible*, 983 F.2d 152, 154 (9th Cir. 1993);

6    *see also Arizona v. California,* 460 U.S. 605, 618 (1983) *decision supplemented,* 466 U.S. 144

7    (1984) ("when a court decides upon a rule of law, that decision should continue to govern the

8    same issues in subsequent stages in the same case").  While there are specific grounds under

9    which Courts may reconsider such law of the case, none are present here and indeed Defendants

10   do not argue any such grounds.  *See* Cali Defendants' Motion to Dismiss at pp. 6-10 & L2

11   Defendants' Motion to Dismiss at pp. 5-9.  As such, Defendants' Motions fail to "present[] the

12   type of 'extraordinary circumstances' required to revisit an earlier ruling."  *Opperman v. Path,*

13   *Inc.*, 2014 WL 246972 (N.D. Cal. Jan. 22, 2014).[7]

14   **Second,** the Court's prior ruling on the first sale doctrine issues was, and is still, correct as

15   a matter of law.  As a preliminary matter, the scrap "Fitbit" products are not subject to the first

16   sale doctrine as a matter of law because, as Fitbit has alleged, there was no authorized first sale.

17   *See Grateful Palate Inc. v. Joshua Tree Imps., LLC*, 220 Fed. Appx. 635, 637 (9th Cir. 2007) (stating

18   that, "[u]nder the first sale doctrine, the mark holder may ordinarily control the initial sale of the

19   product, and a product sold without the authorization of the mark holder is generally deemed non-

20   genuine"); *see* Section II.A. above (setting forth the allegations negating any authorized first sale

21   here).  Without an authorized first sale, the first sale doctrine is simply inapplicable.  *See id.; see also*

22   *Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc.*, 979 F.Supp. 224, 230 (S.D.N.Y. 1997) ("The

23   question of whether a good is genuine [for first sale doctrine purposes], however, presupposes the

24

25   [7] Defendants also neither sought leave to file a motion for reconsideration, as required by Civil
     L.R. 7-9(a), nor did they argue that the grounds for reconsideration required by Civil L.R. 7-9(b)
26   have been met.  They also failed to avoid repetition of arguments, as required by Civil L.R. 7-9(c).
     This further highlights the lack of extraordinary circumstances here that might possibly justify
27   reconsideration of Defendants' rehashed first sale doctrine arguments.

28

1   initial sale was authorized."); *see also Microban Products Co. v. API Indus., Inc.*, 2014 WL

2   1856471, *9-14 (S.D.N.Y May 8, 2014) (granting motion for summary judgment and permanent

3   injunction because, among other things, there was no authorized first sale); *see also FURminator,*

4   *Inc. v. Kirk Weaver Enterprises, Inc.*, 545 F.Supp.2d 685, 689-91 (N.D. Ohio April 7, 2008)

5   ("Goods are not genuine goods until their sale is authorized by the trademark owner.").

6       The *RFA Brands* and *FURminator* cases are directly on point and also held that the first

7   sale doctrine did not apply.  *RFA Brands, LLC v. Beauvais*, 2014 WL 7780975 (E.D. Mich., Dec.

8   23, 2014), report and recommendation adopted (E.D. Mich., Feb. 9, 2015, No. 13-14615) 2015

9   WL 519166; *FURminator, Inc. v. Kirk Weaver Enterprises, Inc.*, 545 F.Supp.2d 685 (N.D. Ohio

10  April 7, 2008).  In *RFA Brands*, the plaintiffs (the manufacturer and seller of electronic products)

11  filed suit for trademark infringement against a defendant that was selling products bearing

12  plaintiffs' trademarks where "the majority of the products had come from the returns section of the

13  warehouse.  For example, many of the products bore various retailer stickers, and some of the

14  goods showed indications of having been opened and improper packaging."  2015 WL 519166, at

15  *2-3.  Like Fitbit, the *RFA Brands* plaintiffs had implemented a quality control process that

16  prohibited the sale of returned goods, prohibited the sale of refurbished goods, and typically

17  destroyed returned goods.  *See id.*  "Plaintiffs assert that the products being sold by defendant do

18  not meet plaintiffs' quality and customer service standards, and plaintiffs' never authorized those

19  products to be re-sold to the public."  *Id.* at *4.  Because the defendant could not establish that the

20  sales of the products at issue were "authorized," the Court concluded that the first sale doctrine did

21  not apply.  *Id.*

22      Likewise, in *FURminator*, FURminator determined that certain of its tools "did not meet

23  its quality control standards and decided that it would not authorize these tools for sale."

24  *FURminator*, 545 F.Supp.2d at 690.  "To keep these tools from entering the marketplace,

25  FURminator undertook to implement their disposal, paying Willimantic to destroy the tools."  *Id.*

26  Instead, Willimantic sold them without FURminator's knowledge to intermediaries, which ended

27  up eventually selling them to the Defendants.  *Id.* at *687-88.  The Defendants then resold them at

28  discounted prices online and at flea markets.  *Id.*  The Court granted partial summary judgment on

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1  the Lanham Act claim, including because the first sale doctrine did not apply, as there was no

2  authorized first sale and the products were materially different.  *Id*. at \*690-92.  As the Court held,

3  to "permit" defendants to avoid summary judgment under such circumstances "would put

4  trademark holders and the good will of their products, names and reputations in substantial

5  jeopardy, while serving no useful purpose, other than to enrich persons who, like defendants, seek

6  to profit from the malfeasance of an intermediary."  *Id.* at \*692.

7        So it should be here.  The first sale doctrine does not apply to the scrap "Fitbit" branded

8  products sold by Defendants because, as Fitbit has alleged in detail, Fitbit did not sell them to its

9  scrap destruction vendor, nor authorize that vendor to resell them under any circumstances.  *See*

10  Section II.A. above.  Indeed, the legal principle articulated in the *FURminator* and *RFA Brands*

11  cases applies as strongly or more so in Fitbit's case, because Fitbit now knows, and has alleged,

12  that the scrap destruction vendor in its reverse supply chain obtained these scrap products through

13  fraud.  In short, "fraudulently obtained" scrap products that were "unlawfully diverted" from

14  Fitbit's reverse supply chain simply do not meet the threshold requirement of having an <u>authorized</u>

15  <u>first sale</u>.  SAC, ¶¶1-3 & 46-50.

16        The cases cited by Defendants in support of their first sale doctrine arguments either

17  support Fitbit on this point or are distinguishable.  *See* Cali Defendants' Motion to Dismiss at pp.

18  6-10 & L2 Defendants' Motion to Dismiss at pp. 5-9.  As the Supreme Court stated in the recent

19  *Impression Products* case, cited by Defendants, the first sale doctrine still requires an authorized

20  <u>sale</u>: "[t]he limit functions automatically: When a patentee **chooses to sell** an item, that product 'is

21  no longer within the limits of the monopoly' and instead becomes the 'private, individual

22  property' of the purchaser, with the rights and benefits that come along with ownership."

23  *Impression Prods. v. Lexmark Int'l, Inc.*, __ U.S. __, 137 S.Ct. 1523, 1531 (2017) (emphasis

24  supplied).[8]  The reason is that the authorized sale is the point where "patent rights yield to the

25  _____

26  [8] While the *Impression Products* case does not support Defendants, it also is easily distinguishable
27  on the facts.  In that case, Lexmark made an authorized first sale of the printer cartridges, which
    Impression Products then merely bought as used and empty, refilled, and resold.  *See id*.  The facts
28  (footnote continued)

common law principle against restraints on alienation." *Id*. at 1532.  As the Court further explained: "[O]nce a patentee **sells an item**, it has 'enjoyed all the rights secured' by that limited monopoly. [Citation omitted]. Because 'the purpose of the patent law is fulfilled ... when the patentee has received his reward for the use of his invention,' that law furnishes 'no basis for restraining the use and enjoyment of the thing sold.'" *Id*. (emphasis supplied) (citations omitted). In contrast, where the owner has been defrauded out of an item, like here, rather than through an authorized sale, the purpose of the first sale doctrine would not be fulfilled, because the owner has not enjoyed all the rights secured by its intellectual property and has not received its "reward." *See id.*; *see also Chaffee v. Boston Belting Co.*, 63 U.S. 217 (1859) (holding that where defendants could not show they "legally acquired [] title" and otherwise "failed to establish any right or license to use their machinery...they appear in the record as naked infringers."); *see also FURminator*, 545 F.Supp.2d at 689-91 ("[D]efendants' cases are inapplicable where, as here, the initial sale of the trademarked product was not authorized.")

The Supreme Court made this distinction even more clear in its discussion of the *General Talking Pictures* case. *See Impression Products*, 137 S.Ct. at 1535 (citing and quoting *General Talking Pictures Corp. v. Western Elec. Co.,* 305 U.S. 124, 127 (1938)).  As the Court noted, the *General Talking Pictures* case involved a "fundamentally different" situation than the *Impression Products* case and "stands for the modest principle that, if a patentee has not given authority for a licensee to make a sale, that sale cannot exhaust the patentee's rights." *Id*. at 1535.  By extension, a product obtained through false pretenses, like here, is "fundamentally different" from the products in the *Impression Products* case, and because there was no authorized sale, there was no trigger to exhaust Fitbit's rights under the first sale doctrine.  Thus, to the extent it is relevant here at all, the *Impression Products* case supports Fitbit and the Court's prior ruling on the first sale doctrine.  *See id*.

Defendants' other cited cases are no more helpful to them.  The majority of their cases are

could not be more different from this case, where the products in question were not sold by the trademark holder, but rather were obtained through false pretenses.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ⁿᵈ FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

PLAINTIFF FITBIT, INC.'S OPPOSITION TO MOTIONS TO DISMISS

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

generic first sale doctrine cases, mostly patent based, which, like *Impression Products*, merely support the requirement that an authorized first sale must occur.  *See* Cali Defendants' Motion to Dismiss at pp. 6-10 (citing *Mallinckrodt, Jazz Photo, Repeat-o-Type, Kirtsaeng, Impression Products, and Sebastian*) & L2 Defendants' Motion to Dismiss at pp. 5-9 (citing *Impression Products, McCoy, McCarthy, Sebastian, NEC, and Debnicare*).  For example, Defendants make much of the *Sebastian Products* case, but it stands for the unremarkable proposition that the first sale doctrine applies where a reseller does nothing more than "stock and resell genuine [trademarked] products lawfully acquired on the open market under the true [] trademark—the precise conduct excluded from the Lanham Act by the 'first sale' rule."  *Sebastian Intern., Inc. v. Longs Drug Stores Corp.*, 53 F.3d 1073, 1077 (9th Cir. 1995).  That is a far cry from the facts here, where the scrap "Fitbit" products were not sold, but were fraudulently obtained, and were among other things altered, re-packaged, and resold using counterfeit marks.  *See* Sections II.A. & B. above.

The unpublished *Analog Devices* case is similarly distinguishable as the Ninth Circuit merely affirmed denial of a preliminary injunction where the Plaintiff "made no effort to ensure the [products] were destroyed; [plaintiff] had not requested certificates of destruction since 1991; and [plaintiff] sold the chips to [defendant] fully marked with the same trademark appearing on chips that had passed its quality control tests."  *Analog Devices v. West Pac. Indus.*, 152 F.3d 923, *2-3 (9th Cir. 1998).  In contrast, Fitbit did not <u>sell</u> the scrap products to its scrap destruction vendor, made significant efforts to ensure the scrap products were destroyed, and requested and received fraudulent certificates of destruction from its scrap destruction vendor.  *See* SAC, ¶¶1-3 & 46-62.

The out-of-circuit stolen goods case – *McCarthy v. Fuller*, 2013 U.S. Dist. LEXIS 162826 (S.D. Ind. Nov. 15, 2013) cited by the L2 Defendants at p. 7:26-27 – is both unpersuasive and easily distinguishable. In that case, the Court found that the resale of religious medallions was protected by the first sale doctrine even if they were "stolen or otherwise obtained illegally" because the medallions were genuine and consumers would not be confused about the source or quality of the goods.  *Id.*  The *McCarthy* court did not discuss or analyze the contradictory caselaw

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

above, requiring an authorized first sale to occur.  *See id.*  Instead, the Court focused only on the fact that there was no consumer confusion about source or quality because the goods were genuine religious medallions.  *See id.*  Not surprisingly, the likelihood of consumer confusion relating to resale of scrap "connected health and fitness wearable products and associated mobile applications and online resources" with substantial related counterfeit issues is exponentially greater than from the resale of genuine religious medallions. SAC, ¶4.  Moreover, as discussed in more detail below, the scrap "Fitbit" products sold by Defendants are not "genuine" due to material differences in the products, packaging, quality control, and warranties.  Further, Fitbit alleged not only a likelihood of consumer confusion here, but actual consumer confusion as well, as a result of Defendants' deceptive resale of the scrap "Fitbit" products with counterfeit packaging and cables (and misleading warranty), as "like new" refurbished goods.  SAC, ¶¶ 1, 3, 6 & 88-94.  As such, *McCarthy* is inapposite at best.

**Third,** none of the patent or other first sale doctrine cases cited by Defendants purport to address or remotely affect the settled federal law, relied on by the Court in its prior ruling, that material differences in the products also render the first sale doctrine inapplicable.  *See, e.g., Grateful Palate, Inc. v. Joshua Tree Imports, LLC*, 220 Fed.Appx. 635, 637 (9th Cir. 2007) ("After that first sale, however, the trademark holder may establish infringement only if he demonstrates that the goods are materially different."); *see also SoftMan Products Co., LLC v. Adobe Sys., Inc.*, 171 F. Supp. 2d 1075, 1092 (C.D. Cal. 2001) ("The first sale doctrine does not apply, however, when an alleged infringer sells trademarked goods that are materially different than those sold by the trademark owner."); *see also Rolex Watch USA, Inc. v. Agarwal*, 2012 WL 12886444 (C.D. Cal. 2012) (denying motion to dismiss trademark infringement claims brought against Rolex watch refurbisher/reseller, including because "[t]he first sale doctrine is inapplicable when the resold product is materially different from the originally sold product.") (quoting *Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC*, 562 F.3d 1067, 1076 (10th Cir. 2009)).  Here, Fitbit has more than adequately pled material differences between the scrap products sold by Defendants in counterfeit packaging, with counterfeit cables, with misleading and substandard warranties, and in violation of Fitbit's quality control standards.  *See* Section II.B.

1   above; *see also Idaho Potato Comm'n v. G&T Terminal Pkg., Inc.*, 425 F.3d 708, 721-22 (9th Cir.

2   2005) (stating that "many cases have found a likelihood of confusion where a trademark owner was

3   prevented from exercising quality control over the merchandise bearing its mark" and that "the actual

4   quality of the goods is irrelevant" as "it is the control of quality that a trademark holder is entitled to

5   maintain").  As such, Defendants' Motions to Dismiss as to the first sale doctrine fail as a matter of

6   law on this basis as well.

7   In short, the Court's prior ruling on the first sale doctrine was correctly decided, it is the

8   law of the case, and Defendants have provided nothing in their Motions that remotely warrants

9   anything more than a flat denial of their Motions on this ground.

10   **C.   Defendants' Remaining Grab-Bag Of Arguments All Fail To Raise Any Pleading Defect Here**

11

12   The remainder of the Motions to Dismiss brought by Defendants similarly miss the mark.

13   The additional arguments relying on their first sale doctrine argument fail for the reasons set forth

14   above.  Their challenges to Fitbit's remaining causes of action on other grounds meanwhile are

15   based on ignoring the applicable law and the actual alleged facts.

16   **1.   Fitbit's Complaint States A Claim Against Defendants Cali and Kelvin for Conspiracy to Defraud**

17

18   The Cali Defendants first argue that Fitbit has not alleged sufficient facts about their

19   agreement to the conspiracy to defraud, while failing to cite or quote the actual legal requirements

20   of the claim.  *See* Cali Defendants Motion to Dismiss at p.1-2.  The reason is because the actual

21   legal standard does not help them.

22   The actual legal standard under the *Wasco* case that they cite is that "the complaint must

23   allege (1) the formation and operation of the conspiracy, (2) the wrongful act or acts done pursuant

24   thereto, and (3) the damage resulting from such act or acts." *Transamerica Life Ins. Co. v. Jurin*,

25   2014 WL 3519205, *6 (N.D. Cal. July 16, 2014) (citing *Wasco Prods., Inc. v. Southwall Techs.,*

26   *Inc.,* 435 F.3d 989, 992 (9th Cir. 2006)).

27   The Cali Defendants primarily challenge the conspiracy's formation, arguing that there are

28   not sufficient allegations of an express agreement here.  *See* Cali Defendants' Motion to Dismiss

1  at pp. 1-5.  Defendants ignore both the law and Fitbit's actual allegations, where Fitbit has alleged

2  over and again how Defendants Cali and Kelvin knew or should have known about the fraud (*see*

3  Section II.C. above), and that "Defendant Cali and Kelvin's coordination with Defendants BCS,

4  Manhan, and Baker in communicating with Fitbit, as well as their profit share with Defendants

5  BCS and Manhan on the resale of the scrap as alleged above, establishes either an express

6  agreement or at least a tacit understanding of the common plan and design to defraud Fitbit, after

7  which Defendants Cali and Kelvin dutifully performed their role of receiving, processing, and

8  reselling the fraudulently obtained scrap 'Fitbit' products."  SAC, ¶60.

9       Fitbit's pleading is robust given that this is a conspiracy case prior to substantial discovery,

10  and not surprisingly, California law supports these allegations as being more than sufficient.

11  Indeed, California does not require an "express agreement" for civil conspiracy, only "a tacit

12  understanding."  *In re Sunset Bay Assocs.*, 944 F.2d 1503, 1517 (9th Cir. 1991).  Under California

13  law, "[t]he existence of a conspiracy may sometimes be inferred from the nature of the acts done,

14  the relations of the parties, the interests of the alleged conspirators, and other circumstances."

15  *Transamerica Life Ins. Co. v. Jurin*, 2014 WL 3519205, *6 (quoting *Ally Bank v. Castle,* 11–CV–

16  896 YGR, 2012 WL 3627631, at *10 (N.D. Cal. Aug. 20, 2012); *see also Facebook, Inc. v.*

17  *MaxBounty, Inc.,* 5:10–CV–04712–JF HRL, 2011 WL 4346514, at *4 (N.D. Cal. Sept. 14, 2011)

18  ("To state a claim for conspiracy, [plaintiff] must plead "an agreement to participate in an

19  unlawful overt act that is performed in furtherance of an agreement. The existence of this

20  agreement may be either express or inferred from a defendant's conduct.").  "The conspiracy

21  allegation serves to establish liability of defendants who agreed to defraud the plaintiff, regardless

22  of whether they were direct participants in the wrongful acts." *Transamerica Life Ins. Co. v. Jurin*,

23  2014 WL 3519205, *6 (citing *Ally Bank,* 2012 WL 3627631, at *10 and 5 Witkin, *Cal. Pro.*

24  (2008) Pleading, § 921 at p. 335)).

25       As established above, Fitbit has alleged that the Cali Defendants entered into *either* an

26  explicit *or* tacit agreement with the BCS Defendants to defraud Fitbit.  *See* Section II.C. above.  It

27  is "difficult to imagine anyone creating [multiple] corporate entities, maintaining them at the same

28  few addresses...and commingling funds [with the co-conspirator], for any reason *other* than to

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1  further a conspiracy." *Ally Bank* at *10.  Indeed, the facts alleged here are far more detailed

2  regarding the conspiracy than those that were found sufficient in the *Transamerica* and *Ally Bank*

3  cases cited above.  Moreover, the conspiracy pleading standard under California law is not strict,

4  as the Cali Defendants appear to argue.  As established above, "the existence of a conspiracy 'may

5  sometimes be inferred from the nature of the acts done, the relations of the parties, the interests of

6  the alleged conspirators, and other circumstances.' "  *In re Sunset Bay Assocs.*, 944 F.2d at 1517

7  (quoting *Greenwood v. Mooradian*, 137 Cal. App. 2d 532, 538 (1955)).  Fitbit's allegations that

8  (a) the Cali Defendants and BCS agreed to a profit share to split the proceeds from the conspiracy

9  after the fact, (b) the co-conspirators coordinated on the settlement statements sent to Fitbit

10  showing the raw materials fraudulently reported to Fitbit as having been recycled, (c) they

11  coordinated on Fitbit's legal questions regarding the scrap destruction process and therefore the

12  Cali Defendants knew BCS was lying to Fitbit about disposal of the scrap products, and (d) the

13  Cali Defendants' attempted to conceal and cover for the BCS Defendants after the conspiracy

14  began to unravel, are more than sufficient to meet the conspiracy standard under California law.

15  *See* Section II. above; *see also Transamerica* at *6; *Ally Bank* at *10.

16        To the extent that the Cali Defendants challenge their wrongful acts done in furtherance of

17  the conspiracy, Fitbit has multiple sections of the Complaint detailing those wrongful acts.  *See*

18  Section II. above.  The Cali Defendants' primary argument appears to be using the word

19  "scintilla" liberally, however, doing so simply exposes the weakness of their argument and does

20  nothing to change the allegations in the actual complaint, which detail their actions in support of

21  the conspiracy to defraud Fitbit.  *See id.*; *see also* Cali Defendants' Motion to Dismiss at p.2.  The

22  Cali Defendants nowhere appear to challenge the damage caused to Fitbit.  Accordingly, each of

23  the Cali Defendants' arguments seeking to undermine the conspiracy allegations fails.  The Court

24  should therefore reject their challenge Fitbit's claims against Defendants Cali and Kelvin for

25  conspiracy to defraud.

26             **2.**    **Fitbit's Complaint States A Claim Against Defendants for Counterfeiting**

27

28  The Cali Defendants and L2 Defendants to some extent appear to challenge the sufficiency

LAW OFFICES

SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1   of Fitbit's pleading regarding Defendants' resale of counterfeit cables and packaging with

2   counterfeit marks. *See* Cali Defendants' Motion to Dismiss at pp. 11-12 and L2 Defendants'

3   Motion to Dismiss at 10. While Defendants' argument on this point is vague, Fitbit's allegations

4   are specific and clear. *See* SAC, ¶¶81-84 & 98-105. Indeed, among other allegations, Fitbit even

5   provided exemplar photographs of Defendants' packaging with the counterfeit marks in the SAC.

6   SAC, ¶81. And, in seeking the TRO in this matter, Fitbit also provided photographs of counterfeit

7   cables packaged and shipped by Defendants with these scrap "Fitbit" products. *See* ECF No. 50-6

8   (Exhibit E to Bonham Declaration). Regardless, Fitbit has more than sufficiently alleged that

9   Defendants violated the Lanham Act's prohibitions against counterfeiting, by among other things,

10  creating, purchasing, and/or reselling packaging and cables with counterfeit marks in violation of

11  the Lanham Act. *See, e.g.,* SAC, ¶¶81-84 & 98-105. The Court should therefore deny this portion

12  of Defendants' Motions as well.[9]

13           **3.     The Cali Defendants' Vague Catch-All Argument Fails As Well**

14          Finally, the Court should reject the Cali Defendants' attempt to sweep all of the other

15  claims in the SAC up in their challenges above to Fitbit's trademark allegations. *See* Cali

16  Defendants' Motion to Dismiss at p. 12. While the challenges to the trademark-based claims fail

17  for all the reasons set forth above, the Cali Defendants also fail to make any substantive argument

18  on Fitbit's other claims, even though the elements for federal unfair competition, trademark

19  dilution, and state unfair competition are distinct from a claim for trademark infringement. The

20  Cali Defendants do not explain how the first sale doctrine argument could possibly have such a

21  preclusive effect, and it is inapplicable here as established above. Thus, the Cali Defendants

22  concede that those claims are sufficiently pled, whereas here, the first sale doctrine does not apply.

23   **D.     The Cali Defendants Do Not Assert Any Separate Or Distinct Basis To
         Challenge The SAC On Behalf Of Defendant Great Value**

24

25          Although the Cali Defendants' Motion to Dismiss purports to have been filed on behalf of

26   ─────────────────

27   [9] The L2 Defendants do not make any other challenges to the SAC other than based on the first
     sale doctrine and the counterfeiting allegations. *See generally* L2 Defendants' Motion to Dismiss.

28

1   Defendant Great Value, it does not make any independent arguments in support of the motion on

2   behalf of Great Value.  Indeed, the Cali Defendants appear to only reference allegations about

3   Great Value on p. 12, vaguely criticizing that it is not clear if their sales were to consumers or to

4   resellers.  This nitpick deserves no response, as it does not impact the sufficiency of the pleading

5   here.  In any event, Great Value knows who it resold to, and knows full well, as alleged, that it

6   resold counterfeit and otherwise infringing "Fitbit" branded products, packaging and cables in

7   violation of the Lanham Act and other laws.  *See* SAC, ¶¶17 & 63-66.

8   **VI.    CONCLUSION**

9           For the foregoing reasons, Fitbit respectfully requests that the Court deny the Cali

10  Defendants' Motion to Dismiss and the L2 Defendants' Motion to Dismiss in their entirety and

11  with prejudice.

12  DATED: September 5, 2017                    SIDEMAN & BANCROFT LLP

13

14                                             By:   /s/ Zachary J. Alinder

15                                                   Zachary J. Alinder
                                                     Attorneys for Plaintiff
16                                                   FITBIT, INC.

3346821

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711