UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FITBIT, INC., <br><br> Plaintiff, <br><br> v. <br><br> LAGUNA 2, LLC, et al., <br><br> Defendants. | Case No. 17-cv-00079-EMC <br><br> **ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTIONS TO STRIKE AND GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS** <br><br> Docket Nos. 127, 152 |

Plaintiff Fitbit, Inc. has filed suit against various entities and persons after discovering that its "scrap" product was being offered for resale through the Internet. Among the entities and persons sued are the Cali Defendants (Cali Resources, Inc. ("Cali"), Carlos Kelvin, and Great Value, LLC) and the L2 Defendants (Laguna 2, LLC ("L2") and Joel Blank). As alleged in the operative second amended complaint ("SAC"), the primary wrongdoers are the BCS Defendants who were hired by Fitbit to destroy or recycle scrap product but who instead sold the scrap product to, *e.g.*, Cali who then resold the product to, *e.g.*, L2 who ultimately offered the product for sale on the Internet (*e.g.*, via Groupon).

Fitbit has asserted various claims against the various defendants, including but not limited to trademark infringement. After unsuccessfully moving to dismiss the SAC, the Cali Defendants and L2 Defendants answered the complaint, and Cali and the L2 Defendants asserted counterclaims. Fitbit has now moved to strike and dismiss the counterclaims, as well as certain affirmative defenses asserted in the answer. This is one of the motions currently pending before the Court. The Court acknowledges that, after Fitbit filed its motion, the Cali Defendants filed an amended answer and counterclaims. This led Fitbit to filing a new motion to strike and dismiss. However, the Court sees no reason not to proceed with the new motion now because, as Fitbit

points out, with limited exceptions, the amended answer and counterclaims are not materially different from the original answer and counterclaims. Thus, the issues raised in both motions to strike and dismiss are largely the same, and thus the ruling herein applies to the amended answer and counterclaims.

Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **GRANTS** in part and **DENIES** in part both the motions to strike and the motions to dismiss.

## I.    FACTUAL & PROCEDURAL BACKGROUND

A.   Cali's Counterclaims

In both its original and amended pleading, Cali asserted the following counterclaims: (1) declaratory judgment of noninfringement of trademark; (2) tortious interference with prospective economic relations; (3) negligent interference with prospective economic relations; (4) trade libel and product disparagement; (5) federal unfair competition (15 U.S.C. § 1125); and (6) California unfair competition (Cal. Bus. & Prof. Code § 17200).

Counterclaims (2)-(6) are based on the following factual allegations:

- That Fitbit falsely informed the U.S. Customs and Border Patrol ("CBP") that certain goods being transported to Cali (from Mexico) were counterfeit. *See, e.g.*, Cali Countercl. ¶ 12; Am. Cali Countercl. ¶ 12.
- That Fitbit sent a letter to Groupon on October 26, 2016, "claiming that the goods sold by L2 on its website were 'stolen.' Since [Cali] is counted among L2's suppliers, the implication of the letter is that [Cali] supplied L2 with stolen goods," when in fact Cali "has always been a good faith purchaser for value of legitimate Fitbit goods and conveyed valid title to L2." Cali Countercl. ¶ 17; Am. Countercl. ¶ 17.

B.   L2 Defendants' Counterclaims

In their pleading, the L2 Defendants assert similar counterclaims: (1) defamation per se; (2) trade libel; (3) slander of title; (4) intentional interference with contract; (5) intentional interference with prospective economic advantage; (6) negligent interference with prospective economic advantage; (7) federal unfair competition (15 U.S.C. § 1125); (8) California unfair

2

1 competition (Cal. Bus. & Prof. Code § 17200); (9) declaratory judgment of noninfringement; (10)
2 declaratory judgment of no dilution; and (11) declaratory judgment of genuine goods.

Counterclaims (1)-(8) – which are asserted by L2 only – are based on the following factual allegation:

- That, on October 26, 2016, "Fitbit wrote to Groupon and stated that certain of the genuine Fitbit-branded trackers that L2 had lawfully obtained and sold to Groupon had been 'stolen' from Fitbit's supply chain." L2 Countercl. ¶ 11.

## II. DISCUSSION

In the pending motions, Fitbit makes three major arguments:

(1) That the Court should strike or dismiss all of the counterclaims that do not ask for a declaratory judgment because they are predicated on Fitbit conduct that is protected by California's anti-SLAPP statute, the California litigation privilege, and/or the Noerr-Pennington doctrine;

(2) That the Court should dismiss the declaratory judgment counterclaims as duplicative; and

(3) That the Court should strike certain affirmative defenses because they are not "true" affirmative defenses or because they are conclusorily pled.

Each of these arguments is addressed below.

A. Libel and Related Counterclaims

The bulk of the counterclaims pled by both Cali and the L2 Defendants do not ask for a declaratory judgment. Rather, they are claims for libel and related misconduct. As noted above, Fitbit contends that these claims should be stricken or dismissed based on California's anti-SLAPP statute, the California litigation privilege, and/or the Noerr-Pennington doctrine. Fitbit's arguments based on California's anti-SLAPP statute and the California litigation privilege apply to the state claims only. *See Hudson Martin Ferrante St. Witten & Demaria, PC v. Forsythe*, No. 16-cv-06551-BLF, 2017 U.S. Dist. LEXIS 53964, at *7 (N.D. Cal. Apr. 7, 2017) (noting that "the anti-SLAPP statute does not apply to federal claims"); *Amaretto Ranch Breedables, LLC v. Ozimals, Inc.*, 790 F. Supp. 2d 1024, 1030 (N.D. Cal. 2011) (Breyer, J.) (stating that "California's

3

litigation privilege does not apply to federal claims"). The Noerr-Pennington doctrine applies to both the state claims and the federal claim. *See Gen-Probe, Inc. v. Amoco Corp.*, No. 95-0998 J, 1996 U.S. Dist. LEXIS 5393, at *9 (S.D. Cal. Feb. 13, 1996) ("reject[ing] Gen-Probe's initial argument that the Noerr-Pennington doctrine would not apply to state claims: it is clear that the Noerr-Pennington doctrine applies to any claim, federal or state, common law or statutory, that has as its gravamen the petitioning of the courts or other government entities to take action"); *Monolithic Power Sys. v. O2 Micro Int'l Ltd.*, No. C 04-2000 CW, 2007 U.S. Dist. LEXIS 22556, at *18 (N.D. Cal. Mar. 14, 2007) (stating that, "[w]hile the Noerr-Pennington doctrine was formulated in the context of antitrust cases, it has been extended to cases involving other types of civil liability, including state law claims of unfair competition").

1. California's Anti-SLAPP Statute

"A SLAPP suit – a strategic lawsuit against public participation – seeks to chill or punish a party's exercise of constitutional rights to free speech and to petition the government for redress of grievances." *Neville v. Chudacoff*, 160 Cal. App. 4th 1255, 1261 (2008). California's anti-SLAPP statute is embodied in California Code of Civil Procedure § 425.16. In that statute,

> [t]he Legislature finds and declares that there has been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances. The Legislature finds and declares that it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process. To this end, this section shall be construed broadly.

Cal. Code Civ. Proc. § 425.16(a).

The statute goes on to provide that:

> (1) A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, *unless* the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.
>
> (2) In making its determination, the court shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based.

4

*Id.* § 425.16(b) (emphasis added).

"A prevailing defendant on a special motion to strike shall be entitled to recover his or her attorney's fees and costs." *Id.* § 425.16(c)(1).

### a. Fitbit's Letter to Groupon

Both Cali and the L2 Defendants bring libel and related state claims against Fitbit based on Fitbit's act of writing a letter to Groupon on October 26, 2016. A copy of the letter to Groupon can be found at Docket No. 19-4 (Blank Decl., Ex. D) [hereinafter "Groupon Letter"]. In the letter, Fitbit states, *inter alia*, as follows:

> Re: SALE OF **STOLEN** AND COUNTERFEIT PRODUCT BY GROUPON; USE OF FITBIT COPYRIGHT IMAGES
>
> . . . .
>
> As Fitbit's Global Director of Brand Protection, I am tasked with ensuring that the Fitbit brand is not damaged as result of sales of unauthorized Fitbit products. Often times, the acquisition of these products by unauthorized 3rd Party sellers is by way of illicit or fraudulent means. This letter is to formally advise you of the results of an investigation of fraudulently obtained Fitbit products in counterfeit packaging being sold by Groupon.
>
> As you will see from the detail below, our investigation has revealed that certain Fitbit products sold on Groupon were supposed to have been scrapped, which promotes confusion for consumers who are expecting to purchase a quality Fitbit product. . . Fitbit conducted a number of test purchases from Groupon, nine of which were identified as being **stolen** from Fitbit's supply chain after being designated for scrap destruction. These products were packaged in counterfeit plastic bags bearing Fitbit trademarks which resemble genuine Fitbit RMA replacement packaging.
>
> . . . .
>
> In addition, products purchased during the course of this investigation were accompanied by a Warranty card . . . , presumably issued by Groupon or Groupon's suppliers which directs the end-customer to Fitbit's website for initial installation. . . .
>
> Since Groupon is not an authorized Fitbit retailer, the products are not eligible for warranty support by Fitbit. There is no disclaimer on the Groupon marketplace site advising customers that neither Groupon nor its suppliers are Fitbit authorized retailers, nor is there a disclaimer that the products purchased from Groupon are not eligible for Fitbit warranty support . . . .
>
> . . . .

5

> We immediately request that Groupon deactivate the above mentioned listings associated to the sale of "scrap" Fitbit products and any related listings from the same supplier. In addition, Fitbit requests Groupon's assistance in a full and comprehensive investigation into the **theft** of Fitbit products from our supply chain to include:
>
> 1) That Groupon identify the seller(s) responsible for selling these stolen devices . . . ;
> 2) That Groupon provide a complete accounting of all Fitbit products sold to date by those seller(s);
> 3) That Groupon cease and desist from selling any Fitbit products packaged in counterfeit packaging misusing Fitbit's trademarks . . . .

Groupon Letter at 1-7 (emphasis added).

Cali and the L2 Defendants focus in particular on Fitbit's characterization of the goods at issue as "stolen" as the basis for the libel and related state claims. Fitbit contends that its characterization of the goods as "stolen" was proper but that, in any event, even its use of that term or similar terms is protected activity under the anti-SLAPP statute.

The first issue for the Court to address is whether Fitbit's act of writing to Groupon regarding "stolen" goods was an act "in furtherance of [its] right of petition or free speech." Cal. Code Civ. Proc. § 425.16(b)(1). This is a dispute between Fitbit and the L2 Defendants only. Cali has conceded to Fitbit on this point. *See* Cali Opp'n at 2 (stating that it "does not dispute that the Anti-SLAPP statute applies to the kind of communications which are the subject matter of [Cali's] counterclaims").

As used in § 425.16,

> "act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue" includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) *any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law*, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest.

Cal. Code Civ. Proc. § 425.16(e) (emphasis added).

According to Fitbit, its act of writing to Groupon regarding "stolen" goods was an act in

furtherance of its right to petition because petitioning activity includes not just the act of filing a lawsuit but also acts preparatory to or in anticipation of bringing a lawsuit. *See Briggs v. Eden Council for Hope & Opportunity*, 19 Cal. 4th 1106, 1115 (1999); *see also Neville*, 160 Cal. App. 4th at 1263 (stating that "communications in connection with anticipated litigation are considered to be under consideration or review by a . . . judicial body") (internal quotation marks omitted); *cf. Rubin v. Green*, 4 Cal. 4th 1187, 1194-95 (1993) (discussing analogous reach of California's litigation privilege).

In response, the L2 Defendants do not dispute that general proposition[1]; however, they point out that § 425.16(e)(2) has a requirement of "in connection with an issue under consideration or review by a . . . judicial body." According to the L2 Defendants, Fitbit's act of writing to Groupon regarding "stolen" goods was not "in connection with an issue under consideration or review" by this Court because the instant lawsuit does not claim theft by any party (including the BCS Defendants) but at most asserts fraud.

The Court is not persuaded. A prelitigation communication must simply be "'reasonably relevant'" to the "'*subject matter*'" of the lawsuit (pending or contemplated) to be considered protected activity. *Neville*, 160 Cal. App. 4th at 1266 (emphasis added). Here, the subject matter of the lawsuit being contemplated by Fitbit was Fitbit's scrap product improperly being sold in the marketplace (however it got there). Fitbit's prelitigation communication – even regarding "stolen" goods – is reasonably relevant to that subject matter.

The authority on which the L2 Defendants rely does not alter the above analysis. For example, *Nguyen v. Proton Technology Corp.*, 69 Cal. App. 4th 140 (1999), one of the main cases cited by L2 Defendants, is distinguishable. The plaintiff in *Nguyen* was an employee of the defendant-company. After several months of employment, however, the plaintiff left the defendant-company, along with others, and started to work for a third party. The defendant-company became concerned that the third party was improperly soliciting its employees and

---

[1] The L2 Defendants also do not argue that litigation was not truly anticipated or contemplated by Fitbit. *See also Neville*, 160 Cal. App. 4th at 1262, 1268-69 (finding statements made by defendant to plaintiff's customers were protected even though made four months before defendant filed suit against plaintiff).

7

customers. The defendant-company had its lawyer send a letter to the third party. In the letter, the defendant-company warned that it would not tolerate the third party's "'recent acts of unfair competition,'" which included the plaintiff's solicitation of the defendant-company's customers "'to induce them to switch their business to [the third party].'" *Id.* at 143. The defendant-company also warned the third party that "'you should be aware that [the plaintiff] was working for [the defendant-company] under a work furlough program sponsored by the Santa Clara County Probation Department. [He] was in prison for repeatedly and violently assaulting his wife.'" *Id.* at 143-44. The defendant-company later learned that it was mistaken regarding the crimes for which the plaintiff had been convicted. His conviction was not for assault but rather for shooting a gun at an unoccupied motor vehicle and vandalism. The defendant-company communicated that error to the third party. *See id.* at 144-45.

Subsequently, the plaintiff filed suit against the defendant-company for, *inter alia*, libel and slander. The defendant-company argued that the plaintiff's claims were barred by California's litigation privilege (which has coverage similar to that of the anti-SLAPP statute).[2] The court agreed only in part.

The court began by noting that, for the litigation privilege to apply, a communication must be in furtherance of the object of the litigation; that requirement is "'simply part of the requirement that the communication be connected with, or have some logical relation to, the action, *i.e.*, that it not be extraneous to the action.'" *Id.* at 147. In other words, "'a statement made in a judicial proceeding is not privileged unless it has some reasonable relevancy to the subject matter of the action.'" *Id.* Accordingly, the privilege "cannot extend to *anything* that is written just because it is contained in a prelitigation demand letter." *Id.* at 148 (emphasis in original).

---

[2] *See Feldman v. 1100 Park Lane Assocs.*, 160 Cal. App. 4th 1467, 1479 (2008) (noting that "[t].he scope of the protections afforded to litigation-related communications under the anti-SLAPP statute and that afforded by the litigation privilege are not identical"; however, "the California Supreme Court has repeatedly recognized the relationship between the two" and "[b]oth the Supreme Court and the Court of Appeal 'have looked to the litigation privilege as an aid in construing the scope of section 425.16, subdivision [(e)](2) with respect to the first step of the two-step anti-SLAPP inquiry – that is, by examining the scope of the litigation privilege to determine whether a given communication falls within the ambit of subdivision [(e)](2)"). [citations]".)

8

The court then determined that the inclusion in the defendant-company's letter "of references to [the plaintiff's] criminal record falls outside of the [litigation] privilege" because "any 'connection' between such a conviction [for shooting at an unoccupied car and vandalism] and the civil unfair competition focus of [the] demand letter is, to be charitable about it, tenuous." *Id.* at 151.

*Nguyen* is easily distinguishable from the instant case because, there, the plaintiff's crimes and the alleged unfair competition were based on entirely different facts – *i.e.*, shooting and vandalism for the former, and improper solicitation of customers for the latter. There was no connection between the two. That is not true in the instant case. The underlying facts here are the same – *i.e.*, Fitbit's scrap product being improperly introduced into the marketplace is both the subject of Fitbit's letter to Groupon regarding "stolen" goods *and* Fitbit's contemplated and eventually filed lawsuit. The difference pertains to the characterization of the conduct which led to the improper introduction of the goods into the marketplace. While the term "stolen" may arguably overstate the culpability of the responsible parties, that assertion does not negate the reasonable relationship of that allegation to the subject matter of this lawsuit. The reasonableness of that relationship is bolstered by the fact that, at the time the letter was sent, Fitbit had no specific information as to how the goods were obtained by the sellers; Fitbit only knew that they were taken or obtained without authorization – thus, "stolen" in lay parlance was not an unreasonable assumption.

*Paul v. Friedman*, 95 Cal. App. 4th 853 (2002), a case that the L2 Defendants invoked at the hearing, is distinguishable for similar reasons. In *Paul*, the plaintiff was a securities broker. He was involved in an arbitration in which former brokerage clients sought millions in compensatory damages from both him and his employer. In the arbitration, the former clients alleged that the broker had violated securities law, committed, fraud, breached his fiduciary duties, and so forth. The broker and his employer prevailed at the arbitration, and the former clients and their lawyer were sanctioned for filing a frivolous claim with the intention to harass the broker and his employer. *See id.* at 856-57.

After the arbitration, the plaintiff sued the former clients and their lawyer, asserting claims

9

for, *e.g.*, intentional infliction of emotional distress ("IIED") and tortious interference with economic relationships. According to the plaintiff, both before and during the arbitration, the former clients and their lawyer conducted an investigation of the plaintiff that far exceeded the scope of permissible discovery or investigation in the arbitration; in addition, in conducting the investigation, the lawyer for the former clients made public disclosures of embarrassing private facts about the plaintiff to his clients and prospective clients. *See id.* at 857-58.

The defendbant-lawyer moved to strike the plaintiff's claims for, *e.g.*, IIED and tortious interference pursuant to the anti-SLAPP statute. The trial court granted the motion but the appellate court held that the motion should have been denied. Contrary to what the defendant-lawyer argued, the anti-SLAPP statute did not protect "any and all conduct 'in connection with [the] securities arbitration proceeding.'" *Id.* at 865. Rather, the conduct had to be related to an issue under consideration or review in the arbitration. *See id.* The plaintiff's

> lawsuit alleged [the defendant-lawyer] conducted a harassing investigation that extended far beyond the scope of the issues subject to arbitration. The investigation was allegedly directed to personal matters bearing no relationship to the claims asserted in the arbitration. In the course of the investigation, [the defendant-lawyer] or his agents allegedly made disclosures to clients and others about [the plaintiff's] personal life that likewise had nothing to do with the claims under consideration in the arbitration. Fairly read, the complaint alleges [the plaintiff] was injured by acts of [the defendant-lawyer] that had *no* connection to the issues under review in the arbitration.

*Id.* at 866 (emphasis added).

Like *Nguyen*, *Paul* is materially distinguishable from the instant case. In *Paul*, the main holding from the court was that there must be "a connection to an issue under review in a proceeding, and not merely to a proceeding." *Id.* Here, for the reasons stated above, it cannot be said that Fitbit's letter to Groupon regarding "stolen" goods has no relation to an issue for review in the contemplated lawsuit.

Because Fitbit's act of writing to Groupon regarding "stolen" goods was in furtherance of its right to petition, the only remaining dispute is whether the L2 Defendants and Cali have "established that there is a probability that [they] will prevail on [their] claim[s]." Cal. Code Civ. Proc. § 425.16(b)(1); *see also Baral v. Schnitt*, 1 Cal. 5th 376, 384 (2016) (stating that, if the

10

defendant makes the required showing that the challenged claim arises from protected activity, "the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success"). The California Supreme Court has

> described this second step as a "summary-judgment-like procedure." The court does not weigh evidence or resolve conflicting factual claims. Its inquiry is limited to whether the plaintiff has stated a legally sufficient claim *and* made a prima facie factual showing sufficient to sustain a favorable judgment. It accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law.

*Id.* at 384-85 (emphasis added).

In the instant case, the issue boils down to whether the L2 Defendants and Cali have adequately pled and made a prima facie factual showing that the charge of "stolen" goods was false. The L2 Defendants have met their burden. Even accepting Fitbit's contention that the BCS Defendants did in fact steal the scrap product, *see* Cal. Pen. Code § 484(a) (providing that a person is guilty of theft if he fraudulently appropriates property which has been entrusted to him), the argument being made by the L2 Defendants is that *they* did not engage in any theft. Fitbit asserts that its letter to Groupon did not accuse the L2 Defendants of having stolen the Fitbit scrap product. While there was no explicit accusation of theft, arguably, the letter made an implicit accusation against the seller – L2. *See Blatty v. N.Y. Times Co.*, 42 Cal. 3d 1033, 1046 (1986) (stating that a "plaintiff must effectively plead that the statement at issue either expressly mentions him or refers to him by reasonable implication"). Fitbit wanted to know the identity of the Groupon seller (*i.e.*, L2), wanted a complete accounting of all Fitbit product sold by the seller, and asked for a deactivation of all "related listings" from the same seller. Groupon Letter at 7.

Cali presents basically the same argument as the L2 Defendants, but the problem for Cali is that the Groupon letter implicates at best only the immediate seller of the product (*i.e.*, L2) as having engaged in theft. The letter says nothing about potential upstream sellers of the product. Nor can it be reasonably implied that the letter charged upstream sellers, or any other person or entity, with theft as well. The letter asks Groupon to identify the "*seller(s)* responsible for selling these stolen devices," not everyone in the seller's supply chain. Moreover, Cali's identity was likely not known to Groupon since it was a step removed from L2 with whom Groupon dealt. It is

11

hard to see how a party unidentified and unknown to the audience of the alleged defamation can claim it was defamed and injured.

Accordingly, with respect to Fitbit's letter to Groupon regarding "stolen" goods, the Court denies Fitbit's motion to strike the L2 Defendants' libel and related state counterclaims but grants the motions to strike Cali's libel and related state counterclaims.

### b. Fitbit's Communications with CBP

Unlike the L2 Defendants, Cali's counterclaims are also based on an act by Fitbit independent of the Groupon letter. More specifically, Cali's counterclaims are also based on Fitbit's act of contacting CBP about "counterfeit" product.

As above, Cali does not dispute that Fitbit's act of contacting CBP is an act in furtherance of its right to petition. Nor could it legitimately dispute such. *See, e.g.*, *Mann v. Quality Old Time Serv., Inc.*, 120 Cal. App. 4th 90, 103 (2004) (stating that "[s]peech is protected if it is 'made in connection with an issue under consideration or review' in an official proceeding" and, thus, reporting a suspected crime to an interested governmental agency is protected speech), *overruled in part on other grounds by Baral v. Schnitt*, 1 Cal. 5th 376 (2016).

Accordingly, the only issue for the Court is whether Cali has established that there is a probability that it will prevail on its claims. *See* Cal. Code Civ. Proc. § 425.16(b)(1). For Cali to establish such, it will have to show that it has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment.

For purposes of the motion, the Court may assume that Cali's claims as pled are legally sufficient. The problem for Cali is that it has not made out a prima facie factual showing in support of its case.

The Court acknowledges that Cali has provided evidence showing that the product seized by CBP was not in any counterfeit packaging – *i.e.*, packaging using the Fitbit mark. *See* Kelvin Decl. ¶ 11 & Ex. 2 (photographs). But Fitbit is not simply claiming that counterfeit packaging was a problem. It has also argued that counterfeit chargers and accessories were sold as accompanying product, *see, e.g.*, Docket No. 29 (Supp. Millar Decl. ¶¶ 15-16, 18-19) (stating that products purchased through the Groupon website were shipped in counterfeit Fitbit packaging, and

12

with counterfeit charging cables and dongles *falsely bearing Fitbit marks*) (emphasis added), and the photographs provided by Cali do not establish that the chargers and accessories (as opposed to the packaging) did not bear any Fitbit trademark. Thus, Cali has failed to present a prima facie factual showing on its libel claim.

Thus, with respect to Fitbit's act of contacting CBP, the Court grants the motions to strike Cali's libel and related state counterclaims.

### c. Attorney's Fees

Because the Court is granting the motions to strike as to the Cali Defendants' libel and related counterclaims, the Court must address the issue of attorney's fees. Under the anti-SLAPP statute, "[a] prevailing defendant on a special motion to strike *shall* be entitled to recover his or her attorney's fees and costs." *Id.* § 425.16(c)(1) (emphasis added). Fitbit represents that it spent approximately $29,000 in fees and costs. *See* 1st Mot. at 19 (claiming that "the current lodestar through filing of the Motion is $16,623.50"); Reply at 2 (updating fees and cost request to $25,900); 2d Mot. at 19 (asserting that, for the second motion to strike, an additional $3,100 in fees were incurred). While there is no evidence that Fitbit did not incur $29,000 in fees, the Court cannot, based on the current record, evaluate whether the fees and costs incurred by Fitbit are *reasonable*.[3] The Alinder declarations, for example, provide no breakdown of hours spent and hourly rates. Moreover, the Court takes note that Fitbit cannot charge all of the fees incurred with respect to the pending motions to Cali. The motions encompass not just motions to strike under the anti-SLAPP statute but also motions to dismiss.[4] Also, unlike the L2 Defendants, Cali did not

---

[3] Even though the statute does not use the term "reasonable" in conjunction with a defendant's fee request (as opposed to a plaintiff's fee request), courts have construed the statute to include a reasonableness requirement. *See Robertson v. Rodriguez*, 36 Cal. App. 4th 347, 361 (1995) (noting that, "[i]f section 425.16 were interpreted to prevent a trial court from awarding attorney fees to a prevailing defendant in an amount the court deems reasonable and simply requires the trial court to award the amount requested, the statute would mandate the court to make what might be an unreasonable award [and] [w]e cannot ascribe such an intention to the Legislature"; adding that, "if a trial court were bound by the amount of attorney fees sought by a prevailing defendant under section 425.16 and had no discretion to award a lesser amount, the potential for abuse would be extraordinary").

[4] As noted below, there is overlap between the anti-SLAPP statute and the California litigation privilege and the Noerr-Pennington doctrine. Nevertheless, the motions to dismiss under the California litigation privilege and the Noerr-Pennington doctrine do involve some distinct issues

13

dispute that Fitbit's acts constituted protected activity under the anti-SLAPP statute.

Taking into account the totality of the circumstances, the Court concludes that a $10,000 fee award is appropriate. This figure represents roughly one-third of Fitbit's requested fee award. Awarding Fitbit one-third of its requested fee award is reasonable given that Fitbit's motion was not purely a motion to strike under the anti-SLAPP statute and that the most legally complex issue was one raised by the L2 Defendants, not Cali. Moreover, assuming an hourly rate of $750, the $10,000 award compensates Fitbit for approximately 13 hours of attorney time, which is a fair assessment of how much time should have been spent on Fitbit's motion to strike vis-à-vis Cali's counterclaims.

### 2. California's Litigation Privilege

Fitbit argues that, even if the Court does not grant its motions to strike based on the anti-SLAPP statute, the libel and related state claims should be dismissed pursuant to the California litigation privilege. *See* Cal. Civ. Code § 47(b) (providing that "[a] privileged publication or broadcast is one made . . . [i]n any (1) legislative proceeding, (2) judicial proceeding, [or] (3) in any other official proceeding authorized by law").

Because the Court found in Fitbit's favor on the first part of the anti-SLAPP analysis above – *i.e.*, that Fitbit's act of writing to Group and its act of contacting CBP were both in furtherance of its right to petition – Fitbit prevails on the litigation privilege as well. *See* note 2, supra.

In its opposition brief, Cali suggests that the litigation privilege is not viable because a party must have "a good faith belief in a legally viable claim." *Blanchard v. DirecTV*, 123 Cal. App. 4th 903, 919 (2004) (stating that, if a "statement is made with a good faith belief in a legally viable claim and in serious contemplation of litigation, then the statement is sufficiently connected to litigation and will be protected by the litigation privilege"). But Cali fails to point to anything suggesting that Fitbit's acts of writing to Groupon and contacting CBP were not in good faith with respect to a legally viable claim. In fact, the Court notes that it has considered Fitbit's likelihood of success on the merits in conjunction with its motions for temporary and preliminary injunctive

---

(*e.g.*, good faith belief in a legally viable claim, no sham litigation). Moreover, the motions to dismiss were also directed to affirmative defenses.

14

relief as well as both the L2 and Cali Defendants' motions to dismiss.

Accordingly, the Court grants Fitbit's motions to dismiss the libel and related state claims (asserted by both the L2 Defendants and Cali) on the basis of California's litigation privilege.[5]

### 3. Noerr-Pennington Doctrine

The scope of the Noerr-Pennington doctrine is similar to the California litigation privilege (and the first part of the anti-SLAPP statute). That is the doctrine provides that "a defendant is immune from liability for claims based on its exercise of its First Amendment right to petition the government for redress of grievances." *Adobe Sys. v. Coffee Cup Partners, Inc.*, No. C 11-2243 CW, 2012 U.S. Dist. LEXIS 127602, at *24 (N.D. Cal. Sep. 6, 2012); *see also Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 643-44 (9th Cir. 2009) (stating that "[t]he Noerr-Pennington doctrine derives from the Petition Clause of the First Amendment and provides that 'those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct'").

Given that the scope of the Noerr-Pennington doctrine is similar to that of the litigation privilege (and the first part of the anti-SLAPP statute), *see, e.g.*, *James R. Glidewell Dental Ceramics v. Keating Dental Arts, Inc.*, No. SACV 11-1309-DOC(ANx), 2013 U.S. Dist. LEXIS 24824, at *37 (C.D. Cal. Feb. 21, 2013) (noting that "both [the Noerr-Pennington doctrine and the litigation privilege] preclude liability for the act of filing a lawsuit"); *Rock River Communs., Inc. v. Universal Music Grp., Inc.*, 745 F.3d 343, 347 n.1 (9th Cir. 2014) (stating that "[t]he Noerr-Pennington doctrine . . . provides that litigation activity (including pre-litigation cease-and-desist letters) cannot form the basis of liability unless the litigation is a 'sham'"), the Court reaches the same result as above – *i.e.*, all libel and related claims (state and federal alike, whether asserted by the L2 Defendants or Cali) are dismissed.

The L2 Defendants' reliance on *Luxpro Corp. v. Apple Inc.*, No. C 10-03058, 2011 U.S. Dist. LEXIS 35008 (N.D. Cal. Mar. 24, 2011), is unavailing. In *Luxpro*, the plaintiff sued the defendant for, *inter alia*, intentional interference with prospective economic advantage and

---

[5] Although the Court already has stricken Cali's claims pursuant to the anti-SLAPP statutes, it renders this ruling to make clear that there is an independent basis to give Fitbit relief.

15

1 contractual relations.  The defendant argued that its alleged act of warning the plaintiff's
2 commercial partners about potential lawsuits that the defendant would bring if the partners
3 continued to sell the plaintiff's products was protected by the Noerr-Pennington doctrine.  The
4 court acknowledged the doctrine might immunize any threats and demands made by the defendant
5 to the commercial partners in pre-suit demand letters.  *See id.* at *18-19 (noting that "Luxpro
6 alleges facts that suggest that Apple's threats and demands made to Luxpro's commercial partners
7 may include pre-suit demand letters").  However, it went on to note that the plaintiff had also
8 made allegations that the defendant "generally threatened [the plaintiff's] commercial partners to
9 stop doing business with [the plaintiff] *without* suggesting the possibility of a lawsuit or
10 mentioning the enforcement of any intellectual property rights." *Id.* at *19.  Because these threats
11 were not connected to a contemplated lawsuit, the court declined to apply Noerr-Pennington
12 immunity.  In the instant case, the L2 Defendants have not made any real argument that Fitbit was
13 not in good faith contemplating a lawsuit based on the scrap product being sold in the
14 marketplace.  Thus, *Luxpro* is not on point.

15 Cali (but not the L2 Defendants) protests that the Noerr-Pennington doctrine still should
16 not apply because there is an exception to that doctrine – *i.e.*, the "sham" exception.  But Cali's
17 position that Fitbit's actions are a sham is meritless.

18 "A 'sham' exception to the [Noerr-Pennington] doctrine developed to prevent the
19 immunization of conduct that used 'governmental process . . . as an anticompetitive weapon.'"
20 *Kearney*, 590 F.3d at 644.  "Sham litigation is . . . private action that is not genuinely aimed at
21 procuring favorable government action as opposed to a valid effort to influence government
22 action." *Innovative Health Sols., Inc. v. DyAnsys, Inc.*, No. 14-cv-5207-SI, 2015 U.S. Dist. LEXIS
23 65431, at *26 (N.D. Cal. May 19, 2015) (citing *Prof. Real Estate Investors, Inc. v. Columbia Pics.
24 Indus.*, 508 U.S. 49, 58 (1993)).  For a lawsuit to be deemed sham, it must be objectively baseless,
25 and the party's subjective motivation in filing suit is to interfere with the business relationships of
26 the opposing party through the use of the governmental process (as opposed to the outcome of that
27 process) as an anticompetitive weapon.  *See id.*

28 In the instant case, Cali's contention that Fitbit's act of writing to Group and act of

16

contacting CBP was a sham, designed simply to interfere with its business relationships, is problematic. The Court's prior analysis of issues in conjunction with the motions for temporary and preliminary injunctive relief and to dismiss establish that Fitbit's acts are not objectively basis. Moreover, it is also worth noting that, for the sham litigation exception, "[t]he Ninth Circuit has established a heightened pleading requirement . . . because '[w]hen a [party] seeks damages . . . for conduct which is prima facie protected by the First Amendment, the danger that the mere pendency of the action will chill the exercise of First Amendment rights requires more specific allegations than would otherwise be required.'" *Adobe*, 2012 U.S. Dist. LEXIS 127602, at *26 (citing *Kearney*, 590 F.3d at 647). No such showing of sham has been pled.

B. <u>Declaratory Judgment Claims</u>

For the declaratory judgment counterclaims asserted by the L2 Defendants and Cali, Fitbit argues for dismissal because they are duplicative – *i.e.*, "mere mirror images of Fitbit's trademark and dilution claims." Mot. at 20. The problem for Fitbit is that the Court has discretion here and there is no apparent prejudice to Fitbit if the Court were to keep the claims in the case. Indeed, there may well be a reason to keep the claims in the case – *e.g.*, a declaration of no misconduct might help protect the defendants' reputations and/or goodwill. Also, if Fitbit were to drop any part of its affirmative claims, the defendants would still be able to press forward with the request for a declaration that they did not act improperly.

The Court thus denies the motions to dismiss the declaratory judgment claims.

C. <u>Affirmative Defenses</u>

In addition to challenging the L2 Defendants and Cali's counterclaims, Fitbit also asks for relief with respect to certain affirmative defenses asserted in the L2 Defendants and Cali Defendants' answers.

1. <u>Cali Defendants</u>

For the Cali Defendants' original answer, Fitbit argued that the first affirmative defense – failure to state a claim for relief – is not an affirmative defense as a matter of law (*i.e.*, not a defense for which the defendants bear the burden of proof) and therefore should be dismissed or stricken. *See* Cali Ans. ¶ 154. For the remaining affirmative defenses (*i.e.*, all affirmative

17

defenses other than that related to the first sale doctrine, *see* Cal. Ans. ¶ 156), Fitbit maintained that they should be dismissed or stricken because they are "mere boilerplate and conclusory allegations without any factual support whatsoever." Mot. at 21; *see also* Cal. Ans. ¶¶ 155, 157-58 (asserting the following affirmative defenses: (1) laches, equitable estoppel, waiver/acquiescence, or unclean hands; (2) nominative fair use; and (3) good faith purchaser for fair value).

In their opposition, the Cali Defendants stated that they were willing to drop the first affirmative defense (for failure to state a claim for relief) as long as they would not be barred from raising it later. For the remaining affirmative defenses, the Cali Defendants stated that they were willing to amend to provide more specificity for unclean hands. The Cali Defendants did not indicate whether they also wanted leave to amend the affirmative defenses of nominative fair use and good faith purchaser for fair value.

After filings their opposition to the motion, the Cali Defendants filed an amended answer and counterclaims, with the amendment targeted to fixing the affirmative defenses.[6] In the amended pleading, the Cali Defendants dropped the affirmative defense of failure to state a claim for relief. They also amended the defense for laches, equitable estoppel, waiver/acquiescence, or unclean hands so that it now includes the following allegation: "(a) Plaintiff's delay in raising its claims against Defendants was excessive, and it caused evidentiary and economic prejudice to Defendants, (b) Plaintiff sold the accused products, and (c) Plaintiff engaged in duplicity in attempting to reclaim rights to control the reuse of the accused products after their first sale by Plaintiff." Cali Am. Ans. ¶ 154. The Court finds the Cali Defendants' amendment adequate and therefore denies Fitbit relief. The Court notes that, although the Cali Defendants did not make any new allegations in support of the defenses of nominative fair use and good faith purchaser for fair value, it is a reasonable inference that these defenses are based on the same factual allegation as above.

---

[6] In its second motion to dismiss, Fitbit argued that the Cali Defendants improperly amended without seeking leave of the Court but this is largely a technical argument given the liberality of Federal Rule of Civil Procedure 15.

18

Accordingly, the Court denies Fitbit's second motion to strike certain affirmative defenses. The first motion to strike with regard to the affirmative defenses is moot.

2. L2 Defendants

For the L2 Defendants' answer, Fitbit challenges the first, eighth, and tenth affirmative defenses. The first affirmative defense is failure to state a claim for relief; as above, Fitbit argues that this is not a true affirmative defense as a matter of law. The eighth affirmative defense is that Fitbit has sustained no loss or damages as a result of the L2 Defendants' conduct. Here, Fitbit also argues that this is not a true affirmative defense as a matter of law. Finally, the tenth affirmative defense is laches, equitable estoppel, waiver, acquiescence, and/or unclean hands. The L2 Defendants allege as follows:

> At a minimum, Fitbit wrote to L2 in November 2015 and raised certain intellectual property issues. L2 worked in consultation with Fitbit to address those issues to Fitbit's satisfaction, and L2 relied on Fitbit's actions and statements. Fitbit also waived its rights and acquiesced to resale by resellers when it parted with its goods and failed to police them.

L2 Ans., Affirm. Def. ¶ 10. According to Fitbit, the tenth affirmative defense is a problem because there are no facts to support the unclean hands portion.

With respect to the first and eighth affirmative defenses, although they are not "true" affirmative defenses (*i.e.*, Fitbit has the burden of proving the elements of its claims), the Court shall not strike them as they are still viable defenses that the L2 Defendants could raise in the future. As for the tenth affirmative defense, it is enough to support some kind of theory unclean hands. To the extent the L2 Defendants have given additional breadth to the defense in their opposition brief, *see* L2 Opp'n at 17 (referring to "Fitbit's lackadaisical supervision of its so-called 'reverse supply chain'" and arguing that if Fitbit had taken "simple steps" it could have prevented the scrap product from entering the market), they may amend the affirmative defense to include such allegations.

Accordingly, the Court denies the motion to strike the L2 Defendants' affirmative defenses. The Court, however, also gives the L2 Defendants leave to amend their tenth affirmative defense consistent with the above.

19

## III. CONCLUSION

For the foregoing reasons, the Court rules as follows.

1. The motion to strike the L2 Defendants' libel and related state claims under the anti-SLAPP statute is denied. However, the L2 Defendants' libel and related claims (both state and federal) are dismissed under the California litigation privilege or the Noerr-Pennington doctrine.

2. The motions to strike Cali's libel and related state claims under the anti-SLAPP statute are granted. Fitbit is awarded $10,000 in fees. In addition, Cali's libel and related claims (both state and federal) are dismissed under the California litigation privilege or the Noerr-Pennington doctrine.

3. The motions to dismiss the declaratory judgment claims are denied.

4. The second motion to strike the Cali Defendants' affirmative defenses is denied. The first motion to strike is moot.

5. The motion to strike the L2 Defendants' affirmative defenses is denied. The L2 Defendants also have leave to amend their tenth affirmative defense. Any amendment shall be filed within one week of the date of this order.

This order disposes of Docket Nos. 127 and 152.

**IT IS SO ORDERED**.

Dated: January 5, 2018

EDWARD M. CHEN
United States District Judge

20