**Pages 1 - 32**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

FITBIT, INC.,                     )
                                  )
          Plaintiff,              )
                                  )
  VS.                             )        **NO. C 17-00079 EMC**
                                  )
LAGUNA 2, LLC, et al.,            )
                                  )
          Defendant.              )
_____   )

                          San Francisco, California
                          Thursday, March 22, 2018

                **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff Fitbit, Incorporated:
                    Sideman & Bancroft LLP
                    One Embarcadero Center, 22nd Floor
                    San Francisco, California  94111
                    (415) 392-1960
                    (415) 392-0827 (fax)
               **BY:  ZACHARY J. ALINDER**

For Defendant P-Cove Enterprises, d/b/a Buyers Consultation
Service:
                    Brown White Osborn LLP
                    333 S. hope Street, 40th Floor
                    Los Angeles, CA  90071
                    (213) 613-0500
                    (213) 613-0550 (fax)
               **BY:  CALEB EDWARD MASON**

Reported By:  Lydia Zinn, CSR No. 9223, FCRR, Official Reporter

**APPEARANCES**:

For Defendant Laguna 2, LLC:
                    Mauriel Kapouytian Woods LLP
                    275 Battery Street, Suite 480
                    San Francisco, CA  94111
                    (415) 738-6334
                    (415) 738-2315 (fax)
              **BY:  JASON R. BARTLETT**

For Defendant Cali Resources, Inc. (via telephone):
                    O'Connor, Christensen & McLaughlin
                    Trial Division of The Eclipse Group LLP
                    1920 Main Street, Suite 150
                    Irvine, CA  92614
                    (949) 851-5000 x 103
                    (949) 851-5051 (fax)
              **BY:  EDWARD O'CONNOR**

**Thursday - March 22, 2018**                    **1:39 p.m.**

                    **P R O C E E D I N G S**

                          **---000---**

THE CLERK:  Calling Case C. 17-00079, Fitbit versus Laguna 2.  Counsel, please come to the podium.  Please state your name for the record.  And Mr. O'Connor please state your name for the record.

MR. O'CONNOR:  This is Edward O'Connor.  I'm --

THE COURT:  Go ahead, Mr. O'Connor.

MR. O'CONNOR:  Okay.  This is Edward O'Connor, on behalf of Cali.

THE COURT:  All right.  Thank you.

MR. ALINDER:  Good afternoon, your Honor. Zach Alinder, on behalf of plaintiff Fitbit, Inc.

THE COURT:  All right.  Thank you.

MR. MASON:  Good afternoon, Your Honor.  Caleb Mason on behalf of BCS, and all of the related BCS defendants, including Manhan and Baker.

THE COURT:  Thank you.

MR. BARTLETT:  And, Your Honor, Jason Bartlett, for Laguna 2.

THE COURT:  All right.  We are on today for the defendant Cali's motion for determination of good faith under 877 point -- or 877.

I do want to state at the outset that in the brief, there

is reference to settlement negotiations in a very specific ways between L2 and Fitbit, in the context of the settlement conference that was held.

**MR. BARTLETT:**  Yes, Your Honor.  We actually have reached settlement.  We've filed a statement yesterday informing Your Honor that we have reached a settlement.  And L2 has therefore withdrawn its opposition to this motion --

**THE COURT:**  Oh.

**MR. BARTLETT:**  -- consistent with that settlement.

**THE COURT:**  Okay.  I wish you would have told me that sooner, because I was going to say basically neither party, without consent, is supposed to disclose any content of any negotiations.  So that -- actually, unless there was consent, that's improper.  I'm not supposed to know anything about what was offered before.  In any event, that's, I guess, water under the bridge at this point.

Well, so if that is correct, then that leaves only BCS. Right?

**MR. MASON:**  That's right, Your Honor.  And if the Court was going to ask my opinion on the settlement, I don't have much to offer right now, except that we obviously would like to know what valuation the parties have put on the various elements of the settlement.  And I think this was the argument made quite eloquently by L2's counsel.  I'm sure we will get full discovery on that, though.

**THE COURT:** Okay. So I didn't see a formal objection or opposition from your client. Right?

**MR. MASON:** No, Your Honor. And we didn't file one.

**THE COURT:** Yeah.

**MR. MASON:** There was one already in place from L2.

**THE COURT:** Yeah, right.

**MR. MASON:** And as of, I guess, about five minutes ago, that's changed.

**THE COURT:** Right.

**MR. MASON:** So at this point I'm not prepared to, you know, take a position on it, except that I think in order to take a position on it, we would need to have some information about the valuation that the parties have put on the terms of the settlement. And for the same reasons that L2 articulated. I mean, we need to know what those were.

**THE COURT:** So does that suggest that there will be a further motion to approve now the new part of the settlement? Are you going to be seeking for a declaration of good faith? Is L2 going to be?

**MR. MASON:** Yes, Your Honor. I mean, I think at this point I just have to reserve right to do that. I'm not -- I don't have any information right now about what this settlement was. I mean, literally, I heard about it as I was sitting here, waiting for the Court to come out.

**THE COURT:** All right, but as to the Cali settlement,

you didn't file an opposition?

MR. MASON:  That is correct.

THE COURT:  So you're okay with that?

MR. MASON:  Yes.

THE COURT:  And now you want to await L2's settlement terms, assuming they're seeking any.  You may or may not seek an 877 determination.  I don't know.

MR. ALINDER:  I'm not aware that they're intending to seek --

MR. BARTLETT:  Right.  Your Honor, there was an indemnity issue which led to, I think, the Cali motion.

THE COURT:  Yeah.

MR. BARTLETT:  But L2 has no relationship with these guys.

THE COURT:  All right.  So maybe that they -- they're not seeking any, in which case you're not harmed; you're not prejudiced by any bar in terms of a contribution or whatever action.  Of course, you may or may not be able to claim an offset.  I guess that's another question.

MR. MASON:  That's right, Your Honor.  And literally counsel's statement is the first I've heard about anything to do with this settlement.  So I would just like some time to see what facts we can get, and see if we are going to have anything to discuss with the Court about that.

THE COURT:  Sure.

**MR. MASON:**  I would say that we have sought through -- and this is one of the topics for the second motion on calendar today.  We have sought to obtain information about the settlement; in particular, valuation of the settlement through discovery.

And we've not been successful.  We're at an impasse on that.  And that's something that we're going to have take up with the Magistrate Court.

**THE COURT:**  All right.  Well, let's deal with this first.  Technically, there's been one opposition or objection filed to the 877.6 motion.  That has now been officially withdrawn, in light of the settlement.  And so -- and there wasn't an opposition filed by the other defendant.

So I believe, without any opposition, that I don't think it is up to me to make some kind of *sua sponte* determination. I just have to find no opposition.  And therefore, the motion is granted with respect to the Cali settlement.  So --

**MR. O'CONNOR:**  Thank you, Your Honor.

**THE COURT:**  Okay.

**MR. O'CONNOR:**  This is Edward O'Connor.

I think you've probably seen the last of us, hopefully. And it's been a pleasure.

**THE COURT:**  All right.  Well, that may be the consequence.  I assume that is, because your settlement was contingent on an 877 approval.  And I'm giving that, in light

of what has developed here.

MR. O'CONNOR:  All right.

THE COURT:  Now, whether or not there's going to be a further motion with respect to the now recent L2 agreement -- that's up to the parties.  And it sounds like that may not happen.

So then that leaves -- and has that settlement been consummated or agreed to in principle?

MR. BARTLETT:  Yes, Your Honor.  I actually understand that L2, just a few moments ago, confirmed that it's performed its initial obligation under that settlement agreement.  So I think the parties will be submitting a stipulated -- stipulation for an order dismissing with prejudice within a few days.

THE COURT:  All right.  So there's a binding agreement.

MR. BARTLETT:  Yes, sir.

THE COURT:  It's been performed or signed; something along those lines.

MR. ALINDER:  Your Honor, I believe both as to Cali and L2, defendants will be working with both of them to get stipulated dismissals on -- within the next three to five days, max.

THE COURT:  All right.  All right.  Good.  Well, that cleans things up, which now leaves a question about:  What do

we do with respect to the remaining claim and the trial?

And tell me what it is that -- what is the outstanding discovery that needs to be completed, from your perspective?

**MR. MASON:**  Sure, Your Honor.

So we would like -- and we have completed, I believe, the initial briefing on this point for the Magistrate Court.

We have a number of 30(b)(6) topics that we need to take testimony on from Fitbit.  These include a 30(b)(6) witness with respect to internal evaluation of lost sales or any facts relating to lost sales; facts relating to reputational issues, such as customer reviews; and, probably most importantly, facts relating to the investigation and termination of the employee, Jennifer Windsor, who was the sole point of contact between Fitbit and BCS.  And, as the Court knows, she was fired following Fitbit's investigation into her job performance.

We noticed, met and conferred on, and took a 30(b)(6) deposition; but Fitbit has objected to testimony -- to providing a witness to provide testimony about these sales calculations, lost-sales calculations, reputational harms.

Also, about marketing, anything having to do with the introduction of new product, Fitbit's design cycle of planned obsolescence -- in other words, anything having to do with the factual basis for the allegation that there are multimillion-dollar harms associated with the existence of this secondary market for Fitbit products -- these are topics that

we very badly need to explore.  And we are faced right now with an impasse between the parties on the extent to which Fitbit is obligated to provide a 30(b)(6) witness on those topics.

And with respect to Jennifer Windsor, again, Fitbit did produce a witness, but the witness was instructed by counsel not to answer the majority of questions about the Jennifer Windsor termination; most prominently, *Why was Jennifer Windsor terminated?*  So that is something that we're going to have to resolve with the newly assigned Magistrate.

I believe that as we -- Mr. Alinder and I are here in court today.  Our colleagues are working out the final details of that 30(b)(6) letter, and we should be able to submit.

We also have similar analogous issues with respect to document production for the categories in which Fitbit has declined to produce a 30(b)(6) witness.  They've also objected to all document production.

And probably the overriding document-production issue has to do with the Rule 34 requirement that a party state whether it is withholding documents pursuant to an objection.  We have been going back and forth with Fitbit on that issue for the last two months since we began this discovery.  And we are trying to get Fitbit to state whether it is withholding documents pursuant to any objection.  It has not yet done so.  Again, we're going to be litigating that with the newly assigned Magistrate Judge.

And finally, Your Honor, if the Court has further questions, I'd be happy to elaborate.

THE COURT: Yeah.

MR. MASON: There are several employees that we learned very recently at the 30(b)(6) depo also left the employ of Fitbit. In other words, the three employees in the chain of authority on this particular set of transactions have all left Fitbit; that is Jennifer Windsor, her supervisor, and her supervisor. We need to track them down and take their depositions.

At this point, I think we are likely also going to have to take depositions from Cali and L2 parties, now that those settlements are finalized.

THE COURT: That discovery is with respect to the terms of settlement, or with respect to --

MR. MASON: Well, I mean particularly the valuation of whatever it was that was exchanged in the settlements.

And we have sent written discovery to both of those parties. I don't know what kind of responses we're going to get.

As the Court may be aware, the issue that was raised by L2 had to do, in part, with what value do parties place -- in particular, what value Fitbit places -- on $X$ number of refurbished Fitbit products.

Refurbished -- basically, it's sitting in a warehouse.

Say we have a hundred thousand of them.  We don't even know what value Fitbit places on that.  That's obviously a key fact for our damages analysis, for our damages experts, and for our defense at trial, and for summary judgment.  If the valuation of those products is set at zero in the settlement, that is a fact that we very much need to know.

And we're going to need to explore how Fitbit came out with whatever valuation it places on these particular refurbished products, because, as the Court knows, the gravamen of Fitbit's theory of damages is:  There was a secondary market out there, and that secondary market, according to Fitbit's 30(b)(6) witness, constituted a one-to-one displacement of new sales, so that -- this is their theory -- for every sale of the refurbished product, a sale of the new product was lost.

Obviously, we have some factual disputes with that and some economic theoretical disputes with that, but we need to know what facts support that particular claim.  What is Fitbit's factual basis for claiming that it lost sales?

And I, again, asked that question directly to the 30(b)(6) witness, and ran into an objection, and an instruction not the answer.

**THE COURT:**  So how does a settlement with other codefendants inform that question?

**MR. MASON:**  I believe that as part of the settlement, the parties placed an explicit dollar value on a warehouse full

of Fitbit refurbished products.

THE COURT:  Well, I'll likely hear comments, but it just seems to me that when you say "value" -- "value of the products," there's sort of intrinsic value; value in terms of its potential impact on the market if released versus not released.  You know, there may be different values.  Value of the scrap value of that?

I -- you know, so I don't know.  It's not clear to me how probative that is, and particularly in light of negotiated settlement.

If this were a straight licensing case, where you were trying to figure out, you know, *What's the value of this copyright license, or this patent*, it's a little more obvious.

This one strikes me as somewhat indirect.

Let me hear your comments.

MR. ALINDER:  I agree, Your Honor.  It's really neither here nor there as to our damages theories, or probative as to their claims or defenses.

What you just heard, though, I think, is interesting; which is Mr. Mason just told the Court what happened, which was he attempted to take expert discovery from our 30(b)(6) witness.  And that was exactly our problem when he issued this overbroad 30(b)(6) notice that sought all of our marketing; all of our expert testimony, essentially, on damages; all of our damages-theories calculations.  He literally pulled out a

calculation in the middle of the deposition with our 30(b)(6) witness and had, *Oh, well, if you calculated this way, is that how you would do the displacement theory?*

It's wildly improper for him do that with our witnesses. That's why we'll be in front of Judge Westmore, apparently, with respect to this 30(b)(6) testimony, because we can't be in a position where with, he's allowed to attempt to take expert discovery of our fact witnesses, where he's allowed to, you know, seek contention discovery from a 30(b)(6) witness. There's, like, case law on that.  It's pretty clear that that is just inappropriate for 30(b)(6) testimony.

THE COURT:  So what is the volume of discovery in dispute, let's say, from a documents perspective?  You know. What's the volume of documents here?  Do you have any sense?

MR. ALINDER:  That's --

THE COURT:  I mean, is this hundreds?  Thousands of documents?

MR. ALINDER:  From our perspective, that's hard to know for sure.  We've been trying to get documents from them. They, at the deposition I was taking yesterday in L.A., walked in with about 1,500 pages of new documents, and gave it to me at the deposition.  I haven't had a chance to --

THE COURT:  But the ones that he's seeking, in terms of trying to ascertain validation of lost sales and impact on reputation -- without disclosing what they are, I mean, are we

talking about -- how many documents are being -- are at issue here?

MR. ALINDER: Well, those -- to be honest, I don't know what he is talking about in terms of documents relating to lost sales. If there are specific ones, not only would we provide them. We want to provide them information with related to lost sales.

And, in fact, with a 30(b)(6) I told him, *If there are facts that relate to damages, those are on the table. No problem. You can ask underlying facts. You just can't ask methodology or other things that would relate to expert testimony.*

So I -- I totally -- you know, to the extent there are damages-related documents that underlie, you know, their potential defense, we will gladly provide them.

THE COURT: What is the date right now for disclosure of experts?

MR. ALINDER: April 12th, Your Honor.

THE COURT: April 12th. And at that point, you know, the --

All right. And how many experts are you all anticipating?

MR. MASON: Your Honor, I believe we each have a damages expert. And we will also likely have experts on environmental recycling standards in reference to consumer electronics.

**THE COURT:** So you'll have the reports and the bases at least to understand the general bases. And you are going to have some time to conduct expert depositions at that point.

Obviously, anything that is relied upon is going to have to be produced, I assume, which is leading me to the question of timing of all of that, because, number one, I'm not inclined to change your trial date, because we have -- you know, we're impacted. And it's not easy to just slip things back. *Oh, let's just move it back three months*. Well, there's a lot of stuff going on.

And I am inclined -- do you have -- so you have not submitted your joint letter to Judge Westmore yet?

**MR. ALINDER:** We have submitted a joint letter on our issue -- on our initial issues related to discovery.

**THE COURT:** Yeah.

**MR. ALINDER:** We are still finalizing the letter that he has referenced -- Mr. Mason has referenced.

**THE COURT:** All right. So let's say that gets resolved one way or another by the discovery Judge, let's say, 10 days after it's submitted. And let's say, you know, the discovery each of you seeks is granted for some reason -- or in large part. What -- realistically, how much time do you need to complete 30(b)(6), to get the documents --

Assuming the documents are then produced -- whoever is ordered to produce does so promptly -- how much time do you

need in order to complete nonexpert discovery?

             **MR. MASON:**  Your Honor, if we were to receive --

     And again, the "if" here is:  I don't know whether Fitbit has withheld documents on the basis of objections.

     For each of their responses to our RFPs, they have stated, *We're responding, you know, notwithstanding all these objections, and in light of these objections*; but they have not stated, as Rule 34 requires, whether they're withholding documents.  So I don't know.

     But assuming that we got the documents relating to just the Jennifer Windsor investigation and termination -- and the 30(b)(6) witness pegged that number somewhere between a hundred and a thousand, just in terms of his own communications about that particular investigation and termination.  He said he had not even looked in her H.R. file, or spoken to anyone at H.R., so I don't know how much is in there.

     But once we have that, we would have to have another deposition with an appropriate and prepared 30(b)(6) witness on that investigation and termination, and human-resources issues.

     We might need to schedule another deposition with Ms. Windsor.  And we would certainly need to have a deposition with either Mr. Milar (phonetic) as an individual -- he's the person who oversaw the investigation -- or other people who appear in the documents who would have pertinent knowledge.

     There have also been references to whether or not Fitbit

PROCEEDINGS

took steps to try to calculate or estimate their lost sales; whether they have any internal discussions memorializing whether they lost sales in any state to anyone.  If we were to find those and have discovery of those documents, I would need an appropriate 30(b)(6) witness on that topic.

And on the separate topic of marketing and new product innovation, that is introduction of new products to create a design sequence of planned obsolescence in order to drive the market for new products, which -- obviously, our theory of the case is that the secondary market actually expands the market for new products.  It does not displace, one to one.  There is a universe of documents and a universe of potential witnesses within Fitbit on that marketing strategy and that particular analysis of the effect that introduction of new product lines has on sales and market penetration with respect to a secondary market.

Again, we met and conferred on this already.  And I submitted detailed set of narrow and very specific topic areas for a 30(b)(6) witness, and have not gotten anything.  We're at a full impasse on this.  So my estimate would be at least a couple months.  That would be once I got the documents to be able to go through them, identify appropriate witnesses, schedule 30(b)(6) depos, and schedule depos with anybody who's, you know, in the chain of communications, but no longer works at Fitbit.

I have two such names already.  One is them is Andrea Abegg.  One of them is Patrick McGivern.  And that is A-b-e-g-g, and M-c-G-i-v-e-r-n.  Both of those were people who were directly responsible for these particular transactions that are at issue in this case.  Neither one of them works at Fitbit anymore.  Fitbit does not know where they are.

I can locate people fairly easily, but then contacting them, scheduling the deposition, and subpoenaing them, if necessary -- that takes time, especially given that there is a 30-day Standing Order if we're going to subpoena documents along with the deposition.

THE COURT:  All right.  Your response?

MR. ALINDER:  Yeah.  So just first as to the responses, I believe Mr. Mason is misstating what occurred here, because we actually served, consistent with his -- the meet-and-confer regarding these things, we served responses -- amended responses yesterday.  So he does know all of those things.

As to the witnesses, they've known about Ms. Abegg and they've to known about Mr. McGivern, and haven't done anything in order to try to get them as witnesses.  So the idea that they now need two months in order to do that is -- it's asking too much, frankly.

I think 30 days is more than enough time for them.  We still have -- what?  It's, like, two weeks left, essentially,

in the discovery period.  You know, if -- if the deadlines were to be pushed out 30 days, I think that should be plenty time for them to get --

THE COURT:  Depends how quickly the issue gets resolved by the Magistrate Judge, and how quick document production is pursuant to any Order that might be issued.

Is your client prepared, if your opponent prevails on getting an order to compel production, to move quickly?

MR. ALINDER:  Oh, absolutely, absolutely.  And I'm sure Mr. Mason agrees, too.  If -- if the Magistrate orders either of the us to provide further information, we will be more than happy to make that happen as quickly as possible.

THE COURT:  Betty, can I have the printout?

(Discussion off the record.)

THE COURT:  So our trial is scheduled for September.  Correct?

MR. ALINDER:  Correct, Your Honor.

THE COURT:  And we have a pretrial conference --

(Discussion off the record.)

THE CLERK:  I'm sorry.  The pretrial conference is scheduled for August 21st at 2:30.

THE COURT:  Now, what is anticipated in terms of a possible summary-judgment motion in this case?

MR. MASON:  We will be filing one for sure, Your Honor.

(Reporter requests clarification.)

MR. MASON:  "We will be filing one for sure, Your Honor," is what I said.

THE COURT:  And what's the basis?  What's going to be the basis of that?

MR. MASON:  We will be moving both on damages as to call claims.  We'll be moving on a contract claim.  And again, we have not -- we have not yet set out for Court, you know, the background of what we've learned in discovery so far, but I mean, there is contract in this case, and our client's adhered to it.  So --

THE COURT:  So that motion for summary judgment will not be dependent on this additional discovery regarding damages, and the reason for the determination of Ms. Windsor?

MR. MASON:  No, Your Honor.  I think it very much will, because we also believe that we can prove that Fitbit fired Ms. Windsor because they were unhappy with this -- with this written contract, this Statement of Work; a Statement of Work that expressly states that Fitbit -- that BCS is entitled to, quote, "repurpose" the product --

THE COURT:  How does that -- whether they are unhappy or not, even if they did fire her for that reason, how does that inform the actual interpretation of this contract?

MR. MASON:  Your Honor, I'm happy to go into a little more detail into what I think this discovery will show, if the

Court would like.

THE COURT:  Well, the reason why I'm asking is this. My inclination right here as we sit is:  I'm not going to change your trial date.

I will give some additional time for discovery.

The only rub comes in with respect to the need to resolve summary judgment motions, because there's got to be enough space in there.  I've got to get that done in enough time for you to meet and confer in advance of the pretrial conference. And if what you're telling me is, *That can't be brought until additional discovery's obtained*, if I believe that, that's one thing.

If I believe that that summary-judgment motion can't proceed on an independent track -- that is, it's not wedded to or contingent upon discovery -- then I can give you more time to complete discovery; more time to do your expert disclosures, while we're on a parallel track; not a sequential track.

MR. MASON:  I certainly like, in theory, the idea of a parallel track, Your Honor.

I am hesitant to commit to saying that our summary-judgment motion, even as to the contract issue, can be fully briefed without this additional discovery.

Certainly, as to the damages issue, we absolutely need additional discovery.  We need to know what the factual basis is for any possible claim analyzed by any expert as to lost

sales.  An expert can theorize on the relationship between a primary and secondary market, and certainly many experts have done that, but an expert needs to be able to opine based on --

THE COURT:  Well, you'll be able to bring dollar motions in conjunction with MILs, so that's how it's typically done.  So we don't need to fold that into a summary-judgment schedule.

MR. MASON:  That is correct.

THE COURT:  So I'm interested in the liability questions, and how that -- whether I can proceed.  If you have a liability defense, than, you know, let's hear it --

MR. MASON:  Yeah.

THE COURT:  -- but I want to make sure that, you know, that can be heard without prejudice.

MR. MASON:  Sure, Your Honor.  So there are essentially eight claims here.  The contract and the trademark and copyright claims that sound under trademark and copyright -- they were asserted against all defendants.

I think that Fitbit may decide in its wisdom to voluntarily dismiss them as to BCS, because, if the Court recalls, there are sort of three levels of transactions here.  And the final sales to the consuming public came from L2.  There's no allegation that BCS did anything, you know; had anything to do with that, or, as Counsel said, had any relationship with L2.

That's up to Fitbit.  If Fitbit does not dismiss those trademark- and copyright-related claims, then obviously we will have a summary-judgment motion as to those.

The claims that actually in the factual narrative in the Complaint make allegations about conduct by BCS and its employees and principals -- those claims are the copyright and fraud claims that allege misrepresentations by BCS employees, and allege that BCS violated its contract with Fitbit.  As to those claims, yes, we will have summary-judgment motion.

And again, with respect to the Court's question about the relevance of this additional discovery regarding Jennifer Windsor's termination, our defense on that liability issue as to all of the fraud claims is that we did not make any rep -- misrepresentations to Fitbit.  And we had a written contract that we sent to Fitbit that Fitbit forwarded up the chain, however it, you know, internally did that, and returned with some revisions which had nothing to do with the issues that they now claim we breached.  They made no proposed revisions to that portion of the Statement of Work, and Fitbit knew that, and Fitbit found out about that.  Fitbit was unhappy about it, and fired the employee who had negotiated and overseen this contract.

We believe that suing BCS after firing its own employee for, you know, setting up this contractual arrangement is fundamentally inappropriate.  And we believe that discovery

will show that there was -- there was a written contract; we did not violate it.  We did not make any misrepresentations.  And Fitbit knew that.

And all of that factual information is going to be found in the further 30(b)(6) testimony and document production with respect to Fitbit's termination of Jennifer Windsor.  I mean, this is what this case is fundamentally about.  They fired the employee who ran this relationship, and then they sued the counterparty, claiming that we had somehow duped the company; but if we had duped the company, why did they fire their own employee who ran the relationship?

THE COURT:  Well, I understand your arguments.  A lot of this sounds like a factual.  These are facts that might support your factual argument at trial.  I don't know if they're enough to make it to summary judgment.

What's your response about my question about parallel tracks or not?

MR. ALINDER:  Yeah.  Without responding to Mr. Mason, as, obviously, we have a serious disagreement about what the facts are and what they show, I think that they can proceed and should proceed on parallel tracks.

You know, to the extent -- and to the extent, you know, any time is needed for the summary judgment, it certainly isn't two months.  It certainly -- if Mr. Mason feels he needs to front load some part of it that relates to his summary-judgment

motion, we'll have a summary-judgment motion, as well.  I don't think more than a month change in that deadline would be necessary, because we can certainly front load the parts of the discovery that he believes is or that the parties believe are necessary to a summary judgment.

            **THE COURT:**  All right.  Right now, your discovery -- nonexpert discovery cutoff is April 12th.  If I extend it by almost a month and a half to May 24th, that still allows you to get the bulk of that discovery done, filed.

    If there is a motion for summary judgment that is sequential and not in parallel, you still file that in sort of late -- late May, have it heard sometime in June, which would still give me enough time, if I move back the pretrial conference a week -- therefore, your filings a week -- so you would have to file your pretrial statement in August, that at least gives me, you know, some time to digest the motion; rule on it; so that you have some time to then absorb that, and meet and confer.

    So I'm going to work out a specific schedule.  And it's compressed a bit; but it will give you until May 24th to complete nonexpert discovery.  The expert discovery can be moved back accordingly to jibe with that.  That, for sure, should not interfere with any summary-judgment motion, because if there are issues about expert testimony, that can be entertained in a *Daubert* motion as a motion *in limine* at

pretrial.

That puts a premium on getting the Judge Westmore -- getting that letter to her, so she can resolve that quickly. I'm going to communicate to her these new deadlines, and the need for as quick a resolution as possible, so that if there's going to be additional discovery, that takes place immediately and forthwith.

But you should not erase the September 17th trial date. That's on.

**MR. ALINDER:**  Thank you, Your Honor.

**THE COURT:**  And I'm going to compress it a little bit, partly at our expense; but we need to get this thing moving, because this case has now been pending for some time.

Let me ask -- I know you've all been through ADR and -- whether there's anything, any further process that could be helpful, in terms of any further ADR efforts between these two last parties.

**MR. MASON:**  Your Honor, I believe there could be. And I wanted to request the Court -- see if the Court thought about this.  And then if the Court would indulge me, I would like to make one more pitch for moving the trial date, if you wouldn't mind.  Not specifically ADR, but I'm wondering if the Court or Magistrate Judge Laporte entertains the prospect of informal discovery conferences or discovery resolution through sometimes, you know, phone conference, or in-person session.  A

lot of our Magistrate Judges in the Central District do that. I think that would be very helpful.  And that would certainly compress the time frame, rather than having to go through this formal process.

I mean, what concerns me right now is I don't even know what the dates are going to be for hearing, you know, each letter briefing sequentially.  So if that's an option --

THE COURT:  I think the process here is the letter brief is intended to inform the discovery Judge what the nature of the dispute is.  And then they have the option of getting on the phone; resolving it.

I mean, the whole idea is not to go through, if at all possible, the normal noticed motion period, because we did this exactly to shortcut.  And often, if it's clear on the papers, they may even sign it on the papers.  They may even do a phone conference, or they have you come in quickly, or have a discovery conference in the courthouse.  It's designed to have that flexibility, and to allow for an expeditious --

And I'm going to make that clear to Judge Westmore; that, you know, we need -- this is not a 35-day notice.  It will throw everything off if it's going to require a full noticed motion.  It needs to be resolved quickly.

MR. MASON:  Thank you, Your Honor.  I appreciate that.

I will discuss with Mr. Alinder the prospect of trying

additional ADR.  Maybe now that we have -- when we have met Judge Laporte and spoken with her, maybe that would be a way to go.  I don't know if that's going to work, but always worth talking about.

THE COURT:  All right.

MR. ALINDER:  Yeah.  We're happy, obviously, to discuss that further during the --

It was not -- there was no progress made between us at the prior one.

THE COURT:  And how long ago was that?  When did you all last have a settlement conference with Judge Laporte?

MR. ALINDER:  It was on January 12th.

MR. MASON:  January 12th, Your Honor.

And that brings me to, if I may, my pitch for why I think it would be in the interests of justice to move the trial date out a lot.  I understand that the case has been pending for a while, but not with my clients.  My clients were not a part of the original lawsuit.  They were not served until -- I believe it was August.  And then didn't file anything until September.  And at that point, there was a bar on discovery until January 12th.  So for us, if you look at the time between the beginning of discovery and the trial date, it actually is only, you know, January and September, which is, you know -- at least, in my experience, would be extraordinarily quick.

So even if we were to push the trial date out to December

or January, that would be a year for discovery through trial, which I think is certainly par for the course in most Districts, and would be appropriate for us.  I understand that the Court has indicated that it is not inclined to do that, but I'd like to make the argument.

          THE COURT:  All right.  Well, I understand.  I think you made that point, I think, in your papers.  And you were certainly new to the case; but by giving you now some extra time, and trying to get your existing disputes resolved as quickly as possible, I believe that there's an adequate amount of time to get this case moving.  So I'm going to issue the Order with new dates.  Some extension on the discovery, as I mentioned.

     I think I may let Judge Laporte know that the parties might be interested in -- if you want to go back to her, I'm sure the door will be open any time with respect to any ADR.

     And I'll let Judge Westmore know of the urgency of our schedule.

          MR. ALINDER:  Thank you, Your Honor.

          THE COURT:  I'll get out a new Scheduling Order that has some compression in there.  And, you know, obviously, I'm doing this with the idea that there may be a sequencing necessary; but to the extent that there's other discovery on which summary judgment does not depend, you certainly can extend my stipulation an extra week or two if you've got to get

in more depositions on some other stuff.  That doesn't affect the summary judgment, you know.  I'm not averse to doing that, either.  So --

MR. MASON:  Would the Court be inclined to put that in the Order?

THE COURT:  I'll put that in, as long as it doesn't basically alter the summary-judgment date.  I don't have any objection to that.

MR. MASON:  Thank you, Your Honor.

MR. ALINDER:  Thank you, Your Honor.

MR. MASON:  For my notes, is the Order going to specify a date certain for the filing of summary-judgment motions?

THE COURT:  Yes.  I will have the last day that summary-judgment motion be heard.  And, of course, you have a 35-day notice period.  So just count backwards five weeks.  All right?

MR. ALINDER:  Thank you, Your Honor.  Appreciate it.

THE COURT:  All right.  Now, if you are interested, I'll let Judge Laporte know.  And I would encourage the parties, especially as you get more discovery and you have more information.  Maybe it's worth the effort.  But I will let her know that the parties at least appear to be open to the possibility of further discussions, and that hopefully she could make herself available, should you want her auspices.

MR. ALINDER:  Great.  Thank you, Your Honor.

THE COURT:  Okay?

MR. MASON:  Thank you, Your Honor.

(At 2:19 p.m. the proceedings were adjourned.)

I certify that the foregoing is a correct transcript from the

record of proceedings in the above-entitled matter.

_Lydia Zinn_

_____  March 27, 2018
Signature of Court Reporter/Transcriber    Date
Lydia Zinn