1  BROWN WHITE & OSBORN LLP
   THOMAS M. BROWN (Bar No. 117449)
2  KENNETH P. WHITE (Bar No. 173993)
   CALEB E. MASON (Bar No. 246653)
3  MATTHEW G. WHITTEN (Bar No. 307410)
   333 South Hope Street, 40th Floor
4  Los Angeles, California 90071-1406
   Telephone:  213. 613.0500
5  Facsimile:   213.613.0550

6  Attorneys for Defendants
   P-COVE ENTERPRISES INC. dba
7  BUYERS CONSULTATION SERVICE,
   ENVIRONMENTAL LIQUIDATION, INC.,
8  JONATHAN MANHAN, and
   FRANCIS MICHAEL BAKER

9

10                  UNITED STATES DISTRICT COURT

11               NORTHERN DISTRICT OF CALIFORNIA

12

13  FITBIT, INC.,                          Case No.: 3:17-cv-00079-EMC-KAW

14              Plaintiff,                  Judge:   Hon. Edward M. Chen

15  v.                                     **DEFENDANTS' MOTION FOR
                                           SUMMARY JUDGMENT AND/OR
16  LAGUNA 2, LLC;                         PARTIAL SUMMARY JUDGMENT**
    P-COVE ENTERPRISES INC. dba
17  BUYERS CONSULTATION SERVICE,           **DECLARATIONS OF:
    a California Corporation;              MATTHEW WHITTEN,
18  ENVIRONMENTAL LIQUIDATION,             JONATHAN MANHAN,
    INC., a California Corporation;        MICHAEL BAKER,
19  JONATHAN MANHAN, an individual;        JOEL BLANK,
    FRANCIS MICHAEL BAKER aka              CARLOS KELVIN;**
20  MIKE BAKER, an individual.
    et al.,                                **PROPOSED ORDER.**
21
                                           Date:     June 28, 2018
22              Defendants.                Time:     1:30 p.m.
                                           Court:    Courtroom 5
23

24

25       PLEASE TAKE NOTICE that on June 28, 2018 at 1:30 p.m. or as soon

26  thereafter as the matter may be heard in the courtroom 5 of 450 Golden Gate Avenue,

27  San Francisco, California, Defendants P-Cove Enterprises Inc. dba Buyers

28  Consultation Service ("BCS"), Environmental Liquidation, Inc. ("ELI"), Jonathan

1    Manhan ("Manhan") and Francis Michael Baker ("Baker") (collectively

2    "Defendants") will and hereby do move the Court for summary judgment and/or

3    partial summary judgment in their favor and against Plaintiff, Fitbit, Inc. ("Fitbit" or

4    "Plaintiff").

5         This Motion is based upon the attached Memorandum of Points and

6    Authorities, the declarations of Matthew Whitten, Jonathan Manhan, Michael

7    Baker, Carlos Kelvin, and Joel Blank and the exhibits to same,[1] the files and records

8    of this case, and upon such further argument as the Court permits.

9     DATED:  May 24, 2018                BROWN WHITE & OSBORN LLP

10
                                          /s/ *Caleb E. Mason*
11                                   By _____

12                                        THOMAS M. BROWN
                                          KENNETH P. WHITE
13                                        CALEB E. MASON
                                          MATTHEW G. WHITTEN
14                                        Attorneys for Defendants
                                          P-COVE ENTERPRISES INC. dba
15                                        BUYERS CONSULTATION SERVICE,
                                                      et al.
16

17

18

19

20

21

22

23

24   [1] The parties met and conferred regarding the exhibits filed herewith, and Plaintiff
     withdrew all confidentiality designations it had previously made as to those exhibits.
25   The Declaration of Joel Blank has been filed provisionally under seal per L.R. 79-5,
     and was filed separately with Defendants' Administrative Motion to File Under Seal,
26   ECF No. 231.

27

28

1

## <u>TABLE OF CONTENTS</u>

2
Page

3 MEMORANDUM OF POINTS AND AUTHORITIES............................................ 1

4 I.      INTRODUCTION ................................................................................................. 1

5 II.     STATEMENT OF RELEVANT FACTS ........................................................... 4

6 III.    ARGUMENT......................................................................................................... 7

7
         A.      Summary Judgment Is Appropriate Where There Is No Genuine Issue
8                of Fact and Movant Is Entitled to Judgment as a Matter of Law............ 7

9        B.      Defendants Are Entitled to Summary Judgment on All Claims for
                 Relief ...................................................................................................... 7
10
                 1.      Summary Judgment on Claim No. 1 Is Proper Because
11                       Defendants Did Not Infringe Fitbit's Trademarks ........................ 8

12               2.      Summary Judgment on Claim No. 2 Is Proper Because
13                       Defendants Did Not Dilute Fitbit's Trademarks......................... 10

14               3.      Summary Judgment on Claim No. 3 Is Proper Because
                         Defendants Did Not Engage in Unfair Competition .................. 11
15
                 4.      Summary Adjudication on Claim No. 4. Is Proper Because
16                       Defendants Did Not Breach the Contract ................................... 11

17               5.      Summary Judgment on Claim Nos. 5 and 6 Is Proper Because
                         Defendants Did Not Defraud Fitbit ............................................ 15
18
                 6.      Summary Judgment on Claim No. 7 Is Proper Because
19                       Defendants Did Not Conspire to Perform an Illegal Act ........... 21

20               7.      Summary Judgment on Claim No. 8 Is Proper Because
21                       Defendants Did Not Engage in Any Unfair Business
                         Practices ..................................................................................... 22

22 IV.    CONCLUSION ............................................................................................. 24
23

24

25

26

27

28

# TABLE OF AUTHORITIES

Page

**Cases**

*Acme Propane, Inc. v. Tenexco, Inc.*,
  844 F.2d 1317 (7th Cir. 1988)................................................................ 20

*AMF, Inc. v. Sleekcraft Boats*,
  599 F.2d 341 (9th Cir. 1979)................................................................. 8

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) .............................................................................. 7

*Apollo Capital Fund, LLC v. Roth Capital Partners, LLC*,
  158 Cal.App.4th 226 (2007) ............................................................... 16

*Applied Equip. Corp. v. Litton Saudi Arabi Limited*,
  7 Cal. 4th 503 (1994) .......................................................................... 22

*Beck Park Apts. v. United States Dept. of Housing*,
  695 F.2d 366 (9th Cir. 1982)............................................................... 14

*Berryman v. Merit Property Mgm't*,
  152 Cal.App.4th 1544 (2007) ....................................................... 21, 23

*Brookfield Comm., Inc. v. West Coast Enter. Corp.*,
  174 F.3d 1036 (9th Cir.1999).............................................................. 11

*California Service Station Assn v. American Home Assurance Co.*,
  62 Cal.App.4th 1166 (1998) ............................................................... 21

*Century 21 Real Estate Corp. v. Sandlin*,
  846 F.2d 1175 (9th Cir. 1988)............................................................. 10

*Chapman v. Skype Inc.*,
  220 Cal.App.4th 217 (2013) ............................................................... 15

*Colgman v. Leatherman Tool Group*, Inc.,
  135 Cal.App.4th 663 (2006) ............................................................... 24

*Darburn Enterprises, Inc. v. San Francisco Comm. Hospital*,
  239 Cal.App.4th 399 (2015) ............................................................... 11

*Daugherty v. American Honda Motor Co., Inc*,
  144 Cal. App. 4th 824 (2006) ........................................................ 21, 23

*Davis v. HSBC Bank Nevada, NA*,
  691 F.3d 1152 (9th Cir. 2012).................................................. 16, 20, 23

*International Union of Bricklayers v. Martin Jaska, Inc.*,
  752 F.2d 1401 (9th Cir. 1985)............................................................. 14

*Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*,
  456 U.S. 844 (1982) .............................................................................. 9

# **TABLE OF AUTHORITIES**

Page

*Lazar v. Superior Court*,
   12 Cal.4th 631 (1996) ............................................................. 15

*Levine v.Blue Shield of California*,
   189 Cal.App.4th 1117 (2010) .................................. 20, 22, 23

*Lockheed Martin Corp. v. Network Solutions, Inc.*,
   194 F.3d 980 (9th Cir. 1999) ................................................. 10

*Marketing West, Inc. v. Sanyo Fisher (USA) Corp.*,
   6 Cal.App.4th 603 (1992) ....................................................... 16

*Mattel Inc. v. Walking Mountain Productions*,
   353 F.3d 792 (9th Cir. 2003) .................................................... 8

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
   567 U.S. 519 (2012) ................................................................ 18

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc*,
   210 F.3d 1099 (9th Cir. 2000) .................................................. 7

*Noll v. eBay Inc.*,
   2013 WL 2384250 (N.D. Cal., May 30, 2013, No. 5:11-CV-04585-EJD) ........... 20

*Northfolk Water Co. v. Medland*,
   187 F. 163 (9th Cir. 1911) ...................................................... 12

*Oregon Public Employees Retirement Fund v. Apollo Group Inc.*
   774 F.3d 598 (9th Cir. 2014) .................................................. 19

*Panavision Int'l, L.P. v. Toeppen*,
   141 F.3d 1316 (9th Cir. 1998) ................................................ 10

*People v. Beaumont Inv, Ltd.*,
   111 Cal.App.4th 102 (2003) ............................................. 21, 22

*Rearden LLC v. Rearden Commerce, Inc.*
   (9th Cir. 2012) 683 F.3d 1190 .................................................. 8

*Reno Air Racing Ass'n, Inc. v. McCord*,
   452 F.3d 1126 (9th Cir. 2006) .................................................. 9

*ScripsAmerica, Inc. v. Ironridge Global LLC*,
   119 F.Supp.3d 1213 (C.D. Cal. 2015) .................................... 20

*Shell Oil Co. v. Winterthur Swiss Ins. Co.*,
   12 Cal.App.4th 715 (1993) ..................................................... 13

*Spy Optic, Inc. v. Alibaba.Com, Inc.*,
   163 F.Supp.3d 755 (C.D. Cal. 2015) ...................................... 11

# TABLE OF AUTHORITIES

Page

*Surfvivor Media, Inc. v. Survivor Productions*,
    406 F.3d 625 (9th Cir. 2005).................................................................................... 8

*Tomek v. Apple, Inc.*,
    2012 WL 2857035 (E.D. Cal., July 11, 2012, No. 2:11-CV-02700-MCE)........... 20

*Waller v. Truck Ins. Exchange Inc.*,
    11 Cal.4th 1 (1995) ............................................................................................... 14

*Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*,
    433 F.3d 1199 (9th Cir. 2006)............................................................................... 10


**Statutes**

15 U.S.C. § 1114........................................................................................... 8, 10, 11

15 U.S.C. § 1125............................................................................................. 10, 11

18 U.S.C. § 2314.................................................................................................... 24

18 U.S.C. § 2315.................................................................................................... 24

Cal. Civ. Code § 1644............................................................................................ 14

Cal. Civ. Code § 1641............................................................................................ 23

Cal. Civ. Code § 1797.81....................................................................................... 13


**Other Authorities**

Bus. & Prof. Code § 17200..................................................................................... 22

Cal. Bus. Prof. Code § 17500 ................................................................................ 23

Fed. Trade Comm. Act, 15 U.S.C. § 45 ................................................................ 23


**Rules**

Fed.R.Civ.P. 56(c) ................................................................................................... 7

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

The plaintiff in this case, Fitbit, Inc. ("Fitbit") is a large technology company that sells health-tracking digital watches.  Defendants are a small recycling company, P-Cove, Inc., dba Buyers' Consultation Services ("BCS"), its owner, Jonathan Manhan ("Mr. Manhan"), and one of its employees, Mike Baker ("Mr. Baker") (collectively "Defendants" or "BCS Defendants").  BCS and Fitbit had a written agreement, the "Statement of Work," under which Fitbit shipped truckloads of returned and overstocked products to BCS, and BCS paid Fitbit for those shipments by weight and then processed the products for recycling in accordance with industry standards and best practices.  Fitbit is now suing the BCS Defendants for doing exactly what the Statement of Work provided that they could do: processing some of those products for refurbishment and resale.  The undisputed facts show that Fitbit's suit is meritless, and the BCS Defendants are entitled to judgment as a matter of law.

As Fitbit knew, BCS is an "R2-Certified" recycler.  In fact, Fitbit demanded that BCS provide its R2 certification.  The R2 Standards, which are the industry best-practices standards for electronics recycling, expressly require that electronics recyclers attempt to repurpose and reuse electronics capable of being refurbished if possible rather than recycling them.  Refurbishing and reusing products is always preferable to grinding them up; keeping functional items alive and in use is the highest environmental and recycling imperative.  That's what BCS did, as mandated by the very certification Fitbit demanded and as permitted by the Statement of Work with Fitbit.

All of Fitbit's claims in this case[2] arise from the undisputed fact that BCS, in

---

[2]  Fitbit alleges eight claims for relief in the Second Amended Complaint ("SAC"): federal trademark infringement, federal trademark dilution, federal unfair competition, breach of contract, intentional fraud, negligent misrepresentation, conspiracy to

1  carrying out its recycling activities in accordance with the R2 Standards and the

2  Statement of Work, sent Fitbit products to another "downstream" processor, Cali

3  Resources ("Cali").  Cali, another R2-certified recycler and a longtime collaborator of

4  BCS, was able to refurbish a portion of the products BCS sent it.  The products that

5  could not be refurbished were broken down for commodity recycling (as, e.g., rubber,

6  glass, or wire).  BCS and Cali had a longstanding agreement that they would split the

7  eventual proceeds from any products that Cali could refurbish.  The Fitbit products

8  were no different: Cali refurbished and repurposed the items that could be refurbished

9  and repurposed, and sold them to a distributor, Laguna 2, LLC ("L2"), which

10  marketed them for sale on Groupon as refurbished products.

11      The Statement of Work, which Fitbit admits memorializes its agreement with

12  BCS, *twice* states *expressly* that BCS will "repurpose at the product level" the

13  products Fitbit sends to BCS.  That is consistent with—indeed, required by—the R2

14  certification Fitbit demanded, which requires repurposing if at all possible.  The only

15  exception to that R2 Standard mandate is if a customer explicitly requests destruction

16  of a particular shipment.  Here, Fitbit made such a request as to two particular

17  shipments, and on both occasions, BCS destroyed the products.  Fitbit made no such

18  demand about the dozens of other shipments it sent BCS, and BCS acted in

19  accordance with the Statement of Work with Fitbit and with the very industry

20  standards for recycling Fitbit demanded.

21      A year and a half later, in January 2017, Fitbit falsely and recklessly accused L2

22  of trafficking in "stolen goods," and sued L2 (and its owner), Cali (and its owner), and

23  the BCS Defendants. ECF No. 1 (Original Complaint), No. 36 (First Amended

24  Complaint), No. 92 (Second Amended Complaint).  Fitbit decided to pretend the

25  Statement of Work did not exist.[3]  This entire case is based on Fitbit's deliberate

26

27  _____

defraud, and California unfair competition.

28  [3] Fitbit terminated the executive, Jennifer Windsor, who had overseen its reverse
logistics supply chain and approved the Statement of Work, and her two superiors,

obfuscation of the fact that it had a written agreement with BCS expressly permitting "repurposing at the product level."  Fitbit's complaint very conspicuously and disingenuously neither attaches nor quotes the provisions of the Statement of Work—because those terms eviscerate its claims.

Fitbit concedes the following crucial facts that demonstrate that the BCS Defendants are entitled to judgment as a matter of law:

- Fitbit *admits* that its relationship with BCS was governed by the written agreement between the parties, the Statement of Work;
- Fitbit *admits* that the Statement of Work expressly contemplates "repurposing at the product level";
- Fitbit *admits* that it reviewed the Statement of Work internally, through four levels of internal review; and
- Fitbit admits that it sent the Statement of Work back to BCS with edits (that BCS accepted) that made no changes to the provisions stating that BCS would "repurpose at the product level" the products Fitbit sent.
- Fitbit admits that it demanded that BCS certify its compliance with R2 Standards.

All of Fitbit's claims founder on the same reef: the parties had a written agreement and BCS held up its end of that agreement. BCS did precisely what the Statement of Work expressly stated BCS could do.  Accordingly, there is no breach of contract, and no misrepresentations.  Further, Fitbit has presented no evidence whatsoever of any falsehood in any statement made by any Defendant.  As a matter of law, BCS had no duty to tell Fitbit that it would do what the contract explicitly permitted it to do.

Fitbit hoped to bully a small recycling company into a quick settlement.  It

_____

Andrea Abegg and Patrick McGivern, also left the company at about the same time (early 2017).

failed.  Discovery inexorably revealed facts establishing that Fitbit has no viable claim against Defendants.  Accordingly, Defendants respectfully request that the Court enter summary judgment for Defendants and against Fitbit as to all claims.

## II.

## STATEMENT OF RELEVANT FACTS

The facts relevant to this motion are straightforward.  Fitbit makes wearable digital health products.  Second Am. Compl., ECF No. 92, ¶ 4.  BCS is a recycler. Declaration of Matthew Whitten ("Whitten Decl.") Ex. B, 23:9-15.  In the spring of 2015, Fitbit engaged BCS to recycle its returned products and retail overstock. Whitten Dec., Ex. D, 47:7-11 (Deposition of Jennifer Windsor); Declaration of Francis Michael Baker ("Baker Decl."), ¶ 2.  Fitbit had recently hired a "Director of Reverse Logistics," Jennifer Windsor ("Ms. Windsor") to organize Fitbit's "reverse logistics" supply chain– the products that had been returned to Fitbit.  Whitten Decl., Ex. D, 29:14-30:4.  Ms. Windsor, BCS's President Mr. Manhan, and BCS's Vice President Mr. Baker had all been in the recycling business for decades, and Ms. Windsor knew Mr. Baker from prior recycling transactions.  Whitten Dec., Ex. D, 47:16-24.  She contacted Mr. Baker and asked if his company, BCS, would be interested in a recycling arrangement with Fitbit to process Fitbit returns and overstock—products that had been returned to retailers by customers, or that retailers had been unable to sell.  Whitten Dec., Ex. D, 43:12-21; Baker Decl., ¶ 2.  Ms. Windsor told Mr. Baker that Fitbit was accumulating large numbers of such products in warehouse and she had been hired to find an environmentally responsible way of processing them.  Baker Dec., ¶ 2.

On May 29, 2015, after consulting with Mr. Manhan, Mr. Baker sent Ms. Windsor a Statement of Work to govern the parties' relationship. Whitten Dec., Ex. E, 149:9-150:3 (Deposition of Francis Michael Baker), Whitten Dec., Ex. J (Email from Kyle Regal to Jennifer Windsor dated May 29, 2015).  Ms. Windsor also asked that Mr. Baker provide documentation that BCS was "R2-certified."  Whitten Dec., Ex. D,

50:15-23; Baker Dec., ¶ 5.  An R2 certification attests that the holder abides by the R2 Standards, which are the electronics recycling industry's leading standards for best practices.  Baker Dec, ¶ 5.  The R2 Standards specifically require refurbishment and resale of electronics when possible: they provide that a recycler "shall take all practical steps to direct tested equipment and components to reuse and resale, and to direct equipment capable of repair to qualified refurbishers, unless a customer directs otherwise."  Whitten Dec., Ex. K, (R2 Standard for Electronics Recyclers) sec. 2(a)(1).  Mr. Baker sent Ms. Windsor BCS's R2 certification as requested.  Whitten Decl., Ex. I (Email from Mike Baker to Jennifer Windsor dated March 12, 2015); Whitten Dec., Ex. D, 44:3-45:21; Baker Decl., ¶ 6.

Fitbit sent one "pilot load" of products in May 2015, prior to receiving the Statement of Work, and thereafter began sending regular shipments until approximately October 2016.  Declaration of Jonathan Manhan ("Manhan Decl."), ¶ 2.  When BCS sent her the Statement of Work, Ms. Windsor sent it for review to her supervisor, Andrea Abegg, and loaded it into a Fitbit corporate server.  Four Fitbit executives reviewed the Statement of Work: Jennifer Windsor, Fitbit's Director of Reverse Logistics; Andrea Abegg, Director of Logistics; Patrick McGivern, Vice-President for Operations; and Eric Lintell, Associate General Counsel-Corporate. Whitten Decl., Ex. A (Deposition of Fitbit's 30(b)(6) representative Brett Millar), 101:8-20; Whitten Decl., Ex. C (Deposition of Brett Millar), 78:2-7.  Fitbit's reviewing executives then requested two changes to the Statement of Work: changes regarding the location of facilities, and the time period of the agreement.  Whitten Decl., Ex. H (Email from Mike Baker to Jennifer Windsor dated December 4, 2015); Whitten Decl., Ex. D, 120:6-122:14.  Ms. Windsor sent the revised Statement of Work back to BCS on November 7, 2015, and BCS agreed to and adopted Fitbit's edits. Whitten Decl., Ex. H.  Fitbit did not request any other changes.  Whitten Decl., Ex. A, 129:12-130:21.  No one from Fitbit ever requested that BCS make any changes to the Statement of Work language regarding "repurposing at the product level." Whitten

Decl., Ex. A, 129:12-130:21.

It is undisputed that the Statement of Work is the only agreement between BCS and Fitbit. Whitten Decl., Ex. A, 162:3-163:13. The Statement of Work stated that the services BCS would provide "will include the recycling and repurposing of the items received from Fitbit," and that BCS would "repurpose" those items "at the product or commodity level." Whitten Decl., Ex. G (Statement of Work dated November 7, 2015) Preamble, ¶ 6. The Statement of Work also provides that BCS would split the "net proceeds" with Fitbit, with a split of 30% for BCS and 70% for Fitbit. Whitten Decl., Ex. G, ¶ 5. BCS relied on the Statement of Work throughout its relationship with Fitbit. Manhan Decl., ¶ 3.

On two occasions, Fitbit specifically requested that BCS destroy, and certify that it had destroyed, particular loads of Fitbit products. Whitten Decl., Ex. B, 204:8-12; Manhan Decl., ¶ 4. On both of those occasions, BCS destroyed the loads of products and informed Fitbit that it had done so. Whitten Decl., Ex. L (Deposition of BCS' 30(b)(6) representative Jonathan Manhan), 269:8-20; Manhan Decl. ¶ 5.

BCS shipped the Fitbit products to one of its regular "downstream" vendors, Cali Resources, LLC ("Cali"), according to its long-time recycling practices. Manhan Decl., ¶ 5. Cali is also an R2-certified recycler and had collaborated with BCS on multiple recycling projects. Cali processed the products and evaluated them for potential refurbishment, as required by the R2 Standard. Declaration of Carlos Kelvin ("Kelvin Decl."), ¶¶ 2-3. Cali and BCS had a long-standing agreement that they would split the profits on any materials BCS sent Cali that Cali was able to refurbish and resell, after deducting associated costs. Manhan Decl., ¶ 6. The majority of the Fitbit products BCS sent Cali were not suitable for refurbishment, and Cali processed those products for recycling at the commodity level (i.e. rubber, glass, gold, wire). Kelvin Decl., ¶ 6. Cali refurbished those that could be refurbished. Kelvin Decl., ¶ 3. Cali then sold those refurbished products to L2. Declaration of Joel Blank ("Blank Decl."), ¶ 2. L2, in turn, sold the products to the public on Groupon.com.

Supplemental Decl. of Brett Millar, ECF No. 29, ¶ 13. Cali made a provisional payment to BCS, subject to final accounting of Cali's costs.  Whitten Decl., Ex. L, 56:13-21, Manhan Decl., ¶ 7.  BCS will owe Cali a refund in the amount of Cali's costs when that accounting is completed; it is not yet completed.  Kelvin Decl., ¶ 5.

Before this lawsuit, Cali did not tell BCS that it was selling refurbished Fitbit products to L2.  Kelvin Decl., ¶ 4.  Nor did Cali tell L2 that the Fitbit products it was selling came from BCS.  Manhan Decl., ¶ 8., Kelvin Decl., ¶ 4., Blank Decl., ¶ 2. BCS and L2 had no relationship and had never interacted or done business with one another; each learned of the other's existence only through this lawsuit.  Manhan Decl., ¶ 8; Blank Decl., ¶ 2.  BCS did not know, prior to this lawsuit, what Cali did with the Fitbit products BCS shipped to Cali. Manhan Decl., ¶ 8.

## III.

## ARGUMENT

**A.**    **Summary Judgment Is Appropriate Where There Is No Genuine Issue of Fact and Movant Is Entitled to Judgment as a Matter of Law**

Courts must grant summary judgment where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  A party may move for, and the Court may grant, summary judgment on an entire complaint or partial summary judgment on specific claims for relief.  *Id.*  The moving party has the burden of demonstrating the absence of a genuine issue of fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  To carry that burden, the moving party "must either produce evidence negating an essential element of the nonmoving party's claim . . . or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc*, 210 F.3d 1099, 1102 (9th Cir. 2000).  "If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary

judgment." *Id*. at 1103

**B.    Defendants Are Entitled to Summary Judgment on All Claims for Relief**

As to each of the Fitbit's claims, as set forth herein, the evidence shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

**1.    Summary Judgment on Claim No. 1 Is Proper Because Defendants Did Not Infringe Fitbit's Trademarks**

Fitbit's First Claim for Relief is for Federal Trademark Infringement in violation of 15 U.S.C. § 1114. The undisputed facts show that the BCS Defendants did not use Fitbit's trademarks in commerce nor induce another to infringe Fitbit's trademarks. The BCS Defendants are entitled to judgment as a matter of law, and this Court should grant it.

To prove trademark infringement Fitbit must prove "(1) that it has a protectible ownership interest in the mark; and (2) that the defendant's use of the mark is likely to cause consumer confusion." *Rearden LLC v. Rearden Commerce, Inc.* (9th Cir. 2012) 683 F.3d 1190, 1202. The Ninth Circuit uses an eight-factor test to assess the likelihood of confusion of allegedly infringing trademark usage. *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-349 (9th Cir. 1979) (abrogated on other grounds in *Mattel Inc. v. Walking Mountain Productions*, 353 F.3d 792, 810, fn. 19 (9th Cir. 2003) (setting out the relevant factors on which likelihood of consumer confusion will be assessed).  Those factors are the strength of the mark at issue, the proximity of the goods, the similarity of the marks, the evidence of actual confusion, the marketing channels used, the type of goods and degree of care likely to be exercised by the purchaser, the defendant's intent in selecting the mark, and the likelihood of expansion of the product line. *Id.* at 348-49. In determining likelihood of confusion, a court need not consider all of the *Sleekcraft* factors.  *Surfvivor Media, Inc. v. Survivor Productions*, 406 F.3d 625, 631-34 (9th Cir. 2005) (the *Sleekcraft* test is not rigid, and that not every factor need be considered in determining a likelihood of confusion).

Fitbit does not allege that the BCS Defendants *themselves* used any of Fitbit's trademarks or sold them to the public. Rather, they complain that the BCS Defendants shipped scrap Fitbit products to Defendant Cali Resources, Inc. ("Cali") for resale. Second Am. Compl., ¶ 60. It's undisputed that Cali then sold those products to third party distributors, who in turn sold them to retailers.  Blank Decl. at ¶ 2, Supplemental Decl. of Brett Millar, ECF No. 29 at ¶ 13. Fitbit has not provided and cannot provide any evidence that Defendants *themselves* used Fitbit's trademarks in connection with these shipments. Nor can Fitbit show that Cali, which received the products from BCS Defendants, was confused as to their sponsorship. "The core element of trademark infringement is whether customers are likely to be confused about the source or sponsorship of the products."  *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1135-36 (9th Cir. 2006). Cali was BCS's downstream vendor (Manhan Decl. at ¶ 5), and Fitbit cannot show that Cali was likely to be confused. This defeats any claim of direct trademark infringement.

Nor can Fitbit prove indirect trademark infringement. Indirect trademark infringement requires proof that a defendant intentionally induced another party to infringe a trademark or continued to supply product to another party knowing the other party was infringing a trademark. *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 853-54 (1982). BCS did neither. BCS had an agreement with Cali that BCS would send Fitbit products to Cali and Cali would split the profits of any sale Cali made to third parties with BCS. Kelvin Decl. at ¶ 3. BCS didn't induce or tell Cali to use Fitbit's trademarks in any way.  BCS therefore did not induce Cali to infringe any trademark.

Moreover, BCS did not learn of what Cali did with the Fitbit products until *after* BCS had completed all transfers of Fitbit products to Cali. Manhan Decl. at ¶ 8; Kelvin Decl. at ¶ 4.  The BCS Defendants had no direct relationship with Defendants Laguna 2, LLC or Joel Blank, who eventually sold the Fitbit products to retailers who put them in the stream of commerce to the public.  Kelvin Decl. at ¶ 4; Blank Decl. at ¶ 2.  The BCS

Defendants did not know that Cali had sold to Laguna 2, LLC or Blank until after the sales ended. Manhan Decl. at ¶ 8. Accordingly, the BCS Defendants could not have continued to sell products to an infringer knowing they were infringing. *Inwood Laboratories, Inc.,* 456 U.S. at 853-54.

Finally, Fitbit cannot prove trademark infringement because Fitbit's contract with BCS allowed BCS to repurpose the Fitbit products – that is, to refurbish and resell them. As is discussed in full in Section III.B.4, below, the operative contract– the Statement of Work– expressly gave BCS the right to repurpose the products. A claim of trademark infringement requires plaintiff to demonstrate that defendant acted without the plaintiff's consent. *Century 21 Real Estate Corp. v. Sandlin,* 846 F.2d 1175, 1178 (9th Cir. 1988); 15 U.S.C. § 1114(a)(1). Fitbit cannot demonstrate that because the undisputed facts demonstrate it *did* give consent to BCS repurposing the products. Based on these undisputed facts, BCS is entitled to judgment on Fitbit's First Claim for Relief of trademark infringement.

### 2. Summary Judgment on Claim No. 2 Is Proper Because Defendants Did Not Dilute Fitbit's Trademarks

Fitbit's Second Claim for Relief is for federal trademark dilution in violation of 15 U.S.C. § 1125. Fitbit cannot produce evidence showing that its trademarks have been diluted, through blurring or tarnishing, as a result of Defendants' actions. Summary judgement on this claim is therefore proper.

In order to prove a violation of the Federal Trademark Dilution Act, a Fitbit must show that (1) the mark is famous; (2) the defendant is making a commercial use of the mark in commerce; (3) the defendant's use began after the mark became famous; and (4) the defendant's use of the mark dilutes the quality of the mark by diminishing the capacity of the mark to identify and distinguish goods and services. *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1324 (9th Cir. 1998), holding modified by *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199 (9th Cir. 2006) (articulating the test for trademark dilution under 15 U.S.C. § 1125(c)).

Like indirect infringement, contributory dilution requires Fitbit to demonstrate that BCS induced someone to dilute Fitbit's trademark or continued to supply Fitbit's product to a third party knowing that the third party was diluting the trademark. *Lockheed Martin Corp. v. Network Solutions, Inc.,* 194 F.3d 980, 986 (9th Cir. 1999). For the same reasons set forth above, Fitbit cannot establish that fact:  BCS only sent Fitbit's products to Cali, didn't know what Cali did with them until after the fact, and didn't have any relationship with the companies that bought the products from Cali. Manhan Decl. at ¶ 8; Blank Decl. at ¶ 2. The BCS Defendants are therefore entitled to judgment on this claim.

### 3.      Summary Judgment on Claim No. 3 Is Proper Because Defendants Did Not Engage in Unfair Competition

Fitbit's Third Claim for Relief is for Federal Unfair Competition in violation of 15 U.S.C. § 1125.  Fitbit's unfair competition claim necessarily fails with its trademark infringement and dilution claims.

"[T]he tests for infringement of a federally registered mark under § 32(1), 15 U.S.C. § 1114(1), infringement of a common law trademark, unfair competition under § 43(a), 15 U.S.C. § 1125(a), and common law unfair competition involving trademarks are the same."  *Spy Optic, Inc. v. Alibaba.Com, Inc.*, 163 F.Supp.3d 755, 768 (C.D. Cal. 2015); *Brookfield Comm., Inc. v. West Coast Enter. Corp*., 174 F.3d 1036, 1046 n. 6, 1047 n. 8 (9th Cir.1999) (showing identical elements).  Therefore, Fitbit can no more prove unfair competition under Section 1125 than it can prove infringement or dilution, as discussed in detail above.  The BCS Defendants are entitled to judgment on this claim as well.

### 4.      Summary Adjudication on Claim No. 4 Is Proper Because Defendants Did Not Breach the Contract

Fitbit's Fourth Claim for Relief is for Breach of Contract.  The terms of the relevant contract – the Statement of Work—are undisputed, and undisputed evidence demonstrates that BCS did not breach them.  Defendants are therefore entitled to

summary adjudication as to this claim.

A claim for breach of contract requires (1) a contract; (2) plaintiff's performance or excuse from performance; (3) defendant's breach; and (4) damage to the plaintiff therefrom. *Darburn Enterprises, Inc. v. San Francisco Comm. Hospital*, 239 Cal.App.4th 399, 409 (2015). Fitbit cannot satisfy these elements under the undisputed facts.

Fitbit's theory is that BCS breached its contract by permitting resale and refurbishment of some Fitbit products. Second Am. Compl., ECF No. 92, ¶ 129. But the contract *permits* those activities. There is no dispute that the operative contract between the parties is the Statement of Work. Fitbit expressly admits that the Statement of Work is the operative agreement. Whitten Decl., Ex. A, 162:3-163:13. The provisions of the Statement of Work expressly permit BCS to do what Fitbit complains it did. The preamble to the Statement of Work provides that BCS' s "services will include the recycling and repurposing of the items received from Fitbit." Whitten Decl., Ex. G at p.2. The preamble delineates what activities BCS can undertake. *See Northfolk Water Co. v. Medland*, 187 F. 163, 170 (9th Cir. 1911) ("[t]he contract in its preamble expressly recites the purpose and object of it"). Moreover, Section 6 of the Statement of Work unmistakably describes BCS's obligations in straightforward language:

> BCS hereby certifies that all product contained in loads will be either recycled down to the commodity level ***or repurposed at the product or component level*** (meaning that product would be recycled down to plastic, metal, wire, cardboard, or other commodity level component).

Whitten Decl., Ex. G at ¶ 6 (emphasis added).

The Statement of Work sets forth, not once but *twice,* that BCS can and will repurpose products Fitbit provides. "Repurposing" clearly includes refurbishing and reselling. This is the plain meaning for several reasons. First, in the course of negotiating the Statement of Work, Fitbit demanded that BCS certify its compliance with R2 Standards in the recycling industry, which expressly require refurbishment

and resale as a first preferred form of recycling.  Whitten Decl., Ex. K at 2(a)(1). Fitbit admits that it demanded compliance with R2 Standards. Whitten Dec., Ex. D, 50:15-23; Baker Dec., ¶ 5. Second, it's uncontested that, on two occasions, Fitbit specifically demanded that BCS destroy particular shipments. Manhan Decl. at ¶ 4.  It simply follows that there would be no need to do so if the Statement of Work required the destruction of *all shipments*.

During his Rule 30(b)(6) deposition, a Fitbit executive asserted that "repurpose" means reducing a product down to constituent parts and recycling those parts. Whitten Decl., Ex. A, 156:6-157:7. That makes no sense for several reasons. First, the Statement of Work repeatedly uses the terms "recycling" and "repurposing" *separately*, not interchangeably. Whitten Decl., Ex. G at 2 ("recycling and repurposing"), ¶ 6 ("either recycled down to the commodity level or repurposed at the product or component level"). Well-settled principles of contract interpretation require that courts "give effect to every part, if reasonably practicable, each clause helping to interpret the other." Cal. Civ. Code, § 1641. In so doing, "the way we define words should not produce redundancy, but instead should give each word significance." *Shell Oil Co. v. Winterthur Swiss Ins. Co.*, 12 Cal.App.4th 715, 753 (1993).

Moreover, the Statement of Work expressly distinguishes between repurposing at the *product* level and repurposing at the *component* level.  The Fitbit executive expressly admitted that repurposing at the *product* level is different from repurposing at the component level, because the "product level" refers to "the entire product," as opposed to the "component level," which refers to the component parts.  The Fitbit executive expressly admitted that these two types of repurposing are different, and that the Statement of Work permits *both*. Whitten Decl., Ex. A, 155:16-158:24.  The Statement of Work defines repurposing *at the component level* as follows: "product would be recycled down to plastic, metal, wire, cardboard, or other commodity level components)." Whitten Decl., Ex. G at ¶ 6. That definition, thus, as a matter of law and logic, cannot also apply to the separate term "repurpose at the *product* level."  If

13

so, the term "product" would be surplusage – a redundancy.  Because "product" and "component" have different meanings—as Fitbit's designated 30(b)(6) witness expressly admitted—the only interpretation that gives each word and phrase effect is the plain reading – the passage allows BCS to recycle everything, to repurpose products (meaning refurbish and resell), or repurpose components (meaning render products down to constituent components and refurbish and resell those). Fitbit's Rule 30(b)(6) witness *conceded* that the terms "products" and "components" have distinct meanings in the Statement of Work.  Whitten Decl., Ex. A, 155:16-158:24.

This issue – the contractual interpretation of "repurpose" in the Statement of Work – is an issue of law for the Court, suitable for resolution on summary judgment. Resolving the meaning of the contract, including the terms "repurpose" and "repurpose at the product level," is a question of law for the Court.  *Beck Park Apts. v. United States Dept. of Housing*, 695 F.2d 366, 369 (9th Cir. 1982) (court determines the meaning of a contract, including resolving issues regarding potential ambiguity). In making that determination, the Court must first look to the language of the contract to determine its plain meaning.  *Waller v. Truck Ins. Exchange Inc.*, 11 Cal.4th 1, 18 (1995) (citing Cal. Civ. Code § 1644 for the proposition that the language of a contract is to be given its ordinary meaning). This Court can and should grant summary judgment based on contractual interpretation even if one party purports to disagree with a term's plain meaning.  *International Union of Bricklayers v. Martin Jaska, Inc.*, 752 F.2d 1401, 1406 (9th Cir. 1985) (a contract is not ambiguous simply because the parties disagree as to its meaning).  This Court is the judge of the meaning of the language in the contract, and this Court should hold that the Statement of Work is clear: BCS would repurpose Fitbit products at the product level, and "repurpose at the product level" means one and only one thing: refurbish for resale.

Fitbit claims that BCS breached the contract by permitting Fitbit products to be refurbished and resold and by sending Fitbit products downstream to Cali for processing, including processing for refurbishment and resale. Second Am. Compl.,

ECF No. 92, ¶ 129. But given that the Statement of Work expressly allowed BCS to repurpose Fitbit products at the product level, the undisputed evidence shows that Fitbit did not breach the Statement of Work by doing so. Fitbit has not offered evidence of any other breaches.  Fitbit's breach of contract claim complains, in effect, that BCS did precisely what the Statement of Work says it would do. The undisputed facts therefore demonstrate that BCS did not breach the contract.  BCS is therefore entitled to judgment as a matter of law, and the Court should grant summary adjudication of this claim.

> **5.    Summary Judgment on Claim Nos. 5 and 6 Is Proper Because Defendants Did Not Defraud Fitbit**

Fitbit makes two fraud-based claims against the BCS Defendants: its Fifth Claim, for "Intentional Fraud, Concealment, and Fraud in the Inducement" and its Sixth Claim, for Negligent Misrepresentation.  Second Am. Compl., ECF No. 92 at ¶¶ 131-141.  Fitbit's claims are based on its meritless arguments that (1) the BCS Defendants affirmatively misrepresented that they would destroy all of the materials Fitbit provided to them, and (2) that the BCS Defendants concealed and failed to disclose that they would resell some Fitbit materials to downstream vendors who would repurpose and resell them.  The BCS Defendants are entitled to summary adjudication of these claims.

The undisputed facts show that the operative agreement, which Fitbit reviewed and accepted, expressly represented that BCS would "repurpose at the product level" some of the Fitbit items.  Moreover, the undisputed facts show that BCS was only obligated to, and only agreed to, destroy those Fitbit items that Fitbit specifically asked BCS to destroy—and that BCS did so when Fitbit made those specific requests. There was no false statement, no material omission, and no reliance on either.

As Fitbit styles its fraud claim, the undisputed facts show that it cannot prove the necessary elements.  Fitbit's intentional fraud and fraud in the inducement theories both require Fitbit to prove "(1) a misrepresentation, (2) knowledge of falsity, (3)

intent to induce reliance, (4) actual and justifiable reliance, and (5) resulting damage." *Chapman v. Skype Inc.*, 220 Cal.App.4th 217, 230-31 (2013); *Lazar v. Superior Court*, 12 Cal.4th 631, 638 (1996). Fitbit's fraudulent concealment theory requires that "(1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage." *Davis v. HSBC Bank Nevada, NA*, 691 F.3d 1152, 1162-63 (9th Cir. 2012), quoting *Marketing West, Inc. v. Sanyo Fisher (USA) Corp.*, 6 Cal.App.4th 603 (1992). Fitbit's negligent misrepresentation theory requires it to prove "(1) the misrepresentation of a past or existing material fact, (2) without reasonable ground for believing it to be true, (3) with intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance on the misrepresentation, and (5) resulting damage." *Apollo Capital Fund, LLC v. Roth Capital Partners, LLC*, 158 Cal.App.4th 226, 243 (2007). Fitbit fails to prove the requisite false statement, material omission, or justifiable reliance that all of these theories require.

Fitbit's entire fraud theory is premised on its allegation that BCS falsely told Fitbit that *all* of Fitbit's materials would be destroyed and *none* would be repurposed, and that BCS concealed from Fitbit the facts that BCS's downstream vendor, Cali Resources, refurbished some Fitbit devices and sold them another company, L2, for resale. In fact, undisputed evidence demonstrates that BCS represented to Fitbit from the outset of their relationship that ***some of Fitbit's materials would be recycled and some would be repurposed***. Fitbit admits that the Statement of Work memorializes Fitbit's agreement with BCS. Whitten Decl., Ex. A at 160:21-163:13. Fitbit admits that the Statement of Work is Fitbit's only agreement with BCS. Whitten Decl., Ex. A, 162:3-163:13. Fitbit further concedes that multiple Fitbit representatives reviewed

and approved the Statement of Work:  Jennifer Windsor, Fitbit's Director of Reverse Logistics; Patrick McGivern, Fitbit's Vice-President for Operations; and Eric Lintell, Fitbit's Associate General Counsel.  Whitten Decl., ¶ Ex. A, 101:8-20; Whitten Decl., Ex. C, 78:2-7.  Fitbit's reviewing officials then requested two changes to the Statement of Work —regarding the location of facilities, and the time period of the agreement—which BCS agreed to and adopted.  Whitten Decl., Ex. H.  They did not request any other changes.  Whitten Decl., Ex. A, 129:12-130:21.  At no time during Fitbit's four layers of internal review did anyone from Fitbit ever request any changes to the Statement of Work language regarding "repurposing at the product level."  Whitten Decl., Ex. A, 129:12-130:21.

That Statement of Work expressly disclosed to Fitbit that BCS would repurpose some of Fitbit's materials:

•   The preamble to the Statement of Work provides that BCS's "services will include the **recycling and repurposing** of the items received from Fitbit." (Whitten Decl., Ex. G, preamble) (emphasis added).

•   Paragraph 6, the Certificate of Work section, provides: "BCS hereby certifies that all product contained in loads will either be recycled down to the commodity level **or repurposed at the product or component level** (meaning that product would be recycled down to plastic, metal, wire, cardboard, or other commodity level components)."   (Whitten Decl., Ex. G at 6 ([emphasis added)].)

BCS also disclosed its plans to refurbish some of Fitbit's materials by providing Fitbit with its R2 certification documentation—documentation Fitbit required and requested.  Before BCS began performance, Fitbit requested that BCS provide its R2 certification.  Whitten Dec., Ex. D, 50:15-23; Baker Dec., ¶ 5.  Defendants did so.  Whitten Decl., Ex. I; Whitten Dec., Ex. D, 44:3-45:21; Baker Decl., ¶ 6.  The R2 certification assures compliance with the R2 Standard, the electronics recycling industry's leading best practices certification governing how recyclers should handle electronic waste.  Baker Decl. at ¶ 5.  R2 Standards specifically and explicitly requires

that electronics should not be destroyed and recycled if they can be refurbished for resale, and that R2-certified recyclers must process products for refurbishment and resale unless a client specifically directs otherwise.  Whitten Decl., Ex. K at ¶ 2.  Fitbit did make such specific requests on two occasions as to specific loads—and on each occasion BCS did destroy the products as requested.  Manhan Decl. at ¶ 4.  In other words, Fitbit specifically asked BCS to certify that it would follow a standard that required BCS to do exactly what BCS did.

Moreover, there is no evidence that BCS ever represented to Fitbit that BCS would, absent specific requests, destroy *all* of Fitbit's materials.  Fitbit has not cited, and cannot cite, any affirmative representation by BCS that BCS would destroy all Fitbit materials.  Fitbit cannot cite any such representation because BCS never made any such representation.  And the plain language of the Statement of Work in fact states the opposite.  BCS's only affirmative statements that it would destroy specific Fitbit materials came on the isolated occasions when Fitbit specifically instructed BCS to destroy particular shipments.  Manhan Decl. at ¶ 9.  It is undisputed that BCS did, in fact, destroy those particular shipments.  Manhan Decl. at ¶ 5; Kelvin Decl. at ¶ 3. These specific instructions also fatally undermine Fitbit's allegation that there was some inchoate and ethereal "understanding" (never reduced to writing anywhere, whether in the Statement of Work, or even an email) that BCS was going to destroy every single item Fitbit shipped it.  Fitbit has no answer to the question of why, if the agreement between Fitbit and BCS provided that BCS would destroy all Fitbit devices, Fitbit *specifically* requested destruction of these *specific* shipments on those *specific* occasions.  In fact, the answer is self-evident: Fitbit specifically requested destruction on two occasions because there was no general agreement to destroy products. The specific instruction demonstrates that there was no general agreement. *Cf*., *e.g*., *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 550 (2012) (the enumeration of a limited, specific power demonstrates the absence of a broader general power: "If the power to regulate the Armed Forces or the value of money

1   included the power to bring the subject of the regulation into existence, the specific

2   grant of such powers would have been unnecessary.")

3        There simply is no statement anywhere in the evidence in which Defendants

4   ever told Fitbit that all the products BCS was processing from Fitbit were being

5   destroyed.  The only statements in which BCS made reference to destroying Fitbit

6   products were statements in reference to *specific loads* Fitbit requested to be destroyed

7   (which BCS did destroy).  And the fact that Fitbit did give, on these three occasions,

8   *specific* instructions to destroy a *specific* load demonstrates that Fitbit did *not* believe

9   that destruction of *all* loads was required, contemplated, or occurring.  In sum, the

10  evidence demonstrates conclusively that BCS did not tell Fitbit that everything was

11  being destroyed, and Fitbit did not think that everything was being destroyed.

12  Because BCS never represented to Fitbit that it would destroy all Fitbit products,

13  Fitbit has no evidence of any affirmative misrepresentation—and Fitbit's own conduct

14  in requesting destruction of specific loads demonstrates that it did not believe there

15  was a general "destroy everything" agreement either.

16       Similarly, Fitbit has no viable claim of material omission either.  As a matter of

17  law, as set forth below, it is not a material omission to fail to say represent something

18  one has no duty to say represent in the first place.  Fitbit claims that the Settlement

19  Statements BCS sent Fitbit for each load of materials BCS received from Fitbit were

20  "misleading" because they did not expressly state that some portion of the materials

21  might later be refurbished.  That claim lacks all merit: BCS had no contractual or

22  industry-practices obligation to make such a representation in its Settlement

23  Statements, because the Statement of Work did not require BCS to make any such

24  representations; the Statement of Work only required BCS to report the volume and

25  composition of what Fitbit sent.  (Whitten Decl., Ex. G at ¶¶ 3, 5-6.)  BCS agreed to

26  pay Fitbit for shipments based on the volume and composition of the shipments, and it

27

28

is undisputed that BCS did so.[4]

Fitbit's fraud theories are all premised on the argument that BCS committed fraud by not telling Fitbit that BCS would do what the Statement of Work expressly allowed it to do.  Such theories are entirely specious.  It is well-established that a defendant does not commit fraud, as a matter of law, by omitting to state facts which the defendant had previously disclosed in writing to, or by omitting to disclose a fact the defendant had no duty to disclose.  For example, in *Oregon Public Employees Retirement Fund v. Apollo Group Inc.* 774 F.3d 598, 607 (9th Cir. 2014), the Ninth Circuit affirmed the dismissal of a securities fraud class action, finding that the plaintiffs could not establish fraud by omission when the record showed revealed that the defendants had disclosed in their written materials the facts allegedly omitted from subsequent communications: "[t]he Plaintiffs' omissions theory fails to state a claim because the Defendants clearly disclosed material information to investors."  Similarly, in *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1151, 1162-63, the Ninth Circuit rejected an argument a fraudulent concealment claim when where the plaintiff simply failed to read the written disclosures that set forth the fact at issue, and only read other portions of the documents.  "The only conclusion that reasonable minds may draw is that Davis's reliance on the purported misrepresentation was manifestly unreasonable."  *Id*. at 1164.  Many courts have applied this common-sense doctrine.  *See*, *e.g.*, *Acme Propane, Inc. v. Tenexco, Inc*. 844 F.2d 1317, 1322 (7th Cir. 1988) (seller's written disclosure of relevant information precluded buyers' securities fraud claim that they were misled about the information); *Tomek v. Apple, Inc*., 2012 WL 2857035, at *4 (E.D. Cal., July 11, 2012, No. 2:11-CV-02700-MCE) ("all of Plaintiff's complaints regarding Defendant's battery-related promises fail because

---

[4] Additionally, BCS *did not know*, at the time it prepared its Settlement Statements, whether any of the products in a given shipment might ultimately be processed for refurbishment and resale. What it did know, and disclosed in the Settlement Statements, was the volume and composition of what it received. This information was necessary to calculate what it owed Fitbit.

Defendant expressly disclosed that '[b]attery life and charge cycles vary by use and settings.'"); *Noll v. eBay Inc.*, 2013 WL 2384250, *4–5 (N.D. Cal., May 30, 2013, No. 5:11-CV-04585-EJD) ("Like the plaintiff in *Davis*, Plaintiffs here had access to the disclosure regarding recurring Insertion Fees, and simply failed to read it. The failure to read an important disclosure that was "within [Plaintiffs'] observation" is fatal to Plaintiffs' claims."); *ScripsAmerica, Inc. v. Ironridge Global LLC*, 119 F.Supp.3d 1213, 1243-–44 (C.D. Cal. 2015) (information disclosed in a stipulation, even if it was "convoluted and virtually unintelligible," could not form basis of omission claim for securities fraud purposes).

As a matter of law, it is not fraud to omit to say something one has no duty to say. *See, e.g., Levine v.Blue Shield of California*, 189 Cal.App.4th 1117, 1136 (2010) (where parties agreed on a certain price for insurance coverage, insurer had no duty to affirmatively inform buyer that it could have structured policy differently and obtained a lower price)[5]; *cf. Berryman v. Merit Property Mgm't*, 152 Cal.App.4th 1544, 1557 (2007) ("Absent a duty to disclose, the failure to do so does not support a claim under the fraudulent prong of the UCL."); *Daugherty v. American Honda Motor Co., Inc*, 144 Cal. App. 4th 824 (2006) (same).[6]

The undisputed facts therefore conclusively demonstrate that Fitbit cannot prove that the BCS Defendants made a false statement or omitted a material fact, or that Fitbit justifiably relied on any such alleged false statement or omission. These undisputed facts are fatal to Fitbit's fraud claims. The Court should grant summary adjudication in favor of Defendants on Fitbit's Fifth and Sixth claims for relief.

---

[5] *Cf., e.g., California Service Station Assn v. American Home Assurance Co.*, 62 Cal.App.4th 1166, 1173 (1998) ("There is no duty of ordinary care to disclose pricing information during arm's-length contract negotiations. If a purchaser wishes to go forward without final agreement on pricing structure, the purchaser takes the risk that the final negotiated price may be higher than expected.").

[6] It is noteworthy that the bar for showing "fraudulent conduct" under the UCL is *lower* than for common-law fraud. *Berryman*, 152 Cal.App.4th at 1556. So if conduct does not meet the test for UCL "fraudulent conduct," then ipso facto it does not meet the test for common-law fraud.

**6.      Summary Judgment on Claim No. 7 Is Proper Because Defendants Did Not Conspire to Perform an Illegal Act**

Fitbit's Fitbit's Seventh Claim for Relief is for Conspiracy to Defraud. Second Am. Compl., ¶ 143.  Because all of Fitbit's substantive claims fail, its conspiracy claim must fail as a matter of law.

To assert a claim for civil conspiracy, a plaintiff must allege "(1) formation of the conspiracy (an agreement to commit wrongful acts); (2) operation of the conspiracy (commission of the wrongful acts); and (3) damage resulting from operation of the conspiracy."  *People v. Beaumont Inv, Ltd*., 111 Cal.App.4th 102, 137 (2003).  In addition to the first three elements, a plaintiff must also demonstrate that the participant in the conspiracy knew that its conduct was wrongful. *Id.* Crucially, a conspiracy claim cannot survive on its own without a substantive claim:

> Standing alone a conspiracy does no harm and engenders not tort liability. It must be activated by the commission of an actual tort. A conspiracy, however atrocious does not give rise to a cause of action unless a civil wrong has been committed, resulting in damage…[t]herefore, it is the acts done and not the conspiracy to do them which should be regarded as the essence of the civil action.

*Applied Equip. Corp. v. Litton Saudi Arabi Limited*, 7 Cal. 4th 503, 511 (1994).

Fitbit's conspiracy claim falls with its substantive claims. As discussed above, the BCS Defendants are entitled to summary adjudication of each and every claim Fitbit asserts. The conspiracy claim cannot survive without them. That same discussion above establishes that the undisputed facts demonstrate that the BCS Defendants did not agree to do anything illegal, which defeats the conspiracy claim. *Beaumont Inv. Ltd*, 11 Cal.App.4th at 137.  Defendants are therefore entitled to judgment as a matter of law.

**7.      Summary Judgment on Claim No. 8 Is Proper Because Defendants Did Not Engage in Any Unfair Business Practices**

Fitbit's Eighth Claim for Relief is for Unfair Competition in violation of California Business & Professions Code §§ 17200 *et seq.*  This claim, like Fitbit's conspiracy claim, is derivative of Fitbit's substantive claims, and fails with them.

"In order to state a claim for a violation of the unfair competition law (Bus. & Prof. Code § 17200), a plaintiff must allege that the defendant committed a business act that is either fraudulent, unlawful, or unfair." *Levine v. Blue Shield of California*, 189 Cal.App.4th 1117, 1136 (2010). A party cannot prevail under the unfairness prong of Section 17200 ("UCL") when the party fails to sufficiently allege that the complained of conduct is tethered to "any underlying constitutional, statutory or regulatory provision, or that it threatens an incipient violation of an antitrust law, or violates the policy or spirit of an antitrust law." *Levine*, 189 Cal. App. 4th at 1137. Thus, when a parties' claim is insufficient as a matter of law under the underlying statue, the party cannot prevail based on the same statue and theory under the UCL.  *Id.*

As is discussed in full above, Fitbit's substantive statutory and tort claims all fail. Its UCL claims fail with them. Fitbit first claims that BCS' conduct was unlawful and unfair because BCS sold scrap products and "unlawfully diverted" these products from Fitbit's supply chain. Second Am. Compl., ECF No. 92 at ¶ 151. As is noted above, this claim – which is simply a rehash of Fitbit's breach of contract, fraud, and negligent misrepresentation claims—  fails because BCS was expressly permitted to "repurpose at the product level" Fitbit's products. Whitten Decl., Ex. G at ¶ 6.  As established above, the failure to affirmatively disclose actions that were expressly disclosed in and authorized by the Statement of Work is not fraud as a matter of law. *Davis,* 691 F.3d at 1164.  And the failure to make a statement one has no duty to make is not fraud, as a matter of law.  *See Levine,* 189 Cal. App.4th at 1121, 1136 (failure to disclose something that the defendant had no obligation to disclose was not a UCL violation); *Berryman v. Merit Property Mgm't*, 152 Cal.App.4th 1544, 1557 (2007) ("Absent a duty to disclose, the failure to do so does not support a claim under the fraudulent prong of the UCL."); *Daugherty  v. American Honda Motor Co.,* Inc 144 Cal.App.4th 824 (2006) (failure to disclose a fact that one has nor affirmative duty to disclose is not a fraudulent or "likely to deceive" under the UCL).

Finally, Fitbit asserts in conclusory fashion that BCS's conduct violated "numerous state and federal statutes" "including but not limited to" false advertising pursuant to Cal. Bus. Prof. Code § 17500, the Federal Trade Commission Act, 15 U.S.C. § 45 (which prohibits "[u]nfair methods of competition in or affecting <u>commerce</u> and unfair or deceptive acts or practices in or affecting <u>commerce</u>"), Cal. Civ. Code § 1797.81 which requires proper labeling of grey market goods, and 18 U.S.C. §§ 2314-15 (which prohibits *inter alia*, transporting, transmitting, or transferring merchandise known to be "stolen, converted, or taken by fraud" and receiving, possessing, concealing, selling, or disposing of merchandise knowing the merchandise to be "stolen, unlawfully converted, or taken). Second Am. Compl. ¶ 151. These claims are simply duplicative and conclusory descriptions of the same conduct, and fail for the same reasons set forth above: Fitbit negotiated for, and agreed to, a contract that let BCS do precisely what it did. Section 17500 prohibits "not only advertising which is false, but also advertising which[,] although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public." *Colgman v. Leatherman Tool Group*, Inc., 135 Cal.App.4th 663, 679 (2006). Fitbit has produced no evidence that BCS engaged in any advertising, let alone false advertising. Similarly, Fitbit cannot prove a violation of 15 USC § 45, prohibiting unfair methods of competition or deceptive acts or practices affecting commerce, fails because Fitbit explicitly agreed to the complained-of conduct in the Statement of Work. Fitbit's fanciful claim that BCS transported stolen, converted, or fraudulently taken merchandise in violation of 18 U.S.C. §§ 2314 and 2315 fails because the undisputed facts show that the Statement of Work allowed BCS to do what it did.

## IV.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that the Court grant summary judgment and/or partial summary judgment, in favor of Defendants, as to each and every claim for relief.

DATED:  May 24, 2018                     BROWN WHITE & OSBORN LLP

By  ___/s/ *Caleb E. Mason*_____

THOMAS M. BROWN
KENNETH P. WHITE
CALEB E. MASON
MATTHEW G. WHITTEN
Attorneys for Defendants
P-COVE ENTERPRISES INC. dba
BUYERS CONSULTATION SERVICE,
et al.

4815-0421-7957, v. 1