1  JEFFREY C. HALLAM (State Bar No. 161259)
   E-Mail:      *jhallam@sideman.com*
2  ZACHARY J. ALINDER (State Bar No. 209009)
   E-Mail:      *zalinder@sideman.com*
3  ELLEN P. LIU (State Bar No. 280459)
   E-Mail:      *eliu@sideman.com*
4  REBECCA K. FELSENTHAL (State Bar No. 303476)
   E-Mail:      *rfelsenthal@sideman.com*
5  SIDEMAN & BANCROFT LLP
   One Embarcadero Center, Twenty-Second Floor
6  San Francisco, California 94111-3711
   Telephone:      (415) 392-1960
7  Facsimile:      (415) 392-0827

8  Attorneys for Plaintiff
   FITBIT, INC.

9

10              **UNITED STATES DISTRICT COURT**

11             **NORTHERN DISTRICT OF CALIFORNIA**

12                **SAN FRANCISCO DIVISION**

13

14 FITBIT, INC.,                        Case No. 3:17-cv-00079 EMC (KAW)

15           Plaintiff,                 **[CORRECTED] PLAINTIFF FITBIT,
                                        INC.'S NOTICE OF MOTION AND
16      v.                              MOTION FOR PARTIAL SUMMARY
                                        JUDGMENT;**
17 LAGUNA 2, LLC, et al.,               **MEMORANDUM OF POINTS AND
                                        AUTHORITIES IN SUPPORT THEREOF**
18           Defendants.
                                        Judge:   Honorable Edward M. Chen
19                                      Date:    June 28, 2018
                                        Time:    1:30 p.m.
20                                      Crtrm.:  5

21

22

23

24

25

26

27

28

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1

## NOTICE OF MOTION AND MOTION

2 **TO ALL PARTIES AND TO THEIR COUNSEL OF RECORD:**

3      **PLEASE TAKE NOTICE THAT** on June 28, 2018 at 1:30 p.m., or as soon thereafter as

4 it may be heard, in the courtroom of the Honorable Edward M. Chen, located in the United States

5 District Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco,

6 CA 94102, Plaintiff Fitbit, Inc. ("Fitbit") will, and hereby does, move this Court for partial

7 summary judgment pursuant to Federal Rules of Civil Procedure Rule 56(a) on the First, Third,

8 Fourth, and Eighth Claims for Relief in Fitbit's Second Amended Complaint.

9      Fitbit seeks partial summary judgment on the ground that there is no genuine dispute as to

10 any material fact and Fitbit is entitled to judgment as a matter of law as to liability on the First,

11 Third, Fourth, and Eighth Claims for Relief in Fitbit's Second Amended Complaint against

12 Defendants P-Cove Enterprises Inc. dba Buyers Consultation Service ("BCS"), Environmental

13 Liquidation, Inc. ("ELI"), Jonathan Manhan ("Manhan"), and Francis Michael Baker aka Mike

14 Baker ("Baker") (collectively, "Defendants").  This Motion is based on this Notice of Motion and

15 Motion, the Memorandum in support below, the Declarations of Brett Millar, Zachary Alinder,

16 Jeff Bonham, Cali Resources, Inc. ("Cali"), Laguna 2, LLC ("L2"), and Groupon, Inc., all filed

17 concurrently herewith, the Expert Reports (or excerpts thereof) of Hal Poret, Greg Regan, and

18 Michael Easterbrook filed concurrently attached to the Alinder Decl., all of the pleadings, orders,

19 and docket entries in this proceeding, including any prior sworn declarations filed in this Action,

20 all matters of which the Court may take judicial notice, and any evidence presented to the Court

21 prior to its ruling.

22 DATED: May 30, 2018                    SIDEMAN & BANCROFT LLP

23                                        By: _____/s/ Zachary J. Alinder_____

24                                              Zachary J. Alinder
                                              Attorneys for FITBIT, INC.

25

26

27

28

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................................ 1

I.  INTRODUCTION ........................................................................................................................ 1

II.  STATEMENT OF ISSUES TO BE DECIDED .......................................................................... 2

III.  STATEMENT OF FACTS ......................................................................................................... 2

    A.  Relevant Background Regarding Fitbit ............................................................................ 2

    B.  Fitbit's Federally-Registered Trademarks ....................................................................... 3

    C.  Fitbit's Supply Chain And Related Quality Control Processes ........................................ 3

    D.  Defendants' Breach of Contract and Related Misrepresentations .................................... 4

    E.  Defendants' Conspiracy To Sell Infringing Products and Control of Same ..................... 7

    F.  The Execution of the Scheme and the Distribution of the Infringing Products ............... 8

    G.  Defendants' Concealment of Their Scheme ..................................................................... 9

    H.  Defendants' Scheme Unravels ....................................................................................... 10

    I.  Consumer Confusion Regarding These Scrap Products ................................................. 13

IV.  ARGUMENT ........................................................................................................................... 15

    A.  Standard on Summary Judgment ................................................................................... 15

    B.  The Court Should Grant Fitbit Summary Judgment On Its Breach of Contract Claim Against BCS ................................................................................... 15

    C.  Summary Judgment Is Warranted On Trademark and Unfair Competition .................. 16

        1.  Federal Trademark Counterfeiting and Infringement ................................. 16

            a.  Fitbit Has a Protectable Ownership Interest in its Trademarks ....... 17

            b.  Consumer Confusion Should Be Presumed Here .......................... 17

            c.  Fitbit Has Also Established High Likelihood of Confusion ........... 19

                (1)  Strength of the Fitbit Marks ............................................... 20

                (2)  Proximity of the Goods ..................................................... 20

                (3)  Similarity Between the Marks ............................................ 21

                (4)  Evidence of Actual Confusion ........................................... 21

LAW OFFICES

SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

(5)     Marketing Channels Used ................................................... 22

(6)     Type of Goods and Purchasers' Likely Degree of Care .................................................................................... 22

(7)     Defendants' Intent in Selecting the Mark ........................... 22

(8)     Likelihood of Expansion of the Product Lines.................. 23

2.     Federal Unfair Competition and California Unfair Competition ................ 23

3.     All Defendants Are Jointly and Severally Liable........................................ 23

V.     CONCLUSION ............................................................................................................. 24

LAW OFFICES

SIDEMAN & BANCROFT LLP

ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adobe Systems Inc. v. Blue Source Group, Inc.*,
    125 F. Supp. 3d 945 (N.D. Cal. 2015) ......................................................24

*AMF Inc. v. Sleekcraft Boats*,
    599 F.2d 341 (9th Cir. 1979)...............................................................19, 21, 23

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ...........................................................................15

*Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*,
    457 F.3d 1062 (9th Cir. 2006)..............................................................17

*Bambu Sales, Inc. v. Sultana Crackers, Inc.*,
    683 F. Supp. 899 (E.D.N.Y. 1988)........................................................24

*Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*,
    174 F.3d 1036 (9th Cir. 1999)..................................................17, 20, 21, 22

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ...........................................................................15

*Cleary v. News Corp.*,
    30 F.3d 1255 (9th Cir. 1994)................................................................23

*Comm. for Idaho's High Desert, Inc. v. Yost*,
    92 F.3d 814 (9th Cir. 1996)..................................................................24

*Congdon v. Uber Techs., Inc.*,
    291 F. Supp. 3d 1012 (N.D. Cal. 2018) .............................................15, 16

*Donsco, Inc. v. Casper Corp.*,
    587 F.2d 602 (3d Cir. 1978).................................................................24

*E. & J. Gallo Winery v. Gallo Cattle Co.*,
    967 F.2d 1280 (9th Cir. 1992)..............................................................20

*Eclipse Assoc., Ltd. v. Data Gen. Corp.*,
    894 F.2d 1114 (9th Cir. 1990)..............................................................20

*El Greco Leather Prods. Co, Inc.. v. Shoe World, Inc.*,
    806 F.2d 392 (2d Cir. 1986).................................................................18

*Entrepreneur Media, Inc. v. Smith*,
    279 F.3d 1135 (9th Cir. 2002)..............................................................21

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

*Fleischmann Distilling Corp. v. Maier Brewing Co.*,
 314 F.2d 149 (9th Cir. 1963)....................................................................................23

*Fonovisa, Inc. v. Cherry Auction, Inc.*,
 76 F.3d 259 (9th Cir. 1996)......................................................................................24

*GoTo.com, Inc. v. Walt Disney Co.*,
 202 F.3d 1199 (9th Cir. 2000)...........................................................................20, 22

*Hokto Kinoko Company v. Concord Farms, Inc.*,
 810 F. Supp. 2d 1013 (C.D. Cal. 2011).....................................................................18

*Intel Corp. v. Terabyte Int'l, Inc.*,
 6 F.3d 614 (9th Cir. 1993)........................................................................................19

*KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*,
 408 F.3d 596 (9th Cir. 2005)....................................................................................17

*Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*,
 658 F.3d 936 (9th Cir. 2011)....................................................................................18

*McIndoe v. Huntington Ingalls Inc.*,
 817 F.3d 1170 (9th Cir. 2016)..................................................................................15

*MetroPCS v. Devor*,
 215 F. Supp. 3d 626 (N.D. Ill. 2016) ......................................................................24

*Moroccanoil, Inc. v. Perfumes World Com, Inc.*,
 234 F. Supp. 3d 1026 (C.D. Cal. 2017).....................................................................18

*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*,
 638 F.3d 1137 (9th Cir. 2011)..................................................................................17

*Official Airline Guides, Inc. v. Goss*,
 6 F.3d 1385 (9th Cir. 1993)......................................................................................23

*Surfvivor Media, Inc. v. Survivor Prods.*,
 406 F.3d 625 (9th Cir. 2005)....................................................................................22

*Transgo, Inc. v. Ajac Transmission Parts Corp.*,
 768 F.2d 1001 (9th Cir. 1985)..................................................................................24

*Ubiquiti Networks, Inc. v. Kozumi USA Corp.*,
 No. 12-2582 CW, 2012 WL 2343670 (N.D. Cal. Jun. 20, 2012) ...........................17

*United States v. Farmer*,
 370 F.3d 435 (4th Cir. 2004)....................................................................................18

*United States v. Milstein*,
 401 F.3d 53 (2d Cir. 2005)........................................................................................19

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

iv

*Westinghouse Elec. Corp. v. Gen. Circuit Breaker & Elec. Supply Inc.*,
  106 F.3d 894 (9th Cir. 1997) ...................................................................................18

*Zeltiq Aesthetics, Inc. v. BTL Indus., Inc.*,
  32 F. Supp. 3d 1088 (N.D. Cal. 2014) .....................................................................23

**Statutes**

18 U.S.C § 2320(a) .........................................................................................................19

Cal. Civil Code section 1619 ..........................................................................................15

Cal. Civil Code section 1621 ..........................................................................................15

Cal. Civil Code section 1622 ..........................................................................................15

**Other Authorities**

CACI No. 305 ..................................................................................................................15

Fed. R. Civ. P. 56(a) .......................................................................................................15

Fed. R. Civ. P. 56(c) .......................................................................................................15

LAW OFFICES

SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.   INTRODUCTION

3      Discovery has now confirmed that BCS and ELI, acting through Manhan and Baker,

4 supplied all of the scrap "Fitbit" branded products that this Court enjoined further sale of last year.

5 *See* February 24, 2017 Order, ECF No. 52, at 3-4; *see also* Stipulated Injunction as to Cali, ECF

6 No. 56.   Defendants' admissions and the undisputed evidence also show that Defendants, acting

7 through Manhan and Baker, masterminded the underlying scheme to resell those "scrap" Fitbit

8 products to unwitting consumers, resulting in conclusive liability on all of Fitbit's claims.[1]

9      As relevant to this Motion, the undisputed facts establish Defendants' liability for breach of

10 contract, trademark infringement, and unfair competition, as a result of their orchestration of the

11 underlying scheme to resell hundreds of thousands of scrap "Fitbit" branded products that they

12 admit they had no authorization to resell.   From mid-2015 to late 2016, Fitbit contracted

13 Defendants' services as a scrap destruction and recycling vendor in Fitbit's reverse logistics

14 process, under "strict instructions" to recycle and/or destroy scrap "Fitbit" products sent to them.

15 Defendants ignored those instructions, and their contractual obligations, and instead sent the scrap

16 "Fitbit" branded products to Cali for refurbishment, repackaging, and resale, earning millions of

17 dollars of ill-gotten profit, pursuant to an agreement with Cali to split the profits from the resale

18 50/50. Defendants also admit that they violated the contractual provision requiring them to obtain

19 written authorization from Fitbit to use Fitbit's brand and intellectual property, which of course

20 occurred each time Defendants resold scrap "Fitbit" branded products bearing the Fitbit trademarks.

21 These undisputed facts establish that Defendants breached their agreement with Fitbit.

22      In addition, under well-established Ninth Circuit law, the resale of these scrap products

23 without authorization rendered them "non-genuine" and infringing as a matter of law.  Defendants'

24 resale of the scrap products deprived Fitbit of its right to control the quality of goods sold with its

25 trademarks, and also resulted in the resale of "Fitbit" branded products that were materially

26

---

27 [1]  In light of the summary judgment standards and page limit, Fitbit has streamlined its requested
relief here to partial summary judgment on its contract, trademark, and unfair competition claims.

28

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1   different from the high quality products that Fitbit authorizes for sale or refurbishes itself for

2   warranty replacements.  Defendants passed off this scrap as like new refurbished products,

3   guaranteeing consumer confusion.  The undisputed facts and expert evidence establish that these

4   products had not met Fitbit's quality control standards and that their designation for scrap

5   destruction was "highly material" to consumer purchasing decisions.  Further, the undisputed facts

6   show that these products were resold in counterfeit packaging and often with counterfeit cables.

7        Actual consumer confusion should be presumed by the Court in such circumstances and

8   summary judgment entered thereon.  Even absent that presumption, the undisputed facts establish

9   significant actual confusion, including thousands of customer support calls related to these products

10  and numerous scathing reviews from duped customers.  In addition, presumed confusion is not

11  necessary here, as the evidence here also easily establish a high likelihood of consumer confusion.

12       In short, the Court should grant Fitbit's Motion and enter judgment as a matter of law

13  against Defendants for their liability on Fitbit's First, Third, Fourth, and Eighth Claims for Relief.

14  **II.      STATEMENT OF ISSUES TO BE DECIDED**

15       Should the Court grant Fitbit's Motion for Partial Summary Judgment on its claims for

16  breach of contract, trademark infringement, and unfair competition where there are no genuine

17  issues of fact regarding Defendants' liability to prevent entry of judgment as a matter of law?

18  **III.      STATEMENT OF FACTS**

19  **A.      Relevant Background Regarding Fitbit**

20       Fitbit is a San Francisco-based technology company focused on delivering health solutions

21  that impact health outcomes through a platform of wearable devices (and a "smart" scale called

22  Aria) with software and services, with sales in excess of $1.6 billion in 2017.  *See* Declaration of

23  Brett Millar in Support of Fitbit's Motion for Partial Summary Judgment and Motion to Seal, filed

24  concurrently with this Motion, ("Millar MSJ Decl."), ¶ 2.  Fitbit's customers recognize these

25  products and services for their high quality and reliability in helping them achieve their health-

26  related goals.  *See id.*  Fitbit has worked hard to earn that reputation by investing significant human

27  and financial resources to develop its cutting-edge products and services, which, in turn, have

28  achieved worldwide popularity.  *See id.*

B.      **Fitbit's Federally-Registered Trademarks**

Fitbit is the owner of numerous federally-registered trademarks related to the Fitbit brand of products and services, including but not limited to the Federal Registration Numbers 3,732,334; 4,343,562; 4,380,130; 4,507,210; 4,851,801; 4,851,802;  4,851,803, 5,013,394; 5,142,157; and 5,210,272 (collectively, the "Fitbit Marks").  *See id.*, ¶ 3 & Ex. A.  These include the Fitbit tradename and trademarks for the specific products resold here, as well as Fitbit's well-known diamond marks:



*Id.*  The Fitbit Marks were registered to Fitbit at its principal place of business at the time of registration in San Francisco, California, and have been used in interstate commerce to identify and distinguish Fitbit's high quality products and services since approximately 2009.  *See id.*

Fitbit has built tremendous goodwill and brand reputation among consumers through significant investment in advertising, promoting, and delivering products and services of the highest quality under the Fitbit Marks the Fitbit trade name.  *See id.* Fitbit vigorously protects this reputation, and consumers have come to rely on the Fitbit Marks, by maintaining high quality-control and supply-chain standards for all of its products.  *See id.*  As a result, Fitbit's products are associated by consumers and the public in general, with exceptional materials, design, functionality, and reliability.  *See id.*

C.      **Fitbit's Supply Chain And Related Quality Control Processes**

To protect its trademarks, brand, and reputation, and also ensure that consumers receive the high quality products and services that they have come to expect from Fitbit, Fitbit has instituted very detailed, non-pretextual, and established corporate protocols that govern the supply-chain by which Fitbit's products are distributed and returned.  *See id.*, ¶ 4; *See also* Supplemental Declaration of Brett Millar in support of TRO ("Supp. Millar TRO Decl."), ECF No. 29, ¶¶ 2-12 (detailing Fitbit's reverse logistics and established quality control processes).  These procedures help ensure that products not meeting Fitbit's standards for high quality and reliability are not sold or otherwise distributed to consumers.  *Id.*  This is vital to preserving Fitbit's brand reputation with

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1   the consuming public, so that Fitbit's brand, reputation, and trademarks are not tarnished or

2   otherwise harmed or degraded, or its customers deceived by inferior non-genuine goods.  *See id.*

3   　　Fitbit's corporate protocols include an established "reverse supply chain" quality control

4   process for any returns or exchanges.  *See id.,* ¶ 4.  At all times relevant here, any returned products

5   that did not pass all of Fitbit's quality control standards were provided to Defendant BCS, acting

6   primarily through Manhan and Baker, as "scrap" for BCS to break down  into component parts and

7   raw materials, recycle the materials that could be recycled, and destroy and dispose of the

8   remaining parts/materials.  *Id.*, ¶ 13.  And, as further set forth below, Fitbit lived up to its end of the

9   agreement, sending Defendants approximately **2 million** scrap products for destruction and

10   recycling.  *See* Declaration of Jeff Bonham in Support of Fitbit's Motion for Partial Summary

11   Judgment and Motion to Seal, filed concurrently with this Motion, ("Bonham MSJ Decl."), ¶ 2.

12   **D.**　　**Defendants' Breach of Contract and Related Misrepresentations**

13   　　At the outset of Defendants' scheme, Defendants represented themselves as a certified scrap

14   destruction and recycling company, assuring Fitbit that they would break down all scrap Fitbit

15   products into raw materials to be recycled or otherwise destroyed, and not resell them.  *See, e.g.,*

16   Declaration of Zachary Alinder in support of MSJ, filed with this Motion, ("Alinder MSJ Decl."),

17   ¶¶ 10, 20, 21, 29, 30, 32, Exs. I, S, T, BB, CC, EE & ¶ 2, Ex. A (Deposition of Jennifer Windsor),

18   at 63:3-64:5, 96:19-97:18.  BCS, acting by and through Baker, Manhan, and other BCS employees,

19   repeatedly confirmed this lie.  *See id.*, at ¶ 6, Ex. E (Deposition of Kyle Regal) at 83:8-88:18; ¶¶ 25,

20   29, 30, 36, 47, Exs. X, BB, CC, II, TT.  Instead, unbeknownst to Fitbit, BCS intended from the very

21   beginning to unlawfully divert these scrap "Fitbit" products, shipping them directly to Cali for

22   refurbishment, repackaging, and resale to unwitting consumers, which they did month after month

23   until Fitbit terminated the relationship.  *See id.*, ¶¶ 17, 18, 22, 37, Exs. P, Q, U, JJ.

24   　　Indeed, on May 26, 2015, Fitbit instructed BCS in writing not to resell any scrap Fitbit

25   products, and Baker (BCS's VP of Business Development) explicitly agreed to this restriction:

26   　　[Mr. Baker:]   All the product I receive will be recycled, unless you allow me to resell items
　　　of your choice. I'm set up to do both.

27   　　[Fitbit's Jennifer Windsor:]   As with Tom Tom, for now, **we won't be able to resell
28   　　anything**. Maybe in time we can resell something as whole, but for now we will have to

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

LAW OFFICES

SIDEMAN & BANCROFT LLP

ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1   break things down to recycle and sell for commodity.  *Id.* (emphasis added).

2   [Mr. Baker:]   ***Sounds perfect.***  ...

3   *See id.*, at Ex. T (emphasis added).  It is also undisputed that at no later point did Fitbit consent to

4   allow BCS to resell any scrap Fitbit branded products.  *See id.* at Ex. A at 126:12-128:19, 148:12-

5   150:19; ¶ 5, Ex. D (BCS 30(b)(6) Deposition) at 161:7-10.

6   On May 29, 2015, Defendants sent Fitbit a Statement of Work ("SOW") that was consistent

7   with Fitbit's express requirement that BCS "break things down to recycle and sell for commodity,"

8   and which Defendants concede constitutes the contract here.  *See id.*, Ex. I & D at 170:7-13.[2]  The

9   SOW confirmed the recycling and destruction "Services" that BCS would provide, and, as

10  Defendants admit, it said nothing about reselling the scrap Fitbit products:

11  a.    BCS will arrange for pick-up when contacted by Fitbit.

12  b.    BCS will receive, weigh and sort material into commodities/channels.

13  c.    BCS will destroy product as requested and provide Certificate of Destruction.

14  d.    BCS to manage downstream activities.   Downstream activities could include
        shredding, smelting, reprocessing cardboard, incinerating, and ***resale of recycled***
15      ***commodities. Additionally, no use of Fitbit's brand or intellectual property is***
        ***authorized hereunder without Fitbit's prior written approval.***

16  e.    Process commodities and record final pricing, weights, and all related costs on the
17      settlement report.

18  *Id.* at FIT005987 (Section 3) (emphasis added).  The SOW also provided that "[a] gain sharing

19  formula will be applied to the net proceeds whereby 30% will remain with BCS and 70% will be

20  remitted to Fitbit. . ." *Id.* at FIT005988 (Section 5).

21  Defendants admit that Fitbit never authorized their use of Fitbit's "brand or intellectual

22  property"; under the explicit terms of the SOW, written authorization was necessary for BCS to do

23  anything other than recycle and destroy the scrap products, including reusing and/or reselling the

24  scrap Fitbit products bearing Fitbit's registered trademarks (which was not allowed in any event).

25  *Id.*; *see also id.,* Ex. D at 161:7-10.  Outside of the actual contractual services BCS agreed to

26  _____

27  [2] BCS and Fitbit amended the SOW in November 2015 to extend the term beyond the initial pilot
    project, but the other material terms did not change.  Alinder MSJ Decl., ¶ 31, Ex. DD.

28

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

provide, BCS also agreed in a "Certification" Section that they would certify the recycling of scrap products "down to plastic, metal, wire, cardboard or other commodity level components" and provide certificates of destruction certifying that process.  *See id.,* Ex. I at FIT005988 (Section 6). The relevant contractual terms were drafted entirely by BCS, acting through its owner Defendant Manhan.  *See id.*, Ex. D at 147:2-5.

On June 2, 2015, four days after BCS provided the SOW, BCS's Operations Manager Kyle Regal again confirmed that the three "avenues" for scrap Fitbit products did not include resale or reuse in any way.  *See id.*, Ex. E at 91:20-93:25; Ex. S.  Regal believed that these three avenues were consistent with BCS's SOW, and claimed he was not aware Defendants were reselling scrap Fitbit products.  *See id.*, Ex. E at 96:1-16.  On July 9, 2015, a few weeks into the initial pilot phase of the project, and pursuant to a pending request from Ms. Windsor, BCS even sent Fitbit videos that purported to demonstrate its "destruction" process for Fitbit products.  *See id.*, Exs. BB & CC.

Notably, Defendants also previewed for Fitbit the settlement report template that would be used to report to Fitbit the destruction and recycling of the Fitbit scrap to raw materials.  *See id.,* Ex. T.  That template settlement report was comprised of seven sections, including a "section 3," which BCS, acting through Baker, confirmed would be used  if items were to be resold.  *See id.*  The resale reporting section understandably included "Finished goods Model numbers, QTY and rate per item."  *See id.*  While the settlement reports sent to Fitbit included all of the other six Sections identified by Baker, it is undisputed, and Defendants admit, that the settlement reports never included the Section 3 resale reporting.  *See id.*, Ex. E at 121:19-122:5; ¶ 8, Ex. G (Deposition of Mike Baker) at 141:1-10; *see also*, Ex. T, *supra*, compared with ¶¶ 19, 34, Exs. R, GG.  BCS's employees had no answer for why the Section 3 resale reporting was missing from the Settlement Reports, given that BCS was reselling these products.  *See id.*, Ex. E at 123:5-17.

The settlement reports and the related certificates of recycling and destruction sent by BCS to Fitbit also contained a detailed breakdown of the commodities, like rubber, steel, and plastic, that were purportedly recycled.  *See id.*, Exs. R, GG.  However, Defendants admit that within a month or two of beginning the contract, BCS actually stopped breaking down any product at all and shipped the product straight to Cali.  *See id.*, ¶ 7, Ex. F (Deposition of Jeffrey Franklin) at 115:13-

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1   118:1; ¶ 9, Ex. H (BCS Depo). at 287:18-290:7; *accord* Alinder MSJ Decl., ¶ 38, Ex. KK ("[T]he

2   product is sent to Cali Resources Inc. and Cali Resources SA de CV for processing.").  Although

3   Defendants were no longer processing any of the scrap products, they continued to report a full

4   breakdown of commodities that had been purportedly recycled.  *See id.*, Exs. R, GG.  To create a

5   plausible breakdown of commodities to report to Fitbit going forward, Defendants sampled one

6   shipment to derive the percentage of commodity weights and used that going forward to fill out the

7   settlement reports sent to Fitbit.  Ex. F at 115:13-18.  When asked whether it was "industry practice

8   to issue a certificate of recycling with commodity breakdown for products that are intended for

9   resale," BCS's General Manager Jeff Franklin admitted flatly "No." *Id.* at 48:21-49:1.

10          **E.     Defendants' Conspiracy To Sell Infringing Products and Control of Same**

11          Discovery has confirmed that Defendants had a long-standing business relationship with

12   Cali, and that they coordinated from the outset to induce Fitbit to use BCS's scrap and recycling

13   services, so that they could divert the Fitbit scrap products for resale as like new refurbished

14   "Fitbit" products.  Alinder MSJ Decl., ¶ 4, Ex. C (Deposition of Jonathan Manhan), 102:5-103:2;

15   *accord* Declaration of Joel Blank in Support of Opposition to Fitbit's TRO ("Blank Decl."), ECF

16   No. 19-5 at ¶ 20 (advertising product as having been refurbished to "perform and look like new...").

17   Indeed, Defendants were so close with Cali that they referred to themselves as a "team," referred to

18   Cali's Mexican refurbishing plant as "BCS's Tijuana Facility," and even set up a masked BCS

19   email address for Cali to communicate directly with Fitbit, acting as a BCS representative.  *See id.*,

20   Ex. C at 187:19-189:23; ¶ 16, Ex. O; Ex. Q; Ex. G at 115:5-116:8, 185:21-186:8; ¶ 70, Ex. MM; ¶

21   33; Ex. FF; Ex. KK.

22          Defendants and Cali partnered on procuring and refurbishing Fitbit products for resale prior

23   to BCS entering into the SOW with Fitbit.  *See id.*, Ex. C at 104:5-9.  BCS first partnered with Cali

24   to refurbish and resell Fitbit products that BCS obtained from Target, ERS, and other wholesalers

25   and dealers.  *Id.* at 104:10-18, 106:19-107:11.  BCS and Cali then extended this agreement to cover

26   the scrap products that BCS received through Fitbit's reverse supply chain (pursuant to their agreed

27   upon 50/50 profit split).  *Id.* at 105:16-106:25 & Ex. D at 37:20-24, 53:1-5, & 91:23-25; ¶ 27, Ex.

28   Z.  As the supplier of the scrap products, Defendants were essential to the distribution chain and

1  completely controlled whether they were recycled or resold.  *See id.*, Ex. D at 95:5-96:21, 105:23-

2  106:8; Exs. KK; ¶ 42, Ex. OO; ¶ 45, Ex. RR.

3  **F.      The Execution of the Scheme and the Distribution of the Infringing Products**

4       As the first step of the agreed-upon distribution chain, Defendants procured the Fitbit scrap

5  from Fitbit's reverse supply chain, using the pretext of scrap destruction and recycling services set

6  forth above.  *See id.*, Ex. D at 96:16-21 and 105:23-106:8.  Defendants then diverted these scrap

7  "Fitbit" branded products to Cali, which attempted to refurbish them at its facility in Tijuana,

8  Mexico.  *See id.*, Ex. RR; *see also*, Ex. D at 109:20-110:7; Exs. U; ¶ 23, Ex. V; Ex. FF ("Q: And so

9  their responsibility was to sell these products to an end customer and then after you guys took out

10  your hard costs, split the proceeds between Cali and BCS, right? A: Cali was our downstream.

11  They did the processing and sale."); Ex. C at 65:15-66:6.  Indeed, Defendants continued to do so

12  knowing that Cali was purchasing counterfeit Fitbit cables from China, to "get orders out" in

13  support of the common plan.  *See id.*, Exs. D at 237:11-238:14; JJ, ¶ 16, Ex. O; and ¶ 46, Ex. SS.

14       BCS, acting through Manhan and Baker, also kept close tabs on Cali's resale of the Fitbit

15  branded products, from getting refurbished inventory reports from Cali, to questioning what

16  happened with product that could not be refurbished, to sending questions about Cali's online sales,

17  including sales on Groupon, and packaging.  *See* Alinder MSJ Decl., Exs. OO & G at 169:18-

18  177:15, Exs. O, SS, & D at 239:3-243:2.  BCS, acting through Manhan and Baker, also controlled

19  the shipping and logistics process to get the scrap Fitbit products to Cali, from coordinating the

20  shipments and logistics to setting up a BCS email alias specifically for Cali – traffic@scrapdr.com –

21  for Cali to communicate directly with Fitbit without Fitbit's knowledge.  *See id.*, Ex. Q (instructing

22  Cali to use the email alias setup by BCS and to represent to Fitbit that they are "BCS primary

23  contact for logistics control") & Ex. C at 186:12-189:23.

24       These "Fitbit" products, procured as scrap by Defendants, acting through Manhan and

25  Baker, and "refurbished" by Cali, were then sold either directly or through downstream secondary

26  market distribution channels to unwitting consumers, duped into thinking they were getting a "like

27  new" Fitbit product on the cheap.  *See* concurrently-filed Declaration of Cali Resources, Inc.

28  Certifying Business Records, ¶ 5; Alinder MSJ Decl.,¶ 48, Ex. UU; Exs. P, U; *see also* Blank

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1  Decl., ECF No. 19-5 at ¶ 20.  This practice continued unabated throughout the relationship,

2  resulting in the resale of hundreds of thousands of scrap "Fitbit" branded products to consumers,

3  both through L2 on Groupon, Woot.com, and eBay, as well as directly by Cali on Overstock.com.

4  *See* Alinder MSJ Decl., at Ex. UU; ¶ 53, Ex. ZZ; *see also* Millar TRO Decl., ECF No. 13, ¶ 7 &

5  Ex. G.  This infringing and unlawful conduct proved extremely lucrative, resulting in over $16

6  million dollars in profit to the infringing distribution chain, millions of which ended up with

7  Defendants, including ELI, which Defendants used to invoice Cali for the profits received from

8  reselling the Fitbit products.  *See* Alinder MSJ Decl., ¶ 27, Ex. Z;  Ex. D at 36:22-37:6 & 53:1-

9  54:18; ¶ 51, Ex. XX (Expert Report of Greg Regan).  In addition to the spurious marks on the

10 counterfeit packaging and cables, all scrap Fitbit product sales made through Defendants'

11 distribution chain necessarily included Fitbit's registered trademarks, as the Fitbit wordmark and

12 the Fitbit diamond trademark are incorporated into the products themselves.  *See* Bonham MSJ

13 Decl., ¶ 11.  Not surprisingly, Defendants' unlawful conduct caused many millions of dollars of

14 damage and harm to Fitbit.  *See id*., Ex. XX.

15      **G.**      **Defendants' Concealment of Their Scheme**

16      Throughout 2016,  Fitbit continued to send scrap products to Defendants in reliance on

17 their continuing representations that they were not reselling anything.  *See id*., ¶ 12, Ex. K; Ex. R;

18 ¶ 24, Ex. W; ¶ 26, Ex. Y; ¶ 34, Ex. GG; ¶ 41, Ex.  NN; ¶ 43, Ex. PP; ¶ 44, Ex. QQ; ¶ 47, Ex. TT;

19 *see also* Declaration of Jeff Bonham in Support of Fitbit's Response to L2's Supplemental

20 Statement re Motion for TRO ("Bonham TRO Decl."), ECF No. 49-1, ¶ 5 (detailing 11/30/2016

21 meeting where BCS represented it "did not resell any Fitbit products it received from Fitbit's

22 authorized logistics partners,  . . . but rather that BCS recycled down to the commodity level

23 and/or destroyed all such scrap Fitbit products it received.").  Defendants' internal

24 communications reflect their efforts to conceal their breaches, fraud, and infringement.  In one

25 example, in a March 13, 2016 email related to the export of 9 pallets of Fitbit scrap from Australia

26 to Los Angeles, Baker emphasized to Cali and its vendor that they should be "aware" of the fact

27 that "Fitbit believes we process material in country."  Alinder MSJ Decl., ¶ 39, Ex. LL.  Mr.

28 Kelvin, Cali's CEO, was not pleased and forwarded the warning to Manhan, stating: "Why does

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

Case No. 3:17-cv-00079 EMC (KAW)
**[CORRECTED] NOTICE OF MOT. AND MOTION FOR PARTIAL SUMMARY JUDGMENT; MPA IN SUPPORT**

1  he put that in writing?" *Id.* In another example, when Defendants attempted to obtain additional

2  Fitbit products from Verizon (which had been introduced to them by Fitbit), Defendants

3  represented to Verizon and Fitbit that "BCS has been given strict instructions to destroy all Fitbits

4  for recycling." *Id.*, Ex. Y. At the same time, Defendants noted internally that the Verizon deal

5  would need to be a "sacrificial lamb," because they could only offer a "scrap play" to "make sure

6  nothing is offered to verizon (sic) that we don't give to fitbit," because of course in so doing they

7  would expose their resale of Fitbit products. *Id.*, at ¶ 28, Ex. AA; Ex. C at 255:3-15.

8         Meanwhile, Defendants continued to send Fitbit settlement reports and the related

9  certificates of recycling and destruction, containing a detailed breakdown of the commodities, that

10  were purportedly recycled, even though these products were being sent whole to Cali. *See id.*, Exs.

11  R, GG. Then, during the fall of 2016, questions started to arise regarding the resale of Fitbit

12  branded products through online marketplaces like eBay and Groupon. *See* Millar TRO Decl., ECF

13  No. 29, ¶ 12. Fitbit sought further information and assurances from Defendants, but was met with

14  more misrepresentations. *See* Alinder MSJ Decl., Ex. W. Baker copied and pasted Fitbit's

15  inquiries into a new email sent to others at BCS, including Manhan, writing "Jen, has meeting with

16  her legal team tomorrow, below she is asking for some info just in case she is asked. ***Which***

17  ***company's do we want to tell her*** in regards to her questions below." *See id.*, Ex. G at 213:14-

18  216:5; ¶ 35, Ex. HH (emphasis added). This was then forwarded to Cali for their assistance. *Id.*

19         Defendants and Cali developed a plan to: "***keep Cali out of the mix if you could and just***

20  ***use downstream for extra layer of protection.***" *Id.*, ¶ 36, Ex. II (emphasis added). Consistent with

21  Mr. Kelvin's instruction that Cali not be referenced to provide an "extra layer of protection," Baker

22  represented to Fitbit that all materials were properly recycled, and without any reference to Cali or

23  to the resale of the Fitbit products: *Id.*, Ex. W. If resale was allowed here, there was no reason to

24  conceal Cali's involvement; however, as Baker agreed, while the "easy answer" to Ms. Windsor's

25  question was that BCS sending the products to Cali for resale, he did not refer to them at all in his

26  response to Fitbit. *Id.*, Ex. G at 215:24-216:8 & 220:20-223:25); Ex. W.

27      **H.**    **Defendants' Scheme Unravels**

28         Defendants' scheme started to unravel after Fitbit purchased a number of "Fitbit" branded

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

[CORRECTED] NOTICE OF MOT. AND MOTION FOR PARTIAL SUMMARY JUDGMENT; MPA IN SUPPORT

products being sold as genuine refurbished Fitbit branded products by L2 on Groupon.com between May and September 2016.  *See* Supp. Millar TRO Decl., ¶¶ 12-23.  Fitbit analyzed those products and determined that their serial numbers matched the serial numbers of Fitbit products that had been designated for scrap destruction.  *Id*.  They were also sold in packaging with a close facsimile of the stylized Fitbit wordmark and the Fitbit diamond trademark symbol:

<u>Example of Genuine Fitbit Packaging:</u>          Defendants' <u>Counterfeit "Fitbit" Packaging</u>

   

*See* Millar TRO Decl., ECF No. 13, ¶ 6, Ex. F, ECF No. 13-6 at pp. 10-17.  The packaging also referred the consumer to Fitbit.com to setup the product and had a "Warranty Card" that referred the customer to the Fitbit.com.  *See id*.  Their product warranty was for 60 days and only covered broken units.  *Id*.  Fitbit's warranty allows product return for any reason for 45 days and one year for defective products in the United States.  *See id*.; *see also* https://www. fitbit.com/legal/returns-and-warranty.  L2 confirmed that the counterfeit packaging and warranty card were not changed until November 2016, a year after these scrap sales began.  Blank Decl., ECF No. 19, ¶ 13.

Further analysis performed by Fitbit confirmed additional physical differences affecting six of these scrap "Fitbit" branded products.  *See* Supp. Millar TRO Decl., ¶¶ 12-23, Alinder MSJ Decl., ¶13, Ex. L; ¶ 14, Ex. M.  While all nine products were shipped in counterfeit packaging, four products were also shipped with counterfeit "Fitbit" accessories and charging cables falsely bearing Fitbit's trademarks.  *See id*.; *see also* Bonham TRO Decl., ECF 49-1, Ex. E:

   

<u>Magnified on the marks:</u>

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1    Bonham TRO Decl. (Publicly Filed Version), ECF Nos. 60 & 60-6.

2        Fitbit also confirmed that one product was defective due to cosmetic defects, one was

3    defective due to band damage, and one was defective due to a broken button.  *Id.*  These defects are

4    material, failing Fitbit's quality control and disqualifying them even from being refurbished for

5    warranty replacement by Fitbit (Fitbit has never resold refurbished products to consumers).  *Id.*

6        Further, Fitbit has now analyzed a sample of 100 from the thousands "Fitbit" branded units

7    recently returned by L2 against Fitbit's internal records and data, and determined that 97 of the 100

8    products appear either conclusively or with a very high likelihood to have been designated for scrap

9    destruction, and therefore would have been sent to BCS to be destroyed and/or recycled at the

10   commodity level.  *See* Bonham MSJ Decl., ¶ 10.  The remaining 3 simply had insufficient data to

11   confirm for sure how they got into L2's inventory.  *See id.*

12       In addition, U.S. Customs and Border Protection ("CBP") informed Fitbit of two seizures of

13   Fitbit products that CBP determined to be counterfeit.  Millar MSJ Decl. at ¶ 6, Exs. B & C.  The

14   first seizure, on or around January 10, 2017, included 1,243 "Counterfeit Fitbit Scales." *Id.* at Exh.

15   B.  The seizure notice identified Cali as the Importer of Record.  *Id.*  The seized shipment also

16   included 13,626 "Counterfeit Fitbit Watches" according to CBP.  *See id.*  Fitbit has now analyzed a

17   sample of ten "Fitbit" branded Aria scales from the Cali seizure that were provided to Fitbit for

18   examination by CBP.  Millar MSJ Decl. at ¶ 8.  Each of those Aria scales had all serial number and

19   regulatory compliance information stripped off the units, making them not only materially altered

20   and non-genuine, but also out of compliance with U.S. law on resale of medical devices.  *See id.*,

21   Exh. D.  While certain of the scales were non-functional, the scales that functioned were all

22   previously designed by Fitbit as scrap.  *See id.*  Cali was not the only reseller of these scrap Fitbit

23   branded products.  CBP also made a subsequent February 7, 2017 seizure, identifying former

24   Defendant MI Technologies as the Importer of Record,  listing 69 "Counterfeit Fitbit Watches" and

25   2 "Counterfeit Fitbit Dongles" that CBP determined to be counterfeit.  *Id.* at ¶ 6, Exh. C.

26       After these products were seized, BCS, acting through Manhan, furnished Cali with a letter

27   regarding the seized Fitbit products, in the hope that CBP would release them.  *See* Cali Decl. at ¶

28   4. In that letter on BCS Letterhead, Manhan admitted that BCS was reselling these Fitbit products

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

jointly with Cali and that Cali was processing and reselling at his and BCS's direction:

> We receive a variety of merchandise and brands from the large retailers we do reverse logistics for...includ[ing]...Fitbit....  Please understand that the product is sent to Cali Resources Inc. and Cali Resources SA de CV for processing.  We only sell refurbished products and do not use logos unless we have prior written consent from manufacturer.  All material is used refurbished and sold as such with warranties from us not the manufacturer.

Alinder MSJ Decl., Ex. KK; *accord* Cali Decl., ¶5 (referring to their "joint sales" with BCS).

## I.     Consumer Confusion Regarding These Scrap Products

It is also undisputed that the listings for these product sales neither disclosed that they had been designated for scrap destruction by Fitbit because they did not meet Fitbit's quality control standards, nor that they were accompanied by counterfeit accessories or in counterfeit packaging. *See* Bonham MSJ Decl. at ¶ 3 Ex. A.  Cali's customer L2 believed that the products "performed and looked like new."  *See* Blank Decl., Dkt. No. 19-5, Ex. E2 (claiming that product ships with "all relevant accessories"); Blank Decl., Ex. E1; Blank Decl., Dkt. No. 33 at ¶ 28 (L2 was told that the accessories were "original" Fitbit accessories).  Not surprisingly, there is also significant evidence of *actual* consumer confusion and brand reputational harm to Fitbit from these scrap sales:

- "You get what you pay for. In three weeks the device stopped syncing with anything. Simply avoid any Fitbit products." – Mikhail K., Oct. 21, 2016

- "Ask yourself why these items are refurbished. I took a chance on this item. I bought one for myself and one for my wife. My wife's unit only lasted a week before it malfunctioned, so I gave her mine. Don't waste your money on a refurbished item. I would even question purchasing this model new." – John C., Oct. 17, 2016

- "Extremely disappointed! I purchased February 7th, 2016 & Loved it initially. Unfortunately, it is now September 2016 and my fitbit [sic] is falling apart. . .  It does not fall under the normal Fitbit 1 year warranty, which is something that was NOT disclosed when purchased, nor is there any kind of warranty through groupon [sic].  . . . I am really upset about this because i [sic] truly enjoyed it while it lasted. But unfortunately even at a discount, paying $80 for a device to last 7 months is just not acceptable." – Lauren H., Sep. 26, 2016

- "I have only had my fitbit [sic] charge since January and its [sic] been coming apart on the sides like 5-6 months in (it rubs my skin raw on top) . . . The battery life was great at first now it only lasts a day and I have to continue to charge it. I am not sure if its [sic] because I got a refurbished one or if its [sic] just the product all together." – Jennifer M., Aug. 17, 2016

*See* Alinder MSJ Decl., ¶ 52, Ex. YY.

Similarly, between November 2015 and the end of 2016, Fitbit received thousands of customer support requests related to "Fitbit" products purchased by customers on Groupon.com and Woot.com.  Bonham MSJ Decl. at ¶ 4.  These included requests to replace broken units and to

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

13

Case No. 3:17-cv-00079 EMC (KAW)
[CORRECTED] NOTICE OF MOT. AND MOTION FOR PARTIAL SUMMARY JUDGMENT; MPA IN SUPPORT

honor Fitbit's warranty, even though these products were never supposed to be resold at all:

- "I received a Fitbit Item # FB404BKS for Mother's Day fro [sic] my kids, they purchased it through Groupon. The item had a 60 day warranty, it quit on me 2 weeks ago. I contacted the Warranty # and they had me send it back to L2 Sullivan Street RMA-BN 4421 Westwood NJ 07675 and I would receive a replacement. Could you check on this for me?" After receiving information regarding Fitbit's warranty policy and that Groupon was not an authorized reseller, the customer further complained "Any suggestions? Groupon won't help either. Are my kids out $79.99 because of a faulty Fitbit?" And then, "Very disappointed as I am a big fan of your product...I was sure it would last longer then 60 days."

- "That stinks ... Groupon is not an authorized retailer. I gave $109.99 for the unit. ... was just hoping Fitbit would stand behind their product."

- "It was a groupon. The warranty card says I should contact fitbit. ... At least I think thats fitbit ... Groupon is an unauthorised reseller?

- "I am not sure if this is a support issue, but I do not see any other email. I bought a refurbished Fitbit Charge HD on Groupon, in Feb 2016 .... I just felt compelled to let your company know how it is being represented by Groupon and LC? [sic]
My fitbit Charge HD would not hold a charge for more then 2 hours at most, I decided in the short time I had it I LOVED it (my sisters and daughter all have Fitbit). I decided to send it back to the warrenty company whos information was in the package the Fitbit came in. I called them , they gave me their address and instructed me to send it back and they would replace it, WONDERFUL! That was March 21 2016, I still have not received the replacement, and they will not answer my calls or emails.

I am not sure what you can do about it, but as two companies (Groupon and L2?) representing Fitbit, I felt you should not how your company is being represented.

The company address is
L2
12 Sullivan St
Westwood NJ 07675-3109...."

*Id.*, Exh. B.  These support cases establish how Fitbit was put in an impossible situation of either further harming the customer experience by refusing the support/warranty request, or making an exception to mitigate the harm to the customer and Fitbit's brand, like Fitbit did in at least two of the instances above.  *Id.*  In addition to the actual confusion from consumers established above, the results of a consumer confusion survey performed by Fitbit's expert, confirm that the resale of scrap "Fitbit" branded products here was substantially likely to cause consumer confusion.  *See* Alinder MSJ Decl., ¶ 50, Ex. WW (Expert Report of Hal Poret) at pp. 45 & 66.  Likewise, a materiality survey performed by Mr. Poret confirmed that the undisclosed fact that these products had not met Fitbit's quality control and/or had been designated for scrap destruction by Fitbit would have been

"highly material" to consumer purchasing decisions. *See id.* at pp. 47 & 72.

## IV. ARGUMENT

### A. Standard on Summary Judgment

The Court should grant summary judgment where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets the initial burden, the burden then shifts to the non-moving party to show that there is a genuinely disputed fact. Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324. A dispute of fact is genuine only if there is sufficient evidence for a reasonable fact finder to decide for the nonmovant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). Thus, the non-moving party must come forward with admissible evidence to satisfy the burden. Fed. R. Civ. P. 56(c). *See also McIndoe v. Huntington Ingalls Inc.*, 817 F.3d 1170, 1173 (9th Cir. 2016) ("If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.")

### B. The Court Should Grant Fitbit Summary Judgment On Its Breach of Contract Claim Against BCS

For summary judgment for breach of contract, Fitbit needs to establish: (1) the existence of the contract;[3] (2) the plaintiff's performance or excuse for nonperformance; (3) the defendant's breach; and (4) damages to the plaintiff as a result of the breach. *Congdon v. Uber Techs., Inc.*, 291 F. Supp. 3d 1012, 1020 (N.D. Cal. 2018). Interpretation of a contract is a matter of law, as is the determination of whether a contract is ambiguous. *Id.* at 1021 (citing *Beck Park Apartments v. U.S. Dep't. of Housing & Urban Dev.*, 695 F.2d 366, 369 (9th Cir. 1982)). The "clear and explicit meaning" of contractual provisions "interpreted in their ordinary and popular sense controls judicial interpretation." *Ibid.* (citing *Santisas v. Goodin*, 17 Cal. 4th 599, 608 (1998)). Contract language is

---

[3] Although the existence of a contract cannot be reasonably disputed here, contracts may be written or oral, and oral contracts are as valid as written contracts. *See* Cal. Civil Code section 1622; Judicial Council of California Jury Instructions ("CACI") No. 304. Contracts may also be created by the conduct of the parties. *See* Cal. Civil Code sections 1619 and 1621; CACI No. 305.

LAW OFFICES

SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

[CORRECTED] NOTICE OF MOT. AND MOTION FOR PARTIAL SUMMARY JUDGMENT; MPA IN SUPPORT

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1   ambiguous only if it is "capable of two or more constructions, both of which are reasonable." *See*

2   *ibid*. (citing *TRB Invs., Inc. v. Fireman's Fund Ins. Co.*, 40 Cal.4th 19 (2006)).   Any ambiguity as to

3   terms are construed against the drafter of the contract.  *Id*. at 1022.

4           Here, it is undisputed that Fitbit and BCS entered into a services agreement for BCS to

5   provide scrap destruction and recycling services in support of Fitbit's reverse supply chain.  Alinder

6   MSJ Decl., Ex. I; Ex. C at 89:12-16; Ex. D at 173:23-174:5.  The plain terms of that agreement

7   required BCS to breakdown products to commodities for recycling and scrap destruction, and

8   nowhere allowed Defendants to resell those scrap products as "like new" purportedly genuine Fitbit

9   branded products.  *See id*.  That agreement also unambiguously required Defendants to obtain

10  written approval prior to any use of Fitbit's brand or intellectual property, which includes

11  trademarks.  *See id*.  It is also undisputed that Fitbit performed under the agreement.  *See id*.;

12  Bonham MSJ Decl. ¶ 2

13          Finally, as set forth in detail in Section III.C.-I. above, the undisputed facts establish that

14  BCS breached the agreement with Fitbit by (1) reselling (and not recycling/destroying) hundreds of

15  thousands of the scrap Fitbit products bearing Fitbit's registered trademarks in violation of their

16  contractual agreement, and (2) using "Fitbit's brand or intellectual property" without Fitbit's

17  approval in connection with those sales.  *See id*., Ex. D at 161:7-10, 162:3-163:7; Ex. I.  Although

18  Defendants contend that the term "repurpose" in the "Certification" section of the SOW allowed for

19  resale, any such interpretation is unreasonable as a matter of law and inconsistent with industry

20  practice.  *See id*., Exh. I & ¶ 49, Ex. VV (Expert Report of Michael Easterbrook).  Further, if

21  Defendants were actually authorized to resell scrap "Fitbit" branded products under the SOW

22  (which they were not), they further breached their agreement with Fitbit by failing to remit 70% of

23  their more than $4,000,000 in profit.  *See id*., Exs. I & Z. Each of these breaches independently

24  justifies the grant of summary judgment in favor of Fitbit on its breach of contract claim.

25          **C.      Summary Judgment Is Warranted On Trademark and Unfair Competition**

26                   **1.      Federal Trademark Counterfeiting and Infringement**

27          To prevail on its trademark infringement claims, Fitbit "must prove: (1) that it has a

28  protectible ownership interest in the mark; and (2) that the defendant's use of the mark is likely to

1   cause consumer confusion."  *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d

2   1137, 1144 (9th Cir. 2011) (quotation omitted).  In cases such as this one, "where the evidence is

3   clear and tilts heavily in favor of a likelihood of confusion," courts do grant summary judgment.

4   *See Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062, 1075 (9th Cir. 2006).

5                    **a.      Fitbit Has a Protectable Ownership Interest in its Trademarks**

6           Fitbit has registered the Fitbit Marks with the US Patent and Trademark Office and has used

7   at least one of the Fitbit Marks for nearly ten years.  *See* Millar Decl., ¶ 3 and Ex. A.  Thus, Fitbit

8   has a protectable ownership in the Fitbit Marks and its registration of the marks constitutes prima

9   facie evidence of Fitbit's ownership and exclusive right to use the Fitbit Marks in commerce.  *See*

10   *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1047 (9th Cir. 1999).

11                    **b.      Consumer Confusion Should Be Presumed Here**

12           As established above, Defendants orchestrated a conspiracy to resell non-genuine scrap

13   products as "like new" refurbished "Fitbit" products, some in counterfeit packaging and with

14   counterfeit cables, and consumer reviews and customer support cases related to Defendants' sales

15   show not just *likely*, but *actual* consumer confusion.  Indeed, in such circumstances, confusion

16   should be presumed.  Even so, the expert evidence is similarly overwhelming that the resale of

17   these scrap products in this manner was substantially likely to cause consumer confusion and that

18   the fact that these products had been designated for scrap destruction and/or recycling by Fitbit

19   would have been highly material to a consumer's decision to purchase the product.

20           "Likelihood of confusion exists when consumers viewing the mark would probably assume

21   that the goods it represents are associated with the source of a different product identified by a

22   similar mark."  *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 608 (9th

23   Cir. 2005).  Where the products are counterfeit, likelihood of confusion is presumed.  *See Ubiquiti*

24   *Networks, Inc. v. Kozumi USA Corp.*, No. 12-2582 CW, 2012 WL 2343670, at *14 (N.D. Cal. Jun.

25   20, 2012) ("counterfeit marks are inherently confusing"); *Louis Vuitton Malletier, S.A. v. Akanoc*

26   *Solutions, Inc.*, 658 F.3d 936, 945 (9th Cir. 2011).  The existence of a material difference between

27   the products sold also creates a presumption of consumer confusion.  *See Moroccanoil, Inc. v.*

28   *Perfumes World Com, Inc.*, 234 F. Supp. 3d 1026, 1030 (C.D. Cal. 2017); *Hokto Kinoko Company*

*v. Concord Farms, Inc.*, 810 F. Supp. 2d 1013, 1029-31 (C.D. Cal. 2011).  Here, the undisputed facts show that Defendants resold non-genuine scrap "Fitbit" products bearing Fitbit trademarks to be later resold as refurbished Fitbit products in counterfeit packaging and often with counterfeit cables.  *See* Section III.C.-I. above.  Thus, the Court should presume likelihood of confusion here.

*First*, although the scrap "Fitbit" branded products here were originally manufactured by Fitbit, Defendants admit that they never obtained written approval to use Fitbit's brand and intellectual property in connection with their unauthorized resale of the scrap "Fitbit" products.  *See* Section III.C.-H. above.  Courts have consistently held that where a good which was originally manufactured by the rights holder is distributed without the rights holder's authorization, that good is not "genuine" within the definition of the Lanham Act.  *See El Greco Leather Prods. Co, Inc.. v. Shoe World, Inc.*, 806 F.2d 392, 395 (2d Cir. 1986) (shoes initially ordered by the company which were subsequently sold without the company's approval after the order was cancelled were not "genuine" under the Lanham Act because the company "never gave its consent to the use of the mark on those shoes"); *see also Westinghouse Elec. Corp. v. Gen. Circuit Breaker & Elec. Supply Inc.*, 106 F.3d 894, 900 (9th Cir. 1997).  The reason for this is to protect a brand owner's "'right to control the quality of the goods manufactured and sold.'"  *United States v. Farmer*, 370 F.3d 435, 441 (4th Cir. 2004) (*quoting Shell Oil Co. v. Commercial Petroleum, Inc.*, 928 F.2d 104, 107 (4th Cir. 1991)) (affirming counterfeit conviction for sales of shirts, rejected as defective by brand, that would "deceive consumers, to trick them into purchasing as Nike or Hilfiger clothing the very shirts those companies had already rejected as of lesser quality" because "the whole point is that deciding whether shirts pass muster is reserved to Nike and Hilfiger, not to [the defendant]. . . .").

Here, Fitbit confirmed through numerous purchases, which bore the Fitbit Marks, that the products Defendants had injected into their infringing distribution chain had been designated to be scrapped as part of Fitbit's standard quality-control processes.  Bonham MSJ Decl., at ¶ 3.  By selling such products without Fitbit's approval to use its brand and intellectual property, Defendants subverted Fitbit's right to control the quality of the goods manufactured and sold.  These scrap products were also determined to be materially different from genuine goods, even after Defendants' sent them for refurbishment, including physical defects, functional defects,

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1    altered/removed labelling, and inferior warranty.  *See* Section III.H. above.  Such goods are not

2    genuine under the Lanham Act, and are thus infringing as a matter of law.

3      *Second*, it is undisputed that the scrap "Fitbit" products were resold in counterfeit packaging

4    and often with counterfeit cables.  *See* Supp. Millar TRO  Decl. ¶¶ 15-20.  Indeed, even if the Fitbit

5    products enclosed within that packaging had been "genuine," where a party repackages genuine

6    goods in packaging bearing a trademark without the trademark owner's authorization, the trademark

7    on the packaging renders the whole counterfeit.  *See United States v. Milstein*, 401 F.3d 53, 62-63

8    (2d Cir. 2005).  In *Milstein*, the defendant purchased genuine drugs from foreign markets, "stripped

9    them of their original factory packaging, [then] repackaged them with forged labels and packaging

10   materials closely resembling those of drugs produced in accordance with FDA requirements for the

11   U.S. market . . ." *Id*. at 59.  Here, as shown above, in addition to the counterfeit cables, the

12   products were repackaged in plastic bags bearing the Fitbit Marks without Fitbit's authorization;

13   thus they were counterfeit.  Likewise, the material alterations to Aria scales, stripping them of serial

14   numbers and compliance labels, also renders those products non-genuine and counterfeit.  *See, e.g.,*

15   *Intel Corp. v. Terabyte Int'l, Inc.*, 6 F.3d 614, 620 (9th Cir. 1993).

16     Accordingly, the Court should presume confusion for each of these independent reasons,

17   and grant summary judgment for Fitbit on each of its Lanham Act claims.

18      **c.**   **Fitbit Has Also Established High Likelihood of Confusion**

19     Even if a presumption of actual confusion did not arise, Defendants' product sales were

20   highly likely to cause consumer confusion under established Ninth Circuit law.  As a preliminary

21   matter, the expert report of Hal Poret has determined, based on analysis of his survey results related

22   consumer confusion caused by L2's Groupon listings, that the "use of the Fitbit marks in the

23   advertising results in a substantial likelihood of consumer confusion – i.e., that a substantial rate of

24   consumers mistakenly believe that the product is refurbished by Fitbit and that the product <u>is</u>

25   approved for sale or endorsed by Fitbit."  *See* Alinder MSJ Decl., ¶50 Ex. WW (Poret Report).

26   That evidence alone satisfies Fitbit's burden, though analysis of the *Sleekcraft* factors also heavily

27   favors Fitbit.  *See, e.g., Eclipse Assoc., Ltd. v. Data Gen. Corp.*, 894 F.2d 1114, 1117 n.3 (9th Cir.

28   1990) (*citing AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348 (9th Cir. 1979)).

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

(1)      **Strength of the Fitbit Marks**

A stronger mark is afforded greater protections under trademark laws.  *See Brookfield Commc'ns, Inc.*, 174 F.3d at 1058.  "The strength of a mark is determined by its placement on a continuum of marks from generic, afforded no protection; through descriptive or suggestive, given moderate protection; to arbitrary or fanciful awarded maximum protection."  *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1291 (9th Cir. 1992) (quotations omitted).  Determining a mark's strength requires evaluating its "conceptual strength and commercial strength."  *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir. 2000).

It is undisputed that the Fitbit Marks require no imagination to form an association between the mark and the product.  *See* Section III.A-B. above.  Moreover, the Fitbit Marks are unique and have no commonly known connection with the products.  *See id.*  It is the strength of the Fitbit Marks, and the positive association consumers have with the products bearing that mark, which justify a greater degree of trademark protection. *See id*.  As such, the first factor weighs heavily in favor of finding likelihood of confusion.

(2)      **Proximity of the Goods**

It is undisputed that Fitbit sells many of its products through online marketplaces, either fitbit.com or the online sites of its authorized distributors, e.g. bestbuy.com.  *See* Alinder MSJ Decl., ¶ 3, Ex. B (Deposition of David Quong) at 18:25-19:25.  Accordingly, there was a very close proximity with the products sold by Defendants through other online retailers, like Groupon, Woot, and Overstock, and such sales competed directly for sales with genuine Fitbit products.  *Id*, Ex. XX.  "When the goods produced by the alleged infringer compete for sales with those of the trademark owner, infringement usually will be found if the marks are sufficiently similar that confusion can be expected."  *Sleekcraft*, 599 F.2d at 348.  Here, Defendants sold "Fitbit" products originally manufactured by Fitbit (that were supposed to be scrapped and/or recycled) to be sold downstream as refurbished "Fitbit" products to consumers.  *See* Section III.C.-H. above.  Thus, there is no doubt that Defendants' non-genuine "Fitbit" products and genuine Fitbit products are related and "[r]elated goods are generally more likely than unrelated goods to confuse the public as to the producers of the goods."  *Brookfield*, 174 F.3d at 1055.  This factor also heavily favors Fitbit.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

(3)      **Similarity Between the Marks**

Defendants' non-genuine "Fitbit" products not only have the Fitbit Marks on the products themselves, but were sold to consumers in packaging bearing colorable imitations of the Fitbit Marks affixed without Fitbit's consent. *See* Section III.C.-I. above.  Thus, this factor also strongly supports a finding of likelihood of consumer confusion. *See Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1144 (9th Cir. 2002) (while the court may consider the differences between the respective trademarks, the similarities should be weighed more heavily than the differences).

(4)      **Evidence of Actual Confusion**

Customer feedback regarding Defendants' sales of "Fitbit" branded products has already established that consumers were actually confused as to the source, nature, and quality of the goods. "Evidence that use of the two marks has already led to confusion is persuasive proof that future confusion is likely." *Sleekcraft*, 599 F.2d at 352.  Indeed, certain consumers believed the refurbished Fitbit products sold by Defendants were actually <u>new</u> Fitbit products. *See* Alinder MSJ Decl., Ex. YY ("bands were brand new"; "absolutely love my new Fitbit"; "I love my new Fitbit"). Similarly, Fitbit's internal records report thousands of customers contacting Fitbit directly regarding their customer support and warranty claims for refurbished Fitbit products they purchased on Groupon and Woot.com during the relevant time period. *See* Bonham MSJ Decl., ¶ 4, Ex. B.

These reviews and customer support cases confirm that consumers were actually confused about the source of the goods, and believed that the source was Fitbit. *See i*d.  In short, Fitbit has been harmed because consumers buying these products, commenting on them, or even reviewing them believe that these products were authorized or affiliated with Fitbit, or that they reflect the quality of new genuine Fitbit products: "Don't waste your money on a refurbished item. I would even question purchasing this model new."  Alinder MSJ Decl., Ex. YY.

The consumers' frustration with the poor quality of the goods sold to them plainly harms Fitbit's brand and goodwill, as consumers mistakenly believed these inferior goods are a reflection of genuine Fitbit goods.  Indeed, the harm is not just to Fitbit and those consumers who purchased these goods, but to all consumers now exposed to these misleading reviews about products that were never intended to be resold to customers at all.  This evidence of actual confusion, and

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1   irreparable harm to Fitbit, its brand, and its goodwill tips this factor sharply in favor of Fitbit.

2   (5)   **Marketing Channels Used**

3   Both genuine Fitbit products and the non-genuine "Fitbit" branded products sold to

4   consumers by Defendants were sold online.  *See* Section III.D.-I. above; Alinder MSJ Decl., Ex. B

5   at 18:18-21:16 & Ex. XX.  The Internet "as a marketing channel is particularly susceptible to a

6   likelihood of confusion since, as it did in this case, it allows for competing marks to be encountered

7   at the same time, on the same screen."  *GoTo.com*, 202 F.3d at 1207; *see also Brookfield*, 174 F.3d

8   at 1057 ("[C]ourts have consistently recognized [the Internet] as exacerbating the likelihood of

9   confusion.").  As such, this factor also heavily favors Fitbit.

10   (6)   **Type of Goods and Purchasers' Likely Degree of Care**

11   As shown by the customer complaints, consumers online looking for good deals often do

12   not take a high degree of care with respect to such purchases.  "In analyzing the degree of care that

13   a consumer might exercise in purchasing the parties' goods, the question is whether a 'reasonably

14   prudent consumer' would take the time to distinguish between the two product lines."  *Surfvivor*

15   *Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 634 (9th Cir. 2005).  The expectations as to the

16   behaviors of the "reasonably prudent" consumer depend on the circumstances.  *Brookfield*, 174

17   F.3d at 1060.  "[W]hen dealing with inexpensive products, customers are likely to exercise less

18   care, thus making confusion more likely."  *Id.*  Given the price of these products, the similarities

19   between the two, and that consumers shopping online are unable to see how well a product works,

20   consumers are not likely to take high care in differentiating between a genuine Fitbit and the non-

21   genuine ones Defendants sold.  This factor therefore also strongly weighs in favor of Fitbit.

22   (7)   **Defendants' Intent in Selecting the Mark**

23   That Defendants knowingly used the Fitbit Marks for scrap products that were not

24   authorized to be sold to consumers as Fitbit products and that Defendants intended to profit from

25   infringing on the Fitbit Marks cannot reasonably be disputed.  Indeed, Defendants have admitted

26   that they were required to obtain permission to use Fitbit's brand and intellectual property, and it is

27   undisputed that Fitbit never provided that authorization.  Alinder MSJ Decl., Ex. D at 161:7-10.

28   Moreover, by reselling products with counterfeit cables and packaging, Defendants adopted the

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1   Fitbit Marks deliberately to benefit from the "good will, good name, and good trade which [Fitbit]

2   has built up," and to reinforce with the consumer that these products were affiliated with, sponsored

3   by, or otherwise approved by Fitbit. *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d

4   149, 158 (9th Cir. 1963). Thus, this factor also tips heavily in Fitbit's favor, as Defendants'

5   conduct indicates that it "expect[ed] confusion and resultant profit." *Id.*

6                        (8)     **Likelihood of Expansion of the Product Lines**

7          "A strong possibility that either party may expand his business to compete with the other

8   will weigh in favor of finding that the present use is infringing." *Sleekcraft*, 599 F.2d at 354

9   (quotation omitted); *see also Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1394 (9th Cir.

10  1993). Defendants thus far have done precisely that in this case, competing directly with Fitbit's

11  online sales products. *See* Section III.D.-I above; *see also* Alinder MSJ Decl., Ex. XX. Indeed,

12  Fitbit is also considering selling authorized refurbished products in the near future. Millar Decl. at

13  ¶ 5. As such, this factor also strongly favors Fitbit.

14         In short, based on either the presumption of confusion, the likelihood of confusion, or the

15  *Sleekcraft* factors, Fitbit has met its burden to receive summary judgment on these claims.

16                **2.     Federal Unfair Competition and California Unfair Competition**

17         Finally, the undisputed material facts show that Defendants have violated unfair competition

18  laws. These claims largely overlap with the analysis above regarding the Lanham Act's consumer

19  confusion test. *Cleary v. News Corp.*, 30 F.3d 1255, 1262–63 (9th Cir. 1994) (finding that 17200

20  claims are substantially congruent with Lanham Act); *see also Zeltiq Aesthetics, Inc. v. BTL Indus.,*

21  *Inc.*, 32 F. Supp. 3d 1088, 1099 (N.D. Cal. 2014). Therefore, for the reasons outlined above, the

22  Court should also grant summary judgment on Fitbit's federal and state unfair competition claims.

23                **3.     All Defendants Are Jointly and Severally Liable**

24         Where multiple defendants are involved in a distribution chain that ultimately sells

25  infringing products to consumers, "'any member of the distribution chain' of allegedly infringing

26  products can be 'jointly and severally liable' for the alleged misconduct." *Adobe Systems Inc. v.*

27  *Blue Source Group, Inc.*, 125 F. Supp. 3d 945, 973 (N.D. Cal. 2015) (citation omitted). Not only

28  has Fitbit shown Defendants to be members of the distribution chain of the infringing "Fitbit"

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1    products, but the undisputed facts also show that Defendants orchestrated this conspiracy to

2    distribute infringing products and set up the distribution chain.  *See Transgo, Inc. v. Ajac*

3    *Transmission Parts Corp.*, 768 F.2d 1001, 1020–21 (9th Cir. 1985); *MetroPCS v. Devor*, 215 F.

4    Supp. 3d 626, 633 (N.D. Ill. 2016) (finding liability based on "conspiracy to sell and offer for sale

5    materially different MetroPCS Handsets, removed from packaging, carrying bad IMEI, and/or

6    devoid of the manufacturer's warranty.").  Defendants also controlled the distribution of scrap

7    products by injecting hundreds of thousands of infringing products into the stream of commerce

8    that were ultimately resold to unwitting consumers through their conspiracy with Cali, and each

9    Defendant profited handsomely from those infringing "joint sales."    *See* Cali Decl., ¶5; Sections

10   III.C.-I. above; *see Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996) (vicarious

11   liability based on control and direct financial benefit).

12          Further, in Lanham Act cases like this one, personal liability extends to corporate

13   employees, like Baker and Manhan, for infringement "which he authorizes or directs or in which he

14   participates, notwithstanding that he acted as an agent of the corporation and not on his own

15   behalf."  *Comm. for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 823 (9th Cir. 1996); *Bambu*

16   *Sales, Inc. v. Sultana Crackers, Inc.*, 683 F. Supp. 899, 914 (E.D.N.Y. 1988) (sales manager found

17   liable for trademark infringement); *see* Sections III.C.-I.  Accordingly, neither Manhan nor Baker

18   may "shield himself behind a corporation when he is an actual participant in the" infringing

19   conduct, as here.  *Donsco, Inc. v. Casper Corp.,* 587 F.2d 602, 606 (3d Cir. 1978).

20                          **V.    CONCLUSION**

21          For the foregoing reasons, Fitbit respectfully requests that the Court grant summary

22   judgment in its favor as to liability on the First, Third, Fourth, and Eighth Claims for Relief.

23   DATED: May 30, 2018                        SIDEMAN & BANCROFT LLP

24

25                                    By:        /s/ Zachary J. Alinder
                                             Zachary J. Alinder
26                                           Attorneys for Plaintiff FITBIT, INC.

27

28