1   JEFFREY C. HALLAM (State Bar No. 161259)
    E-Mail:      *jhallam@sideman.com*
2   ZACHARY J. ALINDER (State Bar No. 209009)
    E-Mail:      *zalinder@sideman.com*
3   ELLEN P. LIU (State Bar No. 280459)
    E-Mail:      *eliu@sideman.com*
4   REBECCA K. FELSENTHAL (State Bar No. 303476)
    E-Mail:      *rfelsenthal@sideman.com*
5   SIDEMAN & BANCROFT LLP
    One Embarcadero Center, Twenty-Second Floor
6   San Francisco, California 94111-3711
    Telephone:   (415) 392-1960
7   Facsimile:   (415) 392-0827

8   Attorneys for Plaintiff
    FITBIT, INC.

9

10              **UNITED STATES DISTRICT COURT**

11             **NORTHERN DISTRICT OF CALIFORNIA**

12                **SAN FRANCISCO DIVISION**

13

14   FITBIT, INC.,                     Case No. 3:17-cv-00079 EMC (KAW)

15             Plaintiff,              **PLAINTIFF FITBIT, INC.'S OPPOSITION
                                       TO DEFENDANTS' MOTION FOR**
16       v.                            **SUMMARY JUDGMENT AND/OR
                                       PARTIAL SUMMARY JUDGMENT**
17   LAGUNA 2, LLC, et al.,
                                       Judge:   Honorable Edward M. Chen
18             Defendants.             Date:    June 28, 2018
                                       Time:    1:30 p.m.
19                                     Crtrm.:  5, 17th Floor

20

21

22

23

24

25

26

27

28

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION AND STATEMENT OF ISSUES TO BE DECIDED ........................... 1

II.     STATEMENT OF RELEVANT FACTS ......................................................... 1

    A.      Relevant Background Regarding Fitbit ................................................ 1

    B.      Fitbit's Supply Chain And Related Quality Control Processes .................................. 2

    C.      Defendants' Misrepresentations to Induce Fitbit to Hire BCS ................................. 2

    D.      Defendants' Continuing Misrepresentations After Entering the SOW ..................... 4

    E.      Defendants' Conspiracy To Sell Infringing Products and Control of Same ............. 5

    F.      The Execution of the Scheme and the Distribution of the Infringing Products .......... 6

    G.      Defendants' Concealment of Their Scheme ............................................... 7

    H.      Defendants' Scheme Unravels ........................................................ 9

III.    LEGAL STANDARD .............................................................. 11

IV.     ARGUMENT ................................................................ 12

    A.      Defendants Cannot Meet Their Initial Burden On Summary Judgment .................. 12

    B.      The Court Should Deny Defendants' Motion As To Breach Of Contract ............... 12

    C.      Defendants' Motion as to Fitbit's Trademark Claims Fails ..................................... 17

        1.      Defendants Used the Fitbit Marks in Commerce ................................. 17

        2.      Defendants Are Liable For Their Entire Infringing Distribution Chain ....... 18

            a.      Defendants Are Liable Under Multiple Legal Theories ................... 19

            b.      Defendants Are Also Liable Under *Inwood* ..................................... 20

    D.      The Court Should Deny The Motion On Dilution And Unfair Competition ........... 21

    E.      Defendants' Motion On Fitbit's Fraud-Related Claims Is Also Meritless ................ 21

    F.      Defendants' Challenge to the Conspiracy and Unfair Competition Claims
        Fails ................................................................. 24

V.      FITBIT'S EVIDENTIARY OBJECTIONS AND MOTION TO STRIKE ......................... 25

VI.    CONCLUSION ................................................................................................................ 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

PLAINTIFF FITBIT, INC.'S OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adobe Systems Inc. v. Blue Source Group, Inc.*,
  125 F. Supp. 3d 945 (N.D. Cal. 2015) ...................................................... 19

*Bar's Leaks Western, Inc. v. Pollock*,
  148 F. Supp. 710 (N.D. Cal. 1957) ........................................................ 19

*Brae Transp., Inc. v. Coopers & Lybrand*,
  790 F.2d 1439 (9th Cir. 1986) ......................................................... 12, 16

*In re Carroll*,
  549 B.R. 375 (Bankr. N.D. Cal. 2016) .................................................... 24

*Coach, Inc. v. Celco Customs Servs. Co.*,
  2014 WL 12573411 (C.D. Cal. June 5, 2014) .......................................... 19, 21

*Daniel v. Ford Motor Co.*,
  806 F.3d 1217 (9th Cir. 2015) ............................................................. 22

*Davis & Cox v. Summa Corp.*,
  751 F.2d 1507 (9th Cir. 1985) .......................................................... 24, 25

*Delk v. Ocwen Financial Corp.*,
  2017 WL 3605219 (N.D. Cal. 2017) ...................................................... 22

*Detoy v. City & Cty. of San Francisco*,
  196 F.R.D. 362 (N.D. Cal. 2000) ......................................................... 25

*Drop Dead Co. v. S.C. Johnson & Son, Inc.*,
  326 F.2d 87 (9th Cir. 1963) .............................................................. 18

*Eddy v. Sharp*,
  1991 Cal.App.3d 858 (1988) .............................................................. 23

*Fonovisa, Inc. v. Cherry Auction, Inc.*,
  76 F.3d 259 (9th Cir. 1996) .............................................................. 19

*FTC v. EDebitPay, LLC*,
  695 F.3d 938 (9th Cir. 2012) ............................................................. 14

*Imation Corp. v. Koninklijke Philips Elecs. N.V.*,
  586 F.3d 980 (Fed. Cir. 2009) ............................................................ 15

*Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*,
   456 U.S. 844 (1982) ....................................................................................... 18

*Karl Storz Endoscopy Am., Inc. v. Surgical Techs., Inc.*,
   285 F.3d 848 (9th Cir. 2002) ........................................................................... 18

*Lawyers Title Ins. Corp. v. U.S. Fid. & Guar. Co.*,
   122 F.R.D. 567 (N.D. Cal. 1988) ..................................................................... 16

*Letizia v. Facebook Inc.*,
   267 F. Supp. 3d 1235 (N.D. Cal. 2017) ..................................................... 12, 15

*Lockheed Martin Corp. v. Network Sols., Inc.*,
   194 F.3d 980 (9th Cir. 1999) ........................................................................... 21

*Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*,
   658 F.3d 936 (9th Cir. 2011) ........................................................................... 20

*Maples v. SolarWinds, Inc.*,
   50 F. Supp. 3d 1221 (N.D. Cal. 2014) ............................................................. 16

*MetroPCS v. Devor*,
   215 F. Supp. 3d 626 (N.D. Ill. 2016) ............................................................... 19

*Mirkin v. Wasserman*,
   5 Cal 4th 1082 (1993) ...................................................................................... 22

*Naidong Chen v. Fleetcor Technologies, Inc.*,
   2017 WL 1092342 (N.D. Cal. 2017) ................................................................ 23

*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*,
   638 F.3d 1137 (9th Cir. 2011) ......................................................................... 17

*Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*,
   210 F.3d 1099 (9th Cir. 2000) .................................................................... 11, 12

*Shell Oil Co. v. Winterthur Swiss Ins. Co.*,
   12 Cal. App. 4th 715 (1993) ............................................................................ 15

*Ticor Title Ins. Co. v. Rancho Santa Fe Assn.*,
   177 Cal.App.3d 726 (1986) ........................................................................ 13, 14

*Transgo, Inc. v. Ajac Transmission Parts Corp.*,
   768 F.2d 1001 (9th Cir. 1985) ......................................................................... 19

*United States v. Stuart*,
   489 U.S. 353 (1989) ......................................................................................... 15

*Vega v. Jones, Day, Reavis & Pogue*
   121 Cal.App.4th 282 (2004) ............................................................................. 24

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

PLAINTIFF FITBIT, INC.'S OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT

**Statutes**

15 U.S.C. § 45 ................................................................................................................... 25

15 U.S.C. § 1127 ........................................................................................................... 17, 18

18 U.S.C. §§ 2314-15 ....................................................................................................... 25

Cal. Bus. & Prof. Code Section 17200 ............................................................................. 25

**Other Authorities**

Fed. R. Evid. 403 .............................................................................................................. 25

Fed. R. Evid. 602 .............................................................................................................. 25

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

Plaintiff Fitbit, Inc. ("Fitbit" or "Plaintiff") respectfully submits the following Opposition to the Motion for Summary Judgment for Partial Summary Judgment (the "Motion") filed by Defendants P-Cove Industries dba Buyers Consultation Service ("BCS"), Environmental Liquidation, Inc. ("ELI"), Jonathan Manhan ("Manhan"), and Francis Michael Baker ("Baker," and collectively, the "Defendants"), ECF No. 241, in the above-captioned Action on May 24, 2018.

## I.   INTRODUCTION AND STATEMENT OF ISSUES TO BE DECIDED

Faced with a mountain of undisputed, damning evidence, confirming their illegal conspiracy to resell scrap Fitbit products, Defendants' Motion ignores the relevant facts and law, and instead asks the Court to redefine the word "repurpose" to mean "resell."  In doing so, Defendants seek to magically transmute their agreement with Fitbit from a scrap recycling and destruction agreement into an authorized reseller agreement.  Defendants' Motion hinges on this thin reed that the resale of scrap products, which Defendants actively concealed from Fitbit, was somehow also authorized by Fitbit.  This desperate tactic, under the guise of summary judgment, confirms that Defendants cannot even meet their initial burden of production for this Motion.  It also confirms Defendants have no plausible defense here, and that the Court should grant judgment in Fitbit's favor, *see* ECF No. 246.

Defendants' remaining grab bag of arguments on Fitbit's other claims are similarly unsupported by the facts and law.  When all the dust has settled, one clear picture emerges from the undisputed facts here:  Defendants orchestrated a sophisticated fraud and infringement scheme to generate millions of dollars in profits based upon the resale of scrap Fitbit products they represented they would not resell.  Defendants are each jointly and severally liable for their part in directing, operating, controlling, and profiting from that unlawful and infringing distribution chain.  The Court should therefore summarily deny Defendants' Motion in full.

## II.   STATEMENT OF RELEVANT FACTS

### A.   Relevant Background Regarding Fitbit

Fitbit is a San Francisco-based technology company focused on delivering health solutions that impact health outcomes through a platform of wearable devices (and the Aria smart scale) with software and services, with sales in excess of $1.6 billion in 2017.  *See* Declaration of Brett Millar in Support of Fitbit's Motion for Partial Summary Judgment, ECF No. 235 ("Millar MSJ Decl."), ¶ 2.

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

PLAINTIFF FITBIT, INC.'S OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

### B.     Fitbit's Supply Chain And Related Quality Control Processes

To protect its trademarks, brand, and reputation, and also ensure that consumers receive the high quality products and services that they have come to expect from Fitbit, Fitbit has instituted very detailed, non-pretextual, and established corporate protocols that govern the supply chain by which Fitbit's products are distributed and returned. *See id.*, ¶ 4; *see also* Supplemental Declaration of Brett Millar in support of TRO ("Supp. Millar TRO Decl."), ECF No. 29, ¶¶ 2-11. These procedures help ensure that products not meeting Fitbit's standards for high quality and reliability are not sold or otherwise distributed to consumers. *Id.* This is vital to preserving Fitbit's reputation with the consuming public, so that Fitbit's brand, reputation, and trademarks are not tarnished or otherwise harmed or degraded, or its customers deceived by inferior non-genuine goods. *See id.*

Fitbit's corporate protocols include an established "reverse supply chain" quality control process for any returns or exchanges. *See* Supp. Millar TRO Decl., ¶ 4. At all times relevant here, any returned products that did not pass all of Fitbit's quality control standards were provided to Defendant BCS, acting primarily through Manhan and Baker, as "scrap" for BCS to break down into component parts and raw materials, recycle the materials that could be recycled, and destroy and dispose of the remaining parts/materials. Supp. Millar TRO Decl., ¶ 11. Fitbit lived up to its end of the agreement, relying on Defendants' representations, by sending Defendants approximately 2 million scrap products for destruction and recycling. *See* Declaration of Jeff Bonham in Support of Fitbit's Motion for Partial Summary Judgment, ECF No. 236 ("Bonham MSJ Decl."), ¶ 2.

### C.     Defendants' Misrepresentations to Induce Fitbit to Hire BCS

At the outset of Defendants' scheme, Defendants represented themselves as a certified scrap destruction and recycling company, assuring Fitbit that they would break down all scrap Fitbit products into raw materials to be recycled or otherwise destroyed, and not resell them. *See, e.g.,* Declaration of Ellen Liu in support of Fitbit's Opposition ("Liu Decl."), ¶¶ 10, 19-21, 29, 30, 32, 34, Exs. I, R-T, BB, CC, EE, GG; ¶ 2, Ex. A (Deposition of Jennifer Windsor) at 63:3-64:5, 96:19-97:18. On May 26, 2015, Defendant Baker (BCS's VP of Business Development) assured Fitbit's representative Ms. Windsor that "All the product I receive will be recycled, unless you allow me to resell items of your choice. I'm set up to do both." *Id.*, Ex. T at FIT006023. Fitbit then instructed

1   and BCS agreed that no resale would be allowed, period: [Ms. Windsor:]  "As with Tom Tom, for

2   now, we won't be able to resell anything. Maybe in time we can resell something as whole, but for

3   now we will have to break things down to recycle and sell for commodity.  [Mr. Baker:]  Sounds

4   perfect..."  *See id*.  At no later point did Fitbit consent to allow Defendants to resell any scrap Fitbit

5   branded products.  *See id*., Ex. A at 126:12-128:19, 148:12-150:19; ¶ 5, Ex. D (Deposition of BCS's

6   30(b)(6)) at 161:7-10.

7         Notably, Defendants also previewed for Fitbit the settlement report template that would be

8   used to report the destruction and recycling of the Fitbit scrap at the commodity level.  *See id*., Ex. T

9   at FIT006023.  That template settlement report was comprised of seven sections, including a

10  "section 3," which Defendant Baker confirmed would be used only if items were to be resold.  *See*

11  *id*.  The resale reporting section 3 included "Finished goods Model numbers, QTY and rate per

12  item."  *See id*.  While the settlement reports sent to Fitbit included all of the other six sections

13  identified by Defendant Baker, it is undisputed, and Defendants admit, that the settlement reports

14  never included any section 3 resale reporting.  *See id*., ¶ 6, Ex. E (Deposition of Kyle Regal) at

15  121:19-122:5; ¶ 8, Ex. G (Deposition of Mike Baker) at 141:1-10; *compare*, Ex. T with Exs. R, GG.

16  Defendants had no answer for why the Section 3 resale reporting was never used in the Settlement

17  Reports, even though they resold the Fitbit products with Cali.  *See id*., Ex. E at 123:5-17.

18        Three days later, on May 29, 2015, Defendants sent Fitbit two documents: a slide deck titled

19  "BCS Location & fitbit Process Flow", and a Statement of Work ("SOW") that was consistent with

20  Fitbit's express requirement that BCS "break things down to recycle and sell for commodity," and

21  which Defendants concede embodied the key terms of the agreement.  *See id*., Exs. I & D at 170:7-

22  13.  The SOW confirmed the recycling and destruction "Services" that BCS would provide, and, as

23  Defendants admit, it said nothing about reselling scrap Fitbit products:

24      a.   BCS will arrange for pick-up when contacted by Fitbit.

25      b.   BCS will receive, weigh and sort material into commodities/channels.

26      c.   BCS will destroy product as requested and provide Certificate of Destruction.

        d.   BCS to manage downstream activities.  Downstream activities could include
27           shredding, smelting, reprocessing cardboard, incinerating, and ***resale of recycled
             commodities***. *Additionally, no use of Fitbit's brand or intellectual property is*
28           *authorized hereunder without Fitbit's prior written approval.*

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

e.      Process commodities and record final pricing, weights, and all related costs on the settlement report.

*Id.*, Ex. I at FIT005987 (Section 3) (emphasis added); ¶4, Ex. C (Deposition of Jonathan Manhan) at 180:12-21.  Thus, the agreement expressly contemplated "resale," but also expressly limited such resale to "recycled commodities."  *Id.*

Outside of the actual contractual Services Defendants agreed to provide, Defendants also agreed in a "Certification" Section that they would certify the recycling and/or repurposing of scrap products, "meaning that product would be recycled down to plastic, metal, wire, cardboard or other commodity level components," and provide certificates of recycling and destruction certifying that process. *See id.*, Ex. I at FIT005988 (Section 6).  Further, it is undisputed that Fitbit never provided approval to use its "brand or intellectual property," as required by Section 3 of the SOW. *Id.*, at Ex. D at 161:7-10, Exh. I at FIT005987 (Section 3).

The relevant contractual terms were drafted entirely by BCS, acting through its owner Defendant Manhan. *See id.*, Ex. D at 147:2-5.  Defendant Manhan, President of BCS and ELI, admitted that he specifically chose the word repurpose, but that he never communicated to Fitbit that his secret reason for doing so was that he wanted the "option" all along to resell scrap products "for their original purpose."  *Id.*, Ex. C  at 177:6-180:21; Ex. D at 174:5-175:5.

The May 29, 2015 slide deck Defendants provided with the SOW also reinforced the intent to recycle at the commodity level, as it showed separate stations at BCS for Fitbit products to be sorted and then broken down into raw materials (dongle, batteries, raw electronic parts, wire, bands...).  *Id.*, Ex. I at FIT005982.  The document then explained that "Station 3 will be a weight reconciliation of product and then it will be consolidated with like product in gaylords ready for recycling," with no mention of resale.  *Id.*  Months later, Defendants updated this slide deck, explaining that each Fitbit product type would be broken down "to basic commodities for recycling," again with no mention of resale.  *See id.*, ¶ 54, Ex. AAA at FIT005406.

**D.      Defendants' Continuing Misrepresentations After Entering the SOW**

On June 2, 2015, four days after Defendants provided the SOW, BCS's Operations Manager Kyle Regal again omitted any mention of resale. *See id.*, Ex. E at 91:20-93:25; Ex. S.  Mr. Regal

LAW OFFICES

SIDEMAN & BANCROFT LLP

ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1   explained that there were only three "avenues" for Fitbit scrap products – Recycling, Incineration,

2   and Landfill – not resale.  *Id.*; *see also id.* Ex. E at 96:1-16. He confirmed at his deposition that this

3   was consistent with his understanding of the SOW.  *See id.*  On July 9, 2015, a few weeks into the

4   initial pilot phase of the project, and pursuant to a pending request from Ms. Windsor, Defendants

5   even sent Fitbit videos that purported to demonstrate its "destruction" process for Fitbit products.

6   *See id.*, Exs. BB & CC.  By mid-July, Defendants had sent several Fitbit loads to their co-

7   conspirators at Cali Resources ("Cali") and provided Cali with an internal BCS email address to

8   communicate directly with Fitbit "representing BCS."  *See id.*, ¶¶ 17, 18, 22, Exs. P, Q, U.  None of

9   their communications disclosed this, and Defendant Manhan later admitted that Fitbit was not aware

10   of Cali's involvement.  *See id.*, Ex. C at 289:21-25.

11          Thereafter, the monthly settlement reports and the related certificates of recycling and

12   destruction sent by Defendants to Fitbit purported to detail breakdown of the recycled commodities,

13   like rubber, steel, and plastic.  *See id.*, Exs. R, GG.  However, Defendants admit that within "weeks"

14   of beginning the SOW, Defendants stopped breaking down any product at all and shipped the

15   product straight to Cali to be resold.  *See id.*, Ex. E at 22:14-29:24;  ¶ 7, Ex. F (Deposition of Jeffrey

16   Franklin) at 115:13-118:1; ¶ 9, Ex. H (Deposition of BCS 30(b)(6) at 287:18-290:7; *accord id.,* ¶ 38,

17   Ex. KK.  Despite this, Defendants continued to report monthly on commodities that had been

18   purportedly recycled, without a hint they were actually reselling the scrap products with Cali.  *See*

19   *id.*, Exs. R, GG.  To help conceal the lack of recycling of commodities, Defendants sampled an early

20   Fitbit shipment to derive a sample percentage breakdown of commodity weights and applied that

21   going forward so they could continue to report a plausible commodity breakdown to Fitbit for each

22   shipment.  *Id.*, Ex. F at 115:13-18; Ex. E at 22:14-29:24.  When asked whether it was "industry

23   practice to issue a certificate of recycling with commodity breakdown for products that are intended

24   for resale," BCS's General Manager admitted flatly "No."  *Id.*, Ex. F at 48:21-49:1.

25          **E.      Defendants' Conspiracy To Sell Infringing Products and Control of Same**

26          Discovery has confirmed that Defendants had a long-standing business relationship with

27   Cali, and that they coordinated from the outset to induce Fitbit to use BCS's scrap and recycling

28   services so that they could divert the Fitbit scrap products for resale as like new refurbished "Fitbit"

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1  products.  Liu Decl., Ex. C at 102:5-103:2, Ex. D at 174:5-175:6; *accord* Declaration of Joel Blank

2  in Support of Opposition to Fitbit's TRO ("Blank Decl."), ECF No. 19, at ¶ 11, Ex. A.  Indeed,

3  Defendants were so close with Cali that they referred to themselves as a "team," referred to Cali's

4  Mexican refurbishing plant as "BCS's Tijuana Facility," and even set up a masked BCS email

5  address for Cali to communicate directly with Fitbit, acting as a BCS representative.  *See id.*, Ex. C

6  at 187:19-189:23; Ex. G at 115:5-116:8, 185:21-186:8; ¶¶ 18, 33, 40, 56, Exs. Q, FF, MM, CCC.

7         Defendants and Cali partnered on procuring and refurbishing Fitbit products for resale prior

8  to BCS entering into the SOW with Fitbit.  *See id.*, Ex. C at 104:5-9; Ex. KK.  Defendants first

9  partnered with Cali to refurbish and resell Fitbit products that BCS obtained from Target, ERS, and

10  other wholesalers and dealers.  *Id.*, Ex. C at 104:10-18, 106:19-107:11.  Defendants and Cali then

11  extended this agreement to cover the scrap products that BCS received through Fitbit's reverse

12  supply chain (pursuant to their agreed upon 50/50 profit split).  *Id.* at 105:16-106:25 & Ex. D at

13  37:20-24, 53:1-5, & 91:23-25; ¶ 27, Ex. Z.  As the supplier of the scrap products, Defendants were

14  essential to the distribution chain and completely controlled whether they were recycled or resold.

15  *See id.*, Ex. D at 95:5-96:21, 105:23-106:8; Ex. KK; ¶¶ 42, 45, Exs. OO, RR.

16         **F.      The Execution of the Scheme and the Distribution of the Infringing Products**

17         The first step in the distribution chain required Defendants to procure the Fitbit scrap from

18  Fitbit, using the pretext of scrap destruction and recycling services set forth above.  *See id.*, Ex. D at

19  96:16-21 & 105:23-106:8.  Defendants then diverted these scrap "Fitbit" branded products to Cali,

20  which attempted to refurbish them at its facility in Tijuana, Mexico.  *See id.*, Ex. RR; *see also*, Ex. C

21  at 65:15-66:6.; Ex. D at 109:20-110:7; Ex. U; ¶ 23, Ex. V; Ex. FF.  Indeed, Defendants continued to

22  do so knowing that Cali was purchasing non-genuine Fitbit cables from China, to "get orders out" in

23  support of their common plan.  *See id.*, Ex. D at 237:11-238:14; Ex. O; ¶¶ 37, 46, Exs. JJ, SS.

24         Defendants also kept close tabs on Cali's resale of the "Fitbit" branded products, from

25  receiving reports of refurbished inventory from Cali, to questioning what happened with product that

26  could not be refurbished, to sending questions about Cali's online sales, including sales on Groupon,

27  and their packaging.  *See id.*, Ex. D at 239:3-243:2; Ex. G at 169:18-177:15; Exs. O, OO, SS.

28  Defendants also controlled the shipping and logistics process to get the scrap Fitbit products from

1    Fitbit's reverse supply chain to Cali.  *See id.*, Ex. C at 186:12-189:23; Ex. H at 291:15-293:7; Ex. Q.

2         These "Fitbit" products, procured as scrap by Defendants and "refurbished" by Cali, were

3    then sold either directly or through secondary market distribution channels to unwitting consumers,

4    duped into thinking they were getting a "like new" Fitbit product on the cheap.  *See* Declaration of

5    Cali Resources, Inc. ("Cali Decl."), ECF No. 237, ¶ 5; Liu Decl.,¶¶ 17, 22, 48, Exs. P, U, UU; *see*

6    *also* Blank Decl. at ¶ 20.  This practice continued unabated throughout the Fitbit relationship,

7    resulting in the resale of hundreds of thousands of scrap "Fitbit" branded products to consumers, by

8    former defendant Laguna 2 ("L2") and others on Groupon, Woot.com, and eBay, as well as directly

9    by Cali on Overstock.com.  *See* Liu Decl., Ex. UU; ¶ 53, Ex. ZZ; *see also* Millar TRO Decl., ¶ 7 &

10   Ex. G.  In addition to counterfeit packaging and cables, all of Defendants' "Fitbit" product sales

11   necessarily included Fitbit's registered trademarks, as Fitbit's wordmark and diamond trademark are

12   incorporated into the products themselves.  *See* Bonham MSJ Decl., ¶ 11.  This unlawful conduct

13   resulted in over $16 million dollars in profit to the infringing distribution chain, millions of which

14   went to Defendants, including ELI, the entity that Defendants used to invoice Cali for the profits.

15   *See* Liu Decl., Ex. D at 36:22-37:6 & 53:1-54:18; Ex. Z; ¶ 51, Ex. XX at p. 2.

16        **G.        Defendants' Concealment of Their Scheme**

17        Throughout 2016, Fitbit sent scrap products to Defendants in reliance on their continuing

18   representations that they were not reselling anything.  *See* Liu Decl., ¶¶ 12, 24, 26, 41, 43, Exs. K,

19   R, W, Y, GG, , PP, QQ, TT; *see also* Declaration of Jeff Bonham in Support of Fitbit's Response to

20   L2's Supplemental Statement re Motion for TRO ("Bonham TRO Decl."), ECF No. 49-1, ¶ 5.

21   Defendants' internal communications reflect their efforts to conceal their breaches, fraud, and

22   infringement.  For example, when Defendants attempted to obtain additional Fitbit products from

23   Verizon (which had been introduced to them by Fitbit), Defendants represented to Verizon and

24   Fitbit that "BCS has been given strict instructions to destroy all Fitbits for recycling."  Liu Decl.,

25   Ex. Y.  At the same time, Defendants noted internally that the Verizon deal would need to be a

26   "sacrificial lamb," because they could only offer a "scrap play" to "make sure nothing is offered to

27   verizon (sic) that we don't give to fitbit," which otherwise of course would risk exposing their

28   resale of Fitbit products to Fitbit.  *Id.*, Ex. C at 255:3-15; ¶ 28, Ex. AA.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1   Even explicit instructions to recycle or destroy scrap Fitbit products in country in 2016 were

2   ignored by Defendants, who instead shipped these products to Cali.  *Id.*, Ex. RR.  In a March 13,

3   2016 email related to the export of Fitbit scrap from Australia to Los Angeles, Baker warned Cali to

4   be careful because "Fitbit believes we process material in country."  *Id.*, ¶ 39, Ex. LL.  Mr. Kelvin,

5   Cali's CEO, forwarded the warning to Manhan, stating: "Why does he put that in writing?"  *Id.*

6   Also in early 2016, when asked to destroy certain Slovakian products in the EU due to an

7   issue with the strap on the products (*id.*, Exs. PP & QQ; ¶ 55, Ex. BBB at FIT000765), Defendants

8   created an elaborate ruse to export them to "BCS's Tijuana facility," another name for Cali:

9   Mr. Manhan:  Have a guy in the UK will that work?

10   Mr. Baker:  I believe that will work.  We can show the recycling name with a UK
    address and a contact name and number.  Fitbit sees the material landing in the UK

11   at a recycling company that we know.  Once the product has landed then we can
    direct product from the UK with new export documents.  This will slow or stop the

12   volley of emails going between Ingram slovakia and Fitbit.

13   *Id.*, ¶¶ 56-57, Exs. CCC, DDD.  Defendants then certified the products as recycled on March 6,

14   though Cali did not receive the scrap in Tijuana until weeks later.  *Id.*, Ex. R at FIT001071; Ex. RR.

15   During the fall of 2016, questions arose regarding the resale of "Fitbit" branded products

16   through online marketplaces like eBay and Groupon.  *See* Millar TRO Decl., ¶¶ 5-11.  Fitbit sought

17   further information and assurances from Defendants, but was met with more misrepresentations. *See*

18   Liu Decl., Ex. W.  In one instance, Defendant Baker copied and pasted Fitbit's inquiries into a new

19   email sent to others at BCS, including Manhan, writing "Jen, has meeting with her legal team

20   tomorrow, below she is asking for some info just in case she is asked. ***Which company's do we want***

21   ***to tell her*** in regards to her questions below." *See id.*, Ex. G at 213:14-216:8; ¶ 35, Ex. HH

22   (emphasis added).  This was then forwarded to Cali for their assistance. *Id.*  Defendants and Cali

23   developed a plan to "***keep Cali out of the mix if you could and just use downstream for extra layer***

24   ***of protection***." *Id.*, ¶ 36, Ex. II (emphasis added).  Consistent with Mr. Kelvin's instruction that Cali

25   be excluded for an "extra layer of protection" and even though the "easy answer" was that BCS was

26   sending the products to Cali for resale, Baker omitted Cali from his response to Fitbit.  *Id.*, Ex. G at

27   215:24-216:8 & 220:20-223:25; Ex. W.  Instead, Baker went into great detail about how all Fitbit

28   scrap was being properly recycled and repurposed into "soles for Sandals and Mats." *Id.*, Ex. W.

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1    On November 30, 2016, Fitbit's senior manager for brand protection and associate general

2    counsel for litigation met with BCS at its facility in Indianapolis.  *See* Bonham TRO Decl., ¶ 5.  At

3    that meeting, BCS, acting through its onsite managers Jeff Franklin and Kyle Regal, provided Fitbit

4    with a tour of the facility, and provided documentation and further verbal representations that

5    Defendants had never resold any products received from Fitbit, but instead had destroyed or

6    recycled them all at a commodity level.  *See id.*; *see also* Liu Decl., ¶ 58, Ex. EEE.  Regal and

7    Franklin did not deny that these conversations occurred, but conveniently claimed not to recall

8    them at their depositions.  *Id.*, Ex. E at 117:11-118:16; Ex. F at 100:11-101:20.

9    **H.    Defendants' Scheme Unravels**

10   During this same time period, Fitbit purchased and analyzed a number of "Fitbit" branded

11   products being sold as genuine refurbished Fitbit branded products by L2 on Groupon.com.  *See*

12   Supp. Millar TRO Decl., ¶¶ 12-23.  Fitbit confirmed that their serial numbers were on the list of

13   products Fitbit had designated for scrap destruction and the packaging contained counterfeit marks:

14   <u>Example of Genuine Fitbit Packaging</u>          <u>Defendants' Counterfeit "Fitbit" Packaging</u>

   

20   *See* Millar TRO Decl., ¶ 6, Ex. F, at pp. 10-17.  The packaging also referred the consumer to

21   Fitbit.com to setup the product and had a "Warranty Card" that referred the customer to the

22   Fitbit.com and contained a significantly inferior warranty.  *See id*; *see also* https://www.

23   fitbit.com/legal/returns-and-warranty.  The counterfeit packaging and warranty card were not

24   changed for at least a year after these scrap sales began.  Blank Decl., ¶ 13.

25   Further analysis performed by Fitbit confirmed additional physical differences affecting six

26   of these scrap "Fitbit" branded products.  *See* Supp. Millar TRO Decl., ¶¶ 12-23; Liu Decl., ¶¶13-14,

27   Exs. L, M.  While all nine products were shipped in counterfeit packaging, four products were also

28   shipped with counterfeit "Fitbit" accessories and charging cables falsely bearing Fitbit's diamond

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1   trademark.  *See id.*; *see also* Bonham TRO Decl., ¶ 7, Ex. E:



Magnified on the marks:



*Id.*  Fitbit confirmed these products had cosmetic defects, band damage, and a broken button.  *Id.*
These defects are material, failing Fitbit's quality control and disqualifying them even from being
refurbished for warranty replacement (Fitbit has never resold refurbished goods to consumers).  *Id.*

Further, Fitbit has now analyzed a sample of 100 from the thousands of "Fitbit" branded
units recently returned by L2 against Fitbit's internal records and data, and determined that 97 of the
100 products appear either conclusively or with a very high likelihood to have been designated for
scrap destruction, and therefore would have been sent to BCS to be destroyed and/or recycled at the
commodity level.  *See* Bonham MSJ Decl., ¶ 10.  The remaining 3 simply had insufficient data to
confirm for sure how they got into L2's inventory.  *Id.*

In addition, U.S. Customs and Border Protection ("CBP") informed Fitbit about the seizure
of thousands of Fitbit products that CBP determined to be counterfeit.  Millar MSJ Decl., ¶ 6, Exs. B
& C.  This seizure, on or around January 10, 2017, included 1,243 "Counterfeit Fitbit Scales."  *Id.*, at
Ex. B.  The seized shipment also included 13,626 "Counterfeit Fitbit Watches" according to CBP.
*See id.*  The seizure notice identified Cali as the Importer of Record.  *Id.*  Fitbit has now analyzed a
sample of ten "Fitbit" branded Aria scales from the Cali seizure that were provided to Fitbit for
examination by CBP.  Millar MSJ Decl., ¶¶ 6-8.  Each of those Aria scales had all serial number and
regulatory compliance information stripped off the units, making them not only materially altered
and non-genuine, but also out of compliance with U.S. law on resale of medical devices.  *See id.*, Ex.
D.  While certain of the scales were completely non-functional, the scales that functioned all had
serial numbers that were previously designated by Fitbit as scrap.  *See id.*

Shortly after CBP seized these counterfeit and scrap products, Defendants furnished Cali
with a letter, in the hope that CBP would release these products back to Cali.  *See* Cali Decl., ¶ 4.  In

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

that letter on BCS Letterhead, Manhan admitted that Defendants were reselling these Fitbit products, that Cali was processing and reselling at their direction, and even claimed they had prior written consent from Fitbit to use its logo (which Manhan has admitted he did not):

> We receive a variety of merchandise and brands from the large retailers we do reverse logistics for...includ[ing]...Fitbit....  Please understand that the product is sent to Cali Resources Inc. and Cali Resources SA de CV for processing. We only sell refurbished products and do not use logos unless we have prior written consent from manufacturer.  All material is used refurbished and sold as such with warranties from us not the manufacturer.

*Id.*, Ex. KK; accord Cali Decl., ¶ 5; *see also* Liu Decl., Ex. D at 161:7-10.  In doing so, Defendants admitted to the direct distribution and resale of counterfeit and scrap Fitbit products.  *See id.*

### I.       Consumer Confusion Regarding These Scrap Products

It is undisputed that it was never disclosed to consumers that these "Fitbit" products had been designated as scrap, or that they were accompanied by counterfeit accessories or in counterfeit packaging.  *See* Bonham MSJ Decl., ¶ 3 at Ex. A; Blank Decl.,  Exs. E1, E2; Declaration of Joel Blank in support of Supplemental Response, ECF No. 33, ¶ 28; Liu Decl., Ex. KK (representing products as "used refurbished and sold as such...").  Indeed, Cali's customer L2 believed the products "performed and looked like new" and were accompanied by "original" Fitbit accessories.  *Id.*  L2's eBay and Groupon listings reflected this confusion, and did not reflect the scrap nature of the goods, to the detriment of Fitbit and hundreds of thousands of duped consumers.  *See id.*

While Defendants do not challenge consumer confusion, it is undisputed that resale of scrap as "like new" genuine product caused significant actual consumer confusion and reputational harm to Fitbit.  *See* Liu Decl., ¶ 52, Ex. YY; Bonham MSJ Decl., ¶¶ 4-5 & Ex. B.  It is also undisputed that the resale of scrap, as like new refurbished units, was substantially likely to cause consumer confusion and that the fact that the products failed Fitbit's quality control and were scrap designated would have been "highly material" to consumers.  *See* Liu Decl., ¶ 50, Ex. WW at pp. 66 & 72.

### III.      <u>LEGAL STANDARD</u>

Defendants have both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment to show that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law here.  *Nissan Fire & Marine Ins. Co. v. Fritz*

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1   *Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). However, as set forth in greater detail

2   below, Defendants have failed to "either produce evidence negating an essential element of the

3   nonmoving party's claim . . . or show that the nonmoving party does not have enough evidence of

4   an essential element to carry its ultimate burden of persuasion at trial." *See id.*

5   ## IV.   ARGUMENT

6   ### A.   Defendants Cannot Meet Their Initial Burden On Summary Judgment

7   As a preliminary matter, the Court should summarily deny Defendants' Motion because they

8   have not remotely met their initial burden of production. *See* Motion, ECF No. 241, pp. 7-8. As set

9   forth in detail below, Defendants' Motion ignores the relevant facts and evidence, and instead

10  creates a fanciful and manicured recitation of the underlying facts. *Id.*, pp. 4-7. While all inferences

11  must be drawn in Fitbit's favor, the undisputed facts, including Defendants' admissions, actually

12  establish that Fitbit is entitled to summary judgment here. As such, and as their deficient and

13  misleading factual showing establishes, Defendants cannot meet their initial burden of production.

14  ### B.   The Court Should Deny Defendants' Motion As To Breach Of Contract

15  Defendants' overarching argument asks this Court to change the entire nature of the

16  agreement with Fitbit by construing the word "repurpose" in the SOW to mean "resell." Motion, pp.

17  11:24-15:8. Doing so would fundamentally alter the intended purpose of the agreement, which was

18  to recycle and/or destroy scrap products. It would also contradict the plain meaning of the term

19  "repurpose," the undisputed evidence of the parties' intent at the time the agreement was formed, the

20  undisputed evidence regarding the parties' disclosed performance under the agreement, and their

21  representations over the course of the relationship. *See Brae Transp., Inc. v. Coopers & Lybrand*,

22  790 F.2d 1439, 1443 (9th Cir. 1986) ("The court may consider the nature and object of the contract,

23  as well as the preliminary negotiations and the circumstances under which it was made."); *Letizia v.

24  Facebook Inc.*, 267 F. Supp. 3d 1235, 1251 (N.D. Cal. 2017) ("[T]he most reliable evidence of the

25  parties' intentions is their conduct after the contract is signed and before any controversy has

26  arisen."). Defendants' Motion as to breach of contract fails for at least five distinct reasons.

27  ***First,*** Defendants agreed up front that they would not "be able to resell anything,"

28  representing to Fitbit: "Sounds perfect." *See* Liu Decl., Ex. T at FIT006023. Four days later,

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

Defendants reflected this agreement to not resell products and to only recycle and/or destroy products in the SOW, which Defendants admit they drafted and which explicitly limited any resale to "resale of recycled commodities." *See id.*, Ex. I.  Thus, resale was expressly contemplated in the agreement between Fitbit and Defendants, but it also was expressly limited to resale of commodities. *Id.*  Moreover, the SOW further confirmed their agreement not to resell by prohibiting any use of Fitbit's brand and trademarks without Fitbit's written authorization, which they never obtained and which would have been required to resell whole products.  *Id.*; *see also* Ex. D at 161:7-10.

Consistent with this agreement, Defendants' settlement reports, certificates of recycling, and all of their communications with Fitbit prior to the lawsuit reflected the purported recycling of tons of raw materials (not the resale of whole products), even though Defendants admit there was a section in their reporting that for use when reselling whole products.  *See id.*, Exs. R, T & GG.  Likewise, BCS's General Manager admitted that it was not "industry practice to issue a certificate of recycling with commodity breakdown for products that are intended for resale."  *Id.*, Ex. F at 48:21-49:1.  In short, Defendants' newly-minted definition for "repurpose" violates the parties' intentions in entering, and their express and implied understanding of the obligations under ,the agreement. *Ticor Title Ins. Co. v. Rancho Santa Fe Assn.*, 177 Cal.App.3d 726, 730 (1986) ("The fundamental canon of interpreting written instruments is the ascertainment of the intent of the parties.").

Indeed, Defendants' onsite manager Kyle Regal explained to Fitbit, four days after he sent Fitbit the SOW, that there were only three "avenues" for Fitbit scrap products – Recycling, Incineration, and Landfill – not resale.  *See id.*, Ex. S.  Mr. Regal admitted in deposition that this was consistent with his understanding of the SOW.  *See id.*, Ex. E at 96:1-16.  In short, as both Mr. Regal and as Fitbit confirmed, resale was not the intent of the parties –  "There was no misunderstanding. There was no misreading."  *See id.*, Ex. A at 149:8-15.

**Second,** Defendants' argument that the use of the term "repurpose" in the Preamble and Certification section of the SOW somehow authorized "resale" of whole products is frankly absurd. *See* Motion, pp. 11:24-15:8.  The word "repurpose" is **not** in the Services section of the SOW, but even if it had been, their argument makes no sense.  The plain meaning of the word "repurpose" is to "[a]dapt for use in a different purpose."  *See, e.g.,* Oxford English Dictionary, available at

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1  https://en.oxforddictionaries. com/definition/repurpose; *accord* Google's definition of repurpose.

2  Resale of whole products *for the exact same intended purpose* is the opposite of repurposing a

3  product or component.  As Baker confirmed to Fitbit at the time, repurposing means, for example,

4  turning the rubber of a Fitbit product into soles for sandals or a rubber mat.  Liu Decl., Ex. W.

5  Reading "repurpose" to mean "resale" would not only violate the entire purpose of the

6  agreement (scrap destruction and recycling), it would also directly contradict the definition for

7  "repurpose at the *product* or component level" that Defendants put in the agreement itself: "meaning

8  that *product* would be recycled down to plastic, metal, wire, cardboard or other commodity level

9  components."  *See id.*, Ex. I at FIT005988 (emphasis added).  Finally, it would also directly

10  contradict the agreed Services to be provided by BCS, which limited *resale* to resale of recycled

11  commodities and which expressly prohibited BCS from using Fitbit's brand or trademarks without

12  prior written approval.  *See id.* at FIT005987; *see also Ticor*, 177 Cal. App. 3d at 730 ("A court must

13  view the language in light of the instrument as a whole and not use a 'disjointed, single-paragraph,

14  strict construction approach.'").  It is undisputed that Defendants never obtained such approval and

15  that all of their sales violated this provision, because the products they resold with Cali were

16  materially different from genuine products and contained Fitbit's trademarks.  *See* Section II.H.

17  **Third,** Defendants' attempt to rewrite the contractual terms years later is contrary to basic

18  hornbook law on contract interpretation.  As established above, the plain meaning of "repurpose"

19  directly contradicts Defendants' new – and previously undisclosed – meaning for this term.

20  Further, it is well established that specific language controls over more general language, and

21  where specific and general provisions conflict, the specific provisions ordinarily qualify the meaning

22  of the more general one.  *See FTC v. EDebitPay, LLC,* 695 F.3d 938, 944 (9th Cir. 2012).  Arguing

23  that "repurpose" meant "resale" violates this canon.  First, the use of "repurpose" in the Preamble in

24  reference to allowed services is more specifically defined in the actual "Services" section of the

25  SOW and cannot be read to allow some additional service.  Liu Decl., Ex. I.  And, to be sure, the

26  "Services" section of the SOW specifically does allow resale, but *only resale of recycled*

27  *commodities*.  *Id.* at FIT005987.  The other "repurpose" language that Defendants cite is in the

28  "Certification" section of the SOW, which also cannot be read to expand the specifically allowed

3609505

14

Case No. 3:17-cv-00079 EMC (KAW)

1   Services.  *Id.* at FIT005988.  Even as to the language in the Certification section regarding

2   "repurpose at the product or component level," as stated above, Defendants specifically defined the

3   "meaning" directly after this language, confirming that ***"product*** would be ***recycled*** down to plastic,

4   metal, wire, cardboard or other commodity level ***components*.**  *Id.* (emphasis supplied).  This

5   "meaning," which Defendants drafted, modifies the entire prior sentence as a summative modifier by

6   referring to each element of the prior sentence together "product," "recycling," and "component."

7   *Id.*; *see also id.*, Ex. A at 125:9-23.

8          It is also well established that the same words used in different parts of a writing should have

9   a consistent meaning.  *See Imation Corp. v. Koninklijke Philips Elecs. N.V.*, 586 F.3d 980, 990 (Fed.

10  Cir. 2009).  Thus, "repurpose" and "recycle" here should be given a similar meaning, neither of

11  which includes <u>resale</u> of whole products, particularly given that Defendants knew how to use the

12  term "resale" when that was intended, like "resale of recycled commodities".  Thus, interpreting

13  repurpose to mean resale here would be internally inconsistent and would violate the rule of giving

14  "each word significance," since resale is already used in the SOW.  *Shell Oil Co. v. Winterthur Swiss*

15  *Ins. Co.*, 12 Cal. App. 4th 715, 753 (1993).

16         ***Fourth,*** the Parties' conduct after entering into the agreement was also consistent with the

17  parties' expressed intent (rather than Defendants' new one) and should be given great weight here.

18  *See Letizia*, 267 F. Supp. 3d at 1251.  Here, Defendants continued to represent to Fitbit that they

19  were recycling all products at the commodity level, reporting to Fitbit, month after month, about the

20  tons of purported raw materials that had been recycled.  Liu Decl., Exs. R, GG.  Defendants

21  confirmed again about nine months into the relationship that they "had been given strict instructions

22  to destroy all Fitbits for recycling."  *Id.*, Ex. Y.  Indeed, Defendants lied to Fitbit to the bitter end,

23  representing to Fitbit on November 30, 2016 (just a week before the initial lawsuit was filed) that

24  Defendants had not resold any scrap Fitbit products.  *See* Bonham TRO Decl., ¶ 5.

25         In addition, Defendants misrepresented and concealed their interpretation of "repurpose" and

26  concede Fitbit had no idea they were using Cali to resell product (*see* Section II.D above); thus, the

27  Court should reject Defendants' interpretation out of hand.  *United States v. Stuart*, 489 U.S. 353,

28  368 n. 7 (1989) ("It is hornbook contract law that the proper construction of an agreement is that

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1   given by one of the parties when 'that party had no reason to know of any different meaning attached

2   by the other, and the other had reason to know the meaning attached by the first party.'") (citing

3   Rest.2d, Contracts § 201(2)); *Brae Transp.*, 790 F.2d at 1443 (court will pierce the objective form of

4   the contract if contract language used to conceal rather than express the true intent).  That

5   Defendants constructed a new definition for "repurpose" years later to immunize their fraud should

6   be given no weight by the Court.  *See Lawyers Title Ins. Corp. v. U.S. Fid. & Guar. Co.*, 122 F.R.D.

7   567, 569 (N.D. Cal. 1988).  Indeed, if Defendants were actually allowed to resell products under this

8   agreement, they were also obligated to pay Fitbit 70% of the millions of dollars of revenue earned

9   pursuant to that agreement, and it is undisputed they did not.  *See* Motion, p. 6:7-10 (admitting they

10  owed Fitbit 70% of revenue); Liu Decl., Ex. XX at p. 2.  Finally, even if there was any ambiguity

11  created by the word "repurpose" (as is plainly not the case here), that ambiguity must be resolved

12  against Defendants as the drafters of the SOW and this term in particular.  *Maples v. SolarWinds,*

13  *Inc.*, 50 F. Supp. 3d 1221, 1228 (N.D. Cal. 2014); *see also* Liu Decl., Ex. C at 89:12-16 & 233:3-8.

14       ***Fifth,*** Defendants' reliance on their R2 certification and two instances of required destruction

15  (rather than recycling) provides no cover for their unlawful conduct.  Motion, p. 13:1-6.  Even if

16  Defendants had disclosed their intent to use the R2 standard as cover for resale, the R2 standard

17  would not have allowed resale here, because it specifically does not permit resale if the customer

18  directs otherwise or if resale is inconsistent with a commercial agreement.  *See* Liu Decl., Ex. VV; ¶

19  59, Ex. FFF.  As discussed in detail above, the agreement between the parties did not allow resale of

20  whole products, and there is no dispute that Defendants received repeated directions from Fitbit that

21  the Fitbit scrap had to be recycled or destroyed, and not resold.  *Id.*, Ex. A at 128:5-19 & 149:8-15;

22  Ex. T.  Likewise, the two instances Defendants cite, where Fitbit required destruction (rather than

23  recycling) also supports Fitbit.  These products had issues, including a product recall, such that *no*

24  *recycling* of the product could occur, and indeed the destruction needed to be witnessed by a

25  government representative.  *See id.*, Ex. A at 147:9-148:11; Exs. J, PP, QQ.  These two instances

26  confirm that the intent of the agreement was to recycle and resell raw commodities from the scrap

27  Fitbit products and to split the net proceeds, such that Fitbit had to specifically inform them in these

28  two instances that no recycling of any commodities could occur.  *See id; see also, id.,* Ex. Z.  As

1  such, these two instances further confirm that the Court should deny Defendants' Motion and reject

2  their request to insert the term "resell whole products" into the agreement years after the fact.

3  **C.      Defendants' Motion as to Fitbit's Trademark Claims Fails**

4      Defendants have similarly failed to satisfy their burden on Fitbit's trademark infringement,

5  unfair competition, and dilution claims.  *See Network Automation, Inc. v. Advanced Sys. Concepts,*

6  *Inc.*, 638 F.3d 1137, 1144 (9th Cir. 2011).  Defendants' primary argument – that Fitbit somehow

7  authorized their infringement (Motion, p. 10:5-14) – fails for the same reasons as the contract

8  argument in Section B above.  Moreover, the undisputed evidence establishes that Defendants are

9  both directly and indirectly liable for trademark infringement here.

10      **1.      Defendants Used the Fitbit Marks in Commerce**

11      Defendants' novel argument, that they did not directly infringe on Fitbit's Marks because

12  they did not "use" them "in commerce," is meritless.  Motion, pp. 9:1-10:4.  Under 15 U.S.C. §

13  1127, a mark is in "use in commerce" when (1) the mark has been placed on the goods or their

14  containers, labels or the documents associated with the goods or their sale, and (2) the goods are

15  "sold or transported in commerce." 15 U.S.C. § 1127.

16      First, Defendants have already admitted that they directed and conspired with Cali to resell

17  the scrap products: "***We*** only sell refurbished products and . . . [a]ll material is used refurbished and

18  sold as such with warranties from ***us*** not the manufacturer."  *See* Liu Decl., Ex. KK (emphasis

19  supplied); *accord* Cali Decl., ¶ 5 (referring to their "joint sales" with BCS).  It is also undisputed that

20  Cali made some of these "joint sales" directly on overstock.com and ebay.com.  *See* Liu Decl., Exs.

21  UU, ZZ; *see* also Millar TRO Decl., ¶ 7 & Ex. G.  Further, it is undisputed that Defendants knew

22  these "joint sales" required buying and reselling non-genuine charging cables from China to "get

23  orders out," and that the massive profit they made was from resale to consumers pursuant to their

24  "long-standing agreement that they would split the profits on any materials BCS sent Cali that Cali

25  was able to refurbish and resell . . . ."  *See* Liu Decl., Ex. D at 237:11-238:14 & 239:3-243:2; Ex. G

26  at 169:18-177:15; Exs. O, JJ & SS; Motion, p. 6:21-23; Decl. of Jonathan Manhan ("Manhan

27  Decl."), ECF No. 241-19, ¶ 6 .  Indeed, in their Motion, Defendants do not dispute the agreed

28  distribution chain: "Cali refurbished and repurposed the items that could be refurbished and

SIDEMAN & BANCROFT LLP

LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

LAW OFFICES

SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1   repurposed, and sold them to a distributor, Laguna 2, LLC ("L2"), which marketed them for sale on

2   Groupon as refurbished products."  Motion, p. 2:7-10.  Accordingly,  Defendants cannot dispute that

3   they "used" the Fitbit Marks in commerce.

4          Moreover, the "or transported" language in 15 U.S.C. § 1127 makes it clear that a "use in

5   commerce" is not limited to sales.  Defendants' shipping of scrap Fitbit products from numerous

6   overseas locations to Cali in California and Tijuana is a use in commerce under Federal law.  *See*

7   *Drop Dead Co. v. S.C. Johnson & Son, Inc.*, 326 F.2d 87, 93 (9th Cir. 1963).  The *Karl Storz*

8   *Endoscopy Am., Inc. v. Surgical Techs., Inc.*, 285 F.3d 848 (9th Cir. 2002) case is instructive.  There,

9   the court evaluated whether the mere repair or refurbishment, without any distribution, could

10  constitute a "use in commerce" under the Lanham Act, and concluded that if repair or refurbishment

11  resulted in a different product, there was use in commerce.  *Id.* at 856.  So it should be here.  Thus,

12  Defendants' shipping of scrap products to Cali across state and international lines to be refurbished

13  and resold constitutes an independent "use in commerce" under the Lanham Act. *See Drop Dead,*

14  326 F.2d at 90; *accord* Motion, p. 6:21-23; Manhan Decl., ¶ 6.

15         Likewise, Defendants' related argument that "Cali was [not] likely to be confused" here is a

16  red herring.  Motion, p. 9:12-14.  Cali was not the consumer here, but rather, and as Defendants

17  admit in their Motion, Cali was Defendants' co-conspirator in reselling the scrap products: "Cali and

18  BCS had a long-standing agreement that they would split the profits on any materials BCS sent Cali

19  that Cali was able to refurbish and resell, after deducting associated costs."  Motion, p. 6:21-28.

20  Thus, Defendants' admissions disprove their own argument of Cali as a consumer, and further admit

21  the facts necessary for conspiracy and joint tortfeasor liability for the resale of these scrap products.

22         **2.     Defendants Are Liable For Their Entire Infringing Distribution Chain**

23         Defendants also cannot escape conspiracy or joint and several liability by claiming not to

24  fully know what their co-conspirators and other members of the infringing distribution chain were

25  doing.  Motion, p. 9:15-23.  Defendants only discuss the contributory liability standard under *Inwood*

26  *Laboratories, Inc. v. Ives Laboratories, Inc.*, and although that standard applies here as well, it

27  ignores Defendants' critical and direct role in the conspiracy to distribute infringing scrap products.

28  456 U.S. 844 (1982).  Whether based on the joint and several liability, conspiracy liability, vicarious

3609505                                    18                Case No. 3:17-cv-00079 EMC (KAW)

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1  liability, or contributory liability, Defendants' liability for the infringement that they controlled and

2  that they profited from handsomely on the back end is settled under federal law.  *See Adobe Systems*

3  *Inc. v. Blue Source Group, Inc.*, 125 F. Supp. 3d 945, 973 (N.D. Cal. 2015) (citations omitted).

4          **a.**      **Defendants Are Liable Under Multiple Legal Theories**

5        It is well established that "[i]n copyright, trademark and unfair competition actions under

6  federal law, all persons participating in the actionable conduct are jointly and severally liable."

7  *Bar's Leaks Western, Inc. v. Pollock*, 148 F. Supp. 710, 714 (N.D. Cal. 1957).  Thus, where as here,

8  multiple defendants are involved in a distribution chain that ultimately sells infringing products to

9  consumers, "'any member of the distribution chain' of allegedly infringing products can be 'jointly

10  and severally liable' for the alleged misconduct."  *Adobe Systems*, 125 F. Supp. 3d at 973.

11        It is undisputed that Defendants were all members of the distribution chain of the infringing

12  "Fitbit" products, and further that Defendants orchestrated this conspiracy to distribute infringing

13  products and set up the distribution chain.  *See Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768

14  F.2d 1001, 1020–21 (9th Cir. 1985); *MetroPCS v. Devor*, 215 F. Supp. 3d 626, 633 (N.D. Ill. 2016)

15  (finding liability for "conspiracy to sell and offer for sale materially different MetroPCS Handsets,

16  removed from packaging, carrying bad IMEI, and/or devoid of the manufacturer's warranty."); *see*

17  Section II.F above.  Indeed, Defendants admitted the basic facts regarding the formation and

18  operation of the conspiracy in their Motion at 6:16-28, and further admitted to their own direct

19  involvement in reselling thousands of "refurbished" scrap products, which CBP seized as

20  counterfeit, "with a warranty from us not the manufacturer."  Liu Decl., Ex. KK; Cali Decl., ¶ 4.

21  Thus, Defendant's conspiracy and joint tortfeasor liability is beyond dispute here.

22        Further, Defendants also controlled the distribution of scrap products by injecting hundreds

23  of thousands of infringing products into the stream of commerce that were ultimately resold to

24  unwitting consumers through their conspiracy with Cali, and each Defendant profited handsomely

25  from those infringing "joint sales."  *See* Cali Decl., ¶ 5; Sections III.C.-I. above; *see, also, Fonovisa,*

26  *Inc. v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996) (finding vicarious liability based on control

27  and direct financial benefit); *see also, Coach, Inc. v. Celco Customs Servs. Co.,* 2014 WL 12573411,

28  at *17 (C.D. Cal. June 5, 2014) (finding contributory liability based on inference of particularized

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1   knowledge of infringement).  Defendants were also required by the SOW to "manage downstream

2   activities" and even Defendants' purported R2 certification required them to know and monitor the

3   downstream resale of these products.  *See* Liu Decl.*,* Ex. I.; *see also* Declaration of Matthew G.

4   Whitten, ECF No. 241-1, Ex. K.  Indeed, Defendants have admitted that *they were the ones reselling*

5   *scrap products, which were <u>seized by CBP as counterfeit</u>, with Cali acting at their direction to*

6   *process those products*, pursuant to a long-standing agreement that Cali would "split profits of any

7   materials . . . Cali was able to refurbish and resell."  *See* Liu Decl., Ex. KK (emphasis supplied); *see*

8   *also* Motion at p. 6:21-28 (describing "long-standing agreement"); Cali Decl., ¶ 4.

9        Thus, the undisputed facts and admissions made by Defendants show an agreed plan to resell

10  scrap products, which included Fitbit's trademarks, and which were materially different from

11  genuine Fitbit products.  *See* Sections II.E-F above.  In short, Defendants are jointly and severally,

12  conspiratorially, and vicariously liable for injecting hundreds of thousands of infringing products

13  into the stream of commerce, profiting off those sales to the tune of millions of dollars.  Defendants

14  held the "master switch" and could have turned off the supply of infringing goods at any time.  *Louis*

15  *Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, 658 F.3d 936, 942-43 (9th Cir. 2011).  The money

16  was simply too good to do the right thing.

17                    **b.        Defendants Are Also Liable Under *Inwood***

18       Instead of disputing their liability under the above well-established legal theories, Defendants

19  argue only that they are not contributorily liable under the *Inwood* case, claiming they "did not

20  induce or tell Cali to use Fitbit's trademarks in any way."  Motion, p. 9:22.  Not so.  The Court made

21  clear in *Inwood* that "[e]ven if a manufacturer does not directly control others in the chain of

22  distribution, it can be held responsible for their infringing activities under certain circumstances."

23  *Inwood,* 456 U.S. at 854; *see also Akanoc Solutions*, 659 F.3d 936 (holding Akanoc liable where

24  they held the "master switch" controlling the means of infringement).

25       The Court in *Inwood* also specifically distinguished its facts from a case, like here, with

26  undisputed evidence of a conspiracy to distribute infringing products.  *Inwood,* 456 U.S. at 854.

27  Here, Defendants not only had a long-standing relationship with Cali, but Defendants knew that Cali

28  would be infringing on Fitbit's marks by reselling these scrap products (*see* Liu Decl., Exs. O, JJ,

PLAINTIFF FITBIT, INC.'S OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1   KK, SS), and admit they did not inform the rest of the infringing distribution chain of their lack of

2   authorization to resell the scrap Fitbit products or to use Fitbit's brand or trademarks.  *See id.*, Ex. D

3   at 162:18-163:7.  Indeed, when Fitbit raised questions about how the products were being

4   destroyed/recycled, Defendant Manhan assured Cali: Mr. Kelvin: "Your good right?" [*sic*], Mr.

5   Manhan: "Yes sir."  *Id.*, ¶ 25, Ex. X.  Indeed, in Mr. Manhan's letter to CBP attempting to get

6   thousands of Fitbit products, seized as counterfeit, released back to Cali, he admitted that Cali was

7   acting at his direction in "processing" the products, and that "[a]ll material is used refurbished and

8   sold as such with warranties from us not the manufacturer."  *Id.*, Ex. KK.  Defendants simply cannot

9   escape liability for an infringing distribution chain where they were the start and the end, and from

10  which they received millions of dollars of split profits based on the resale of the infringing goods.

11          It is also beyond dispute that Defendants continued to supply Fitbit's products to Cali with

12  actual or constructive knowledge that such products would be resold to consumers.  *See Lockheed*

13  *Martin Corp. v. Network Sols., Inc.*, 194 F.3d 980, 983 (9th Cir. 1999); *see also Coach, Inc.*, 2014

14  WL 12573411, at *17.  The undisputed facts and admissions (*see* Sections II.D-H above), along with

15  their control of the supply and profit share on the resale, easily establish contributory liability here.

16          **D.      The Court Should Deny The Motion On Dilution And Unfair Competition**

17          Defendants have similarly failed to meet their burden by establishing that their actions did

18  not constitute dilution or unfair competition.  Defendants' arguments on dilution and federal unfair

19  competition rely completely on their failed contract and trademark arguments above, and the Court

20  should deny those portions of their Motion for the same reasons.  *See* Sections IV.B.-C. above.

21          **E.      Defendants' Motion On Fitbit's Fraud-Related Claims Is Also Meritless**

22          Defendants' primary fraud and negligent misrepresentation argument relies on the absurd

23  claim above that they were authorized to resell scrap Fitbit products.  Motion, pp. 15:9-21:22.  That

24  argument fails for the same reasons as it did with respect to the breach of contract claim.  *See*

25  Section IV.B. above.  Defendants' additional fraud-related arguments also fail on their face.

26          Putting aside the contract related arguments above, Defendants' Motion also hinges on an

27  bizarre reading of Fitbit's fraud-related claims in its Second Amended Complaint: that Fitbit's

28  claims for relief arise out of BCS falsely telling Fitbit that *all* of Fitbit's materials would be

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1   destroyed and *none* would be repurposed.  Motion, p. 16:19-20.  The undisputed facts show, and

2   Defendants concede, that BCS falsely represented to Fitbit that they would break down all scrap

3   Fitbit products into raw materials to be recycled or otherwise destroyed, and not resell whole Fitbit

4   products.  *See* Motion, p. 16:23-25; *see also* Liu Decl., Exs. I, R-T, BB, CC, EE; Ex. A at 63:3-64:5

5   & 96:19-97:18.  Defendants' argument is therefore a straw man and does not help them at all.  The

6   evidence of Defendants' fraud and negligent misrepresentation here is simply overwhelming.

7   First, discovery has proven that Defendants (1) made intentional or negligent representations

8   to Fitbit that were not true and which Defendants knew were not true at the time they were made, (2)

9   intended for Fitbit to rely on their misrepresentations so that BCS could obtain the benefit of Fitbit's

10   business, and that (3) Fitbit justifiably relied on Defendants' misrepresentations.  *See Delk v. Ocwen*

11   *Financial Corp.,* 2017 WL 3605219, at *7 (N.D. Cal. 2017); *see* Sections II.C-D above.

12   Here, there is damning evidence that Defendants intended to deceive Fitbit from the outset.

13   *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015).  As discussed in detail in Sections

14   II.C-D above, Defendants induced Fitbit to engage them by agreeing that they would break down all

15   scrap Fitbit products into raw materials to be recycled or otherwise destroyed, and specifically

16   agreed not resell them.  *See*, *e.g.,* Liu Decl., Exs. I, S, T, BB, CC, EE; Ex. A at 63:3-64:5 & 96:19-

17   97:18.  All of the documents and communications from BCS to Fitbit and the SOW

18   contemporaneous with the hiring of BCS confirmed these misrepresentations, including videos sent

19   to Fitbit showing BCS employees destroying and/or breaking down all the Fitbit products to

20   commodities even though at least three trailers of Fitbit scrap had already been sent directly to Cali.

21   *See id*., Ex. D at 170:7-13; Ex. E at 91:20-93:25 & 96:1-16; Exs. I, S, T, U, BB, CC, EE.

22   Moreover, Defendants committed other independent misrepresentations along the way to

23   keep Fitbit on the hook, establishing reasonable reliance.  *Mirkin v. Wasserman*, 5 Cal 4th 1082,

24   1093 (1993).  The settlement reports and the related certificates of recycling and destruction sent by

25   BCS to Fitbit month after month contained a detailed breakdown of the commodities, like rubber,

26   steel, and plastic, that were purportedly recycled, and reported nothing about resale of whole

27   products.  *See* Liu Decl., Exs. R, GG.  These reports were false, because Defendants were actually

28   reselling the products with Cali, and using a sample commodity breakdown from an early shipment

3609505                                                                                     Case No. 3:17-cv-00079 EMC (KAW)

PLAINTIFF FITBIT, INC.'S OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT

1   to fill out the reports to Fitbit.  *See id*., Ex. F at 115:13-118:1; Ex. H at 287:18-290:7; *accord* Ex.

2   KK.  Defendants represented to Fitbit that there was section in these reports for resold product, but it

3   is undisputed that Defendants never used that section to ensure Fitbit continued to believe they were

4   recycling product and continued to send them more scrap to resell.  *Compare id*., Ex. T (describing a

5   section 3 to be used "if we resell items") with Ex. R (showing no section 3 in any report).

6          In addition, on at least two occasions Defendants represented to Fitbit that they would

7   destroy scrapped Fitbit products in country in Australia and Slovakia when in fact, unbeknownst to

8   Fitbit, those products were also shipped to Cali.  *Id.,* Exs. LL, RR; Ex. A at 141:24-142:12.  The

9   documents even reveal their guilty conscience – whether questioning "Why does he put that in

10  writing?" to referring to the Verizon deal as a "sacrificial lamb" so as not to have to reveal their

11  resale of products to Fitbit.  *See* Section II.G above; *see also* Liu Decl., Ex. Y (admitting that

12  "BCS has been given strict instructions to destroy all Fitbits for recycling."); Ex. AA.  Fitbit would

13  never have used Defendants if they had been honest – as reflected in the SOW and as Ms. Windsor

14  testified,  Fitbit "dictated to BCS . . . what our understanding was. And there was no question that it

15  was understood; that our product, if it wasn't coming back to our warehouse, needed to be

16  destroyed, broken down to the commodity level, period. There was no misunderstanding. There

17  was no misreading."  Liu Decl., Ex. A at 149:8-15; Section II.C., *supra*.

18         These undisputed facts regarding Defendants' fraud by deceit, omission, and concealment

19  further disprove Defendants' disingenuous argument that they had no obligation to inform Fitbit that

20  they were reselling the scrap Fitbit products they received.  *See* Motion, pp. 19:16-21:22.  As Fitbit's

21  trusted scrap vendor, BCS had a duty to disclose to Fitbit that it was reselling the scrap Fitbits and

22  receiving enormous profits.  *Naidong Chen v. Fleetcor Technologies, Inc.*, 2017 WL 1092342, at

23  *14 (N.D. Cal. 2017).  A party to a business transaction has the duty to exercise reasonable care to

24  disclose material facts before consummating the transaction where the other party would have reason

25  to believe, based on the relationship, that such material facts would be disclosed.  *See Eddy v. Sharp*,

26  1991 Cal.App.3d 858, 864 (1988).  And, as set forth in detail in Section II.C.-G. above, Defendants

27  concealed and suppressed numerous material facts from Fitbit to keep Fitbit from learning the truth

28  and stopping the flow of scrap products.  Throughout the relationship, Fitbit continued to send scrap

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1   products to Defendants in reliance on their continuing representations that they were not reselling

2   anything.  *See* Liu Decl., Exs. K, R, W, Y, GG, NN, PP, QQ, TT; *see also* Bonham TRO Decl., ¶ 5.

3   At no time was Cali identified as BCS's refurbishing and resale partner, and in fact Defendants went

4   to great lengths to hide Cali's involvement from Fitbit.  *See* Section II.C.-G above; Liu Decl., Exs.

5   II, EEE.  Even when Fitbit asked BCS directly about what they were doing with the Fitbit scrap, and

6   whether they were reselling any of the whole Fitbits, they were met with lies and material omissions.

7   *See id.*, Ex. G at 213:14-216:8 & 220:20-223:25; Exs. W, Y, HH, II.  *See Vega v. Jones, Day, Reavis*

8   *& Pogue* 121 Cal.App.4th 282, 292 (2004) ("active concealment or suppression of facts ... is the

9   equivalent of a false representation").  As Defendant Manhan later admitted, Fitbit "was not aware"

10  of the refurbishing and resale of the scrap products.  Liu Decl., Ex. C at 289:21-25.

11          Defendants' fraud caselaw also does not help them.  *See* Motion, pp. 18-21.  Those cases

12  either deal with clearly disclosed information (*see id.*, citing *Apollo Group, Davis, Acme Propane,*

13  *Tomek, Noll, and ScripsAmerica*) or unnecessary omissions in specific industries, *e.g.* real estate (*see*

14  *id.*, citing *Levine, Berryman, Daugherty*) that are completely inapposite.  None of these cases

15  remotely changes the settled law that where a party makes a disclosure, it must make a full and fair

16  disclosure.  *See, e.g., In re Carroll*, 549 B.R. 375, 383 (Bankr. N.D. Cal. 2016).  Defendants did not

17  remotely meet this requirement and cannot avoid fraud liability here.  *See* Section II.C.-G above.

18          The undisputed facts and admissions here establish that BCS intended to defraud Fitbit from

19  start, continued to do so throughout, and went to great lengths to conceal that fraud from Fitbit to the

20  bitter end.  *See* Sections II.C-H above.  Accordingly, the Court should also deny Defendants' Motion

21  on Fitbit's fraud-related claims, including negligent misrepresentation and conspiracy.

22          **F.     Defendants' Challenge to the Conspiracy and Unfair Competition Claims Fails**

23          Defendants' only argument on conspiracy and primary argument on state unfair competition

24  relies on their challenge to the underlying substantive claims, and it fails for the same reasons set

25  forth above in Sections IV.B-E.  Motion, pp. 22:1-24:23.  Indeed, Defendants' Motion admits the

26  basic facts of the formation and operation of the conspiracy to resell infringing and fraudulently

27  obtained scrap products.  *See* Motion, p. 6:16:28.  Defendants obtained these scrap products from

28  Fitbit through false pretenses and transported them from across the globe to Cali in San Diego and

1   Mexico in support of their plan to refurbish and resell them to consumers and thereafter to split the

2   profits with Cali.  *See* Section II.F above.  As such, the undisputed facts here, including

3   Defendants' admissions, easily meet the test for fraudulent and unlawful conduct under Cal. Bus. &

4   Prof. Code Section 17200, including under 15 U.S.C. § 45 and 18 U.S.C. §§ 2314-15.

5   **V.      FITBIT'S EVIDENTIARY OBJECTIONS AND MOTION TO STRIKE**

6           While Defendants' recitation of facts in general is misleading, Fitbit submits the following

7   limited evidentiary objections and moves to strike the same as plainly objectionable and prejudicial:

8           (1)    **Legal conclusions re contract.  Motion at 4:24-25** ("Mr. Baker sent Ms. Windsor a

9   Statement of Work to govern the parties' relationship."); **6:2-3** ("It is undisputed that the Statement

10  of Work is the only agreement between BCS and Fitbit"); **Whitten Decl. at Ex. A, 162:3-163:13**

11  (Q: Okay.  So my question is: Are there any other documents that Fitbit contends, as you sit here

12  today, constitute the contract or agreement between Fitbit and BCS? . . . A: Right.  This is the only

13  agreement between Fitbit and BCS.").  **Objections**: These statements call for a legal conclusion as to

14  formation and scope of the contract.  Moreover, the testimony attached as Whitten Decl. Ex. A, was

15  outside the scope of the 30(b)(6) notice and therefore is not binding on Fitbit and lacked foundation.

16  *See Detoy v. City & Cty. of San Francisco*, 196 F.R.D. 362, 367 (N.D. Cal. 2000); Fed. R. Evid. 602.

17          (2)    **Prejudicial and Misleading Recitation**.  **Motion at 4:27-28** ("Ms. Windsor also

18  asked that Mr. Baker provide documentation that BCS was "R2-certified."); **5:20-22, 17:4-5**

19  ("Fitbit's reviewing executives then requested two changes to the Statement of Work"); **17:23-24**

20  ("Before BCS began performance, Fitbit requested that BCS provide its R2 certification.").

21  **Objections**: The statements above are particularly misleading and inaccurate summaries of the

22  evidence and are therefore unfairly prejudicial under Fed. R. Evid. 403.  *See also Davis & Cox v.*

23  *Summa Corp.*, 751 F.2d 1507, 1516 (9th Cir. 1985).  First, as to the R2 certification, Ms. Windsor

24  testified that she requested "all their certificates" simply because it "show[ed] them as a reputable

25  business."  Whitten Decl., Ex. D, 50:15-19.  Second, as to the SOW, Ms. Windsor also testified that

26  she (not unnamed "executives") requested those changes.  Whitten Decl., Ex. D at 120:6-122:20.

27          **VI.     CONCLUSION**

28          For the foregoing reasons, the Court should deny Defendants' Motion in its entirety.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1    DATED: June 7, 2018                    Respectfully submitted,

2                                           SIDEMAN & BANCROFT LLP

3                                           By:        /s/ Zachary J. Alinder
                                                       Zachary J. Alinder
4                                                      Attorneys for FITBIT, INC.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF FITBIT, INC.'S OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711