JEFFREY C. HALLAM (State Bar No. 161259)
E-Mail:        *jhallam@sideman.com*
ZACHARY J. ALINDER (State Bar No. 209009)
E-Mail:        *zalinder@sideman.com*
ELLEN P. LIU (State Bar No. 280459)
E-Mail:        *eliu@sideman.com*
REBECCA K. FELSENTHAL (State Bar No. 303476)
E-Mail:        *rfelsenthal@sideman.com*
SIDEMAN & BANCROFT LLP
One Embarcadero Center, Twenty-Second Floor
San Francisco, California 94111-3711
Telephone:      (415) 392-1960
Facsimile:      (415) 392-0827

Attorneys for Plaintiff
FITBIT, INC.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| FITBIT, INC., <br><br> Plaintiff, <br><br> v. <br><br> LAGUNA 2, LLC, et al., <br><br> Defendants. | Case No. 3:17-cv-00079 EMC (KAW) <br><br> **PLAINTIFF FITBIT, INC.'S REPLY IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT** <br><br> Judge:   Honorable Edward M. Chen <br> Date:    June 28, 2018 <br> Time:    1:30 p.m. <br> Crtrm.:  5, 17th Floor |

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION .................................................................................................. 1

II.  THE COURT SHOULD GRANT FITBIT'S MOTION IN FULL ........................ 1

    A.  Defendants Are Liable For Breach of Contract ......................................... 1

    B.  Federal Trademark Counterfeiting and Infringement ................................ 7

        1.  Defendants Concede The Presumption Here ................................. 8

        2.  The Presumption Applies to Defendants' Counterfeit Sales .......... 8

            a.  Scrap Products Are Non-Genuine, Different, And Confusing .......... 9

            b.  Defendants Are Liable For Counterfeit Sales Too .......................... 10

        3.  Defendants Are Liable For Their Infringing Distribution Chain ................. 10

        4.  Fitbit Has Established Likelihood of Confusion ......................................... 13

    C.  Federal Unfair Competition and California Unfair Competition ............................. 13

    D.  Defendants' Final Damages Argument Is Meritless ................................. 13

III.  RESPONSE TO DEFENDANTS' OBJECTIONS AND JUDICIAL NOTICE.................. 14

    A.  Responses to Defendants' Evidentiary Objections 1-3 ............................. 14

    B.  Responses to Defendants' Evidentiary Objections 4 [sic]-7 ..................... 14

    C.  Response to Defendants' Evidentiary Objection 8 ................................... 14

    D.  Responses to Defendants' Evidentiary Objections 9-11 ........................... 14

    E.  Motion to Strike RJN and Whitten Declaration Paragraphs ..................... 15

IV.  FITBIT'S ADDITIONAL OBJECTIONS TO SOOD DECL. AND OPP. LENGTH ......... 15

V.  CONCLUSION .................................................................................................. 15

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A. Kemp Fisheries, Inc. v. Castle & Cooke, Inc., Bumble Bee Seafoods Div.*,
   852 F.2d 493 (9th Cir. 1988) ................................................................................. 7

*Adobe Systems Inc. v. Blue Source Group, Inc.*,
   125 F. Supp. 3d 945 (N.D. Cal. 2015) ................................................................... 15

*Asmodus, Inc. v. Junbiao Ou*,
   2017 WL 2954360 (C.D. Cal. May 12, 2017) ....................................................... 12

*Bar's Leaks Western, Inc. v. Pollock*,
   148 F. Supp. 710 (N.D. Cal. 1957) ....................................................................... 15

*Brae Transp., Inc. v. Coopers & Lybrand*,
   790 F.2d 1439 (9th Cir. 1986) .......................................................................... 6, 10

*Cahill v. Golden Gate Bridge, Highway & Trans. Dist.*,
   2016 WL 1070655 (N.D. Cal. Mar. 18, 2016) ....................................... 17, 18, 19

*Coach, Inc. v. Celco Customs Servs. Co.*,
   2014 WL 12573411 (C.D. Cal. June 5, 2014) ...................................................... 16

*Cordas v. Uber Techs., Inc.*,
   228 F. Supp. 3d 985 (N.D. Cal. 2017) .................................................................. 18

*El Greco Leather Products Co., Inc. v. Shoe World, Inc.*,
   806 F.2d 392 (2d Cir. 1986) ............................................................................ 13, 14

*Fonovisa, Inc. v. Cherry Auction, Inc.*,
   76 F.3d 259 (9th Cir. 1996) .................................................................................. 16

*FTC v. EDebitPay, LLC*,
   695 F.3d 938 (9th Cir. 2012) .................................................................................. 8

*In re Gilead Scis. Sec. Litig.*,
   536 F.3d 1049 (9th Cir. 2008) ................................................................................ 5

*Hatcher v. County of Alameda*,
   2011 WL 1225790 (N.D. Cal. Mar. 31, 2011) ......................................... 8, 12, 17

*Hewlett-Packard Co. v. Repeat-O-Type Stencil Mfg. Corp.*,
   1995 WL 338181 (N.D. Cal. Feb. 7, 1995) ........................................................... 17

*Intel Corp. v. Terabyte Int'l, Inc.*,
   6 F.3d 614 (9th Cir. 1993) ........................................................................... 13, 14

*Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*,
   456 U.S. 844 (1982) ...................................................................................... 15, 16

*Jesse A. Verrecchia, et al. v. Darrell Aviss, et al.*,
   2017 WL 9486151 (C.D. Cal. Nov. 8, 2017) ....................................................... 18

*Lawyers Title Ins. Corp. v. U.S. Fid. & Guar. Co.*,
   122 F.R.D. 567 (N.D. Cal. 1988) ...................................................................... 10

*Letizia v. Facebook Inc.*,
   267 F. Supp. 3d 1235 (N.D. Cal. 2017) ........................................................... 6, 9

*Lockheed Martin Corp. v. Network Sols., Inc.*,
   194 F.3d 980 (9th Cir. 1999) ............................................................................ 16

*Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*,
   658 F.3d 936 (9th Cir. 2011) ............................................................................ 16

*Maples v. SolarWinds, Inc.*,
   50 F. Supp. 3d 1221 (N.D. Cal. 2014) ............................................................... 9

*MetroPCS v. Devor*,
   215 F. Supp. 3d 626 (N.D. Ill. 2016) ............................................................... 15

*Novadaq Techs., Inc. v. Karl Storz GmbH & Co. K.G.*,
   143 F. Supp. 3d 947 (N.D. Cal. 2015) ............................................................. 12

*Operating Engineers' Pension Tr. Fund v. Clark's Welding & Mach.*,
   688 F. Supp. 2d 902 (N.D. Cal. 2010) ............................................................... 7

*People v. Barro*,
   93 Cal. App. 4th 63 (2001) ............................................................................... 19

*Rearden LLC v. Rearden Commerce, Inc.*,
   683 F.3d 1190 (9th Cir. 2012) .......................................................................... 17

*Rocawear Licensing LLC v. Pacesetter Apparel Group*,
   2007 WL 5289737 (C.D. Cal. Sept. 12, 2007) ............................................. 15, 16

*Shell Oil Co. v. Winterthur Swiss Ins. Co.*,
   12 Cal. App. 4th 715 (1993) .............................................................................. 9

*Ticor Title Ins. Co. v. Rancho Santa Fe Assn.*,
   177 Cal.App.3d 726 (1986) .............................................................................. 7, 8

*Transgo, Inc. v. Ajac Transmission Parts Corp.*,
   768 F.2d 1001 (9th Cir. 1985) .......................................................................... 15

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

*United States v. Farmer,*
    370 F.3d 435 (4th Cir. 2004)...................................................................................14

*United States v. Stuart,*
    489 U.S. 353 (1989) ...........................................................................................10

*Vernor v. Autodesk,*
    621 F.3d 1102 (9th Cir. 2010).............................................................................13

*In re Yan,*
    381 B.R. 747 (N.D. Cal. 2007).........................................................................6, 10

**Statutes**

Cal. Pen. Code § 1385 ...........................................................................................19

**Other Authorities**

Fed. R. Evid. 401 ..................................................................................................19

Fed. R. Evid. 403 ..................................................................................................19

Fed. R. Evid. 702 ..................................................................................................19

Fed. R. Civ. Proc. 8(c)(1) .....................................................................................12

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

Plaintiff Fitbit, Inc. ("Fitbit" or "Plaintiff") respectfully submits the following Reply Memorandum in Support of Fitbit's Motion for Partial Summary Judgment (the "Motion"), ECF No. 246, against Defendants and in response to their Opposition ("Opp."), ECF No. 254.

## I.   INTRODUCTION

Stripped bare of bluster and rhetoric, Defendants' Opposition is a thinly-veiled attempt to avoid summary judgment by (i) asking the Court to rewrite an agreement years after the fact, (ii) conclusorily denying responsibility for their orchestration of an infringement scheme, which they actively concealed from Fitbit and from which they received millions of dollars in profit, and (iii) ignoring all of the contemporaneous and subsequent evidence that confirms both arguments to be unsupported and unsupportable.  Defendants' conclusory denials, unwarranted deductions of fact, and unreasonable inferences are insufficient to create a genuine material factual dispute to avoid summary judgment.  *See In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).  Indeed, with the undisputed facts insurmountably stacked against them, Defendants do not even rebut numerous arguments, conceding that summary judgment is appropriate.  Accordingly, the Court should grant Fitbit's Motion in its entirety.

## II.   THE COURT SHOULD GRANT FITBIT'S MOTION IN FULL

### A.   Defendants Are Liable For Breach of Contract

The Court should grant summary judgment as to Defendants' liability for breach of contract because the parties' agreement (1) did not allow resale of whole products, (2) required written approval for use of Fitbit's brand or trademarks, and (3) required remission of 70% of the net proceeds that Defendants received.  *See* Motion, Section III.D.  As to the first and third arguments, none of the arguments in Defendants' Opposition are supported by the undisputed facts, including Defendants' numerous damning admissions.  Further, Defendants do not dispute, and therefore concede, that summary judgment is appropriate on the second ground above.  *See* Opp., pp. 7-12.

Defendants' overarching argument asks this Court to change the entire nature of the agreement with Fitbit by construing the word "repurpose" in the SOW to mean "resell."  Opp., pp. 8:1-12:3.  Doing so would not only fundamentally alter the intended purpose of the agreement, but

would also contradict (a) the plain meaning of the term "repurpose," (b) the undisputed evidence of the parties' intent at the time the agreement was formed, (c) the undisputed evidence regarding the parties' disclosed performance under the agreement, and (d) their representations over the course of the relationship. *See Brae Transp., Inc. v. Coopers & Lybrand*, 790 F.2d 1439, 1443 (9th Cir. 1986) ("The court may consider the nature and object of the contract, as well as the preliminary negotiations and the circumstances under which it was made."); *Letizia v. Facebook Inc.*, 267 F. Supp. 3d 1235, 1251 (N.D. Cal. 2017) ("[T]he most reliable evidence of the parties' intentions is their conduct after the contract is signed and before any controversy has arisen."). There is no genuine factual dispute with regard to Defendants' breach of contract here for at least six reasons.

*First,* Defendants agreed up front that they would not be able to resell anything "as whole," confirming with Fitbit: "Sounds perfect." *See* Motion, Section III.D. Defendants further represented that their settlement reports to Fitbit would contain a section for resale of whole products (section 3), if resale of whole products were later authorized. *Id.* Three days later, Defendants reflected this agreement to not resell whole products and to only recycle and/or destroy products in the SOW, which Defendants admit they drafted and which explicitly limited resale to "resale of recycled commodities." *See id.* Thus, resale was expressly contemplated in the agreement between Fitbit and Defendants, but it also was expressly limited to resale of commodities. *Id.* Moreover, the SOW further confirmed Defendants' agreement not to resell by prohibiting any use of Fitbit's brand or trademarks without Fitbit's written authorization, which they admit they never obtained. *Id.*

Defendants argue that their May 26, 2015 email wherein they explicitly agreed that they would not resell whole Fitbit products, and would get Fitbit's approval in the future for any such resale, is inadmissible parol evidence (*see* Opp., pp. 9:24-10:6) because this email alone destroys their entire case (though there are many more like it). But bad evidence is not the same as parol evidence. The parol evidence rule provides that terms "set forth in writing intended by the parties as a final expression of their agreement with respect to such terms . . . may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement." *See In re Yan*, 381 B.R. 747, 754–55 (N.D. Cal. 2007) (citing Cal. Code of Civ. Proc. § 1856(a)). Here, it is undisputed that the SOW has no integration or merger clause, and Defendants have offered no evidence in their

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1   Opposition suggesting that the SOW was the exclusive and entire embodiment of all terms of the

2   Parties' agreement.  *See* Declaration of Zachary J. Alinder in Support of Motion for Partial Summary

3   Judgment ("Alinder Decl."), ECF No. 234, Ex. I at FIT005987-88; *see also, A. Kemp Fisheries, Inc.*

4   *v. Castle & Cooke, Inc., Bumble Bee Seafoods Div.*, 852 F.2d 493, 495 (9th Cir. 1988) (if a contract

5   is not integrated, the parol evidence rule does not apply).

6        Even if the SOW were an integrated contract, however, the May 26, 2015 email (and other

7   similar emails and documents) do not contradict any terms in the SOW, but instead confirm its

8   unambiguous language.  *See Operating Engineers' Pension Tr. Fund v. Clark's Welding & Mach.*,

9   688 F. Supp. 2d 902, 911 (N.D. Cal. 2010) (court can receive evidence concerning parties' intentions

10  to determine whether an ambiguity exists); Motion, Section III.D.  Defendants' monthly settlement

11  reports and certificates of recycling, and all of their communications with Fitbit prior to the lawsuit,

12  further reflect the purported recycling of tons of raw materials, not the resale of whole products.  *See*

13  Motion, Sections III.D-G.  Indeed, Defendants' operations manager Kyle Regal confirmed, four days

14  after he sent Fitbit the SOW, the Parties' intent that "anything that can be broken down to raw

15  materials will be recycled accordingly (most plastics, cardboard, metals, etc)," and further confirmed

16  that the other two "avenues" for Fitbit scrap products did not include resale.  *See* Alinder Decl., Ex.

17  S; Ex. E at 91:20-96:16.  Thus, there was no expressed intent of any party at the time to allow resale

18  of whole scrap products, quite the opposite.  *See* Motion, Section III.D; *Ticor Title Ins. Co. v.*

19  *Rancho Santa Fe Assn.*, 177 Cal.App.3d 726, 730 (1986) ("The fundamental canon of interpreting

20  written instruments is the ascertainment of the intent of the parties.").

21        *Second,* Defendants' argument that the use of the term "repurpose" in the Preamble and

22  Certification section of the SOW somehow authorized "resale" of whole products is absurd.  *See*

23  Opp., pp. 8:15-9:23.  The word "repurpose" is **not** in the actual Services section of the SOW, but

24  even if it had been, their argument makes no sense.  *See* Motion, Section III.D.  The plain meaning

25  of the word "repurpose" is to "[a]dapt for use in a different purpose."  *See, e.g.,* Oxford English

26  Dictionary, available at https://en.oxforddictionaries. com/definition/repurpose; *accord* Google's

27  definition of repurpose.  Resale of whole products *for the exact same intended purpose* is the

28  opposite of repurposing a product or component.  As Defendant Baker described to Fitbit at the time,

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1   repurposing means turning it into something new or different, for example, turning the rubber from a

2   Fitbit product into "soles for Sandals and Mats."  Alinder Decl., Ex. W at FIT008511.

3         Reading "repurpose" to mean "resell" would not only violate the entire purpose of the

4   agreement (scrap destruction and recycling), it would also directly contradict the definition for

5   "repurpose at the product or component level" that Defendants put in the agreement itself: "meaning

6   that *product* would be *recycled* down to plastic, metal, wire, cardboard or other commodity level

7   *components*."  *See id*., Ex. I at FIT005988 (emphasis added).  This "meaning," also drafted by

8   Defendants, modifies the entire prior sentence as a summative modifier by referring to each element

9   of the prior sentence together: "product," "recycling," and "component."  *Id.*.  Finally, reading

10   repurpose to mean resale would also directly contradict the agreed Services to be provided by BCS,

11   which limited resale to "resale of recycled commodities," and which expressly prohibited BCS from

12   using Fitbit's brand or trademarks without prior written approval.  *See id*., Ex. I at FIT005987; *see*

13   *also Ticor*, 177 Cal. App. 3d at 730 ("A court must view the language in light of the instrument as a

14   whole and not use a 'disjointed, single-paragraph, strict construction approach.'").  It is undisputed

15   that Defendants never sought or obtained such approval and that all of their sales violated this

16   provision, because the products they resold with Cali were materially different from genuine

17   products and contained Fitbit's trademarks on the products themselves (not to mention the

18   counterfeit packaging and cables).  *See* Motion, Section III.D.-H.  Defendants do not even challenge

19   this last argument in Opposition, conceding that the Court should grant Fitbit's Motion on at least

20   this ground.  *See* Opp., pp. 7-12; *see also Hatcher v. County of Alameda*, 2011 WL 1225790, at *3

21   (N.D. Cal. Mar. 31, 2011) (failure to address arguments in opposition concedes those claims).

22         ***Third,*** Defendants' attempt to rewrite the contractual terms years later is contrary to basic

23   hornbook law on contract interpretation.  It is well established that specific language controls over

24   more general language, and where specific and general provisions conflict, the specific provisions

25   ordinarily qualify the meaning of the more general one.  *See FTC v. EDebitPay, LLC,* 695 F.3d 938,

26   944 (9th Cir. 2012).  Arguing that "repurpose" meant "resale" violates this canon.  The use of

27   "repurpose" in the Preamble in reference to allowed services is more specifically defined in the

28   actual "Services" section of the SOW and cannot be read to allow some additional service.  Alinder

1  Decl., Ex. I at FIT005988; Motion, Section III.D. The "Services" section of the SOW only allows

2  for resale *of recycled commodities*. *Id*. The other "repurpose" language that Defendants cite is in

3  the "Certification" section of the SOW, not the "Services" section, and therefore also cannot be read

4  to expand the specifically allowed Services. *Id*.

5       Further, repurpose cannot possibly be read as ***resale*** of whole products, given that the Parties

6  actually used the term "resale" where that was their intent, as they did (i) for "resale of recycled

7  commodities" in the SOW, and (ii) in agreeing up front not to "resell anything.... [m]aybe in time we

8  can resell something as whole, but for now we will have to break things down to recycle and sell for

9  commodity." Motion, Section III.D. On the other hand, interpreting "repurpose" as its common

10  meaning does not render the term surplusage, as products or components could be repurposed into

11  found art, science projects, jewelry, or as Defendant Baker explained any "new items that use this

12  material," including sandals or mats. Alinder Decl., Ex. W at FIT0008511. On the other hand,

13  Defendants' interpretation of "repurpose" that would render the term "resale" here surplusage and

14  violate the rule of giving "each word significance." *Shell Oil Co. v. Winterthur Swiss Ins. Co.*, 12

15  Cal. App. 4th 715, 753 (1993).

16       Finally, even though the Court should not find any ambiguity in the word "repurpose," any

17  ambiguity must be resolved against Defendants as the undisputed drafters of the SOW. *Maples v.*

18  *SolarWinds, Inc.*, 50 F. Supp. 3d 1221, 1228 (N.D. Cal. 2014); *see also* Motion, Section IV.B;

19  Alinder Decl., Ex. D at 147:2-5. Defendants do not, and cannot, dispute this, and thereby concede

20  that the Court should construe any contractual language ambiguities in the SOW against them.

21       ***Fourth,*** the Parties' conduct after entering into the agreement was also consistent with the

22  parties' expressed intent (rather than Defendants' new one) and should be given great weight here.

23  *See Letizia*, 267 F. Supp. 3d at 1251. Defendants continued to represent to Fitbit that they were

24  recycling all products at the commodity level, reporting to Fitbit, month after month, about the tons

25  of purported raw materials that had been recycled. Motion, Sections III.D-G; Alinder Decl., Ex. R.

26  Defendants never reported the resale of whole products in their monthly reports to Fitbit, despite

27  representing that there was a section in these reports "used only if we resell items." Alinder Decl.,

28  Ex. T at 6023. Defendants confirmed again about nine months into the relationship that they "had

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

been given strict instructions to destroy all Fitbits for recycling." *Id.*  Indeed, Defendants lied to Fitbit about the resale of products to the bitter end, representing to Fitbit on November 30, 2016 that they had not resold any scrap Fitbit products.  *See* Declaration of Jeff Bonham in Support of Fitbit's Motion for TRO ("Bonham TRO Decl."), ECF No. 49-1, ¶ 5.  That Defendants have now constructed a new definition for "repurpose" years later in an attempt to immunize their unlawful conduct should be given no weight by the Court.  *See Lawyers Title Ins. Corp. v. U.S. Fid. & Guar. Co.*, 122 F.R.D. 567, 569 (N.D. Cal. 1988).  Defendants' secret belief about the meaning of the term "repurpose" makes no difference: "proper construction of an agreement is that given by one of the parties when 'that party had no reason to know of any different meaning attached by the other, and the other had reason to know the meaning attached by the first party.'"  *United States v. Stuart*, 489 U.S. 353, 368 n. 7 (1989); *see also Brae Transp.*, 790 F.2d at 1443 (court will pierce the objective form of the contract if contract language used to conceal rather than express the true intent).

   *Fifth*, Defendants' reliance on their R2 certification and two instances of required destruction (rather than recycling) provides no cover for their unlawful conduct. Opp., pp. 10:16-12:3.  The Court should not consider parol evidence contradicting the plain language of the SOW at all, let alone evidence so far afield.  *See In re Yan*, 381 B.R. at 754–55.  Defendants never indicated at the time of the agreement that they intended to use the R2 standard as cover for resale.  See, e.g., Alinder Decl., Exs. I & T.  And, the R2 standard does not permit resale if, like here, the "customer directs otherwise" or if resale is "contrary to commercial agreements."  Declaration of Matthew G. Whitten, Ex. K, ECF No. 241-16, at §§ 2(a)(1) & 6(a).  As discussed above, the agreement between the parties did not permit resale of whole products, and there is no dispute that Defendants received repeated directions from Fitbit that the Fitbit scrap was to be recycled or destroyed, and not resold. Motion, Sections III.D-G.  Likewise, the two instances cited by Defendants where Fitbit required destruction (rather than recycling) just add further support for Fitbit.  Those products had issues, including a product recall, such that <u>no recycling</u> of the product could occur, and indeed the destruction needed to be witnessed by a government representative.  *See* Alinder Decl., Exs. J, PP, QQ.  These two instances therefore confirm that the intent of the agreement was to recycle and resell raw commodities from the scrap Fitbit products, such that Fitbit specifically informed Defendants in

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1    these two instances that *no recycling* of any commodities could occur.  *See id; see also id.,* Ex. Z.

2         Further, Defendants' submission of a declaration and report from their R2 expert, Sarah

3    Cade, does not create a question of disputed fact here.  *See* Opp., pp. 11:13-12:3.  Indeed, the only

4    specific document from the case that Ms. Cade cites is the preamble in the SOW, which as set forth

5    above does not support her conclusion.  *See* Declaration of Sarah Cade ("Cade Decl."), ECF No.

6    256, at ¶ 4.  At most, the Cade Decl. shows that Defendants duped their own expert by not providing

7    her with the relevant evidence.  Ms. Cade's declaration cannot change the agreement between the

8    parties.  Nor does it explain away the clear directions from Fitbit and the language in the agreement

9    limiting resale to recycled commodities and requiring express authorization to use Fitbit's brand or

10   trademarks, which even under the R2 Standard, required Defendants not to resell whole products.

11   *See* Alinder Decl., Ex. VV; *see also* Declaration of Michael Easterbrook in Support, filed

12   concurrently with this Reply, ¶¶ 2-8 and Ex. A; ECF No. 241-16, at §§ 2 & 6.

13        **Sixth**, it is undisputed that Defendants were obligated, but failed, to pay Fitbit 70% of "net

14   proceeds" they earned pursuant to the Parties' agreement.  Defendants' Motion for Summary

15   Judgment ("Defendants' Motion"), ECF No. 241, p. 6:7-10; Motion, Section IV.B.  Defendants'

16   argument that there was no breach of the payment provision is based solely on the claim that "there

17   were no profits yet to which the 70% formula could be applied."  *See* Opp., p. 12:4-24.  The claim

18   that Defendants were still waiting to sort out the profits before remitting to Fitbit is made of whole

19   cloth.  As the undisputed facts show, Defendants paid Fitbit along the way for Fitbit's purported

20   share of 70% of the fake recycled commodity sales that Defendants were reporting to Fitbit on a

21   monthly basis.  *See*, *e.g.,* Alinder Decl., Ex. R (showing month after month of settlement reports and

22   amounts to be remitted to Fitbit by Defendants for each class of purportedly recycled commodities);

23   *see* Motion, Section III.D.  The undisputed facts, including their admissions, establish that there is no

24   genuine factual dispute as to this breach; it is at most a disingenuous attempt to rewrite the facts.

25        **B.      Federal Trademark Counterfeiting and Infringement**

26        Defendants' Opposition also fails to raise a triable issue of material fact to preclude summary

27   judgment as to their infringement and unfair competition liability.  Defendants' primary argument –

28   that Fitbit somehow authorized their infringement (Opp., pp. 12:25-13:19) – fails for the same

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1   reasons as their contract argument above.  Further, to the extent that Defendants' arguments rely on

2   an affirmative defense of license, that argument not only fails for the same reasons, but in addition, it

3   has long since been waived and would be prejudicial to allow here after fact discovery has closed.

4   *See* Defendants' Answer, ECF No. 119 (asserting no affirmative defenses); FRCP 8(c)(1) ("In

5   responding to a pleading, a party must affirmatively state any avoidance or affirmative defense,

6   including . . . license[.]"); *Novadaq Techs., Inc. v. Karl Storz GmbH & Co. K.G.*, 143 F. Supp. 3d

7   947, 954 (N.D. Cal. 2015) (refusing affirmative defense in opposition to summary judgment).

8   Finally, none of Defendants' trademark-specific arguments raise any material disputed issue here.

### 1.   Defendants Concede The Presumption Here

10  As a preliminary matter, Defendants do not dispute that the scrap products they resold were

11  materially different, and also fail to address the argument that the Court should presume confusion

12  in material difference cases, like this.  *See* Motion, p. 17:27-28; *accord Asmodus, Inc. v. Junbiao

13  Ou*, 2017 WL 2954360, at *16 (C.D. Cal. May 12, 2017); *cf.* Opp.,  pp. 12-19.  In failing to address

14  this argument, they concede it.  *See Hatcher*, 2011 WL 1225790, at *3.

15  Instead of taking this argument head-on, Defendants create a straw man, arguing that

16  refurbished products are not "counterfeit."  Opp., pp. 13:2-16:5.  But, the undisputed facts and

17  admissions are clear that Defendants were not simply selling refurbished genuine products and

18  advertising it correctly as such.  *See* Motion, Sections III.C-I.  Instead, Defendants were selling

19  non-genuine scrap product and never informed their co-conspirators downstream that these

20  products were scrap and had not met Fitbit's quality control standards.  *Id.,* at Sections III.E-H.

21  Further, for many products, the "refurbishment" process did not fix significant physical defects,

22  and in other instances, introduced significant defects like stripping the products of their serial

23  number and related regulatory information.  *See id.*, Section III.H.  The undisputed evidence

24  therefore, as Defendants concede in failing to rebut this evidence, is that these scrap products were

25  materially different and therefore non-genuine, infringing, and presumptively confusing.  *See id.*

### 2.   The Presumption Applies to Defendants' Counterfeit Sales

27  As set forth above, Defendants' only challenge to the presumption is with respect to their

28  resale of counterfeit products.  *See* Opp., pp. 13:24-16:8.  Their arguments fail to distinguish

Fitbit's caselaw and also ignore their own direct and indirect liability for counterfeit sales.  Further, most of Defendants' arguments appear to be thinly-veiled attempts to assert a first sale doctrine affirmative defense.  *See Vernor v. Autodesk*, 621 F.3d 1102, 1107 (9th Cir. 2010) (confirming it is an affirmative defense).  While the first sale doctrine does not apply for the reasons this Court previously found in granting Fitbit preliminary injunctive relief here (ECF No. 52 at pp. 3-4), and Defendants do not argue any first sale occurred here, Defendants waived all affirmative defenses long ago and it would be prejudicial to revive any such defenses now.  *See* Answer, ECF No. 119.

### a.   Scrap Products Are Non-Genuine, Different, And Confusing

Next, Defendants spend three pages arguing that refurbished products are not "counterfeit," though this is not Fitbit's argument at all.  Opp., pp. 14-16.  Fitbit's argument is that the scrap products are non-genuine and materially different, and therefore infringing and inherently confusing.  *See* Motion, pp. 17:11-19:2; *see also* Alinder Decl., Ex WW at 47 & 72.  One of the factors rendering these scrap products materially different and non-genuine is that Defendants have subverted Fitbit's quality controls by reselling scrap products.  Under Ninth Circuit law, "[o]ne of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark."  *Intel Corp. v. Terabyte Int'l, Inc.*, 6 F.3d 614, 618 (9th Cir. 1993).  Defendants were the driving force in subverting this quality control protection provided by the Lanham Act to Fitbit, and therefore, utterly fail to distinguish themselves from the settled caselaw in support of Fitbit.

For example, Defendants argue that the *El Greco* case is distinguishable because (1) the offending manufacturer in *El Greco* made false statements to the consuming public about the shoes by marketing them as "new" rather than "refurbished," and (2) the shoes were never genuine because under the terms of the parties' contract, the plaintiff had never accepted them.  Opp., p. 14:11-20.  But here, the scrap products were resold as "like new" refurbished goods (*see* Motion, Section III.F), and the agreement did not allow for resale or use of Fitbit's brand or trademarks, (*see id.*, Section III.D), both confirming that *El Greco* is directly on point.  *See El Greco Leather Products Co., Inc. v. Shoe World, Inc.*, 806 F.2d 392 (2d Cir. 1986).

Defendants also ignore the main holding of *El Greco* – that a trademark owner has the right

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1    to control the quality of goods and that trademarked goods are **not** genuine where they are sold

2    without authorization.  *El Greco*, 806 F.2d 392, 395.  Even if Defendants had been entitled to resell

3    scrap products (though they were not), they concede they never received permission to use Fitbit's

4    brand or trademarks, which they did in reselling these products.  *See* Motion, Section III.H.   And,

5    if they had any question, under *El Greco*, they were required at a minimum to get clarification from

6    Fitbit "on how to dispose of" the scrap products.  *See El Greco*, 806 F.2d 392, 396.

7                    **b.      Defendants Are Liable For Counterfeit Sales Too**

8            Defendants next argue that *United States v. Farmer*, 370 F.3d 435 (4th Cir. 2004), does not

9    apply because there the defendant bought "factory-reject clothes with no brand labels, then sewed

10   on counterfeit brand labels."  *Farmer*, 370 F.3d at 436.  Defendants' argument ignores the

11   undisputed evidence that Defendants, through Cali, repackaged Fitbit products, added counterfeit

12   cables, and counterfeit Fitbit labels before reselling and generating massive profit for Defendants.

13   *See* Motion, Sections III.D-F & IV.C; Declaration of Jonathan Manhan ("Manhan Decl."), ECF No.

14   241-19, ¶ 6.  *Farmer* is therefore on point.  Further, Defendants do not even discuss the *Milstein* or

15   *Terabyte* cases or attempt to refute Fitbit's argument that their repackaging of products and

16   material alterations to the Aria scales with Cali rendered those products counterfeit.  *See* Motion, p.

17   19:3-17 & Section III.H.  Defendants cannot dispute this because, during the pendency of this

18   action, U.S. Customs and Border Protection ("CBP") seized 1,243 "Counterfeit Fitbit Scales" that

19   Cali was attempting to import in conjunction with Defendants.  *Id*.  In seeking to get those products

20   released by CBP, Defendants explained their direct involvement and control:

21           Please understand that the product is sent to Cali Resources Inc. and Cali Resources
             SA de CV for processing.  ***We only sell refurbished products*** and do not use logos
22           ***unless we*** have prior written consent from manufacturer.  All material is used
             refurbished and sold as such with warranties ***from us*** not the manufacturer.
23

24   *Id.*  Thus, Defendants admitted to the direct distribution and resale of counterfeit and scrap Fitbit

25   products, with Cali merely "processing" those products for Defendants.  *See id*.

26                    **3.      Defendants Are Liable For Their Infringing Distribution Chain**

27           Next, Defendants argue in multiple sections (Opp., pp. 16:7-17:8 & 18:17-19:5) that by

28   putting an additional distributor, L2, between them and Cali and the majority of their product sales,

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1  they should be allowed to escape liability.  Not so.  Defendants are liable for orchestrating,

2  controlling, and ultimately profiting from the resale of infringing products to consumers under

3  multiple legal theories.  *See Motion*, Sections III.E-H; *see also Rocawear Licensing LLC v.*

4  *Pacesetter Apparel Group*, 2007 WL 5289737 at *6 (C.D. Cal. Sept. 12, 2007) (co-conspirators

5  need not know all the details).  Defendants complete reliance on *Inwood* is misplaced, and

6  misconstrue the law and ignores their own critical and direct role in the tortious conspiracy to

7  distribute infringing scrap products.  *See* Opp., pp. 17:7-19:1 (*citing Inwood Laboratories, Inc. v.*

8  *Ives Laboratories, Inc.,* 456 U.S. 844 (1982)).  Whether based on the joint and several liability,

9  conspiracy liability, vicarious liability, or contributory liability, their liability for infringement that

10  they orchestrated, controlled, and profited from handsomely is settled under federal law.  *See*

11  *Adobe Systems Inc. v. Blue Source Group, Inc.*, 125 F. Supp. 3d 945, 973 (N.D. Cal. 2015).

12      First, "[i]n copyright, trademark and unfair competition actions under federal law, all persons

13  participating in the actionable conduct are jointly and severally liable."  *Bar's Leaks Western, Inc. v.*

14  *Pollock*, 148 F. Supp. 710, 714 (N.D. Cal. 1957).  Thus, where multiple defendants are involved in a

15  distribution chain that ultimately sells infringing products to consumers, any member "can be

16  'jointly and severally liable' for the alleged misconduct."  *Adobe Systems*, 125 F. Supp. 3d at 973.

17      Second, it is undisputed that Defendants were all members of the distribution chain of the

18  infringing "Fitbit" products, and further that Defendants orchestrated the conspiracy to distribute

19  infringing products and set up the distribution chain.  *See Transgo, Inc. v. Ajac Transmission Parts*

20  *Corp.*, 768 F.2d 1001, 1020–21 (9th Cir. 1985); *MetroPCS v. Devor*, 215 F. Supp. 3d 626, 633 (N.D.

21  Ill. 2016) (finding conspiracy liability for "materially different MetroPCS Handsets, removed from

22  packaging...devoid of the manufacturer's warranty."); *see also* Motion, Section III.C-I.  Indeed,

23  Defendants admit the basic facts regarding the formation and operation of the conspiracy in their

24  own Motion: "Cali refurbished and repurposed the items that could be refurbished and repurposed,

25  and sold them to a distributor, Laguna 2, LLC ("L2"), which marketed them for sale on Groupon as

26  refurbished products."  Defendants' Motion, p. 2:7-10.  They have also admitted to their own direct

27  involvement in reselling nearly fifteen thousand scrap Fitbit products, which CBP seized as

28  counterfeit last year.  *See* Motion, Section III.H.  Thus, the undisputed facts, including Defendants'

admissions, confirm that Defendants are liable as co-conspirators and joint tortfeasors for the entire infringing distribution chain that they set up and controlled from start to finish.  *See id.*, Sections III.C.-H; *see Rocawear*, 2007 WL 5289737 at *6 (C.D. Cal. Sept. 12, 2007).

Third, Defendants are also vicariously liable for the entire infringing distribution chain because they controlled the distribution of scrap products by injecting hundreds of thousands of infringing products into the stream of commerce that were ultimately resold to unwitting consumers through their conspiracy with Cali and they directly profited from those "joint sales."  *See* Cali Decl., ¶ 5; *see* Motion, Sections III.C.-I. above; *see, also, Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996) (vicarious liability based on control and direct financial benefit).

Finally, they are also contributorily liable here.  As the *Inwood* court held, "[e]ven if a manufacturer does not directly control others in the chain of distribution, it can be held responsible for their infringing activities under certain circumstances."  *Inwood*, 456 U.S. at 854; *see also Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, 658 F.3d 936, 942-43 (9th Cir. 2011) (holding Akanoc liable where they held the "master switch" for infringement).  Here, Defendants continued to supply infringing scrap products to Cali with knowledge that those products would be resold to consumers.  *See Lockheed Martin Corp. v. Network Sols., Inc.*, 194 F.3d 980, 983 (9th Cir. 1999). Indeed, they would not have received the millions of dollars in profit they did, if not for the resale of these infringing scrap products to consumers, and the undisputed facts show that they were in fact well aware that these products were being resold to consumers online, through websites like Groupon.  *See* Motion, Sections III.E-F.  Accordingly, the undisputed facts, including their control of the supply and knowing profit share based on the downstream resale to consumers, easily establish contributory liability here.  *See Coach, Inc. v. Celco Customs Servs. Co.,* 2014 WL 12573411, at *17 (C.D. Cal. June 5, 2014) (contributory liability based on inference of knowledge).

In short, Defendants are jointly and severally, conspiratorially, vicariously, and contributorily liable for injecting hundreds of thousands of infringing scrap products into the stream of commerce, and profiting off those infringing sales to the tune of millions of dollars.  Defendants held the "master switch" and could have turned off the supply of infringing goods at any time.  *Akanoc Solutions*, 658 F.3d at 942-43.  The money was simply too good to do the right thing.

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

### 4.   Fitbit Has Established Likelihood of Confusion

As a preliminary matter, Defendants do not dispute that the *Sleekcraft* factors heavily favor Fitbit here.  *See* Opp., pp. 17-18; *see also* Motion, pp. 19:18-23:22.  With that concession alone, Fitbit has established likelihood of confusion here.  *See Hatcher*, 2011 WL 1225790, at *3. Without a valid defense, Defendants unsuccessfully claim there is a battle of experts.  Opp., pp. 17-18.  First, Fitbit has established confusion here without expert evidence.  Second, even if the Court considered expert evidence, that evidence is one-sided.  Fitbit's survey stands unrebutted by Dr. Sood, as the only expert evidence regarding confusion.  *See* Motion, Section I; Declaration of Hal Poret in Support, filed concurrently with this Reply, ¶¶ 3-17 & Ex. A; *see Cahill v. Golden Gate Bridge, Highway & Trans. Dist.*, 2016 WL 1070655, at *5 (N.D. Cal. Mar. 18, 2016) (overruling objection to expert report where subsequent sworn declaration remedied any defect).  Defendants' marketing expert, Dr. Sood, has no affirmative opinions on confusion, is not a trademark survey expert, and his criticisms do not affect the significant and reliable confusion evidence presented here, leaving Fitbit's evidence unrebutted.  Opp. at. 18.

### C.   Federal Unfair Competition and California Unfair Competition

For the reasons set forth above and in Fitbit's Motion at Section IV.C., the undisputed material facts show that Defendants have violated state and federal unfair competition laws. Therefore, the Court should also grant summary judgment on Fitbit's unfair competition claims. *See Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1221 (9th Cir. 2012).

### D.   Defendants' Final Damages Argument Is Meritless

Finally, Defendants' argument that Fitbit must prove damages to be entitled to summary judgment on the issue of liability is contrary to federal law.  *See Hewlett-Packard Co. v. Repeat-0-Type Stencil Mfg. Corp.*, 1995 WL 338181, at *3–5 (N.D. Cal. Feb. 7, 1995) (granting summary judgment on liability though damages "remain[ed] to be resolved").  Even if that were not the case, Defendants conceded in their Opposition to the failing to pay Fitbit 70% of the net proceeds here, claiming only that they still have not calculated how much they owe.  Opp., p. 12:4-22. Regardless, Fitbit has produced ample evidence of the fact of its damages, including from Defendants' infringement, breaches, and harm to Fitbit's brand and reputation with consumers.

1   Motion, Sections III.C-I.  Finally, Fitbit has filed a sworn declaration confirming the expert

2   damages calculation to remove any doubt.  *See* Declaration of Greg Regan in Support, filed

3   concurrently with this Reply, ¶ 2 & Ex. A; *see Cahill,* 2016 WL 1070655, at *5.

4   **III.     RESPONSE TO DEFENDANTS' OBJECTIONS AND JUDICIAL NOTICE**

5   **A.      Responses to Defendants' Evidentiary Objections 1-3**

6   Defendants object to various statements in the Declarations of Brett Millar (ECF No. 235)

7   and Jeff Bonham (ECF No. 236) as lacking foundation and/or hearsay.  The Court should overrule

8   Defendants' objections because all of the statements to which Defendants object are statements of

9   fact offered by the declarants based on their personal knowledge.  *See* ECF No. 235 at ¶ 2, ECF No.

10   236 at ¶ 2; *See Jesse A. Verrecchia, et al. v. Darrell Aviss, et al.*, 2017 WL 9486151, at *5 (C.D.

11   Cal. Nov. 8, 2017).  And Defendants present no evidence to the contrary.

12   **B.      Responses to Defendants' Evidentiary Objections 4 [sic]-7**

13   Defendants also object to Fitbit's internal business records of customer support cases

14   attached as exhibits to the Declaration of Jeff Bonham as hearsay.  These objections should be

15   overruled because Mr. Bonham declares that he personally reviewed the customer support records

16   (ECF No. 236 at ¶¶ 4-9), is familiar with them for his job, and authenticates them as Fitbit's

17   business records.  *Id.*; *see Cordas v. Uber Techs., Inc.*, 228 F. Supp. 3d 985, 989 (N.D. Cal. 2017).

18   **C.      Response to Defendants' Evidentiary Objection 8**

19   Defendants then object, as lacking foundation and as hearsay, to Mr. Bonham's summary of

20   the analysis he recently performed on a sample of 100 products recently returned by L2.  For the

21   reasons discussed above, Defendants' hearsay objections should be overruled on the same grounds.

22   Defendants also contend that Fitbit failed to timely disclose Mr. Bonham's analysis because a

23   related document was first created on April 26, 2018, but not produced until May 24, 2018.  Their

24   objection should be overruled because the analysis was not completed until the night of May 23,

25   2018, the day before Fitbit produced the document, which was still prior to the close of discovery.

26   *See* Supplemental Declaration of Jeff Bonham in Support, filed concurrently with this Reply, ¶ 2.

27   **D.      Responses to Defendants' Evidentiary Objections 9-11**

28   Defendants next argue that Fitbit's expert reports are not admissible (attached as Exhibits

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1   VV, WW, and XX to the Alinder Decl.).  First, as confirmed above, Fitbit has more than met its

2   burden in its Motion without any expert evidence.  Second, Defendants' argument that the reports

3   are unsworn is a technical objection, and is not well-taken, as Fitbit's Rule 26(a) Expert Witness

4   Disclosure asserts that it may use any of those experts at trial, and as the Parties have already

5   scheduled expert witness depositions.  Third, there is no prejudice to Defendants as all three

6   witnesses were properly disclosed, and the reports timely served.  And finally, in an abundance of

7   caution, and without conceding the legitimacy of Defendants' objections, Fitbit has concurrently

8   filed sworn declarations of its expert witnesses.  *See Cahill,* 2016 WL 1070655, at *5.

9     **E. Motion to Strike RJN and Whitten Declaration Paragraphs**

10     The Court should strike Paragraphs 7-13 of the Declaration of Matthew Whitten in Support

11   of Defendants' Opposition and Defendants' Request for Judicial Notice ("RJN"), ECF No. 258,

12   and each exhibit thereto as "immaterial, impertinent, or scandalous" on the grounds that the

13   Defendants do not even cite to this material in their Opposition and it appears to have been filed for

14   an improper purpose.  Not only do Defendants fail to reference this material, but Defendants'

15   submissions themselves show that it is immaterial and apparently submitted for an improper

16   purpose.  *See* Fed. R. Evid. 401 & 403.  Exhibit D shows that the charges referred to were

17   dismissed in the furtherance of justice pursuant to Cal. Pen. Code § 1385.  RJN, Ex. D.  Such a

18   dismissal "operates to wipe the slate clean," such that "[t]he defendant stands as if he had never

19   been prosecuted for the charged offense."  *People v. Barro*, 93 Cal. App. 4th 63, 67 (2001).

20   **IV. FITBIT'S ADDITIONAL OBJECTIONS TO SOOD DECL. AND OPP. LENGTH**

21     Fitbit further objects to the Opposition Declaration of Ashish Sood (ECF No. 255),

22   including because Dr. Sood does not even claim to have any background or experience with

23   trademark surveys (*see* ECF No. 255, ¶ 2), and therefore, is not qualified to provide any opinions

24   regarding the trademark survey implemented by Fitbit's expert Hal Poret.  *See* Fed. R. Evid. 702.

25   Finally, Fitbit objects to Defendants' Opposition, as it contains two numbered pages at the start of

26   the pleading and 25 numbered pages thereafter, in violation of N.D. Cal. Civ. L.R. 7-3(a).

27   **V.  CONCLUSION**

28     For the foregoing reasons, the Court should grant Fitbit's Motion in full.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1   DATED: June 14, 2018                Respectfully submitted,

2                                       SIDEMAN & BANCROFT LLP

3                                       By:  _____/s/ Zachary J. Alinder_____

4                                              Zachary J. Alinder
                                               Attorneys for Plaintiff
5                                              FITBIT, INC.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

PLAINTIFF FITBIT, INC.'S REPLY IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT